**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LEONARD C. JEFFERSON,** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 04-44 Erie** |
| | ) | **District Judge McLaughlin** |
| **WILLIAM WOLFE, et al.,** | ) | **Magistrate Judge Baxter** |
| **Defendants.** | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.      RECOMMENDATION**

It is respectfully recommended that Defendants' Motion to Dismiss Plaintiff's Third

Amended Complaint [Document # 67] be granted in part and denied in part.

**II.      REPORT**

On February 17, 2004, Plaintiff Leonard C. Jefferson, an inmate incarcerated at the State

Correctional Institution at Albion ("SCI-Albion"), filed this *pro se* civil rights action pursuant to

42 U.S.C. § 1983.  Named as Defendants are:  William J. Wolfe ("Wolfe"), former

Superintendent at SCI-Albion; Jeffrey Beard ("Beard"), Secretary of the Pennsylvania

Department of Corrections ("DOC"); Robert Boeh ("Boeh"), Program Manager at SCI-Albion;

Glenn McQuown ("McQuown"), former Facility Chapel Program Manager at SCI-Albion;

Patricia Gamble ("Gamble"), Unit Counselor at SCI-Albion; Michael Snyder ("Snyder"), Unit

Counselor at SCI-Albion; Patricia McKissock ("McKissock"), Unit Manager at SCI-Albion;

Timothy Hametz ("Hametz"), Unit Manager at SCI-Albion; Thomas L. James ("James"), Chief

Grievance Coordinator at the DOC; Sharon M. Burks ("Burks"), Chief Grievance Coordinator

at the DOC; Barry Lobdell ("Lobdell"), Corrections Officer at SCI-Albion; Mr. Clement

("Clement"), Corrections Officer at SCI-Albion; Ivory Barnett ("Barnett"), former Misconduct

Hearing Examiner at SCI-Albion; and Zachary Moslak ("Moslak"), former Misconduct Hearing

Examiner at SCI-Albion.

Plaintiff alleges that Defendants violated his First and Fourteenth Amendment rights.  In particular, Plaintiff alleges that (i) his First Amendment right to free speech was violated when he was fired from his prison job, and later issued allegedly false misconduct reports, in retaliation for his writing of two poems regarding racial injustice in the legal system; (ii) his First Amendment right to free exercise of religion was violated by the enforcement of the DOC's prescriptive programs policy; (iii) the First Amendment's Establishment Clause was violated by the promulgation and enforcement of the prescriptive program policy; (iv) his Fourteenth Amendment Due Process and Equal Protection rights were violated by the issuance of an allegedly false misconduct report, which led to an increase in his custody level and removed him from housing on an honor block within SCI-Albion.  As a result of these claims, Plaintiff seeks declaratory and injunctive relief and monetary damages.

Defendants have filed a motion to dismiss [Document # 67] claiming that (i) Plaintiff's First Amendment free exercise and Establishment Clause claims, as well as his 2002 retaliatory misconduct claims, are barred by the applicable statute of limitations, or, alternatively (ii) Plaintiff has failed to state a cognizable First Amendment claim upon which relief may be granted; (iii) Plaintiff has failed to state a cognizable Fourteenth Amendment claim upon which relief may be granted; and (iv) Plaintiff has failed to allege personal involvement on the part of Defendants Wolfe, Beard, McKissock, Hametz, James, Burks, Moslak, and Barnett, upon which relief may be granted.  Plaintiff has filed a brief in response to Defendants' motion essentially reiterating the basis for his claims. [Document # 76].  This matter is now ripe for consideration.

### A.    Relevant Factual History

Plaintiff was committed to SCI-Albion in or around July 1994. (Document # 39 at ¶ 19). He was transferred to SRCF-Mercer in July 1998 and was returned to SCI-Albion in October 1999. (Document # 39 at ¶¶ 21, 23).  In August 2000, Plaintiff was housed on the honor block at SCI-Albion, where he had been housed prior to his transfer to SRCF-Mercer. (Document # 39 at ¶ 24).

On or about November 13, 2000, Plaintiff was hired as a Chapel Clerk at SCI-Albion,

which required him to report to work at 8:00 a.m. (Document # 39 at ¶ 25, 32).[1]  As a result, Plaintiff began attending the 7:15 a.m. line to obtain his blood pressure medication from the Medical Department. (Document # 39 at ¶ 25).  He continued to attend the 7:15 a.m. medication line until February 2002, when Defendant Clement stopped him on the walkway to the Medical Department and informed him that he was in an unauthorized area.  Consequently, Plaintiff was issued a misconduct, of which he was ultimately found guilty by Defendant Barnett and sentenced to serve 15 days of cell restriction.[2]  (Document # 39 at ¶¶ 19, 25, and 29).

Meanwhile, on December 5, 2001, Plaintiff submitted an inmate's request to Defendant Gamble stating that he was forbidden by his Islamic religion from participating in the DOC's prescriptive programs, and asking that his "D.O.C. file be made to reflect the fact that the teachings and practices of Islam meet and fulfill all of my so-called programming needs." (Document # 39 at ¶ 81 and Exhibit F).  Defendant Gamble responded to Plaintiff's request on December 6, 2001, stating that Plaintiff was "not program compliant" and that Plaintiff's commitment to his "religious practices and beliefs ... does not replace institutional programs." (Document # 39 at ¶ 82 and Exhibit F).

On October 24, 2002, Minister Michael Anderson, a contract employee of the DOC, asked if he could make a photocopy of a newspaper article in Plaintiff's possession. (Document # 39 at ¶ 35).  On the back of the newspaper article were two poems written by Plaintiff, which addressed the subject of racial injustice in the courts. (Document # 39 at ¶ 37).  Minister

---

[1]

In paragraph 25 of his Third Amended Complaint, Plaintiff indicates that he was hired as Chapel Clerk in October 2002.  In paragraph 32, however, Plaintiff states that he was "assigned to work as a Chapel Clerk" on November 13, 2000.  Since the latter date is consistent with the allegations of Plaintiff's original Complaint (see Document # 3 at Section IV.C, ¶ 1), and more closely corresponds with Plaintiff's subsequent allegations, this Court will construe November 13, 2000, as the appropriate date on which he began his employment as Chapel Clerk.

[2]

In addition to the charge of being in an unauthorized area, Plaintiff was also charged with lying to an employee as a result of his comment to Defendant Clement that "0800 Education Building workers had been required to use the 7:15 Med Line since 1996." (Document # 39 at ¶ 27).  Plaintiff claims that he was wrongfully charged with a misconduct because he "was never informed that he was not authorized to use the 7:15 Med Line with other similarly situated 0800 Education Building workers." (Document # 39 at ¶ 29).

