IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA



LEONARD C. JEFFERSON,
    Plaintiff,

    v.                  C.A. No. 04-44 ERIE

WILLIAM WOLFE, et al,
    Defendants.

## REQUEST FOR JUDICIAL NOTICE

NOW COMES plaintiff, LEONARD C. JEFFERSON, and respectfully request, pursuant to Rule 201 of the Fed. R. Civ. P., that the Court take Judicial Notice of the following:

1. Plaintiff's Third Amended Complaint (hereinafter Doc # 39) states claims upon which relief can be granted.

2. Plaintiff has fulfilled the exhaustion requirements of the PLRA, pertaining to his religious claims, as is demonstrated by the 10/06/03 response from the Secretary's Office to Plaintiff's Grievance Appeal to Final Review, # 59644, which is attached to Doc # 39 as Exhibit "I".

3. Plaintiff has fulfilled the exhaustion requirements of the PLRA, pertaining to his retaliation claim, as is demonstrated by the 04/09/03 responses from the Secretary's Office to Plaintiff's Grievance Appeals to Final Review, # 38293 and # 41691, which are attached to this request for Judicial Notice as attachments 1 and 2, respectively.

4. Plaintiff is not barred by the Eleventh Amendment from seeking relief from Defendants in their individual capacity .

5. The Defendants in this action are liable for any/all injuries which Plaintiff is able to prove he suffered as a result of Defendants' violations of well-established Constitutional rights.

6. The Due Process Clause gives Plaintiff the right to continue to move forward toward trial on the issue stated in the 05/15/06 Magistrate Judge's

Report and Recommendation (Doc # 81) at Section III, Conclusion, in
subparagraphs 4, a through d. (Section III, 4, a – d).

7. None of the issues stated in Section III, 4, a – d of Doc # 81 are
barred by a statute of limitations.

8. Defendants' failure to present any evidence/argument/document (which
would show that (a) Plaintiff's poetry posed a threat to the security of the
jail and/or caused Defendants to issue a Misconduct Report to Plaintiff for
writing and/or possessing the poetry, (b) Plaintiff's poetry posed a
potential threat to the security of the jail and/or caused prison officials
to confiscate any or all copies of the poetry, and (c) prison officials
conducted a security investigation of the alleged-plot to distribute the
poetry to other inmates) via their Motions to Dismiss indicates: (i)
Plaintiff's poetry did not pose any real or legitimate threat to security,
(2) defendants were aware that the poetry was protected by the First
Amendment, and (3) Defendants' assertions, that Plaintiff had intended to
distribute his poetry to other inmates, were/are merely a belated attempt to
provide some justification for firing Plaintiff from the Chapel Clerk job.

9. The JOB ASSIGNMENT NOTICE dated 11/14/02 (Exhibit "A' of Doc 39)
establishes the fact that Plaintiff was removed from the Chapel Clerk job on
11/14/02.

10. The JOB ASSIGNMENT NOTICE dated 11/14/02 (Exhibit "A" of Doc # 39)
establishes the fact that Plaintiff's pay was reduces from $2.52 per day (42¢
per hour) to 72¢ per day (18¢ per hour) as a result of Plaintiff being
removed from the Chapel Clerk job.

11. Defendant McQuown and Gamble's actions on 11/13/02 violated
Plaintiff's right to Free Speech when, as is indicated by the written
statements of McQuown and Gamble on Exhibits "B", "C-1" & "C-2" of Doc # 39,

said Defendants decided to fire Plaintiff because of the views expressed in his poetry.

12. Defendant gamble acknowledged her belief, based upon her professional interactions with and observations of Plaintiff, that Plaintiff's religious beliefs are sincerely held beliefs, by writing the comments: "We are done discussing this issue. I commend that you are committed to your religious practices and beliefs. However this commitment does not replace institutional programming." on the Inmate Request to Staff Member, dated 12/06/01, which is attached to Doc # 39 as Exhibit "F".

13. The 12/06/01 written statement of Defendant Gamble -- which states: "I have discussed this with the unit mgmt team [i.e, Defendant McKissock and unknown others]. No program at Albion is Anti-Islamic. (See Exhibit "F" of Doc # 39) -- indicates Defendants Gamble and McKissock were aware of Plaintiff's religious-based objections to participating in non-Islamic-based programming as early as 12/06/01.