Anderson's secretary photocopied the front and back of the newspaper article and distributed both the article and Plaintiff's poems to "various superintendents, program directors and department heads at SCI-Albion." (Document # 40). On November 13, 2002, Defendants McQuown, Gamble, and Snyder conducted a Support Team Meeting at which Plaintiff claims he was "told that he did not have any right to write such poetry." (Document # 44). The next day Plaintiff received a Job Assignment Notice informing him that he had been released from his job as Chapel Clerk, for which he was earning 42¢ an hour, and was reassigned to the General Labor Pool, where he would earn 72¢ a day. (Document # 39 at ¶ 48 and Exhibit A).

On November 18, 2002, Plaintiff sent an inmate's request to Defendant McQuown requesting a written statement of his "reasons and justification" for his decision to remove Plaintiff from his job as Chapel Clerk. (Document # 39, Exhibit B). In response, Defendant McQuown explained that Plaintiff's poetry, and his intent to share it with "all," was found to be a "threat to the orderly running of the institution," "inflammatory and disruptive," and that Plaintiff's position as Chapel Clerk provided him with "access to many inmates to spread this disruptive material and view." (Document # 39, Exhibit B).

On November 20, 2002, Plaintiff sent another inmate's request to Defendant Gamble requesting reasons why he was removed from his job as Chapel Clerk. (Document # 39, Exhibit C). Defendant Gamble responded to Plaintiff's request by indicating that the support team had security concerns regarding the intent of the poetry, "the extent of the contact [Plaintiff's] job allowed [him] with other inmates," and "the possibility of [Plaintiff] distributing [the poetry]" to other inmates. (Document # 39, Exhibit C at p. 2).

On July 11, 2003, Defendant Snyder informed Plaintiff that his custody level had been raised from CL-2 (honor block) to CL-3. (Document # 39 at ¶ 87). In response to Plaintiff's inmate request for a written statement of the reasons for the increase in his custody level, Defendant McKissock cited Plaintiff's "misconduct record, the fact that [Plaintiff didn't] have a job, and the issue of [Plaintiff's] refusal to complete any programming." (Document # 39 at ¶ 88 and Exhibit G). As a result, on July 16, 2003, Plaintiff was transferred from SCI-Albion's honor block to a CL-3 unit. On August 6, 2003, in response to a grievance Plaintiff filed with

regard to his custody level increase, Defendant Hametz clarified that Plaintiff's "refusal to participate in programs is the reason [he] was moved off the honor unit." (Document # 39, Exhibit H).

In early April 2004, Plaintiff received a job assignment notice informing him that he was to report to Defendant McQuown on April 5, 2004 to resume his work as a Chapel Clerk at the pay rate of 33¢ an hour. (Document # 39 at ¶ 62). While working as Chapel Clerk on the morning of May 12, 2004, Plaintiff's immediate supervisor informed him that there was no work to be done at that time, so Plaintiff sat in the lobby reading his Qur'an. (Document # 39 at ¶ 64). Upon seeing Plaintiff reading in the lobby, Defendant Lobdell ordered Plaintiff to go in the Chapel where he worked, whereupon Plaintiff allegedly became abusive. (Document # 39 at ¶ 65). As a result, Defendant Lobdell filed a misconduct report against Plaintiff claiming that he "(1) repeatedly refused an order, (2) became very aggressive, (3) pushed defendant Lobdell with his shoulder and chest to enter the Chapel Office, and (4) removed his hands from the wall during the pat search." (Document # 39 at ¶ 65). On May 17, 2004, Defendant Moslak, acting as Misconduct Hearing Examiner, denied Plaintiff's request to present witnesses at the hearing, found him guilty of the misconduct, and sentenced him to serve 30 days in punitive segregation. (Document # 39 at ¶ 70). In addition, Plaintiff was again removed from his job as Chapel Clerk. (Document # 39 at ¶ 72).

## B.    Standard of Review

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be viewed in the light most favorable to the plaintiff and all the well-pleaded allegations of the complaint must be accepted as true. Neitzke v. Williams, 490 U.S. 319 (1989); Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000). The motion cannot be granted unless the court is satisfied "that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984). See also Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002).

Rule 8(a) of the Federal Rules of Civil Procedure states that a pleading must set forth a

claim for relief which contains a short and plain statement of the claim showing that the pleader is entitled to relief.  The issue is not whether the plaintiff will prevail at the end but whether he should be entitled to offer evidence in support of his claim.  <u>Neitzke v. Williams</u>, 490 U.S. 319 (1989); <u>Scheuer v. Rhodes</u>, 419 U.S. 232 (1974).  However, a court need not credit a complaint's "bald assertions" or "legal conclusions" when deciding a motion to dismiss.  <u>Morse v. Lower Merion School Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997) <u>citing</u> <u>In re Burlington Coat Factory Securities Litigation</u>, 114 F.3d 1410, 1429-30 (3d Cir.1997).  Therefore, in order to survive a motion to dismiss for failure to state a claim, the complaint must only set forth sufficient information to suggest that there is some recognized legal theory upon which relief can be granted.  <u>See</u> <u>Swierkiewicz</u>.

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears "'beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  <u>Haines v. Kerner</u>, 404 U.S. 519, 520-521(1972) <u>quoting</u> <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).  If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should be done so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. <u>Boag v. MacDougall</u>, 454 U.S. 364 (1982); <u>United States ex rel. Montgomery v. Bierley</u>, 141 F.2d 552, 555 (3d Cir. 1969)(petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); <u>Smith v. U.S. District Court</u>, 956 F.2d 295 (D.C.Cir. 1992); <u>Freeman v. Department of Corrections</u>, 949 F.2d 360 (10th Cir. 1991).  Under our liberal pleading rules, a district court should construe all allegations in a complaint in favor of the complainant.  <u>Gibbs v. Roman</u>, 116 F.3d 83 (3d Cir.1997).  <u>See, e.g.</u>, <u>Nami v. Fauver</u>, 82 F.3d 63, 65 (3d Cir. 1996)(discussing Fed.R.Civ.P. 12(b)(6) standard); <u>Markowitz v. Northeast Land Company</u>, 906 F.2d 100, 103 (3d Cir. 1990)(same).