14. The religion known as al-Islam advances "valid penological objectives" as that phrase is interpreted and used in Turner V. Safley, 482 U.S. 78 (1987).

15. The First Amendment prohibits the Defendants from deciding that Plaintiff be required to attend so-called "secular programs" which teach values that are offensive to Plaintiff's religious beliefs. (See Tenafly Eruv Assn., Inc. v. Borough of Tenafly, 309 F.3d 144 (3rd Cir. 2002)(the free exercise clause's mandate of neutrality towards religion prohibits government from deciding that secular motivations are more important than religious motivations.))

16. Defendants' acts of attempting to force Plaintiff to attend, and of denying Plaintiff privileges as punishment for refusing to attend, so-called

secular D.O.C. prescriptive programs, with full knowledge that said
prescriptive programs teach values that are offensive to Plaintiff's
religious beliefs, constitutes violations of the First Amendment's religious
clauses.

17. Recent court decisions in Pennsylvania -- such as McGill v. Dept. of
Health, 758 A.2d 268 (Pa. Cmwlth. 2000); Weaver v. Pennsylvania Board of
Probation and Parole, 688 A.2d 766 (Pa. Cmwlth. 1997); and Rauser v. Horn,
241 F.3d 330 (3rd Cir. 2001) -- caused the Secretary of Pennsylvania's
Department of Corrections (PA DOC) to be informed of the existence of clearly
established federal rights that allow prisoners to refuse, on religious
grounds, to participate in so-called prescriptive programming that teach
values and principles which are offensive to a prisoner's religious beliefs.

18. As a result of the court decisions in McGill, id.; Weaver, id. and
Rauser, id. Pennsylvania government agencies, including the PA DOC, were
required to modify their array of prescriptive programs to accommodate the
religious, and/or non-religious, beliefs of the plaintiffs in these cases.

19. Defendants -- having been put on notice of the federal right which
allows prisoners to refuse, on religious grounds, to participate in
prescriptive programs which the prisoner deems offensive, for approximately
six (6) years prior to 07/16/03, the day Defendants removed Plaintiff from
the Honor Unit due, in part, to Plaintiff's refusal, on religious grounds, to
participate in so-called prescriptive programs -- can not reasonable argue
that they were acting in good faith, nor that they were acting in a
reasonable and/or objective manner when Defendants, after being informed by
Plaintiff of his right to refuse of religious grounds, then subjected
Plaintiff to punishment for exercising his right to refuse.

20. As is indicated by Defendant McKissock's written statement, that

"the issue of your refusal to complete any programming" was a factor that
caused the raising of Plaintiff's custody level (See Exhibit "G" of Doc #
39), and by Defendant Hametz's written statement, which states "Your refusal
to participate in programs is the reason you were moved off the Honor Unit."
(See Exhibit "I" of Doc # 39); Defendants' actions deprived Plaintiff of
rights, privileges and immunities secured to him by the First Amendment of
the U.S. Constitution because Defendants had been informed by Plaintiff,
verbally and in writing, (See Exhibit "F" of Doc # 39) that his refusal to
participate was based upon religious grounds.

21. Defendants, after being informed and reminded in each instance by
Plaintiff of his rights, went far beyond the duties which are authorized by
statutes and regulations when they: (1) fired Plaintiff from employment as a
Chapel Clerk, reduced his pay from $2.52 per day to 72¢, and subsequently
cited this loss of job as a factor which caused Plaintiff's custody level to
be raised by prison officials as acts of retaliation against Plaintiff for
exercising his right to Free Speech, and (2) raised Plaintiff's custody level
from minimum to medium security and removed Plaintiff from housing on the
Honor Unit due to Plaintiff's exercise of rights pursuant to the religious
clauses of the First Amendment and, therefore, are liable for their
violations of Plaintiff's rights.