## C.     DISCUSSION

### 1.     Statute of Limitations

Defendants argue the Plaintiff's First Amendment free exercise of religion and Establishment Clause claims, as well as his 2002 misconduct claim, are barred by the applicable statute of limitations.  The federal civil rights laws do not contain a specific statute of limitations for § 1983 actions.  However, it is well established that the federal courts must look to the relevant state statute of limitations for personal injury claims.  Samerica Corp. Del., Inc. v. City of Philadelphia, 142 F.3d 582 (3d Cir. 1998)(internal citations omitted).  Thus, based on Pennsylvania's applicable statute of limitations, a § 1983 claim must be filed no later than two years from the date of the alleged violation.  See Urrutia v. Harrisburg County Police Dept., 91 F.3d 451 (3d Cir.(Pa.) 1996).  In this case, Plaintiff's complaint was received by the Clerk of Courts on February 17, 2004. (See Document # 3, Complaint).  However, in determining the date upon which a prisoner's pleading is filed, Pennsylvania applies the prison mailbox rule, which provides that the "date of delivery of [the pleading] by the [inmate] to the proper prison authority or to a prison mailbox is considered the date of filing of the [pleading]." See Commonwealth v. Castro, 766 A.2d 1283, 1287 (Pa.Super. 2001), citing Commonwealth v. Little, 716 A.2d 1287 (Pa.Super. 1998).  In this case, Plaintiff's original complaint is dated February 11, 2004, which is the earliest date on which Plaintiff could have delivered the complaint to the proper prison authority or to a prison mailbox.  Thus, giving Plaintiff every benefit of the doubt, any of Plaintiff's claims arising from events that occurred prior to February 11, 2002, is barred by the applicable statutes of limitations and should be dismissed.

### a.     First Amendment Free Exercise of Religion and Establishment Clause Claims

Defendants contend that the basis for Plaintiff's First Amendment free exercise and Establishment Clause claims is the conversation he had with Defendant Gamble in December 2001, during which Defendant Gamble allegedly informed Plaintiff that he was required to participate in certain institutional programs. (Document # 68 at p. 4; Document # 39 at ¶ 80 (emphasis in original)).  Since this conversation occurred more than two years prior to the filing

of the present lawsuit, Defendants argue that Plaintiff's free exercise and Establishment Clause claims are barred by the applicable statute of limitations.  However, this argument is based on a misinterpretation of Plaintiff's allegations and is, thus, unavailing.

Although Plaintiff does recount his conversation with Defendant Gamble in December 2001, Plaintiff's free exercise and Establishment Clause claims arise primarily from the increase of his custody level that occurred on July 11, 2003, as a result of his refusal to participate in institutional programs. (Document # 39 at ¶¶ 87-94).  In particular, Plaintiff claims that the DOC "has established a State/DOC sponsored religion in the form of selected DOC programs," which fail to make "exceptions for prisoners, such a[s] plaintiff, who exercise their rights to refuse to participate in (1) State/DOC sponsored religious activities, and (2) State/DOC secular activities which are offensive to an individual's religious beliefs." (Document # 39 at ¶¶ 91, 93). As a result, Plaintiff claims that DOC policy has caused his custody level to be raised "for no reason other than plaintiff's sincerely held religious beliefs." (Document # 39 at ¶ 94).

Since Plaintiff's free exercise and Establishment Clause claims arise primarily from events that occurred on and after July 11, 2003, they fall well within the applicable two-year statute of limitations.  Nevertheless, to the extent Plaintiff is making First Amendment Establishment Clause and free exercise claims against Defendant Gamble based on Defendant Gamble's comments that were made in December 2001, this Court agrees that such claims are time-barred and should be dismissed against Defendant Gamble.

### b.    2002 Misconduct Claim

Plaintiff claims that Defendant Clement wrote a misconduct report in "February of 2002" alleging that he had "violated a rule where and when there was, in fact, no written policy which stated the conduct at issue was prohibited, and plaintiff had never received any prior notification that the conduct was prohibited; all in violation of the Fourteenth Amendment of

the United States Constitution." (Document # 39 at ¶¶ 19, 25, 29, 107).[3]  Defendants simply

argue that, to the extent the Defendant Clement's misconduct report was issued prior to

February 11, 2002, Plaintiff's claim is time-barred.  While this may be true, Defendants would

have been better served by providing this Court with a copy of the misconduct report at issue,

which would have provided this Court with a definitive date on which to base its statute of

limitations analysis.  Without a definitive date, this Court is unable to determine whether or not

Plaintiff's claim is time-barred.

### 2.     Establishment Clause

Plaintiff alleges that Defendants "violated the Establishment Clause by attempting to

force plaintiff to participate in State/DOC sponsored religious programs and then by inflicting

punitive measures upon plaintiff when plaintiff repeatedly refused to participate in the

State/DOC sponsored religious programs." (Document # 39 at ¶¶ 113).  In particular, Plaintiff

claims that his custody level was increased and he was removed from SCI-Albion's honor block

as a result of his refusal to participate in DOC's prescriptive programs, such as Alcoholics

Anonymous ("A.A.") and Narcotics Anonymous ("N.A."), which he characterizes as

"State/DOC sponsored religious programs." (Document # 39 at ¶¶ 83, 114).  Unfortunately,

Plaintiff fails to make clear whether his prescriptive programming actually included A.A. or

N.A., or whether he is merely challenging programs "such as" A.A. and N.A.  In fact, the record

in this case is devoid of any documents evidencing the prescriptive programs in which Plaintiff

refused to participate.  Nevertheless, construing Plaintiff's allegations in the light most

favorable to him, this Court will presume that participation in A.A. and/or N.A. was included in

---

[3]

In their brief in support of the pending motion to dismiss, Defendants inaccurately portray this claim as a retaliation
claim (Document # 68 at pp. 4-5); however, it is quite apparent that Plaintiff is claiming a due process violation.  In
either case, the same two-year statute of limitations is applicable.

Plaintiff's prescriptive programming.[4]

The Third Circuit has recognized that "[t]he government violates the First Amendment's Establishment Clause when it requires a prisoner to participate in a drug or alcohol rehabilitation program with a religious component." Bobko v. Lavan, 157 Fed.Appx. 516, 518, 2005 WL 3304147 at *2 (3d Cir. Dec. 7, 2005), citing Warner v. Orange County Dep't of Probation, 115 F.3d 1068, 1074-75 (2d Cir. 1997)(finding that A.A. program has a "substantial religious component"); Kerr v. Farrey, 95 F.3d 472, 479-480 (7th Cir. 1996)(finding that N.A. program's steps "are based on a religious concept of a Higher Concept"). Both Warner and Kerr based their holdings on the Supreme Court's decision in Lee v. Weisman, 505 U.S. 577 (1992), in which the Supreme Court held that "at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" Lee, 505 U.S. at 587. The Lee court further stated that "[g]overnment pressure to participate in a religious activity is an obvious indication that the government is endorsing or promoting religion." Id. at 604.