22. The proper standard of review for a court to use to determine
whether or not the PA DOC's prescriptive programs constitute religion is to
look "to the familiar religions as models in order to ascertain, by
comparison, whether the new set of ideas or beliefs is confronting the same
concerns, or serving the same purpose, as unquestioned and accepted
'religions'." (Quoting Malnak v. Yogi, 592 F.2d 197, 207 (3rd Cir. 1979).

23. "Under the modern view, 'religion' is not confined to the

relationship of man with his creator, either as a matter of law or as a matter of theology." (Quoting Malnak at 207).

24. Three useful indicia for determining whether or not teachings, a group of ideas, or a set of beliefs constitutes a religion are: (1) do the teachings, ideas or beliefs address fundamental questions such as what is right and wrong or good and evil?, (2) are the teachings, ideas of beliefs comprehensive, having a broader scope than one isolated moral teaching?, and (3) whether or not there are external signs. (See Malnak, id.; Africa v. Commonwealth, 662 F.2d 1025 (3rd. Cir. 1981)).

25. The PA DOC's Mission Statement (i.e., "Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime victims.") is a credo.

26. The original idea/motive for building and filling penitentiaries in the United States was to cause their inmates to become penitent, God-fearing and responsible religious people by providing "opportunities for inmates to acquire skills and values necessary to become law-abiding citizens." (Quoting the PA DOC Mission Statement/Credo).

27. The names "Department of Corrections," "rehabilitation programs," and "prescriptive programs" indicate the intent of the PA DOC to instill fundamental values -- of what the PA DOC believes to be right and wrong, good and evil, and/or acceptable beliefs and practices and unacceptable beliefs and practices -- in the minds of its prisoners.

28. If early release from confinement and/or preferential treatment and privileges within the prison can only be obtained via compliance with one's prescriptive program plan; then, participation in said programs is not

voluntary, it is coerced. (See Nusbaum v. Terrangi, 210 F.Supp.2d 748 E.D. VA

2002)(while attendance was voluntary, inmates were coerced to attend due to

lack of acceptable alternatives.))

29. Theistic and non-theistic religions are made up of teachings, values,

principles, ideas and beliefs that serve the purpose of providing individuals,

and whole societies, with ways to make progress in overcoming natural and

man-made problems in order to obtain success and/or happiness.

30. Theistic and non-theistic religions have codes of conduct which are

similar to the code of conduct that the PA DOC has established vi PA DOC

DC-ADM 801, INMATE DISCIPLINE (ADM 801).

32. The following list of "Class 1 Misconduct Charges", which are set

forth in ADM 801, identify behaviors which are also prohibited by some, and

in many instance all, of the world's recognized major religions: Assault,

Murder, Rape, Arson, Riot, Robbery, Burglary, Kidnapping, Unlawful Restraint,

Aggravated Assault, Voluntary Manslaughter, Extortion, Involuntary Deviant

Sexual Intercourse, Threatening, Sodomy, Possession of Controlled Substances,

Possession or Use of Intoxication Beverages, Sexual Harassment, Tattooing or

Other Forms of Self-Mutilation, Indecent Exposure, Unauthorized Group

Activity, Gambling, Using Abusive of Obscene Language, and Lying.

33. ADM 801 has prohibited the behaviors listed in ¶ 32 to confront the

same concerns and to serve the same purposes as the concerns confronted and

purposes served by theistic religions' edicts which prohibit these same

behaviors. (i.e., to establish and to maintain an organized, stable and

peaceful society by providing opportunities for believers/disciples "to

acquire the skills and values necessary to become productive law-abiding

citizens." (Quoting the PA DOC Mission Statement/Credo.)

34. Many theistic religions, including Islam, Judaism and some Christians,

have dress codes and personal grooming codes, such as distinctive head gear and growing beards, which are external signs of their respective religion.

35. The PA DOC enforces a dress code, and a personal grooming code (ADM 807), which have the effect of producing external signs.

36. Theistic and non-theistic religions regulate marriage.

37. The PA DOC regulates inmate marriages via ADM 821.

39. Theistic and non-theistic religions promise good results and rewards for good conduct and promise bad results and punishments for bad conduct.