Here, Defendants argue that participation in prescription programs such as A.A. and N.A. is voluntary, and, thus, cannot form the basis of a First Amendment Establishment Clause claim. However, in Griffin v. Coughlin, 88 N.Y.2d 674, 649 N.Y.S.2d 903, 673 N.E.2d 98 (1996), a case cited by both Warner and Kerr, the court emphasized that, notwithstanding the voluntary nature of the A.A. program offered to prisoners, it was the coercive circumstances, i.e., conditioning a desirable privilege on the prisoner's participation in a religious program, without alternative, that caused the court to find a violation of the Establishment Clause. Griffin, 649 N.Y.S.2d at 915. Thus, the Griffin court found that denial of family visitation privileges to a prisoner for his refusal to participate in an A.A. program was a violation of the

---

[4]

The Court is unwilling to do as Defendants suggest and simply dismiss Plaintiff's allegations as unsupported and conclusory at this stage of the proceeding. (See Document # 68 at p. 6). However, identification of the actual prescriptive programs in which Plaintiff refused to participate is necessary for, and will have a direct bearing on, the ultimate determination of this issue.

Establishment Clause.  Similarly, the <u>Kerr</u> court found that, where inmates were offered no alternative other than a substance abuse program with explicit religious content (N.A.) on pain of being rated a higher security risk and suffering adverse parole effects, the state impermissibly coerced participation in a religious program in violation of the Establishment Clause.  <u>Kerr</u>, 95 F.3d at 479-80.  <u>See also</u> <u>Warner</u>, 115 F.3d at 1076 n. 8 ("sending [plaintiff] to A.A. as a condition of his probation, without offering a choice of other providers, plainly constituted coerced participation in a religious exercise" in violation of the Establishment Clause).

In this case, Plaintiff has alleged that he was assigned a higher security classification as a result of his refusal to participate in prescription programming having a religious component, presumably A.A and/or N.A.  Accepting these allegations as true, Plaintiff has sufficiently stated a cause of action for violation of the Establishment Clause.

### 3.        Free Exercise of Religion

Plaintiff alleges that Defendants "conditioned plaintiff's continued residence on an 'honor block' upon plaintiff's abandonment of sincerely-held religious beliefs," thus violating his First Amendment right to free exercise of religion. (Document # 39 at ¶ 112).  In particular, Plaintiff alleges that he follows and practices the religion of al-Islam, which "clearly and adamantly state[s] the edict that it is not permissible for 'believers" to listen to and/or to accept the teachings of 'non-believers' in matters pertaining to how one should act or think...." (Document # 39 at ¶¶ 75-76).  Thus, Plaintiff claims that he "has been punished (with an increase in his custody level and removal from the honor block) for asserting his constitutional rights to free exercise of religion by adhering to the principles, practices and beliefs of the Religion of al-Islam," which forbid him from participating in "non-Islamic based programs," such as A.A. and N.A. (Document # 39 at ¶¶ 83-84).

It is well-established that prisoners have a First Amendment right to practice religion while incarcerated.  <u>Bell v. Wolfish</u>, 441 U.S. 520, 544 (1979).  However, the right to practice one's religion while in prison is not absolute.  <u>See</u> <u>Price v. Johnston</u>, 334 U.S. 266, 285 (1948) ("Lawful incarceration brings about the necessary withdrawal or limitation of many privileges

11

and rights, a retraction justified by the considerations underlying our penal system.").  Under the First Amendment, regulations or policies that infringe upon a prisoner's rights to religious freedom must pass a reasonableness standard, rather than the usual strict scrutiny standard.[5] Turner v. Safley, 482 U.S. 78, 89 (1987).  "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  Turner, 482 U.S. at 89.  Courts generally accord great deference to prison officials' adoption and execution of policies, regulations, and practices relating to the preservation of internal order, discipline, and security within the prison environment.  Thornburgh v. Abbott, 490 U.S. 401, 407-08 (1989); Turner, 482 U.S. at 85.

The Turner v. Safley reasonableness test includes four factors for consideration:

> 1) whether there is a legitimate rational connection between the prison regulation and the governmental interest;
>
> 2) whether the prisoners have alternative means of exercising the constitutional right at hand;
>
> 3) the impact that accommodation of the constitutional right would have on other prisoners, guards, and prison resources in general; and
>
> 4) the availability of alternatives to the regulation.

482 U.S. at 89-90.  See also Waterman v. Farmer, 183 F.3d 208 (3d Cir. 1999).[6]

The first Turner factor considers the relationship between the policy and the penological interest.  "A prison regulation fails this prong if it promotes an interest that is illegitimate or not

---

[5]

Strict scrutiny is not required because courts need to "afford appropriate deference to prison officials" so that they may "anticipate security problems and adopt innovative solutions to the intractable problems of prison administration."  O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) quoting Turner v. Safley, 482 U.S. at 89.

[6]

The Turner analysis "... assumes as a predicate that the plaintiff inmate has demonstrated that a constitutionally protected interest is at stake."  DeHart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000).  "The mere assertion of a religious belief [by a prisoner] does not automatically trigger First Amendment protections ... [O]nly those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection."  Id.  See also Africa v. Pennsylvania, 662 F.2d 1025, 1029-30 (3d Cir. 1981) ("A court's task is to decide whether the beliefs avowed are (1) sincerely held, and (2) religious in nature...").  Defendants do not argue that Plaintiff's beliefs do not constitute a religion.

neutral, or ... bears no valid, rational connection to the asserted interest." Fraise v. Terhune, 283 F.3d 506, 516 (3d Cir. 2002). Under this prong, the court must "accord great deference to the judgments of prison officials 'charged with the formidable task of running a prison.'" Sutton v. Rasheed, 2003 WL 1354099, at * 11 (3d Cir. March 19, 2003) quoting O'Lone v. Shabazz, 482 U.S. 342, 353 (1987). This factor requires a two-fold analysis: "we must determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective." Id. quoting Thornburgh v. Abbott, 490 U.S. 401, 414-15 (1989). "The first factor is 'foremost in the sense that a rational connection is a threshold requirement - if the connection is arbitrary or irrational, the regulation fails, irrespective of whether the other factors tilt in its favor. But, ... we do not view it as subsuming the rest of the inquiry." Id. quoting Wolf v. Ashcroft, 297 F.3d 305, 310 (3d Cir. 2002).

The second Turner factor "requires a court to assess whether inmates retain alternative means of exercising the circumscribed right." Fraise, 283 F.3d at 518 quoting Turner, 482 U.S. at 90. However, the analysis focuses specifically on whether Plaintiff "has alternative means of practicing his religion generally, not whether an inmate has alternative means of engaging in the particular practice in question." DeHart, 227 F.3d at 55 (emphasis added).

The final two factors "focus on the specific religious practice or expression at issue and the consequences of accommodating the inmate for guards, for other inmates, and for the allocation of prison resources." Sutton at * 15, quoting DeHart, 227 F.3d at 57.