40. The PA DOC promises rewards for good conduct and promises punishment for bad conduct.

41. It is highly probable, and all but a certainty, that any/all so-called rehabilitative programs that were designed and implemented by non-Muslims without any input from, or consideration of the religious obligations of, Muslims would contain elements, teachings, values and principles that would be offensive and unacceptable to Muslims.

42. The First Amendment not only prohibits Defendants from imposing religious values and religious teachings upon Plaintiff but also prohibits Defendants from attempting to impose the select/preferred/choice so-called secular teachings and values upon Plaintiff where and when the so-called secular teachings and values oppose, and are offensive to, the teachings and values of Plaintiff's religion.

43. The PA DOC is without authority to either ask or to require Plaintiff to abandon his religious beliefs, values and/or traditional practices, to the extent that Plaintiff's religious beliefs, values and/or traditional practices do not interfere with the security or the orderly operation of the jail.

44. The PA DOC is without authority to either ask or to attempt to

coerce Plaintiff to embrace non-religious beliefs, values and/or traditions after Plaintiff has informed the PA DOC of his religious objections to participating in programs which propagate beliefs, values and/or traditions that are offensive to Plaintiff's religious beliefs.

45. (In light of Federal Court decisions which recognize Islam's prohibitions against pork, which are mentioned in only four (4) verses of the Holy Qur'an, as being a major/important tenet/practice of the Faith) the Qur'anic prohibitions against believers listening to the teachings of non-believers (in all matters that have been addressed and settled by Allaah and/or His Messenger, Muhammad) which are stated in more than forty-nine (49) verses of the Qur'an (see Attachments 3 and 4 of this Request for Judicial Notice) are the basis of a major/important tenet/practice of the Religion that is, therefore, entitled to the same judicial respect and deference that's been shown to the prohibitions against pork.

46. The PA DOC's prescriptive Drug and Alcohol, Stress and Anger Management, Citizenship/Personal Responsibility, and Domestic Relations programs were implemented to confront the same concerns, and to serve the same purposes, as the edicts and teachings of theistic religions that address and regulate these mundane affairs in the lives of believers.

47. The religion of al-Islam is comprehensive in that its teachings give guidance and instructions to mankind for every conceivable situation and, similarly, the ideas, values, principles and beliefs presented via the PA DOC's rehabilitative programs are designed and intended to give guidance and instruction to their student/disciples for every conceivable situation.

48. It is a common practice of religious groups and religions cults to isolate their disciples, via fences, walls and remote locations, from the

general public at large.

49. Jim Jones and his disciples in Jonestown Guyana and David Kuresh (phonetic spelling) and his disciples near Waco, Texas are well-known examples of religious groups that isolated their disciples from the general public at large.

50. The PA DOC has spent billions of state and federal taxpayers' dollars erecting and maintaining stone walls, wire fences, and purchasing and developing property in remote locations in order to isolate its captive disciples/inmates from the general public at large.

WHEREFORE Plaintiff respectfully ask the Court to take Judicial Notice of the foregoing facts.

Respectfully submitted

*Leonard C. Jefferson*

Leonard C. Jefferson, CL-4135
10745 Rt. 18
Albion, PA 16475-0002

August 2, 2006

CERTIFICATE OF SERVICE

I hereby certify that I mailed a true and correct copy of the foregoing

REQUEST FOR JUDICIAL NOTICE, via first-class mail, to:


Mary Lynch Friedline
Senior Deputy Attorney General
OFFICE OF ATTORNEY GENERAL
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA 15219

*Leonard C. Jefferson*
Leonard C. Jefferson, CL-4135
10745 Rt. 18
Albion, PA 16475-0002


August 2, 2006

Leonard C. Jefferson, CL-4135
10745 Rt. 18
Albion, PA 16475-0002
August 2, 2006

Clerk's Office
U.S. District Court
P.O. Box 1820
Erie, PA 16507

RE: JEFFERSON V. WOLFE, C.A. NO. 04-44 ERIE

Dear Sir or madam:

Would you please file the enclosed REQUEST FOR JUDICIAL NOTICE and PLAINTIFF'S INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS in the above-captioned case.

Thank you for your attention to this matter.

Respectfully

Leonard C. Jefferson