Under Turner's third factor, this Court must examine the impact of an accommodation on other inmates, prison staff, and the available resources within the prison, but "should defer to prison officials when the accommodation 'will have a significant ripple effect on fellow inmates or on prison staff ....'" Fraise, 283 F.3d at 520 quoting Turner, 482 U.S. at 90.

The fourth Turner factor requires this Court to assess whether there are alternatives to the regulation that would impose only "*de minimis* cost to valid penological interests." Turner, 482 U.S. at 91. "The absence of ready alternatives is evidence of the reasonableness of a prison regulation." Id. However, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may

13

consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id.

With regard to the first Turner factor, Defendants have made the blanket assertion that "[a]s a matter of law, the rehabilitative purposes by [sic] the DOC's prescriptive programs advance valid penological objectives." (Document # 68 at p. 9)(citations omitted).  This is a misguided generalization of the "law."  While the Supreme Court has recognized that rehabilitation is a legitimate penological interest, see O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987), there is no authority for Defendants' assertion that the DOC's prescriptive programs definitively serve "valid penological objectives," simply because they are rehabilitative in nature.  In fact, "[w]hile the obvious end of rehabilitation is the prevention of further lawbreaking once offenders are released from prison, the scope of the interest itself has never been defined by the Supreme Court."  Ramirez v. Pugh, 379 F.3d 122, 128 (3d Cir. 2004). The Ramirez court went on to observe that:

> [c]ertainly falling within the legitimate bounds of the interest [of rehabilitation] are prison policies designed to target the specific behavioral patterns that led to a prisoner's incarceration in the first place, or behavioral patterns emerging during incarceration that present a threat of lawbreaking activity other than that for which the prisoner was confined.  To say, however, that rehabilitation legitimately includes the promotion of "values," broadly defined, with no particularized identification of an existing harm towards which the rehabilitative efforts are addressed, would essentially be to acknowledge that prisoners' First Amendment rights are subject to the pleasure of their custodians.

Ramirez, 379 F.3d at 128.

Thus, "where the penological interest advanced by the government is rehabilitation ... a district court must describe with particularity the specific rehabilitative goal or goals relied upon by the government to justify the challenged regulation," rule or policy.  Ramirez, 379 F.3d at 129, citing Wolf v. Ashcroft, 297 F.3d 297 F.3d 305, 308 (3d Cir. 2002)(rejecting "conclusory" statements that make it difficult to determine what connection a court sees between the advanced penological interest and a prison restriction).  In this case, Defendants have failed to describe the specific rehabilitative goal or goals relied upon by the DOC to justify its requirement that Plaintiff participate in such prescriptive programs as A.A. or N.A., or suffer the

loss of housing privileges.  Furthermore, there is no evidence in the record upon which this Court can opine that the prescriptive programs at issue are "designed to target the specific behavioral patterns that led to [Plaintiff's] incarceration in the first place, or behavioral patterns emerging during incarceration that present a threat of lawbreaking activity other than that for which [Plaintiff] was confined."  Ramirez, 379 F.3d at 128.

As the Third Circuit has made clear, this Court cannot simply accept Defendants' conclusory statement that the DOC's prescriptive programs serve the valid penological interest of rehabilitation and, thus, satisfy the first prong of the Turner test.  Thus, a determination as to whether Turner's first factor has been met in this case cannot be made based upon the record presently before this Court.

While the first Turner factor is "foremost" among the four factors enunciated by the Supreme Court, it does not "subsum[e] the rest of the inquiry." Wolf, 297 F.3d at 310.  Thus, an analysis of the remaining three factors is required.

With regard to the second Turner factor, it is clear from the record that Plaintiff "has alternative means of practicing his religion generally." DeHart, 227 F.3d at 55.  In particular, Plaintiff has acknowledged that the DOC "has, since early 2001, employed ... a full-time Imam to meet the needs of [SCI] Albion's prisoners who adhere to the Islamic way of life," and that SCI-Albion offers "an array of seven Islamic-based programs." (Document # 39 at ¶ 85). Furthermore, Plaintiff's allegations indicate that he has a personal copy of the Qur'an, which he is free to read, and he has been "an active participant in the Islamic services, programs and activities made available by the PA DOC [since] July, 1994." (Document # 39 at ¶¶ 64, 76, 77). Thus, the second Turner factor favors the Defendants.

With regard to the third Turner factor, Defendants argue that an analysis is not warranted because "Plaintiff has not made clear what accommodation, if any, he requests of the DOC." (Document # 68 at p. 10).  This statement is incorrect.  Plaintiff plainly proposes that SCI-Albion's current "array of seven Islamic-based programs... could easily be adapted to fulfill any so-called 'prescriptive programming' need the PA DOC may deem appropriate for plaintiff in a manner which neither opposes nor offends plaintiff's Islamic beliefs...." (Document # 39 at

15

¶ 85).  Since Defendants have failed to recognize this proposition, the record is devoid of any evidence or argument upon which this Court may determine the impact such an accommodation would have on guards and other inmates, and on the allocation of prison resources generally.  As a result, a determination regarding the fulfillment of <u>Turner</u>'s third factor cannot be made at this time.  For the same reason, this Court is unable to determine whether the alternative proposed by Plaintiff would "fully accommodate the prisoner's rights at *de minimus* cost to valid penological interests," or whether there is an absence of ready alternatives to the DOC's prescriptive programs.  Thus, the fourth <u>Turner</u> factor cannot be fully considered at this time, based on the existing record in this case.

For the foregoing reasons, the record is insufficient for this Court to determine whether the DOC's rule or policy that require Plaintiff to participate in programs that conflict with his religious beliefs in order to maintain his housing on an honor block, is reasonably related to legitimate penological interests.  As a result, in the context of a motion to dismiss, Plaintiff's allegations are sufficient to state a First Amendment free exercise of religion claim, and such claim should be allowed to proceed at this juncture.

### 4.    Retaliation

Plaintiff claims that he was fired from his job as Chapel Clerk on or about November 14, 2002, in retaliation for two poems he wrote about "racial injustice in the courts." (Document # 39 at ¶¶ 37-51).  In addition, Plaintiff claims that a misconduct report he was given on May 12, 2004, was "fabricated" as "another act of retaliation flowing from plaintiff's exercise of his constitutional right to complain in [his poems] about injustices in the courts." (Document # 39 at ¶¶ 62-68).  As a result of the latter action, Plaintiff was confined to disciplinary segregation for a period of approximately 30 days. (Document # 39 at ¶ 65, 73).

Retaliation for the exercise of one's constitutional rights is a separate matter, requiring a distinct legal analysis.  "Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983."  See <u>White v. Napoleon</u>, 897 F.2d 103, 111-12 (3d Cir.1990).  "Government actions, which standing alone, do

not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial

part by a desire to punish an individual for exercise of a constitutional right." Mitchell v. Horn,

318 F.3d 523, 530 (3d Cir. 2003), quoting Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir.

2000).

  In order to state a prima facie case of retaliation, a prisoner must demonstrate:

> 1) the conduct in which he was engaged was constitutionally protected;
>
> 2) he suffered "adverse action" at the hands of prison officials[7]; and
>
> 3) his constitutionally protected conduct was a substantial or motivating factor in the decisions to discipline him.[8]

Carter v. McGrady, 292 F.3d 152, 157-58 (3d Cir. 2002), quoting Rauser v. Horn, 241 F.3d 330,

333 (3d Cir. 2001).  Following the satisfaction of a prima facie case of retaliation, the burden

then shifts to the defendants to demonstrate, by a preponderance of the evidence, that their

actions would have been the same, even if Plaintiff were not engaging in the constitutionally

protected activities.  Carter, 292 F.3d at 158.  "Once a prisoner has demonstrated that his exercise

of a constitutional right was a substantial or motivating factor in the challenged decision, the

prison officials may still prevail by proving that they would have made the same decision absent

the protected conduct for reasons reasonably related to a legitimate penological interest."  Rauser,

241 F.3d at 334.  In evaluating a prison official's opinion, "[p]rison administrators should be

accorded wide-ranging deference in the adoption and execution of policies and practices that in

---

[7]

To show an "adverse action," the plaintiff must demonstrate that defendants' action were "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights."  Allah v. Al-Hafeez, 208 F.Supp.2d 520,535 (E.D. Pa. June 24, 2002), quoting Allah v. Seiverling, 229 F.3d at 225.  See also Dixon v. Brown, 38 F.3d 379, 379 (8th Cir. 1994) (a plaintiff "need not show a separate, independent injury as an element of the case ... because the retaliatory disciplinary charge strikes at the heart of an inmate's constitutional right to seek redress of grievances, [and] the injury to his right inheres in the retaliatory conduct itself.").

[8]

In analyzing the third element of the retaliation test, the court must determine whether there is a causal connection between the exercise of the constitutional rights and the adverse actions.  "A suggestive temporal proximity between the protected activity and an alleged retaliatory act may be sufficient to meet the causal link requirement of the prima facia case."  Allah v. Al-Hafeez, 208 F.Supp.2d at 535, citing Rauser, 241 F.3d at 330 and Johnson v. Rendell, 56 F.Supp.2d 547, 552 (E.D. Pa. 1999).

their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979).

### a.  Constitutionally Protected Activity

To satisfy the first prong of a retaliation claim, Plaintiff must establish that he was engaged in constitutionally protected activity.  Plaintiff has met this burden, as writing poetry is clearly a protected form of free speech under the First Amendment.

### b.  Adverse Action

To satisfy the second prong, Plaintiff's allegations regarding his termination from the Chapel Clerk job, and the allegedly "fabricated" 2004 misconduct report, must rise to the level of adverse action.  In each case, this means that Plaintiff's allegations must be sufficient to demonstrate that the adverse consequences he suffered would deter a person of ordinary firmness from engaging in the protected activity of writing poetry.

### i.  Termination from Prison Job

Plaintiff has alleged that he suffered a significant wage loss as a result of his termination from the Chapel Clerk job and subsequent reassignment to the General Labor Pool.  Specifically, Plaintiff claims that he was earning 42¢ an hour as Chapel Clerk, while he received only 18¢ an hour from the General Labor Pool after his reassignment. (Document # 39 at ¶ 48).  Defendants argue that Plaintiff cannot demonstrate that he suffered an adverse action from the loss of his prison job because he does not have a right to be employed while in prison. (Document # 68 at p. 11).  This argument misses the mark.

The relevant question in a retaliation case is not whether Plaintiff had a "protected liberty interest in the privileges he was denied, but whether he was denied those privileges in retaliation for exercising a constitutional right." Rauser, 241 F.3d at 333.  "Although there is no right to a job or a particular position in a prison, prison officials cannot punish or retaliate against a prisoner who exercises his First Amendment rights...." Hill v. Blum, 916 F.Supp. 470, 473-74

(E.D.Pa. 1996), <u>citing</u> <u>Williams v. Meese</u>, 926 F.2d 994, 998 (10th Cir. 1991).

In this case, Plaintiff has alleged that he was fired from his Chapel Clerk job because of the content of his poems.  (<u>See</u> Document # 39, Exhibits B, C, D and E).  As a result, this Court finds that Plaintiff has sufficiently alleged an adverse action to satisfy the second prong of his retaliation claim regarding his termination from the Chapel Clerk job.  <u>See</u> <u>Floyd v. Dugal</u>, 2003 WL 23101802 at * 7(E.D.Pa. Dec. 16, 2003)(finding that a "reasonable factfinder" could find that the loss of a prison job causing a significant loss of pay would deter a prisoner of ordinary firmness from exercising his First Amendment rights).

### ii.       "Fabricated" 2004 Misconduct Report

Plaintiff states that the allegedly "fabricated" misconduct report that was filed against him on May 12, 2004, resulted in his confinement in disciplinary segregation for a period of approximately 30 days.  This Court finds that a reasonable jury could determine that the filing of an allegedly "fabricated" misconduct, resulting in Plaintiff being sanctioned to disciplinary confinement, would be sufficient to deter a person of ordinary firmness from engaging in constitutionally protected activity.  <u>See</u> <u>Jacobs v. Beard</u>, 2006 WL 825784 at * 3 (3d Cir. Mar. 29, 2006), <u>citing</u> <u>Bell v. Johnson</u>, 308 F.3d 594, 603 (6th Cir. 2002)("Unless the claimed retaliatory action[s] [are] truly 'inconsequential,' the plaintiff's claim should survive a motion for judgment as a matter of law"); <u>Allah v. Seiverling</u>, 229 F.3d 220, 224-25 (3d Cir. 2000)(holding that a prisoner may state a cognizable claim of First Amendment retaliation by alleging that he was detained in administrative segregation in retaliation for filing a civil rights action against prison officials).  As a result, Plaintiff has satisfied the second prong of a retaliation claim with regard to the 2004 misconduct report.

### c.       Causal Connection

To satisfy the third prong of his retaliation claim, Plaintiff must allege a causal connection between his constitutionally protected activity of writing poetry and the adverse actions he claims to have suffered as a result.  With regard to Plaintiff's termination from his job

as Chapel Clerk, it is clear that the termination was directly related to the content of Plaintiff's poems. (Document # 39, Exhibits B, C, D and E). Thus, Plaintiff's allegations, and the record as a whole, demonstrate a direct causal connection between Plaintiff's constitutionally protected activity and the adverse action he suffered.

With regard to the 2004 misconduct report, however, there is no direct causal connection apparent from the record. Thus, Plaintiff must establish that there was, at least, a temporal proximity between the discovery of his poetry and the misconduct report to suggest a causal link sufficient to satisfy the third prong of his retaliation claim. See Allah v. Al-Hafeez, 208 F.Supp.2d at 535. This he cannot do. According to Plaintiff, his poetry was discovered in November 2002; however, the misconduct report Plaintiff challenges as being retaliatory was written 18 months later, in May 2004. Thus, the temporal proximity between Plaintiff's poetry and the misconduct report at issue is tenuous, at best. The only connection Plaintiff attempts to make between his poetry and the misconduct report is that he "believes ... the problem that caused [Defendant Lobdell] to falsify a Misconduct Report against plaintiff, flows from the animosity generated by plaintiff's poetry." (Document # 39 at ¶ 67). Such a "belief" is not sufficient to establish the causal connection necessary to satisfy the third prong of a retaliation claim.

Based on the foregoing, Plaintiff has failed to meet the requirements necessary to state a prima facie claim of retaliation in connection with the misconduct report that was filed against him in May 2004. As a result, that claim should be dismissed.

Plaintiff has, however, sufficiently alleged a prima facie case of retaliation in connection with his termination from the Chapel Clerk job. Thus, the burden falls upon Defendants to demonstrate, by a preponderance of the evidence, that they would have fired Plaintiff from his job as Chapel Clerk even if Plaintiff had not engaged in the constitutionally protected activity of writing poetry. Carter, 292 F.3d at 158. In this case, that will be a difficult burden for Defendants to overcome and, certainly, there is insufficient evidence before this Court to allow Defendants to meet this burden at this stage of the proceeding. As a result, Defendants' motion to dismiss Plaintiff's retaliation claim related to his termination from the Chapel Clerk job should

be denied.

### 5.    Equal Protection

Plaintiff alleges a violation of his equal protection rights.  The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "This is not a command that all persons be treated alike but, rather, 'a direction that all persons similarly situated should be treated alike' " Artway v. Attorney General of State of N.J., 81 F.3d 1235, 1267 (3d Cir. 1996), quoting City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439 (1985).  "Treatment of dissimilarly situated persons in a dissimilar manner by the government does not violate the Equal Protection Clause." Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir. 1994).

"When an inmate asserts an equal protection claim based on the allegedly disparate treatment of different religious groups, the governing standard is whether the disparate treatment is reasonably related to a legitimate penological interest."  Fraise, 283 F.3d at 521 quoting DeHart, 277 F.3d at 61.   However, as a threshold matter, in order to establish a equal protection violation, the plaintiff must "...demonstrate that [he has] been treated differently by a state actor than others who are similarly situated simply because [he] belongs to a particular protected class." Keevan v. Smith, 100 F.3d 644, 648 (8th Cir. 1996).

Although far from clear, Plaintiff appears to be claiming that prisoners who participate in "religious programs" such as A.A. and N.A. are "rewarded" by the DOC for their participation, while Plaintiff "has been punished (with an increase in his custody level and removal from the honor block)" for adhering to the beliefs of his Islamic religion and refusing to participate in such programs. (Document # 39 at ¶ 83).  From these allegations, one may deduce that Plaintiff is similarly situated to other inmates who receive recommendations to participate in prescriptive programs such as A.A. and N.A.  Plaintiff has also made clear that he is a practicing member of the Islamic religion.  By Plaintiff's own tacit admission, Defendants made available to him the same programs that are offered to those similarly situated to him, and he was eligible to receive the same privileges for participating in such programs as those similarly situated to him.

Nevertheless, Plaintiff is essentially claiming that the programs offered by Defendants violate his religious beliefs and, thus, he was ostensibly precluded from obtaining the same privileges as those similarly situated to him. Construing Plaintiff's allegations in the light most favorable to him, Plaintiff has met the threshold requirements for establishing a cognizable equal protection claim. The burden, thus, falls upon Defendants to establish that the disparate treatment of which Plaintiff complains is reasonably related to a legitimate penological interest. Defendants have not attempted to meet this burden at this stage of the proceeding. As a result, Defendants' motion to dismiss Plaintiff's equal protection claim should be denied.

### 6.      Due Process

Plaintiff claims that the misconducts he received in February 2002 and May 2004 were either unsubstantiated or fabricated. To the extent these claims allege violations of Plaintiff's due process rights under the Fourteenth Amendment, they must fail. The filing of a misconduct, even if later proven to be false, "is not a constitutional violation so long as the inmate is provided with due process." Flanagan v. Shively, 783 F.Supp. 922, 931 (M.D.Pa. 1992), aff'd, 980 F.2d 722 (3d Cir. 1992), cert denied, 510 U.S. 829 (1993)(citations omitted).

In this case, it is clear from Plaintiff's allegations that he was properly notified of the charges associated with each misconduct and was afforded a hearing regarding each of the misconducts. In addition, Plaintiff availed himself of the opportunity to appeal the hearing examiner's decision regarding each of the misconducts. Thus, Plaintiff was provided with all due process to which he was entitled. As a result, Plaintiff's claim that Defendants wrote unsubstantiated and/or fabricated misconduct reports against him fails to state a cognizable claim under the Fourteenth Amendment's Due Process Clause.

As to Plaintiff's complaints regarding the time he spent in cell restriction and/or disciplinary custody as a result of the challenged misconduct reports, the Supreme Court has held that a prisoner's state created liberty interest is limited to those situations that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). In Sandin, the Supreme Court considered the

question of whether segregated confinement implicated a constitutional liberty interest and concluded that "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." 515 U.S. at 486.  See also Griffin v. Vaughn, 112 F.3d 703 (3d Cir. 1997) (placement of a prisoner in administrative custody for a period of 15 months did not impose atypical and significant hardship on prisoner and, thus, did not deprive due process rights).  Thus, the fact that Plaintiff was found guilty of the 2002 and 2004 misconducts and sanctioned to cell restriction and/or disciplinary custody does not implicate a violation of a constitutional liberty interest under the Fourteenth Amendment.

Finally, Plaintiff has claimed that, during the hearing regarding the May 2004 misconduct report, Defendant Moslak refused to allow him to call witnesses in violation of his due process rights.  However, since Plaintiff did not have a liberty interest to protect, the refusal to allow Plaintiff to call witnesses at his misconduct hearings did not violate his procedural due process rights.  Rivers v. Horn, 2001 WL 312236 at *2 (E.D.Pa. Mar. 29, 2001).

Based on the foregoing, Defendants' motion to dismiss Plaintiff's due process claims should be granted.

### 7.     Respondeat Superior

Defendants Wolfe, Beard, McKissock, Hametz, James, Burks, Moslak, and Barnett, argue that they should be dismissed from this action because Plaintiff has not alleged their personal involvement in any of his claims.

When a supervisory official is sued in a civil rights action, liability can only be imposed if that official played an "affirmative part" in the complained-of misconduct.  Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986).   Although a supervisor cannot encourage constitutional violations, a supervisor has "no affirmative constitutional duty to train, supervise or discipline so as to prevent such conduct."  Id. quoting Brown v. Grabowski, 922 F.2d 1097, 1120 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991).  The supervisor must be personally involved in the alleged misconduct.  Rode v. Dellarciprete, 845 F.2d 11958, 1207 (3d Cir. 1988).  Section 1983

23

liability cannot be predicated solely on *respondeat superior*.  Rizzo v. Goode, 423 U.S. 362 (1976).

### a.      Defendants Barnett and Moslak

The only allegations against Defendants Barnett and Moslak claim due process violations arising from the misconduct hearings that were conducted before them in February 2002 and May 2004, respectively.  As this Court has already recommended dismissal of Plaintiff's due process claims related to these misconduct hearings, there are no cognizable claims remaining against Defendants Barnett and Moslak.  As a result, these Defendants should be dismissed from this case.

### b.      Defendants James and Burks

The only allegation against Defendant James is that he denied Plaintiff's appeal of his grievance regarding his termination from the Chapel Clerk position. (Document # 39 at ¶ 57). Similarly, the only allegation against Defendant Burks is that she denied his Appeal to Final Review of his grievance regarding the increase in his custody level. (Document # 39 at ¶¶ 90-93 and Exhibit I).  These allegations are insufficient to establish such Defendants' personal involvement in the challenged conduct under Section 1983.  See Watkins v. Horn, 1997 WL 566080 at * 4 (E.D.Pa.. 1997)(concurrence in an administrative appeal process is not sufficient to establish personal involvement); Payton v. Vaughn, 798 F.Supp. 258, 260 (E.D.Pa. 1992)(holding that prisoner failed to state a cognizable Section 1983 claim where he could not show that supervisory officials were personally involved in deprivation of rights).  Accordingly Defendants James and Burks should be dismissed from this case.

### c.      Defendant Wolfe

In the introductory paragraphs of his Amended Complaint, Plaintiff claims that Wolfe, as Superintendent of SCI-Albion at the time the alleged constitutional violations occurred, was "legally responsible for the operation of SCI-Albion and for the welfare of all the inmates at that prison." (Document # 39 at ¶ 4).  All subsequent allegations against Defendant Wolfe stem from

24

his supervisory responsibility as Superintendent.  Such allegations fail to establish Defendant Wolfe's personal involvement in the challenged conduct and are insufficient to state a cognizable claim under Section 1983.  As a result, Defendant Wolfe should be dismissed from this case.

### d.    Defendant Beard

_____In the introductory paragraphs of his Amended Complaint, Plaintiff claims that Defendant Beard, as Secretary of the Pa DOC was "responsible for formulating, and implementing, policies and for the overall operation of the PA DOC and each institution under its jurisdiction, including SCI-Albion."  In this context, Plaintiff alleges that Defendant Beard "implemented policies which require(d) plaintiff to attend N/A and A/A, and other programs which are offensive to plaintiff's religious beliefs,..." (Document # 39 at ¶ 114).  This allegation implicates Defendant Beard's direct involvement in formulating the policies that Plaintiff is challenging under the First Amendment's Establishment Clause and the Fourteenth Amendment's Equal Protection Clause. As a result, Defendants' motion to dismiss Plaintiff's claims against Defendant Beard should be denied.

### e.    Defendants McKissock and Hametz

The allegations against Defendants McKissock and Hametz arise from their responses to Plaintiff's inmate's request and grievance regarding the increase in his custody level. (Document # 39 at ¶¶ 88, 90; Exhibits G and H).  In particular, Plaintiff alleges that:

> (i)    Defendant McKissock responded to his inmate's request for a written statement of the reasons for the increase in his custody level by stating that "[t]here are several factors that affect your level.  Those factors include a misconduct record, the fact that you do not have a job and the issue of your refusal to complete any programming." (Document # 39 at ¶ 88 and Exhibit G).

> (ii)    Defendant Hametz responded to his grievance regarding the increase in custody level by stating that "[y]our refusal to participate in programs is the reason you were moved off the honor unit." (Document # 39 at ¶ 90 and Exhibit H).

Viewed in the light most favorable to Plaintiff, these allegations establish that Defendants McKissock and Hametz were aware of the reason(s) for the increase in Plaintiff's

custody level and his removal from SCI-Albion's "honor block," and may have had personal involvement in the decision to increase his custody level, which Plaintiff challenges as a violation of the First Amendment's Establishment Clause and his First Amendment right to free exercise of religion.  As a result, Defendants' motion to dismiss Plaintiff's claims against Defendants McKissock and Hametz should be denied.

## III    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss complaint [Document # 67] should be granted in part and denied in part, as follows:

1.    Plaintiff's retaliation claim regarding the misconduct report that was filed against him in May 2004 should be dismissed.

2.    Plaintiff's Due Process claims should be dismissed.

3.    Defendants Barnett, Moslak, James, Burks, Wolfe, Lobdell, and Clement should be dismissed from this case.[9]

4.    The following claims set forth in Plaintiff's Amended Complaint [Document # 39] should be allowed to proceed:

   a.    First Amendment Establishment Clause claim against Defendants Beard, Boeh, McKissock, and Hametz;

   b.    First Amendment free exercise of religion claim against Defendants Boeh, McKissock and Hametz;

   c.    Retaliation claim regarding Plaintiff's termination from his job as Chapel Clerk against Defendants Gamble, Snyder and McQuown; and

   d.    Fourteenth Amendment Equal Protection claim against Defendants Beard and Boeh.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and

---

[9]

The only allegations against Defendant Lobdell are made in connection with Plaintiff's retaliation and due process claims regarding the 2004 misconduct report that was written by Defendant Lobdell, both of which claims are recommended for dismissal.  Similarly, the only allegations against Defendant Clement are made in connection with Plaintiff's due process claim regarding the 2002 misconduct report that was written by Defendant Clement, which claim has also been recommended for dismissal.  Thus, both of these Defendants should be dismissed from this case in the event the underlying claims against them are, in fact, dismissed.

Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

S/Susan Paradise Baxter
SUSAN PARADISE BAXTER
Chief U.S. Magistrate Judge

Dated:  May 15, 2006

cc:   The Honorable Sean J. McLaughlin
      United States District Judge