# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LEONARD. C. JEFFERSON,
Plaintiff,

v. C.A. NO. 04-44 ERIE

WILLIAM WOLFE, ET AL.,
Defendants.

REQUEST FOR ADMISSIONS

Pursuant to Fed.R.Civ.P. Rule 36 Plaintiff requests the Defendants to make the following admissions within 30 days after service of this request.

1. Michael Anderson and Barbara Brannon were working as employees of the PA DOC on the afternoon of 10/24/02.

2. Michael Anderson and Barbara Brannon were in the Chapel Area of SCI-Albion performing their normal duties on the afternoon of 10/24/02.

3. Michael Anderson was acting in the capacity of a chaplain for inmates who follow the teachings of the Nation of Islam on 10/24/02.

4. Barbara Brannon was acting in the capacity of a secretary in the Chapel Office on 10/24/02.

5. Michael Anderson is an African-American.

6. Barbara Brannon is a European-American.

7. Michael Anderson and Barbara Brannon spoke to each other as they performed their respective duties on the afternoon of 10/24/02.

8. Plaintiff was working in the capacity of an Islamic Chapel Clerk throughout the entire month of October 2002.

9. Plaintiff's immediate supervisor during October 2002 was Imam Elhafiz Abdalla.

10. In October 2002 Elhafiz Abdalla worked for the PA DOC in the capacity of a chaplain for inmates who adhere to Sunni Islamic Traditions.

11. At certain times during the afternoon of 10/24/02 Michael Anderson, Barbara Brannon and Plaintiff were all present, simultaneously, within 6 feet of Ms. Brannon's desk.

12. Mr. Anderson and Plaintiff were in an adjoining office prior to the first time Mr. Anderson and Plaintiff approached the desk together that afternoon.

13. Mr. Anderson was talking on the telephone during the time when he and Plaintiff were together in the office.

14. Inmate Wayne Bair, III, CQ-0475, worked in the capacity of a Chapel Clerk for Mr. Anderson during October 2002.

15. At sometime around 1:10 or 1:15 PM on 10/24/02 Inmate Bair entered the office where Plaintiff sat and Mr. Anderson talked on the phone.

16. Inmate Bair informed Mr. Anderson that his presence was required in the multi-purpose room to begin the (Nation of Islam's) services.

17. Mr. Anderson terminated his conversation on the phone in order to go tend to his congregation in the multi-purpose room.

18. SCI-Albion policy prohibits an inmate from being present in an office unless there is a staff member inside the office.

19. Inmate Bair, Plaintiff and Mr. Anderson began exiting the office together; in single file and in that sequence.

20. While exiting the office Mr. Anderson asked Plaintiff to allow him to make a copy of a photocopied newspaper article that Plaintiff had in his possession.

21. Plaintiff complied with Mr. Anderson's request.

22. Plaintiff handed the article to Mr. Anderson while walking to exit the office.

23. The headlines on Plaintiff's photocopied article stated: "Pa. imprisons blacks at highest rate: Study by reform group finds it's 14 times that of whites."

24. Said article was written by Post-Gazette Harrisburg correspondent John M. R. Bull.

25. The article appeared in print in the Pittsburgh Post-Gazette in July of 2001.

26. Martha Eichenlaub was employed as a psychologist at SCI-Albion during the period between 1996 and 2003.

27. Ms. Eichenlaub conducted groups, including one named "Long Distance Dads," while employed at SCI-Albion.

28. Ms. Eichenlaub distributed copies of the article at issue to the inmate participants of her "Long Distance Dads" group at at least one of the groups meetings prior to October 2002.

29. Ms. Eichenlaub and inmate participants in the "Long Distance Dads" group discussed the subject matter of the article at issue at at least one of the groups meetings prior to October 2002.

30. Ms. Brannon's desk sits directly in front of the office which inmate Bair, Plaintiff and Mr. Anderson exited around 1:15 PM on 10/24/02.

31. The distance between the office door -- which inmate Bair, Plaintiff and Mr. Anderson exited -- and Ms. Brannon's desk is approximately six feet.

32. Ms. Brannon was sitting at her desk when inmate Bair, Plaintiff and Mr. Anderson exited the adjoining office and walked past her desk around 1:15 PM.

33. As Mr. Anderson was passing the desk he handed Plaintiff's copy of the article to Ms. Brannon.

34. Mr. Anderson asked Ms. Brannon if she would make one copy of the article for him and return the original to Plaintiff.

35. Ms. Brannon nodded, indicating the she would make the copy.

36. Mr. Anderson was not aware that something was typed on the backside of Plaintiff's copy of the article when he (Mr. Anderson) handed it to Ms. Brannon.

37. Inmate Bair, Plaintiff and Mr. Anderson continued walking, in single file, out of the Chapel Office wherein Ms. Brannon sat and into the Lobby Area.

38. Inmate Bair and Mr. Anderson continued walking and entered the first door that they came to on the left, wherein the Nation of Islam service was held.

39. Plaintiff kept walking and entered the first door on the right.

40. During the next hour or so Mr. Anderson was occupied with the religious service.

41. At sometime between 1:15 and 2:30 PM Ms. Brannon went to another office, to use its photocopier, to make the copy for Mr. Anderson.

42. At this time, Ms. Brannon copied both sides of Plaintiff's original.

43. Ms. Brannon read the poetry that was typed on the backside of Plaintiff's original copy of the article.

44. Ms. Brannon made an unknown number of additional two-sided copies of Plaintiff's original.

45. At some time around 2:30 PM when Mr. Anderson and Plaintiff were both within six feet of her desk, Ms. Brannon handed Plaintiff's original and one two-sided copy of that original to Mr. Anderson.

46. Ms. Brannon did not utter a word to anyone as she extended her arm to hand Mr. Anderson the two sheets of paper.

47. Mr. Anderson thanked Ms. Brannon for making the copy for him as he

received the two sheets of paper in his hand.

48. Mr. Anderson, upon receiving the two sheets of paper from Ms. Brannon, raised his empty hand to meet his hand holding the papers, took one of the sheets of paper in his empty hand and, in one continuous flowing motion, handed it to Plaintiff.

49. While extending his arm to hand Plaintiff his original Mr. Anderson noticed there was something typed on the backsides of both sheets of paper.

50. Mr. Anderson immediately read the typewritten poems on the backside of his copy of the article while standing near the desk.

52. Mr. Anderson interrupted his initial reading of the poetry to make the audible comment (to Ms. Brannon, to Plaintiff or maybe to himself) that "This is some smoking poetry here!"

52. Upon completing his reading of the poetry Mr. Anderson stated, as a question, "You know, I distribute things?"

53. Plaintiff responded by asking Mr. Anderson to go in the Chapel Sanctuary to continue the conversation.

54. Mr. Anderson agreed and followed Plaintiff out of the Chapel Office and into the Chapel Sanctuary.

55. In the Sanctuary Plaintiff informed Mr. Anderson that he (Mr. Anderson) was free to do what he pleased with the article.

56. Plaintiff then informed Mr. Anderson that he (Mr. Anderson) did not have Plaintiff's permission to distribute his poetry.

57. At some time after making the photocopies, Ms. Brannon caused copies of the two-sided original to reach various program directors, superintendents and department heads at SCI-Albion.

58. Subparagraph 14 of Section B (Specific Rules and Regulations) of the PA DOC CODE OF ETHICS, (DC-174) was in full effect on 10/24/02.

59. Subparagraph 14 of Section B of DC-174 required all employees of the PA DOC to "Promptly report to their superiors any information which comes to their attention and indicates violation of law, rules and/or regulations of the Department of Corrections by either an employee or an inmate, and will maintain reasonable familiarity with the provisions of such directives."

60. Subparagraph 22 of Section B of DC-174 required all employees of the PA DOC to "submit any necessary and/or requested work related reports in a timely manner and in accordance with existing regulations."

61. Subparagraph 22 of Section B of DC-174 required that "Reports submitted by employees shall be truthful and no employee shall knowingly enter or cause to be entered and inaccurate, false, or improper information or data, or misrepresentation of the facts in any Department record of report."

62. The terms of DC-ADM 801, INMATE DISCIPLINE, were in full effect on 10/24/02.

63. No written document is capable of speaking for itself.

64. DC-ADM 801, INMATE DISCIPLINE, VI. (Procedures), A (Misconduct/Rule Violation Reports) indicates: "All rule violations are to be reported via a DC-141; 'Misconduct Report' Part 1 ... any inmate charged with any of the listed violations will receive a copy of the report." (Emphasis added.)

65. DC-ADM 801 indicates that all of the following behaviors constitute an offense, a violation of said policy, for which a DC-141 Part 1 Misconduct Report must be written by at least one PA DOC employee who has witnesses or has become aware of the prohibited conduct: (1) engaging in, or encouraging unauthorized group activity, (2) possession of contraband ... or other items which in the hands of an inmate present a threat to the inmate, others or to the security of the facility, (3) failure to report the presence of contraband, and (4) possession of any items not authorized for retention or receipt by an inmate not specifically enumerated as Class 1 contraband.

66. The PA DOC had not granted Plaintiff an exemption on 10/24/02, or at any other time, that would preclude the issuance of an appropriate Misconduct Report in the event that any prison official learned that Plaintiff had violated one or more prison rules.

67. Plaintiff did not receive a Misconduct Report, which alleged he possessed contraband, on 10/24/02 nor on any other day.

68. Plaintiff did not receive a Misconduct Report, which alleged he had engaged in or encouraged unauthorized group activity, on 10/24/02 nor on any other day.

69. Plaintiff did not receive a Misconduct Report, which alleged he possessed items which in the hands of an inmate present a threat to the inmate, others or to the security of the facility, on 10/24/02 nor on any other day.

70. Plaintiff did not receive a Misconduct Report, which alleged he failed to report the presence of contraband, on 10/24/02 nor on any other day.

71. Plaintiff did not receive a Misconduct Report, which alleged he possessed any item not authorized for retention or receipt by the inmate not specifically enumerated as Class 1 contraband, on 10/24/02 nor on any other day.

72. Plaintiff did not receive a Misconduct Report, which alleged he possessed unauthorized writings intended for distribution or circulation, on 10/24/02 nor on any other day.

73. Prior to the filing of the complaint in this action PA DOC officials had never confiscated any poetry from Plaintiff.

74. In the event that prison officials had determined that Plaintiff had violated a prison rule on 10/24/02, or on any other day, said officials were

duty-bound by PA DOC regulations to issue Plaintiff a Misconduct Report.

75. The theme of the poetry at issue is Racism In The Judicial System and Lynchings.

76. The United States of America does have an embarrassing and well-documented history of racial injustices in its Judicial system, and of lynchings, that pre-date the signing of the Declaration of Independence in 1776.

77. The PA DOC does not have any rule that prohibited Plaintiff from writing poetry.

78. The PA DOC encourages its inmates to express themselves via writing poetry, essays and short stories.

79. The PA DOC conducts poetry contest for its prisoner on a fairly regular basis.

80. PA DOC policy prohibits prisoners from possessing printed material which it deems to be racially inciteful.

81. PA DOC officials, beginning on 10/24/02 and continuing to this present day, have been, and remain, unable to demonstrate that the poetry copied by Ms. Brannon on 10/24/02 poses any threat to the security of the jail.

82. Plaintiff remained employed as a Chapel Clerk between 10/24/02, the day Ms. Brannon made the photocopies, and 11/13/02, the day the Support Team Meeting (Staffing) was conducted.

83. Plaintiff reported to work and performed his assigned duties without incident on each of the 13 working days between 10/24/02 and 11/13/02.

84. Plaintiff's immediate supervisor, Elhafiz Abdalla, did not write an Unusual Occurrence Report, or any other type of report, on 10/24/02 about Plaintiff's poems.

85. Defendants Gamble, Snyder and McQuown were all employees of the PA DOC at all times relevant to this lawsuit.

86. Defendant McQuown was employed in the capacity of the Facility Chapel Program Director (FCPD) at SCI-Albion throughout the year 2002.

87. Ms. Brannon gave Defendant McQuown a photocopy of the article and poems on 10/24/02.

88. Defendant Snyder was employed in the capacity of a Unit Counselor but on 11/13/02 he was performing the duties of the acting-Unit Manager of/for A-Unit at SCI-Albion.

89. Defendant Gamble was employed as a Unit Counselor at all times relevant to this lawsuit.

90. Defendants Gamble, Snyder and McQuown were the three prison officials who sat as Support Team Members at the Staffing for Plaintiff on 11/13/02.

91. During the Staffing on 11/13/02 Defendants Gamble, Snyder and McQuown each questioned Plaintiff about the poems that Ms. Brannon had photocopied.

92. Plaintiff informed the Support Team Members, during the meeting on 11/13/02, that the First Amendment of the U.S. Constitution gave him the right to write the poetry.

93. Defendant McQuown told Plaintiff, during the meeting on 11/13/02, that the First Amendment did not give Plaintiff the right to yell "fire" in a movie theatre.

94. Plaintiff's response to Defendant McQuown indicated that the First Amendment does indeed give one the right to yell "fire" in a movie theatre if/when the theatre is, in fact, burning.

95. The SCI-ALBION JOB ASSIGNMENT NOTICE, that is attached to Plaintiff's Third Amended Complaint (Doc. # 39) as Exhibit "A", is genuine.

96. The "Form DC-135 A Inmates Request To Staff Member" that is attached to Doc. # 39 as Exhibit "B" is genuine.

97. The "Form DC-135A" that is attached to Doc. # 39 as Exhibit "C" is genuine.

98. The typewritten sheet, which Defendant Gamble has initialed with the letters "T" and "G", that is attached to Doc. # 39 as Exhibit "C-1" is genuine.

99. The form "DC-804, Part 2" which is attached to Doc. # 39 as Exhibit "D'" is genuine.

100. The memo entitle "Appeal to Superintendent Grievance # 41961" that is attached to Doc. # 39 as Exhibit "E" is genuine.

101. The "Form DC-135A" that is attached to Doc. # 39 as Exhibit "F" is genuine.

102. The "Form DC-135A" that is attached to Doc. # 39 as Exhibit "G" is genuine.

103. The form "DC-804, Part 2" which is attached to Doc. # 39 as Exhibit "H" is genuine.

104. The memo "RE: DC-ADM 804 Final Review Grievance No. 58644" that is attached to Doc. # 39 as Exhibit "I" is genuine.

105. Between 10/30/00 and 11/13/02 Plaintiff's rate of pay, as a Chapel Clerk, was 42¢ per hour or $2.25 per six hour day.

106. The SCI-ALBION JOB ASSIGNMENT NOTICE, Exhibit "A" of Doc. # 39, indicates Plaintiff has been "released from Chapel Payroll," on 11/14/02.

107. The SCI-ALBION JOB ASSIGNMENT NOTICE, Exhibit "A" of Doc. # 39, indicates Plaintiff "has been assigned as follows: Job GLP, Rate 72¢ [per] day" as of 11/14/02.

108. DC-ADM 816 indicates that inmates who "do not have a work assignment ... will be placed in the General Labor Pool" (GLP).

109. Inmates who do not have any work assignment other than GLP are in fact unemployed.

110. on 11/18/02 defendant McQuown indicated, by writing on Exhibit "B" of Doc. # 39, that his "reasons and justification for [his] decision and actions to remove [Plaintiff] from [his] job" ... were "Your poem which you stated you intended for all."

111. On 11/18/02 Defendant McQuown indicated, by writing on Exhibit "B" of Doc. # 39, that he "found this to be a threat to the orderly running of the institution. It is inflammatory & disruptive."

112. An inmate's conduct that poses a "threat to the orderly running of the institution" is conduct which is prohibited by DC-ADM 801.

113. DC-ADM 801 indicates that a staff member is required to issue a DC-141 Misconduct Report to an inmate whom the staff member has found to be engaged in conduct that poses "a threat to the orderly running of the institution."

114. Notwithstanding Defendant McQuown's written statement, which indicates he found Plaintiff's conduct "to be a threat to the orderly running of the institution," neither Defendant McQuown, nor any other prison official ever issued Plaintiff a Misconduct Report for said alleged violation(s) of the prison's rules.

115. If the statements written by Defendant McQuown on 11/18/02 on Exhibit "B" are true statements of his beliefs, Defendant McQuown was duty-bound by PA DOC policies DC-801 and DC-174 to cause Plaintiff to receive a DC-141 Misconduct Report for violating prison rules.

116. If the statements written by Defendant McQuown on 11/18/02 on Exhibit "B" were known to him to be false statements, he would be prohibited, by DC-801 and DC-174, from causing Plaintiff to receive a DC-141 Misconduct Report based upon a fabricated pretext in this matter.

117. The fact that no prison official ever issued a DC-141 Misconduct Report to Plaintiff related to his possession of poetry would cause most reasonable people to believe Plaintiff was removed from the Chapel Clerk job for some reason other than the reason that Defendant McQuown has written on Exhibit "B".

118. Plaintiff's duties as an Islamic Chapel Clerk on 10/24/02 included maintaining attendance records for all Islamic activities at SCI-Albion and teaching other inmates how to read and write the Arabic alphabet.

119. DOC policy required that Plaintiff be certified as an "Inmate Peer Leader" before Plaintiff would be allowed to give instructions to other inmates.

120. The status of "Inmate Peer Leader" is the highest and most honored and trustworthy status that an inmate can reach in the Chaplancy Department at SCI-Albion.

121. A Support Team Meeting was conducted by Defendant McQuown and others, during the summer months of 2002, whereat the Support Team Members elevated Plaintiff to "Inmate Peer Leader" status.

122. The most natural and logical assumption -- that would occur to the mind of an unbiased fact-finder who has rejected, as ludicrous and obviously fabricated, the justification for an action that has been offered by a party -- is that the party fabricated the ludicrous-justification in an attempt to conceal the true/and most likely improper motivation for the actions being challenged.

123. Both Defendants McQuown and Gamble, in Exhibits "B" and "C-1" of Doc. # 39 respectively, wrote about "concerns that we had regarding the content of your poetry combined with our concerns about the extent of contact your job allowed you to have with other inmates." (Quote from Exhibit "C-1".)

124. Defendants' act of re-assigning Plaintiff from the Chapel Clerk job to GLP status could not, in any way, address any legitimate concern that prison officials claimed to have had about the content of the poetry nor any legitimate concern that prison officials claimed to have had about the number of prisoners with whom Plaintiff had contact.

125. The Defendants' act of re-assigning Plaintiff from the Chapel to GLP did not serve any legitimate correctional purpose.

126. Inmates on GLP status are permitted to go to the yard every morning and afternoon year round; and are allowed to attend the yard each evening whenever it is open.

127. Chapel Clerks are confined to the Chapel Area every morning and afternoon while they are on the job.

128. SCI-Albion's records indicate a larger number of inmates actually attended the morning and afternoon sessions of the yard in November of 2002 than attended the morning and afternoon activities in the Chapel Area.

129. The authorized work area of Chapel Clerks is limited to: (1) the Chapel Offices, (2) The Religious Service Area, i.e., the sanctuary, (3) the Multi-purpose room in the Education Lobby, and (4) the Education Lobby Area.

130. Where and when prison officials identify and announce the existence of a threat to security and then fail to take appropriate actions to completely eliminate that threat an unbiased fact-finder would logically and naturally view the prison officials' failure to act as evidence that prison officials knew that the announced threat was a non-existent threat.

131. It is neither unheard of nor uncommon for courts to find/rule that prison officials have cited non-existent security concerns, in an attempt to provide some semblance of justification and/or correctness, to conceal a blatant illegal act.

132. Prison officials would have immediately confiscated Plaintiff's poems and confined Plaintiff in the hole, as is required by PA DOC policy, if said officials' concerns about Plaintiff and his poetry vis-a-vis the security of the jail were genuine.

133. Robert Boeh acted as the Grievance Officer in Grievance No. 41961 (see Exhibit "D" of Doc. # 39).

134. Robert Boeh investigated Plaintiff's claims and memorialized the findings of said investigation on a DC-804 Part 2 which bears his signature and the date 03/07/03.

135. Robert Boeh's written findings on the DC-804 Part 2 include the following statement: "You were dismissed from your employment as a chapel clerk because of the fact that you distributed your poetry which was racially inciteful (sic) and completely inappropriate to be distributed in the correctional setting."

136. According to Robert Boeh, Plaintiff actually distributed "poetry which was racially inciteful (sic) and completely inappropriate to be distributed in the correctional setting."

137. The written reasons given by Support Team members Gamble and McQuown for removing Plaintiff from the Chapel Clerk job are different from the written reason (for removing Plaintiff from that job) that were given by Robert Boeh.

138. On 03/20/03 Supt. Wolfe responded in Appeal to Superintendent Grievance # 41961 (see Exhibit "E" of Doc. # 39).

139. The reasons that Supt. Wolf has presented, on Exhibit "E", for removing Plaintiff from the Chapel Clerk job differ from the written reasons of Defendants Gamble and McQuown for removing Plaintiff from that job.

140. The reasons presented by Supt. Wolfe, on Exhibit "E", for removing Plaintiff from the Chapel Clerk job differ from the reasons given by Robert Boeh on the DC-804 Part 2 dated 03/07/03.

141. Supt. Wolfe's written statements, on Exhibit "E" do not in any way indicate that security concerns were a factor in the decision to re-assign Plaintiff from the Chapel to GLP.

142. Supt. Wolfe's statement, on Exhibit "E" -- that he "will stand by the decision that you are not appropriate for the clerks position in the Religious Service Area" -- indicates that a decision, that Plaintiff was no longer appropriate for that job, was made.

142. The initial decision to re-assign Plaintiff from the Chapel to GLP was made at some time prior to the Support Team meeting on 11/13/02.

143. The initial decision to re-assign Plaintiff from the Chapel to GLP was made by someone other than the members of the 11/13/02 Support Team.

144. The views expressed in Plaintiff's poems caused prison officials to deem Plaintiff to be inappropriate for the clerks position in the Chapel.

145. The PA DOC took custody of Plaintiff in July of 1994.

146. Between July of 1994 and January of 2002 Plaintiff did not receive any Misconduct Reports.

147. Plaintiff's employment record for the period between his commitment to DOC custody and the 11/13/02 Support Team Meeting is as follows:

| DATES | SUPERVISORS | JOB DESCRIPTION | TERMINATED FOR |
|---|---|---|---|
| 03/20/95 - 04/08/96 | Davis, Crosby | Floor Crew | New Assignment |
| 04/08/96 - 07/15/98 | Meyerhoff | Stained Glass | Sent to new jail |
| 12/03/98 - 07/17/99 | Hewett | Sign Shop | Sent to new jail |
| 10/30/00 - 11/13/02 | Abdalla | Chapel Clerk | Poems at issue |

148. Not one of the Supervisors named in the previous paragraph has caused negative comments, about Plaintiff's conduct and performance on the job, to be present in the permanent file that the DOC maintains on Plaintiff.

149. Plaintiff has never received anything less than "above-average" and "excellent" ratings on work evaluations at the above-mentioned jobs.

150. Plaintiff has maintained "above-average" and "excellent" ratings on every Housing Unit Report that has been made on Plaintiff in general population from 07/94 until 10/24/02.

151. Reports, evaluations and notes in PA DOC files on Plaintiff indicate Plaintiff maintained a uniform excellence of conduct and character from his first day in PA DOC custody until 10/24/02, the day prison officials discovered Plaintiff's poems.

152. Prison officials were annoyed, by the views expressed in Plaintiff's poems, to the point of taking improper actions against Plaintiff.

153. On 07/31/06 Defendant Gamble conducted Plaintiff's Yearly Classification Review with Plaintiff.

154. Defendant Gamble and Plaintiff discussed the fact that they were opposing parties in this lawsuit during their discussion on 07/31/06.

155. During the conversation on 07/31/06 Defendant Gamble and Plaintiff discussed the 11/13/02 Support Team Meeting and Plaintiff's post-11/14/02 employment history which indicates Plaintiff has been on GLP status during 43 of the 44 months that lapsed since the 11/13/02 Support Team Meeting.

156. On 07/31/06 Defendant Gamble informed Plaintiff that the members of the 11/13/02 Support Team were ordered (by their superiors) prior to the

Support Team Meeting to remove Plaintiff from the Chapel Clerk job.

157. When any artist makes the statement that a piece of his/her work is intended for "everybody" or "all" a rational thinking person of normal intelligence would not interpret that artist's statement in a way that would indicate some intent of the artist to provide "everybody" or "all" with an individual copy of that artwork.

158. Michael Anderson has an established practice of distributing written materials to prisoners confined in the RHU Units of the PA DOC prisons where he works.

159. DC-ADM 816, WORK ASSIGNMENTS, allows an inmate who has been removed from a particular job to be re-assigned to that same job at a later date.

160. Inmates at SCI-Albion have received work-related Misconduct Reports which caused them to serve Disciplinary Sentences in the hole and were, subsequently, re-assigned to the work assignment where they received the Misconduct Report..

161. Inmates at SCI-Albion have been returned to the same work assignment after having been removed from that work assignment by Support Team action.

162. The SCI-ALBION JOB ASSIGNMENT NOTICE dated 04/05/04 and attached herein as Exhibit "J" is genuine.

163. Exhibit "J" indicates that, as of 04/05/04, Plaintiff was: (1) released from GLP payroll, (2) "assigned as follows: Job: Chapel/Clerk, rate: .33 [per] hour," (3) instructed to "report to Chaplain McQuown, who is your supervisor, on or before: 0800 the starting date shown above."

164. The form DC-141 Part 1, bearing the number A453158, attached herein as Exhibit "K" is genuine.

165. Exhibit "K" indicates that a Misconduct Report was filed against Plaintiff on 05/12/04 around 1045 - 1100 hours.

166. On 05/12/04 Plaintiff was performing his Chapel Clerk duties from around 0800 until he was escorted to RHU and placed on AC Status Pre-hearing confinement around 1100 hours that morning.

167. Plaintiff has been on GLP status from 11/14/02 until this present day with the exception of the period between 04/05/04 and 05/12/04.

168. Imam Abdalla's immediate supervisor, at all relevant times, was Defendant McQuown.

169. On 04/05/04 neither Defendant McQuown nor Imam Abdalla expressed any concern that Plaintiff was inappropriate for the Chapel Clerk job.

170. A fabricated report is more likely to be inconsistent with itself than a truthful report.

171. The report on DC-141 Part 1 No. A453158 is inconsistent with itself.

172. There were no incidents or unusual occurrences reported in the Education Building between 1000 and 1100 hours on 05/12/04 other than the incident which is alleged on DC-141 Part 1 No. A453158.

173. The author of a fabricated statement usually has an ulterior motive for presenting a fabricated statement instead of a true statement.

174. The written statements of Defendant McQuown, on Exhibit "B", which indicate this defendant believed Plaintiff and his poems posed a threat to security, are fabricated statements.

175. The written statements of Defendant Gamble, on Exhibit "C-1", which indicate this defendant believed Plaintiff and his poems posed a threat to security, are fabricated statements.

176. The written statement of Defendant Boeh, on Exhibit "D", which indicates Plaintiff distributed racially inciteful poems, is a false statement.

177. The 03/20/03 written statement of Superintendent Wolfe, on Exhibit "E", that Plaintiff is "not appropriate for the clerks position in the Religious Service Area" is belied by the decisions that led to Plaintiff being re-assigned to the Chapel Clerk job on 04/05/04.

178. In June of 2004, after Plaintiff was returned to general population from the Hole, Imam Abdalla informed Plaintiff that he (Abdalla) was going to rehire Plaintiff as a Chapel Clerk.

179. Imam Abdalla never indicated a personal belief that, pursuant to all DOC regulations and policies, Plaintiff was inappropriate for the Chapel Clerk position.

180. Stories told about the racial injustices suffered by non-white people in the courts and prison camps of Nazi Germany are not generally classified as being racially inciteful.

181. The DIARY OF ANNE FRANK is a well-known book that documents some of the racial injustices that were inflicted upon non-white people as a matter of official policy, by the Nazi Government.

182. A person who had engaged in committing atrocities against non-whites in Hitler's death camps would be more likely to view a factual presentation of the atrocities committed in those death camps as being racially inciteful than a person who had not.

183. It is a natural and inescapable part of human nature that causes people who have engaged in some form of despicable behavior, that they are ashamed of, to be unrealistically hypersensitive to any/all mention of such despicable behavior, even when it is attributed to others.

184. A man may feel terrible about what he has done and genuinely wants to stop beating his wife but can become trapped in an endless cycle of spouse-abuse if/when he believes he can/should stop her from talking/writing about

the beatings by beating her again, and again, and again, ad infinitum.

185. One important purpose served by the Free Speech Amendments of the Federal and States Constitutions is to guarantee to citizens the right to speak freely about abuses that are committed by Federal and State government officials.

186. According to the July 2001 article written by John M. R. Bull, Blacks, at that time, were incarcerated in Pennsylvania at a rate that was fourteen times that of Whites.

187. According to the statistics presented on page 126 of the FINAL REPORT OF THE PENNSYLVANIA SUPREME COURT COMMITTEE ON RACIAL AND GENDER BIAS IN THE JUSTICE SYSTEM (2003) (hereinafter THE REPORT) Blacks'incarceration rate in Pennsylvania is 18.4 times that of Whites.

188. According to page 320 of THE REPORT, in Allegheny County African-American defendants often plead guilty to crimes that they did not commit, because they know there ain't no justice for you there if you are Black and poor.

189. In Doyle V. Allegheny County, 96-13606 (Allegheny County Court of Common Pleas), Robert L. Spangenberg, a consultant who had visited 250 public defenders offices during the preceding 20 years, filed an affidavit in which he summarized some of the "major inadequacies" that: (1) deprive poor people of their Constitutional Rights, and (2) caused him to rate Allegheny County's system as the worst large urban system he has seen.

190. Mr. Spangenberg's affidavit included a statement that: "The current system is unable to safeguard the constitutional rights of its indigent clients."

191. Violations of a defendants' Constitutional Rights increase the likelihood that those who are actually innocent will be convicted.

192. Plaintiff is in DOC custody as the result of a conviction obtained in the Allegheny County Court of Common Pleas at CC No. 1993 15250.

193. The Allegheny County Public Defenders Office was involved in CC No. 1993 15250 from its City Court Preliminary Hearing stage to its direct appeal stage.

194. Plaintiff complained about the services provided by the Public Defenders prior to, during and after the jury trial at CC 1993 15250.

195. Article 1, Section 7 of the Pennsylvania Constitution establishes the following: "The printing press shall be free to every person who may undertake to examine the proceedings of the legislature or any other branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty."

196. Art. 1, § 7 of the Pennsylvania Constitution can be read as being an

encouragement to speak, write and print on the subject of racial injustices in the court.

197. Writings that express the fact that a trial judge -- with full knowledge of the actual innocence of the accused and full knowledge of the fabricated nature of the testimony and evidence presented against said accused -- allowed a deceived jury to convict the accused of a vicious and unprovoked aggravated assault with a base ball bat upon a woman whom the accused knew to be 20 weeks pregnant are protected speech under the First Amendment of the U.S. Constitution and protected/encouraged speech pursuant to Art.1, § 9 of the Pennsylvania Constitution.

198. Writings that express the fact that a trial judge has accepted as genuine truth facts which are contrary to human experience and violate well-known laws of physics/nature are protected speech pursuant to the State and Federal Constitutions.

199. Writings that express the fact that the victim of an alleged-assault gave statements, at the time of the incident, that were more in agreement with the physical evidence than the relevant statements presented to the jurors are protected speech.

200. Pittsburgh Police Officer Ben Bogus, Badge No. 2792, took a statement from Andrea V. Wells (sic) on 10/26/93 around 11:00 PM.

201. In her report to Off. Bogus, made within minutes of the incident, the alleged-victim stated she was standing when Plaintiff struck her shin with a baseball bat and, when she bent over, Plaintiff struck her on top of her head with the bat and, after that, Plaintiff struck her abdomen with the bat.

202. In her testimony at trial, some 6½ months after the incident, the alleged-victim informed the judge and jury that she was lying prone on the floor, unable to move due to pains in her stomach, at all times when Plaintiff struck her with the bat.

203. The alleged-victim's trial testimony, statements of the trial judge during sentencing and written opinions of the trial and Superior Court of Pennsylvania all assert as unquestionable fact that, as the alleged-victim lay beaten and helpless at Plaintiff's feet, Plaintiff used full-force, from-over-the-shoulder, batter-style swings, with a wooden Louisville Slugger baseball bat, to land blows on the alleged-victim's shin and head.

204. The alleged-victim's trial testimony, statements of the trial judge during sentencing and written opinions of the trial and Superior Court of Pennsylvania all assert as unquestionable fact that there were bruises present on the alleged-victims abdomen from the alleged blow with the bat.

205. The ACCIDENT/INCIDENT REPORT filed by Off. Bogus on 10/26/93 indicates Ms. Wells (sic) was immediately transported to West Penn Hospital.

206. Upon her arrival at West Penn on 10/26/93 Ms. Webb began undergoing examinations which included: x-rays, fetal monitoring, and questions about how she obtained her injuries during the treatment she received for a 3 cm scratch on her scalp, a bruise on her shin and an abrasion on her buttock.

207. Forceful blows from an object such as a baseball bat upon bony surfaces of a human body, like its shin and skull, usually result in broken bones, pulverized bones, fractured bones and serious injuries of the soft tissues in the areas of impact.

208. The medical professionals who examined Ms. Webb on 10/26 - 27/93 did not find any evidence that could be the result of full-force, from-over-the - shoulder, batter-style swings/blows from a wood baseball bat.

209. The medical professionals who examined Ms. Webb on 10/26 -27/93 did not find a single broken, pulverized or fractured bone during their examination of Ms. Webb.

210. While being examined and treated at West Penn on 10/26 - 27/93 Ms. Webb did not inform anyone that, during the incident, Plaintiff had knocked her to the floor several times, wrestled with her down on the floor, and/or had repeatedly punched her upper body with his fists.

211. When being questioned on 10/26/93 about the incident Ms. Webb did not inform Off. Bogus that Plaintiff had knocked her to the floor, wrestled with her down on the floor, and/or that Plaintiff had punched her a single time.

212. The alleged-victim's trial testimony, statements of the trial judge during sentencing and written opinions of the trial and Superior Court of Pennsylvania all assert as unquestionable fact that, prior to the blows with the bat, Plaintiff had knocked Ms. Webb to the floor several times; wrestled with her down on the floor; and punched her repeatedly with his fists on her upper body.

213. The page of transcript attached herein, as Exhibit "L", is a true, correct, accurate and genuine copy of page 8 of the transcript of the Preliminary Hearing conducted by Pittsburgh Magistrate Donald Machen in the case that was, at that time, captioned Commonwealth V. Jefferson, OTN: C886389-0.

214. The question and its answer, at lines 20 - 22 of Exhibit "L", indicate that, while under oath on 11/16/93, Ms. Webb responded in the negative to the question: "What about your stomach or your abdomen area? Did you receive any injuries?"

215. During the trial at CC 1993 15250 Plaintiff's Public Defender, Charles Clark, possessed a copy of the 11/16/93 Preliminary Hearing transcript which contained a copy of Exhibit "L".

216. During the trial at CC 1993 15250 Charles Clark handed a copy of the 11/16/93 Preliminary Hearing transcript to Ms. Webb for her to read (to herself) to refresh her recollection while she was undergoing cross-examination.

217. During the trial at CC 1993 15250 Charles Clark did not make any attempt to impeach Ms. Webb's testimony to the jury (i.e., that there were bruises on her abdomen from the alleged-blow with the bat) with the prior

inconsistent sworn testimony recorded on Exhibit "L".

218. No medical witnesses were called to testify during any proceeding at CC 1993 15250.

219. Failure to present a witness whom a State would normally be expected to call is evidence that said witness's testimony would be detrimental to the State's case.

220. The records of Ms. Webb's treatment at West Penn Hospital on 10/26 - 27/93 were sent into the jury room with the jurors during their deliberations.

221. The trial prosecutor, Eric Soller, used the last words of his closing argument to tell the jurors that the medical records are "going to tell you this man committed the crime of aggravated assault on Miss Webb on October 26, 1993."

222. Plaintiff could neither confront nor cross-examine the State's expert witnesses who provided testimony against Plaintiff exclusively in the seclusion of the jury room on 05/18/94.

223. Cross-examination is commonly described as the best and most trustworthy truth-determining engine.

224. The omission of the known and available expert medical witnesses from the trial at CC 1993 15250 deprived the jurors of the type of accurate and unbiased information that a decision-maker must have to reach an informed and reliable decision.

225. The two-page PRELIMINARY/DETENTION HEARING REPORT, dated 12/13 & 29/93, attached herein as Exhibits "M-1" and "M-2" are true, correct, accurate and genuine copies of said report.

226. A statement on Exhibit "M-2" indicates that on 12/13/93 Plaintiff/ Parolee testified: "Andrea Wells (sic), the alleged victim came to his house and stayed there. He asked her to leave. She slapped him. She would not leave. Mr. Jefferson tried to put her out. She physically resisted. He 'tapped' her with a bat. Mr. Jefferson has called the police on her before."

227. Exhibit "M-1" indicates that, on 12/29/93, an oath was administered to Errolynne Redden.

228. Exhibit "M-2" contains the following statement: "Witness Errolynne Redden said Andrea Wells (sic) provoked Mr. Jefferson. She said Ms. Wells wouldn't leave the apartment and slapped Mr. Jefferson. A struggle occurred. Ms. Wells beaten. Mr. Jefferson said he hit her with a bat."

229. Exhibit "M-1" contains a statement which indicates PA PBPP Agent Mitchell indicated "The victim is a probation absconder from South Carolina."

230. The trial testimony of Ms. Webb in CC 1992 15250 indicates Ms. Redden was present, in the small living room, with Ms. Webb and Plaintiff on 10/26/93 prior to, during and after the incident involving Ms. Webb and Plaintiff.

231. The testimony of Ms. Redden on "M-2" indicates Ms. Webb became a trespasser in Plaintiff's home on 10/26/93.

232. The testimony of Ms. Redden on "M-2" indicates that Ms. Webb initiated a physical assault upon Plaintiff while trespassing in his home.

233. 18 Pa. C.S.A. § 500 et seq. authorizes the use of force, by a licensee, to eject a trespasser from his home.

234. 18 Pa. C.S.A. § 500 et seq. does not authorize a licensee to inflict serious bodily injury upon a trespasser while ejecting the trespasser from his/her home.

235. The records at CC 1993 15250 indicate Ms. Webb did not sustain any serious body injury as the result of Plaintiff's actions on 10/26/93.

236. The page of the 10/26 - 27/93 West Penn Hospital report attached herein as Exhibit "N" is a true, accurate, correct and genuine copy.

237. The notes on Exhibit "N" indicate that, while in West Penn Hospital shortly after the incident, Ms. Webb informed hospital personnel that Plaintiff struck her with the bat (first) and then, subsequently, dragged her "down the stoop" out of his house.

238. The records of Ms. Webb's testimony to the jurors in CC 1993 15250 indicated the sequence of events, after Ms. Webb had been asked to leave, were as follows: Ms. Webb slapped Plaintiff, Ms. Webb was knocked to the floor several times by Plaintiff, Plaintiff wrestled with Ms. Webb down on the floor, Plaintiff dragged Ms. Webb (by her feet across the floor) out of the house, Ms. Webb (standing outside) asked for and received permission from Plaintiff to reenter, upon reentry Plaintiff knocked her to the floor again, wrestled with her down on the floor, repeatedly punched her upper body with his fists, Plaintiff got up and went into the next room while Ms. Webb lay on the floor unable to move due to pains in her stomach, Plaintiff returned with the baseball bat, struck Ms. Webb with the bat as she lay prone on the floor, Ms. Redden helped Ms. Webb get up off the floor, Ms. Webb seated herself on the staircase, Plaintiff approached Ms. Webb with a 9-inch Chef's knife in one hand and the bat in the other, Plaintiff put the knife to Ms. Webb's throat and told her that if he went to jail she was going to the morgue, and Ms. Redden terminated the incident at this point by stepping in between Ms. Webb and Plaintiff and then (Ms. Redden) escorted Ms. Webb out of the house.

239. The nurses notes on Exhibit "N" contain an account, given by Ms. Webb on 10/27/93, of how she received her injuries.

240. The notes on Exhibit "N" do not indicate that Ms. Webb ever complained, about being knocked to the floor or punched, while being examined and seeking treatment for any and every injury that she might have sustained during the incident.

241. The nurses notes on Exhibit "N", which indicate Ms. Webb told the nurses she had been dragged "down the stoop" after she had been hit with the

bat, were redacted from the copy of the hospital records sent out with the jurors.

242. Charles Clark did not make any attempt to inform the jurors that Ms. Webb had made the prior inconsistent statement which appears on Exhibit "N" pertaining to the point in time during the incident that Plaintiff dragged her out of his house.

243. Charles Clark did not make any attempt to inform the jurors that Pennsylvania law authorized Plaintiff to use the force that a trespasser makes necessary to terminate the trespass into his home.

244. Notwithstanding Plaintiff's protests/complaints to the trial judge prior to and during the trial, Charles Clark did not present the known favorable eyewitness testimony nor the known favorable medical witnesses testimony during the trial.

245. The Commonwealth did not present testimony from Ms. Redden, the known eyewitness, during the trial at CC 1993 15250.

246. Charles Clark did not make any attempt to inform the jurors that Ms. Webb was a fugitive from justice on the day of the incident in Plaintiff's home.

247. The jurors were not informed that Ms.Webb had been paid to provide testimony for the Commonwealth against Plaintiff.

248. Notwithstanding Plaintiff's protests/complaints to the trial judge prior to and during the trial about Charles Clark's failure to obtain Pittsburgh Police records, of five calls Plaintiff made for assistance against Ms. Webb during the nine months immediately preceding 10/26/93, Charles Clark failed to acquire and utilize the information contained in said records.

249. The trial transcript at CC 1993 15250 indicates Plaintiff informed the trial judge that Charles Clark had urged and advised Plaintiff to lie to the jury.

250. Plaintiff readily admitted during his first interview after being arrested, on 11/05/93, and at each subsequent interview, that he "tapped" Ms. Webb's shin and head with the bat and then dragged her out of his house and locked her outside before she had an opportunity to try to renew her trespass for a second time during the incident.

251. The final argument of Kevin Clancy at Plaintiff's 11/16/93 Preliminary Hearing indicates Plaintiff had admitted "tapping" Ms. Webb with the bat.

252. The trial transcript at CC 1993 15250 indicates Charles Clark attempted to have Ms. Webb admit the she sustained the scratch on her scalp by bumping her head on a door frame during the struggle.

253. An acceptable definition of a "Police-State-style-trial" is a trial wherein the State is permitted to present evidence and legal arguments, but the defendant is not.

254. An acceptable definition of a "Police-State-style-trial" is a trial wherein the State is permitted to present testimony from witnesses, but the defendant is not.

255. An acceptable definition of a "Police-State-style-trial" is a sham procedure wherein the objective is to obtain a conviction against the accused.

256. Superior Court of Pennsylvania Official Docket, Docket # 01284PGH94 indicates Plaintiff filed a Notice of Appeal, pro se, on 07/29/94.

257. Official Docket # 10284PGH94 indicates Plaintiff filed a Motion For Appointment of Counsel on 09/27/94.

258. The Motion For Appointment of Counsel filed by Plaintiff specifically: (1) described a conflict of interest that existed between Allegheny County Public Defenders and Plaintiff, and (2) requested appointment of counsel other than a person from that Public Defenders Office.

259. Official Docket # 01284PGH94 indicates a Praecipe For Appearance Of Attorneys Stark, Nauhaus, and Konow was entered on 10/06/94.

260. On 10/06/94 attorneys Stark, Nauhaus and Konow were all employed as Allegheny County Public Defenders.

261. Official Docket # 01284PGH94 indicates the Superior Court issued an ORDER, on 10/12/94, which stated: "MOTION FOR APPOINTMENT OF COUNSEL IS DENIED AS MOOT, THE COURT NOTING THAT COUNSEL ENTERED AN APPEARANCE FOR APPELLANT."

262. Official Docket # 01284PGH94 indicates a Motion To Withdraw As Counsel was filed on 12/19/94 and denied on 12/28/94.

263. Official Docket # 01284PGH94 indicates a Motion For Reconsideration Of Order Denying Petition To Withdraw As Counsel was filed on 01/26/95 and GRANTED on 02/03/95.

264. No on-the-record colloquy was conducted as is required — by Commonwealth v. Monica, 597 A.2d 600, 528 Pa. 266 (Pa. 1991); Commonwealth v. Grant, 323 A.2d 354, 229 Pa. Super. 419 (Pa. Super. 1974); Commonwealth v. Fletcher, 269 A.2d 730. 441 Pa. 28, 32 (Pa.1970); Commonwealth v. Fowler, 412 A.2d 614, 271 Pa. Super. 138 (Pa. Super. 1979) decided after remand 419 A.2d 34, 275 Pa. Super. 544.; Pa.R.Crim.P. Rule 121 (formerly 318); Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948); and, Commonwealth v. Hill, 422 A.2d 491, 492 Pa. 100 (Pa. 1980) — to form a sufficient factual basis which would enable a court to conclude that Plaintiff wished to waive his right to counsel on direct appeal.

265. The records at CC 1993 15250 and 01284PGH94 do not indicate that Plaintiff made any knowing, voluntary or intelligent waiver of the right to counsel.

266. The Motion For Appointment of Counsel filed by Plaintiff on 09/27/94 informed the Court that Plaintiff "is unlearned in law and desires counsel to

properly present the serious issues of his appeal to this Honorable Court."

267. The Motion For Appointment of Counsel filed by Plaintiff on 09/27/94 informed the Court "It would be a conflict of interest for a Public Defender to raise and/or argue, or to investigate and prepare Appellant's ineffective assistance of counsel claim against another Public Defender."

268. Plaintiff's attempts to have counsel, other than a Public Defender, represent him on direct appeal were ultimately unsuccessful.

269. Plaintiff filed a pro se Statement of Matters Complained Of, pursuant to Pa.R.A.P. Rule 1925(b), in the trial court.

270. Plaintiff filed a pro se Appellate Brief in the Superior Court on his direct appeal at 01284PGH94.

271. In January of 2003 Plaintiff filed a Private Criminal Complaint, pursuant to Pa.R.Crim.P. Rule 506, with the Allegheny County District Attorney's Office.

272. Plaintiff's 2003 Private Criminal Complaint named then-Magistrate Donald Machen, public defenders Kevin Clancy, Bruce Steimer, Charles Clark and then-public defender Lester Nauhaus, A.D.A. Eric Soller, Paul F. Lutty, Jr. and unknown others with committing violations of 18 Pa. C.S.A. §§ 903, 4902, 5101 and 5301 against Plaintiff.

273. Plaintiff's 2003 Private Criminal Complaint alleged, among other things, that Paul F. Lutty wrote known false statements in the Opinion which he filed in the Superior Court at 01284PGH94 in May of 1995.

274. Pursuant to the ten-year statute of limitations for prosecution of crimes committed by officials -- as stated in Commonwealth v. O'Kicki, 597 A.2d 152, 408 Pa. Super. 518 (Pa. Super. 1991), appeal denied 626 A.2d 1156, 534 Pa. 637, reconsideration denied -- the prosecution of offenses committed in May of 1995 would not be barred by the statute of limitations until May of 2005, in the event the official(s) remains in office.

275. On March 26, 2003 A.D.A. Darrell Dugan wrote a letter and sent it to Plaintiff pertaining to Plaintiff's 2003 Private Criminal Complaint.

276. In his 03/26/03 letter to Plaintiff, A.D.A. Dugan wrote: "After review of the documentation sent to our office dated January 28, 2003. It would appear that the statute of limitations would bar any criminal action with your complaint."

277. The written statement of A.D.A. Dugan in his letter of 03/26/03 "that the statute of limitations would bar any criminal action with your complaint" is a statement that did/does not reflect the truth of that matter.

278. Plaintiff did not have any PCRA Petition or any PCRA Motion filed or otherwise pending in Allegheny County's Court of Common Pleas at any time between 12/31/02 and 01/01/04.

279. Plaintiff filed a Motion To Disqualify District Attorney which was

date/time stamped in the Allegheny County Clerk of Courts Office on 04/23/03.

280. Plaintiff's Motion To Disqualify District Attorney requested "that this Court require Allegheny County District Attorney Stephan A. Zappala, Jr. ... to refer the criminal complaint filed by Leonard C. Jefferson on 01/23/03 to the Office of Pennsylvania's Attorney General pursuant to the authority of the Commonwealth Attorney Act, ..."

281. Paragraph 4 of said Motion To Disqualify District Attorney states: "Petitioner's Complaint alleges that, between 11/16/93 and May of 1995: (then) Magistrate Donald Machen, Allegheny County Public Defenders Kevin Clancy, Bruce Steimer, Lester Nauhaus, and Charles Clark; Allegheny County Assistant District Attorney Eric Soller; Allegheny County Court of Common Pleas Judge Paul F. Lutty, Jr., and other actors who are unknown to Petitioner at this time, all participated in a Criminal Conspiracy in violation of 18 Pa. C.S.A. § 903 via multiple violations of 18 Pa. C.S.A. 4902, 4952 (sic), 5101 and 5301."

282. Paragraph 6 of said Motion To Disqualify "asserts there is a potential for an actual or apparent conflict of interest with Allegheny County's DA's Office and with DA Zappala.

283. Paragraph 7 of said Motion To Disqualify asserts: "This conflict exist, partially, because the DA's Office cannot now be expected to properly investigate nor to effectively prosecute the actors named in the Petitioner's Complaint where the facts clearly indicate that the criminal acts of all of the conspirators named in the Complaint have been concealed, condoned and supported by the DA's office since 1993."

284. Plaintiff's Motion to Disqualify District Attorney was assigned CC 1993 15250 as its docket number.

285. Plaintiff's Motion To Disqualify District Attorney was forwarded, by the Clerk's Office, to the same Judge Paul F. Lutty, Jr. that Plaintiff had named as an actor in his Private Criminal Complaint.

286. Plaintiff filed a Motion For Disqualification And Recusal Of Judge which was date/time stamped in the Allegheny County Clerk of Courts Office on 05/05/03.

287. Paragraph 8. of Plaintiff's Motion For Disqualification And Recusal Of Judge states: "Pursuant to the CODE OF JUDICIAL CONDUCT, effective 01/01/74, Canon 3, C. (1) 'A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where: (1) he had a personal bias or prejudice concerning a party...'"

288. Paragraph 1 of Plaintiff's Motion For Disqualification And Recusal Of Judge states: "Paul F. Lutty, Jr. cannot reasonably be expected to adjudicate any question of law nor of fact in proceedings wherein he has a personal interest -- and especially not in proceedings wherein Petitioner has filed a Sworn Criminal Complaint which identifies Judge Paul F. Lutty, Jr. by name as one of the actors in a criminal conspiracy wherein he violated the

laws of this Commonwealth of Pennsylvania -- in the impartial and unbiased manner that is mandated by the CODE OF JUDICIAL CONDUCT.

289. As of the date of service of the instant Request For Admissions upon Ms. Friedline; Judge Lutty has neither disqualified nor recused himself from hearing the Motions at CC 1993 15250 pertaining to the Private Criminal Complaint filed by Plaintiff in January of 2003.

290. On the 18th day of June of 2003 Judge Lutty signed a NOTICE OF INTENTION TO DISMISS which stated: "Petitioner is notified, pursuant to Pennsylvania Rule of Criminal Procedure 1507(a), that the Court intends to dismiss Petitioner's PCRA motion for the following reason[s]: 1) The Court also has reviewed the entire record in this matter and has concluded that there are no other issues which would afford Plaintiff relief." (emphasis added).

291. On the 16th day of July of 2003 Judge Lutty signed and ORDER OF COURT which stated: "... having reviewed the PCRA petition filed in this case and the relevant portions of the record, this Court is satisfied that there are no issues of material fact, that Petitioner is not entitled to relief, and no purpose would be served by further proceedings. It is hereby ORDERED, ADJUDGED and DECREED that said petition is DISMISSED.

292. During the three-plus years that have lapsed between 05/05/03 and the day the instant Request For Admissions was served upon Ms. Friedline, Judge Lutty failed to decide the matter of Plaintiff's Motion To Disqualify District Attorney and failed to the decide the matter of Plaintiff's Motion For Disqualification And Recusal Of Judge which were docketed by the Clerk of Courts in April and May of 2003 respectively.

293. The Free Speech Clause of the U.S. Constitution's First Amendment gives one, whose rights have been abused in State court proceedings, the right to write and to possess poetry on the subject of the race-based, and economic-based, injustices that facilitated and accompanied the abuse of the poet's rights.

294. Plaintiff's Free Speech rights cannot be extinguished by the mere fact that prison officials were/are annoyed by the unpleasant realities communicated via Plaintiff's poems.

295. It is likely that Plaintiff is more troubled, by the injustices communicated via his poems, than the prison officials.

296. Defendants failure to confiscate the poems from Plaintiff is evidence of Defendants' awareness that the poems at issue were/are protected speech.

297. Speech, including poetry, which exposes the abusive acts of government officials and all others should be encouraged, not punished.

298. Pursuant to the State and Federal Constitutions and pursuant to PA DOC policy; prison officials' action which raise the custody level of a prisoner who exercised Constitutional Rights, for no valid reason other than

the exercising of his/her rights, are illegal actions.

299. Provisions of the Federal AEDPA and State PCRA statutes cause an unknown number of prisoner to be procedurally barred from obtaining relief from the courts which they are otherwise eligible to apply for.

300. Prisoners who are procedurally barred from applying for legal redress that they are otherwise entitled to have a legitimate grievance about a Judicial System that is incapable of delivering justice in their case(s).

301. The poetry at issue does nothing more than repeat, as "Ebonic Echoes," facts and figures that are presented via "academic discourse" in the reports of official government bodies and highly-respected social scientists.

302. Prisoners in general population in the PA DOC have the right to obtain written reports that address the subject of racial injustice in the courts.

303. Prisoners in general population in the PA DOC have the right to possess written reports that address the subject of racial injustices in the courts.

304. Prisoners in general population in the PA DOC have the right to read reports that address the subject of racial injustice in the courts.

305. Prisoners in general population in the PA DOC have the right to write poetry that addresses the subject of racial injustices in the courts.

306. The mere fact that Plaintiff obtained/possessed/read reports and articles about racial injustice in the courts and then wrote poetry on that subject cannot, alone and according to all relevant laws and regulations, make Plaintiff inappropriate for any DOC work assignment.

307. On 10/27/95 Plaintiff was informed that his custody level had been reduced from CL-3, Medium, to CL-2, Minimum security.

308. On 08/13/96 Plaintiff was re-assigned from housing of F/B, a CL-3 Unit, to housing on A/A, a CL-2 Honor Unit.

309. Plaintiff remained housed on A/A from 08/13/96 until 07/15/98.

310. On 07/15/98 Plaintiff was transferred from SCI-Albion to SRCF-Mercer.

311. Plaintiff's custody level was CL-2 at all times between 10/27/95 and 07/15 or 16/99.

312. On or around 07/15/99 Plaintiff's custody level was raised to CL-4.

313. The raising of Plaintiff's custody level in July of 1999 was administrative and not the result of any misconduct by Plaintiff.

314. Plaintiff's custody level was raised in July of 1999 to facilitate his return to SCI-Albion.

315. Plaintiff was returned to SCI-Albion on 10/13/99.

316. On 03/03/00 Plaintiff was informed that his custody level had been returned to CL-2.

317. On 08/22/00 Plaintiff was re-assigned from housing on B/A, a CL-3 Unit, to housing on A/A, a CL-2 Honor Unit.

318. Plaintiff was informed on 07/11/03 that his custody level had been raised from CL-2 to CL-3.

319. Plaintiff was re-assigned from housing on A/A, a CL-2 Honor Unit, to housing on F/B, a CL-3 non-honor Unit, on 07/16/03.

320. DOC records indicate that from 07/94 until 10/24/02 prison officials viewed Plaintiff as a "model inmate."

321. Plaintiff did not receive a single Misconduct Report between July of 1994 and February of 2002.

322. In February of 2002 Plaintiff received a DC-141 Misconduct Report.

323. A Yearly Classification Review was conducted for Plaintiff by Defendant Gamble on 07/24/02.

324. On 07/24/02 Defendant Gamble informed Plaintiff that the February 2002 Misconduct Report caused Plaintiff's custody level to be CL-3.

325. On 07/24/02 Defendant Gamble informed Plaintiff of the decision, made by Defendants McKissock and Gamble, to keep Plaintiff at CL-2 notwithstanding the February 2002 Misconduct Report.

326. On 07/24/02 none of the Defendants in this case were aware of Plaintiff's poetry.

327. Defendant McKissock has indicated, on Exhibit "G" of Doc. # 39, that the "Penna. Additive Classification Tool (PACT)" was used to determine Plaintiff's custody level in July of 2003.

328. In the PACT system positive and/or negative number values are assigned to the ten (10) following factors: (a) gravity of current offense, (b) severity of criminal history, (c) history of institutional violence, (d) number of disciplinary reports, (e) severity of disciplinary reports (f) inmate's present age, (g) escape history, (h) program participation, (i) work performance, and (j) housing performance.

329. In the PACT system each inmate's custody level is determined by adding and/or subtracting the number values which correspond to the inmate in the ten (10) previously-mentioned factors.

330. Generally, pursuant to the PACT scheme higher total scores produce

higher custody levels and lower total scores produce lower custody levels.

331. In the PACT system good performance by the inmate is rewarded by deducting points while computing the total score.

332. In the PACT system less-than-expected performance by the inmate is punished by adding points while computing the total score.

333. A total score of 2, or less than 2, on the PACT is required for a male inmate to be classified Minimum Security (L-2).

334. A male inmate with a total score from 3 to 14 on the PACT is classified Medium Security (L-3).

335. A male inmate with a total score of 15 or more on the PACT is classified Close Security (L-4).

336. Defendant McKissock has indicated, on Exhibit "G" of Doc. # 39, that one of "several factors that affect [Plaintiff's] level ... [is] the issue of [Plaintiff's] refusal to complete any programming."

337. The statements of Plaintiff and of Defendant Gamble, written on Exhibit "F" of Doc. # 39, indicate that Defendants were aware of Plaintiff's objections, on religious grounds, to participating in non-Islamic-based prescriptive programs as early as December of 2001.

338. In July of 2003 three (3) points were added, in the total score of Plaintiff on the PACT, due to Plaintiff's non-participation in prescriptive programs.

339. In July of 2003 three (3) points were subtracted from the PACT score of each inmate, at his/her Yearly Classification Review, that had successfully completed prescriptive programs.

340. In July of 2003 two (2) points were subtracted from the Pact score of each inmate, at his/her Yearly Classification Review, that had "active/partial treatment" in prescriptive programs.

341. Defendants' failure to provide alternative prescriptive programs (that were not offensive to Plaintiff's religious beliefs) precluded Plaintiff from obtaining the two (2) or three (3) point reduction in his PACT score that was available to other inmates in July of 2003.

342. The Free Exercise Clause of the First Amendment prohibits Defendants from raising Plaintiff's custody level, and from taking any other adverse actions against Plaintiff, for refusing to participate in prescriptive programs that are offensive to Plaintiff's religious beliefs.

343. The Establishment Clause of the First Amendment prohibits Defendants from raising Plaintiff's custody level, and from taking any other adverse actions against Plaintiff, for refusing to participate in religious and secular programs that are offensive to Plaintiff's religious beliefs.

344. The PA DOC does not presently offer any prescriptive programs that are based upon Islamic beliefs and traditions.

345. The PA DOC does not presently offer any prescriptive programs that are taught from an Islamic perspective.

346. The only option presented to Plaintiff by Defendants, that would allow Plaintiff to earn the two (2) or three (3) point reduction of his PACT score for participating in PA DOC prescriptive programs, has been that Plaintiff must either violate of abandon his Islamic beliefs.

347. Defendant McKissock has indicated, on Exhibit "G" of Doc. # 39, that one of "several factors that affect [Plaintiff's] level ... [is] the fact that [Plaintiff] does not have a job..."

348. Above average work performance causes three (3) points to be subtracted in the equation that produces the total PACT score.

349. Idle status, known as GLP, neither causes points to be added nor causes points to be subtracted in the equation that produces the total PACT score.

350. Plaintiff's above-average work performance as a Chapel Clerk caused three (3) points to be deducted in the equation that produced his total PACT score at his 07/29/02 yearly review.

351. Plaintiff's Idle/GLP status deprived Plaintiff of a three (3) point deduction in the equation that produced his total PACT score at his 07/11/03 Yearly Review.

352. Prior to implementing its array of prescriptive programs, no DOC official made any attempt to determine whether or not the persons and/or groups who created the programs, which Plaintiff refused to attend, had consulted with Muslims to determine if the program would be perceived as being offensive by inmates who are Muslims.

353. During the past forty (40) years the prison system in Pennsylvania has recognized, and then took steps to accommodate, the religious beliefs of its Muslim prisoners by: (a) allowing Holy Qur'ans and other Islamic books and literature to be possessed by prisoners, (b) serving protein substitutes in meals wherein pork is served, (c) establishing observances of weekly Jumu'ah Prayer services and bi-annual Eid Prayers and Feasts, (d) facilitating the thirty (30) day long fasting of Ramadaan, (e) allowing Muslims to wear religious head coverings and to possess prayer rugs and prayer beads, and (f) hiring permanent staff, who are Muslims, to function as Imams to meet the needs of prisoners who happen to be Muslims.

354. No DOC employee filed an Unusual Occurrence Report or Misconduct Report on 10/24/02 pertaining to Plaintiff and/or his poetry.

355. Defendant Beard is not willing to concede that it is highly probable that programs — that were designed and implemented without any considerations of, or adjustments to meet the unique religious requirements of Muslims -- would contain elements, teachings, values and principles that would be

offensive to Muslims.

356. A DC-43 Prescriptive Program Plan was prepared for Plaintiff by Defendant Gamble on 07/20/01.

357. The DC-43, dated 07/20/01, indicates "alcohol" is and "area of concern."

358. A DC-43 was prepared for Plaintiff by Defendant Snyder on 07/11/03.

359. The DC-43, dated 07/11/03 indicates one of the "issues to be addressed" is "drug/alcohol."

360. The fact that a DOC program is unquestionably non-religious does not preclude the possibility that some elements of said unquestionably non-religious program will be deemed offensive by members of Faith groups.

361. The diet served by the DOC to inmates in general population is not a religious diet.

362. The non-religious diet served by the DOC contains food items that are offensive to Muslims and members of other Faith groups.

363. The DOC provides alternate protein items to/for Muslims if/when pork is the meat item in a meal.

364. The DOC provides the alternative protein to Muslims to allow Muslims to maintain a properly balanced nutritious diet with out having to eat foods that are offensive to their religious beliefs.

365. Defendants assert the following programs are not religious in nature: Violence Prevention, Citizenship, Batterers Intervention, Long Term Offender, and Personal Responsibility.

366. Defendants have not asserted that the DOC's so-called non-religious programs do not contain elements that are prohibited and/or offensive to Muslims.

367. In the same way that Defendants cannot truthfully state the DOC's non-religious diet does not contain food items that are offensive to Muslims; Defendants cannot truthfully state the DOC's so-called non-religious programs do not contain elements that are prohibited and/or offensive to Muslims.

368. The Religion of al-Islam promotes high moral standards.

369. The Religion of al-Islam promotes healthy lifestyles.

370. The Religion of al-Islam promotes a non-criminal lifestyle.

371. The Religion of al-Islam promotes respect for the rights and dignity of everything in creation.

372. The Religion of al-Islam prohibits the possession, sale and use of

intoxicants.

373. The Religion of al-Islam prohibits fornication and adultery.

374. The Religion of al-Islam prohibits sexual activity outside of marriage.

375. The Religion of al-Islam prohibits stealing and prescribes the cutting off of the thief's hand.

376. The Religion of al-Islam condemns all criminal and anti-social conduct in the strongest terms.

377. Lying is considered to be a major sin, like murder, in the Religion of al-Islam.

378. Defendants' response, to Plaintiff's interrogatories number 4 and 5, erroneously state by implication that the Religion of al-Islam "does not address the criminogenic factors that caused individuals to commit criminal acts."

379. The Moral Code of Islam is generally viewed as being much stricter than the Moral Code of non-Muslims.

380. Homosexual conduct is acceptable in most non-Islamic nations.

381. Homosexual conduct is viewed as an unacceptable abomination by the Religion of al-Islam.

382. Many behaviors that lead to crime and degradation of human dignity are permissible in non-Islamic societies but are prohibited in Islamic societies.

383. The three photocopied sheets attached herein, as Exhibit "O", are true copies of the Preface of the King Fahd translation of the Holy Qur'an. (Note: Imam Abdalla has copies of said Qur'an in his office at SCI-Albion.)

384. The underlined sentence near the middle of the page numbered "iii" of Exhibit "O" indicates: "It becomes incumbent upon each and every person who seeks the dignity of this world and the bliss of the Hereafter to regulate his life according to it [the Qur'an], to implement its commandments and to pay homage to the magnificence of the One Who revealed it."

385. The underlined sentences near the bottom of the page numbered "iii" of Exhibit "O" indicate: "[The Qur'an's] contents are not confined to a particular theme or style, but contain the foundation for an entire system of life, covering a whole spectrum of issues, which range from specific articles of faith and commandments to <u>general moral teachings, rights and obligations, crime and punishment, personal and public law, and a host of other private and social concerns</u>. (Emphasis added.)

386. Paragraph number 7 on the page numbered "v" of Exhibit "O" indicates "[The Qur'an] <u>contains a complete code which provides for all areas of life,</u>

whether spiritual, intellectual, political, social or economic. It is a code which has no boundaries of time, place or nation. Verily this Qur'an doth guide to that which is most right." (Emphasis added.)

387. Charles J. Adams of McGill University authored an article on the subject of Islam which appears in Vol. 15 of Encyclopedia Americana, 1993.

388. The following comments, on the subject of "law" in Islam, appear in Mr. Adam's article on page 499 of Vol. 15 of Encyclopedia Americana, 1993.

> The heart of Islamic religious concern is the law. Islam is an eminently practical way of life. What Muslims most expect from their religion is guidance for all the specific situations of life so that they may know how to please God in this world and achieve blessedness hereafter. The Islamic law is an attempt by Muslims to derive a series of specific rules of conduct from the basic sources of guidance, and it comprises a comprehensive set of prescriptions and proscriptions."
>
> Sharia. The common word for law is sharia, which originally meant a pathway. It may roughly be translated as 'the path in which God wishes men to walk.' The prescriptions of the Sharia are ordained by God as His eternal will. It is, thus, the standard of right and wrong in human affairs, and it provides an all-inclusive scale of religious valuation for conduct. Every human deed falls under the perspective of the law, without exception. Actions are classified as obligatory (fard); meritorious or recommended (mandub); indifferent, that is, bringing neither reward nor punishment (mubah); reprehensible, that is, not punishable but disapproved (makruh); and forbidden (haram). There has been no more far reaching effort to lay out a complete pattern of human conduct than the Islamic Sharia.
>
> The assumption underlying the Sharia is that men are incapable of discriminating right and wrong by their own unaided powers. It was for this reason that guidance was sent to them through prophets. God, who is all-powerful and perfectly free, has decreed a pathway for men. ... The Sharia is both a divine and an eternal law and, hence, completely trustworthy. As the basic institution of Islamic civilization throughout the centuries, it explains the certainty and assurance Muslims have felt in the rightness of their way of life.
>
> In its content, the Sharia is much more than law in the modern sense. Not only does it deal with matters of religious ritual, but it regulates every aspect of political, social and private life."

389. Vincent J. Cornell authored an article on the Religion of al-Islam which appears in Vol. 10 of World Book 2002.

390. The following comments appear in Mr. Cornell's article on pages 463 - 465 of Vol. 10 of World Book 2002:

> "Islam, ihs LAHM, is the name given to the religion preached by the Prophet Muhammad in the A.D. 600's. Islam is an Arabic word that means surrender or submission. God is called Allah (in Arabic, pronounced ah LAH), which means The God. A person who submits to Allah and follows the teachings of Islam is called a Muslim. ...
>
> Muhammad was born about A.D. 570 in the Arabian city of

Mecca. Muslims believe that in about 610, he began to receive revelations from Allah that were transmitted by the angel Gabriel. These revelations took place in the cities of Mecca and Madina over about a 22-year period. They were assembled in a book called the Quran (ku RAHN), sometimes spelled Koran. The Quran is the holy book of the Muslims, who believe it contains God's actual words. The Quran and the Sunna (SOON uh), the example of the words and practices of Muhammad, make up the foundation of Islamic law.

Islam is the world's second largest religion behind Christianity. Over 1.1 billion people follow Islam. Today Muslims live in every country of the world. ...

The central concept of Islam is tawhid (taw HEED), the oneness of God. For Muslims, there is one God who is the lord of the universe. People owe worship and obedience to God before any other thing. God is one, the creator, the all-knowing. In relations with humanity, God is the lawgiver, judge, and restorer of life after death. ...

Ethics and morals. Actions in Islam are judged on five values: (1) obligatory (required), (2) recommended, (3) neutral, (4) disapproved, and (5) forbidden. Most religious duties, such as the Five Pillars, are obligatory. Anyone who fails to perform them may be punished by God or the Islamic state. For example, in many Muslim countries, refusal to fast during Ramadan may result in fines or imprisonment. In some Muslim countries, special organizations ensure that people make their five daily prayers at the proper time and follow accepted standards of dress and behavior.

Most actions in Islamic law are not obligatory. People who fail to perform acts that are recommended or neutral are seldom punished. Most acts that are clearly forbidden are mentioned in the Quran. They include adultery, gambling, cheating, consuming pork or alcoholic beverages, and lending money at interest. The Quran details severe punishments for such crimes as murder, theft, and adultery. Crimes are punished harshly because they violate not only the rights of the victim, but also the commands of God. The Quran seeks to lessen the severity of these punishments, however, by urging Muslims to practice mercy and not to yield to revenge.

Islamic virtues. Islam teaches respect for parents, protection for orphans and widows, and charity to the poor. It also teaches the virtues of faith in God, kindness, honesty, hard work, honor, courage, cleanliness, and generosity. Heads of families must treat household members kindly and fairly. A wife has rights against her husband and may sue for divorce in cases of physical abuse, lack of financial support, or the inability to produce a child. Islam also teaches that a person must not refuse request for help, even if they seem unnecessary."

391. PA DOC prescriptive programs were designed with the specific intent of providing direction and guidance, in a comprehensive fashion, in each and every area of an inmate's life, and especially in areas of the inmates life where the inmate must modify his/her behavior in order to "reduce the likelihood of further criminal behavior and victimization upon release to the community." (Quoting Defendants' 09/19/06 response to Plaintiff's interrogatory number 2.)

392. In the year 1681 William Penn received a charter from the King of

England to establish Pennsylvania.

393. William Penn was/is known, by respected historians, to have been a member of The Religious Society of Friends."

394. Members of The Religious Society of Friends were commonly known as Quakers in 1681 and are commonly known as Quakers today.

395. Pennsylvania is commonly known as The Quaker State.

396. History indicates William Penn established Pennsylvania as a "religious experiment."

397. Quakers governed Pennsylvania from 1682 until 1756.

398. Quakers are Christians.

399. The Christian beliefs of 17th & 18th Centuries Quakers caused Quakers in the United States to reject the idea that capital punishment (except in cases of murder) and corporal punishment were unacceptable forms of punishment.

400. The Quakers who governed Pennsylvania during the 17th & 18 Centuries believed offenders could be reformed to accept Christian ethics and morals through hard labor and silent meditation.

401. The Quakers who governed Pennsylvania during the 17th & 18 Centuries developed and established the features of jails and workhouses that are considered by some authorities to be the first true penitentiaries.

402. The first system developed and established by the Quakers to reform criminals became, and is known today as, the Pennsylvania System.

403. The original plan of the Pennsylvania System was based upon the complete isolation of prisoners with work limited to crafts that were allowed to be done in one's cell.

404. By the mid-1820's Quakers in Albany, NY developed and established a different method for attempting to reform their prisoners.

405. The system developed and established by the Quakers at Albany in the 1820's is commonly known as the Albany System.

406. In the Albany system prisoners were permitted to work together in groups but were required to remain absolutely silent at work and in their small one-occupant cells.

407. Originally, in both the Pennsylvania and the Albany Systems, prison regulations forbade prisoners to communicate with each other.

408. Silent meditation is a form of worship that was practiced by 17th and 18th Century Quakers and is practiced today.

409. The Quakers used brutal force and strict disciplinary measures to

compel their prisoners to engage in silent meditation.

410. Quakers, as a Religious Group, do not have a written Creed.

411. Most prisons in the United States today follow a modified form of the Auburn System.

412. Pennsylvania's Super-Maxes and Long Term Segregation Units (LTSU) clearly represent slightly modified versions of the Quaker's Pennsylvania System.

413. Quakers developed and established the Pennsylvania and Auburn System with the specific intent of reforming prisoners by forcing them to become penitent and God-fearing people.

414. Quakers developed and established the Pennsylvania and Auburn Systems with the specific intent of reforming prisoners by imposing Quaker religious beliefs and practices (excluding the beliefs and practices of all other religious and non-religious philosophies) upon their prisoners.

415. It is a well known and accepted fact that the term "penitentiary" implies a place of isolated confinement wherein prisoners are exposed to harsh conditions intended to cause feelings of regret for some specific allegedly-condemnable act that the prisoner has allegedly committed.

416. Being housed in a penitentiary for a sufficient amount of time may cause a person who has not committed any crime to become penitent.

417. Religious books, such as the Holy Qur'an and the Holy Bible, are among the few items that prisoners in Pennsylvania's Super-Maxes and LTSU's are permitted to possess in their cells.

418. Defendants believe religious activities are a positive pursuit, which they support and encourage, since it may help the prisoner develop a more pro-social lifestyle upon release.

419. The 17th & 18th Century Quakers knew, and utilized the knowledge, that two inherent results of prolonged and unnatural isolation are inner-reflection and spiritual awakenings.

420. 21st Century penologist know, and utilize the knowledge, that two inherent results of prolonged and unnatural isolation are inner-reflection and spiritual awakenings.

421. The PA DOC's decision to make available programs which are clearly religious (such as Christian and Islamic worship services) to prisoners is an indication that PA DOC officials recognize and desire the rehabilitational benefits that flow from a prisoner's genuine spiritual awakening.

422. The objective of PA DOC prescriptive programs is to permanently replace a prisoners sinful behavior with saintly behavior.

423. A program, such as the PA DOC Personal Responsibility Program for

example, may truly be a non-religious program where and when those who are participating in the program are not living deprived lives as prisoners and, simultaneously, be an unquestionably religious program where and when those who are participating in the program are experiencing the spiritual awakening that is inherent in prolonged and unnatural isolation in a penitentiary, prison, correctional institution, mental hospital, jail, etc..

424. A program that non-prisoner participants view as non-religious may, simultaneously, be viewed by participants who are prisoners as being religious, due to the state of mind produced by prolonged and unnatural deprivations and isolation in prison, in the same way that a woman who looks disgusting and is ignored by men who are not prisoners is viewed as attractive and desirable to prisoners who have been confined for years.

425. Prisoners in the PA DOC are forced to exist in a deprived and unnatural environment.

426. PA DOC programs -- such as Violence Prevention, Citizenship, Batterers Intervention, Long Term Offenders, and Personal Responsibility -- present propaganda that extols PA DOC values of what is right and wrong in an attempt to change the prisoners' thinking in such a way that he/she acquires what the PA DOC believes to be the "values necessary to become productive law-abiding citizens." (Quote from PA DOC Mission Statement.)

427. PA DOC officials and staff have determined that Plaintiff should participate in the Violence Prevention, Citizenship, Batterers Intervention, Drug and Alcohol, Long Term Offenders and Personal Responsibility programs in order to absorb the values that may "reduce the likelihood of further criminal behavior and victimization upon release to the community." (Quoting Defendants' 09/19/06 response to Plaintiff's interrogatory number 2.)

428. Each and every one of the PA DOC's prescriptive programs presents the PA DOC's value judgments of what is right, and of what is wrong, for the specific purpose of indoctrinating prisoners.

429. Prisoners who reject, disagree with and/or refuse to accept being indoctrinated by the PA DOC are subjected to adverse consequences from the PA DOC.

430. All of the major religions of the World -- and especially Judaism, Christianity and Islam -- present value judgments, respectively, of what is right and of what is wrong; of what is sinful and of what is saintly, to believers who are willing to be indoctrinated by the religious group of their choice.

431. Judiasm, Christianity and Islam teach their adherents who reject, disagree with and/or refuse to accept the Faiths' indoctrination -- of what is right/wrong and saintly/sinful -- are promised and threatened with adverse consequences in actions taken by the congregation they belong to and from God, such as eternal damnation in the fires of Hell.

432. According to Malnak v. Yogi, 592 F.2d 197, 207 (3rd Cir. 1979), the proper standard of review for a court to use to determine whether or not the PA DOC's prescriptive programs constitute religion is to look "to the familiar

religions as models in order to ascertain, by comparison, whether the new set of ideas or beliefs is confronting the same concerns, or serving the same purpose, as unquestioned and accepted 'religions'."

433. According to Malnak, Id., "Under the modern view 'religion' is not confined to the relationship of man with his creator, either as a matter of law or as a matter of theology."

434. According to Malnak, Id. and Africa v. Commonwealth, 662 F.2d 1025 (3rd Cir. 1981), three useful indicia for determining whether or not teachings, a group of ideas, a set of values and/or PA DOC prescriptive programs constitute a religion are, specifically: (1) Do the PA DOC's prescriptive programs address fundamental questions such as what is right and wrong or good and evil?, (2) Are the PA DOC prescriptive programs comprehensive, having more than one isolated moral teaching?, and (3) Whether or not the PA DOC has external signs.

435. The name "Department of Corrections" (if I may borrow a phrase used by Defense Counsel) speaks for itself.

436. The dress and personal grooming codes that are enforced in and by the PA DOC produce external signs that are as distinctive and as easily identifiable as the external signs that are produced by the dress and personal grooming codes of well-known established and accepted religions.

437. Theistic religions and the PA DOC offer good results and rewards for good conduct and threaten, and impose, punishments for perceived bad conduct.

438. The forty-nine (49) verses from the Holy Qur'an, which are attached to Plaintiff's 08/02/06 Request for Judicial Notice as Attachments 3 & 4, clearly state the prohibition against Muslims accepting the teachings of non-Muslims on subjects which have been legislated by Allaah and/or by the Prophet Muhammad (peace and blessings be upon him).

439. Plaintiff has not been issued any misconduct report(s) for refusing to participate in PA DOC prescriptive programs.

440. The mere fact that Plaintiff is not participating in PA DOC prescriptive programs in no way poses or presents a genuine threat to the security of Defendants' prison.

441. The Establishment Clause of the First Amendment prohibits government from funding religious programs.

442. The prison itself (i.e., its stone, steel and other building materials) is maintained and utilized by the PA DOC to serve many of the same purposes as the stone, steel and other building materials of known religious monasteries.

443. The PA DOC imposes celibacy upon its prisoners that is identical to the celibacy that may be self-imposed by members of well-known religious groups.

444. The PA DOC has intentionally selected remote locations to construct

its prisons.

445. Prisons in remote locations isolate prisoners from society more effectively than prisons that are located in urban areas.

446. PA DOC prescriptive programs -- which were intentionally designed and implemented to impose fundamental values, in a comprehensive manner, upon prisoners who are forcefully isolated from society by remote locations, walls, fences, razor wire, guns, super-scientific electronic devices, etc. -- constitute a State-sponsored religion.

447. PA DOC prescriptive programs are funded by State and Federal tax dollars.

448. According to all of the World's major religions "unbelievers" are heathens who reject God's authority to determine how one should live his life.

449. One of Plaintiff's duties as a Chapel Clerk was to count the number of Muslims in SCI-Albion and then report the total to Imam Abdalla and/or to Defendant McQuown.

450. It is common knowledge, among the Imams employed by the PA DOC, that there are approximately ten thousand (10,000) people who claim they are Muslims in PA DOC custody (not including parolees).

451. The employment records and personal information which the PA DOC maintains on its past and current employees contains an indication of each employees' religious preference or Faith Group.

452. The employment records and personal information which the PA DOC maintains on its past and current employees indicates that none of the following employees identified themselves as Muslims: Joel Barrow, Lois Brown Velkoff, Melissa Cidade, Sara Crawford, Roxanne Dinesen, Elizabeth Eppley, Greg Gaertner, Rex Hildebrand, Barbara Hollinbaugh, Eric Johnson, John Johnson, Bob Wienckoski, Jim Rice, Dave Roberts, Geoff Lucas, Paul Thomas, Harvey Bell, Donna Giordano, Joan Mann, Rebecca Bollinger, and Amy Florence.

453. When Defendant Beard objected "to plaintiff's mischaracterization of the prescriptive programs" arguing that "the programs are not faith based" Defendant Beard means the programs were/are not based upon faith in the Creator and Owner of the universe and all that it contains. (Quote from Defendants' 09/19/06 response to Plaintiff's interrogatory number 11.)

454. The PA DOC's prescriptive programs are based upon faith in Joel Barrow, Lois Brown Velkoff, Melissa Cidade, Sara Crawford, Roxanne Dinesen, Elizabeth Eppley, Greg Gaertner, Rex Hildebrand, Barbara Hollinbaugh, Eric Johnson, John Johnson, Bob Wienckoski, Jim Rice, Dave Roberts, Geoff Lucas, Paul Thomas, Harvey Bell, Donna Giordano, Joan Mann, Rebecca Bollinger, and Amy Florence in the same way that the Quakers' programs are based upon their faith in the ideas, principles, morals and values promoted by George Fox.

455. The 23rd verse of Chapter 45 of the Holy Qur'an, as translated by

Muhammad M. Pickthal, presents the following:

> "Hast thou seen him who maketh his desires his god, and Allah sendeth him astray purposely, and sealeth up his hearing and his heart, and setteth on his sight a covering? Then who will lead him after Allah (hath condemned him)? Will ye not then heed?"

456. Plaintiff's claim that PA DOC prescriptive programs constitute a State-sponsored religion is a separate and distinct claim from Plaintiff's claim that he has a Constitutional Right to refuse to participate in so-called "secular" programs which are offensive to Plaintiff's religious beliefs.

457. The penitentiaries developed and established by Quakers, in the 17th & 18th Centuries were created as "religious experiments" on the subject of the reformation/rehabilitation of human morals.

458. The penitentiaries and correctional institutions throughout the world and the PA DOC's prescriptive programs are a continuation of the "religious experiment" with punishments, deprivations, isolation and moral teachings in an attempt to promote moral/religious reformation.

459. Prisoners in 17th & 18th Century prisons run by American Quakers were, without doubt, coerced to accept the teachings, values and morals of a State-sponsored religion.

460. Historians believe and report that a man named George Fox founded the Religious Society of Friends in England in 1652.

461. George Fox founded the Religious Society of Friends based upon his experiences, perceptions and personal opinions of what he believed to be wrong or right.

462. Defendants have reported that the following men and women founded certain PA DOC prescriptive programs based upon their experiences, perceptions and personal opinions of what they believed to be wrong or right: Joel Barrow, Lois Brown Velkoff, Melissa Cidade, Sara Crawford, Roxanne Dinesen, Elizabeth Eppley, Greg Gaertner, Rex Hildebrand, Barbara Hollinbaugh, Eric Johnson, John Johnson, Bob Wienckoski, Jim Rice, Dave Roberts, Geoff Lucas, Paul Thomas, Harvey Bell, Donna Giordano, Joan Mann, Rebecca Bollinger, and Amy Florence.

463. Prisoners were the only group of people in the United States in the 17th & 18th Centuries against whom Quakers used the power of the State, physical force and moral teachings in an attempt to force their prisoners to accept, and to adopt and practice, the moral teachings of George Fox.

464. Prisoners in PA DOC custody today are the only group of people in Pennsylvania against whom Defendants use the power of the State, physical force, threats, deprivations, isolation, psychological warfare tactics and moral teachings in an attempt to coerce their prisoners to accept, adopt and to practice the moral teachings of Joel Barrow, Lois Brown Velkoff, Melissa Cidade, Sara Crawford, Roxanne Dinesen, Elizabeth Eppley, Greg Gaertner, Rex Hildebrand, Barbara Hollinbaugh, Eric Johnson, John Johnson, Bob Wienckoski, Jim Rice, Dave Roberts, Geoff Lucas, Paul Thomas, Harvey Bell, Donna Giordano, Joan Mann, Rebecca Bollinger, and Amy Florence.

465. In these United States of America every citizen, including prisoners, have an absolute right to reject, and not comply with, the moral teachings of a State sponsored group.

466. In these United States of America States are prohibited from taking any types of adverse actions against citizens, including prisoners such as Plaintiff, if/when the citizen exercises the right to reject, and to not comply with, the moral teachings of a State-sponsored group.

467. The 81st and 82nd verses of Chapter 17 of the Holy Qur'an, as translated by Muhammad M. Pickthal, state:

> "Truth has come and falsehood hath vanished away. Lo! falsehood is ever bound to vanish. And We reveal of the Qur'an that which is a healing and a mercy for believers though it increases the evil-doers in naught save ruin."

468. The 18th verse of Chapter 21 of the Holy Qur'an, as translated by Muhammad M. Pickthal, states:

> "Nay, but We hurl true against the false, and it doth break its head and lo! it vanisheth. And yours will be woe for that which ye ascribe (unto Him)."

469. The Religion of al-Islam overpowers human beings with the force of truth and logical reasoning, not the sword.

470. The 256th and 257th verses of Chapter 2 of the Holy Qur'an, as translated by Muhammad M. Pickthal, states:

> "There is no compulsion in religion. The right direction is henceforth distinct from error. And he who rejects false deities and believeth in Allah hath grasped a firm handhold which will never break. Allah is Hearer, Knower. Allah is the Protecting Friend of those who believe. He bringeth them out of darkness into light. As for those who disbelieve, their patrons are false deities. They bring them out of light into darkness. Such are the rightful owners of the Fire. They will abide therein."

**October 1, 2006**

Leonard C. Jefferson

**Leonard C. Jefferson, CL-4135**
10745 Rt. 18
**Albion, PA 16475**

 F/B

STATE CORRECTIONAL INSTITUTION AT ALBION
JOB ASSIGNMENT NOTICE

NAME: Jefferson NUMBER: CL-4135

HAS BEEN ASSIGNED AS FOLLOWS: HOUR: ✓

JOB: Chap/Clerk RATE: .33 DAY:

STARTING DATE: 4/5/04 DAYS OFF:

REPORT TO: Chaplain McQuown, WHO IS YOUR SUPERVISOR,

ON OR BEFORE: 0800 THE STARTING DATE SHOWN ABOVE.

RELEASED FROM GLP PAYROLL

*****FAILURE TO REPORT WILL RESULT IN DISCIPLINARY ACTION.*****

APPROVED BY: C. Mitchell

**MS. C. MITCHELL**
**CORRECTIONS EMPLOYMENT AND**
**VOCATIONAL COORDINATOR**

****LISTED BELOW IS A JOB ORIENTATION ACKNOWLEDGEMENT FORM FOR JOB DUTIES AND SAFETY POLICIES. JOB SUPERVISOR SHOULD REVIEW JOB DESCRIPTION AND SAFETY POLICIES WITH THE ABOVE NAMED INMATE. BOTH THE WORK SUPERVISOR AND INMATE MUST SIGN AND RETURN THE ENTIRE FORM TO THE INMATE EMPLOYMENT OFFICE AS SOON AS POSSIBLE. THANK YOU FOR YOUR COOPERATION.

**ORIENTATION ACKNOWLEDGEMENT FORM**

I HAVE RECEIVED INSTRUCTIONS FOR JOB DUTIES AND SAFETY POLICIES FOR THE JOB ASSIGNMENT LISTED BELOW.

Chap. Clerk
JOB ASSIGNMENT

Leonard C. Jefferson
INMATE'S SIGNATURE – DATE

[signature] 4/05/04
SUPERVISOR'S SIGNATURE - DATE

EXHIBIT "J"

FORM **DC-141** **PART 1**
Rev 3/00

# COMMONWEALTH OF PENNSYLVANIA
# DEPARTMENT OF CORRECTIONS

**A** 453158

MISCONDUCT REPORT ☐ OTHER ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| | | | | | |

| Quarters | Place of Incident |
|---|---|
| | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**

**STAFF MEMBER'S VERSION**

**IMMEDIATE ACTION TAKEN AND REASON**

| PRE-HEARING CONFINEMENT | | |
|---|---|---|
| | IF YES | |
| ☐ YES ☐ NO | TIME | DATE |

**FORMS GIVEN TO INMATE**
☐ REQUEST FOR WITNESSES AND REPRESENTATION ☐ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY DATE | TIME 24 HOUR BASE |
|---|---|---|---|
| | | | |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER DATE | TIME | MISCONDUCT CATEGORY | | Signature of Person Serving Notice |
|---|---|---|---|---|
| | | ☐ CLASS 1 | ☐ CLASS 2 | |

**NOTICE TO INMATE**

**You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have will be removed.**

WHITE — **DC-15** YELLOW — **Inmate** PINK — **Reporting Staff Member** GOLDENROD — **Deputy Superintendent Facility Management**

*DC-ADM 801 Inmate Discipline Policy, Attachment B*

EXHIBIT "K"

THIS IS A PAGE OF THE TRANSCRIPT OF ANDREAU'S 11-16-93 PRELIMINARY HEARING TESTIMONY.

and I went over to another friend's house, and that's when she called the paramedics and the police.

Q Did the paramedics take you to the hospital?

A They took me to West Penn.

Q And how long were you in the hospital?

A They kept me overnight to monitor the baby.

Q And what injuries did you receive to your head?

A It was just a laceration, a cut. It didn't require any stitches, but they like shaved a little piece of my hair and cleaned it and patched it.

To my leg, it was just a major bruise, a cut.

Q Did you receive any stitches to your leg?

A I didn't receive any stitches.

Q What about your stomach or your abdomen area? Did you receive any injuries?

A No.

They kept me on ultrasound and a fetal monitor to monitor the baby just to make sure that there was no trauma to the baby.

EXHIBIT "L"

343

PRELIMINARY/DETENTION HEARING REPORT

[Paro]lee: Leonard C. Jefferson   Inst. No. Cranston Co Rhode Island 53801   Parole No. 4182Y

[Hea]ring Date/Place: December 13, 1993 – Allegheny County Prison. December 29, 1993 – witness testimony in Pittsburgh

[Ty]pe of Hearing: ( ) Preliminary ( ) Detention (✓) Probable Cause Hearing other

[P]arole Agent: John Mitchell (✓) Present ( ) Not Present

COUNSEL: (Name & Address) Glenn Steiner 1530 Penn Ave Pittsburgh Pa 15222   (✓) Public Defender ( ) Private

[W]itnesses Present: (Name & Address) – 12/29/93 – Evrolynne Redden 5334 Kincaid Street Pittsburgh Pa 15224

(✓) Oath administered to all witnesses who testified.

__ Waiver of Counsel   __ Request for continuance of hearing

__ Waiver of Preliminary __ Detention Hearing as cited in PBPP 340 dated ______.

[D]ate of Arrest 11-3-93   Date of Board Warrant 11-30-93

| [T]echnical Parole Violations | Pending Criminal Charges |
|---|---|
| | Aggravated Assault |

[S]TATE EVIDENCE

( ) Agent read the ( ) technical ( ) criminal charges as cited in PBPP 340 dated ______.

(✓) Agent testified from the PBPP 257A dated 12-7-93.

(✓) Other testimony: Agent Mitchell said the criminal charges were held for court

(✓) In support of the ( ) technical (✓) criminal charges the agent submitted:

| TPV/New Charge | Document | Date |
|---|---|---|
| Agg. Assault | Criminal complaint (5-3) | 10/26/93 |
| | Magistrate Docket | 11/10/93 |

[OB]JECTIONS/CROSS-EXAMINATION

( ) There were no objections or cross-examination by counsel.

( ) The attorney objected to:

| TPV/New Charge | Objection | Ruling |
|---|---|---|
| | | |

RECEIVED JAN 03 1995 Probation

EXHIBIT "M-1"

PETITIONER"S EXHIBIT

Significant cross-examination: The victim is a prosecutor Ascenla from South Carolina.

Agent Mitchell said Mr. Jefferson ...

On 12/29/93 — witness Evelynne Kedden said Andrea Wells provoked Mr. — She said Ms Wells wouldn't leave the apartment and slapped Mr Jefferson. A struggle occurred. Ms Wells beaten Mr Jefferson and he hit her with a bat.

DEFENSE EVIDENCE

(✓) Parolee was advised of his/her rights (new criminal charges only).
( ) Parolee admitted violating condition(s) ______
( ) Parolee denied violating condition(s) ______
( ) Parolee offered no testimony.
(✓) Parolee testified: Andrea Wells, the alleged victim came to his house and stayed there. He asked her to leave. She slapped him. She would not leave. Mr Jefferson tried to put her out. She physically resisted. He "tapped" her with a bat. Mr. Jefferson has called the police on her before. (Mr Jefferson was not present on 12/29/93)

FINDING

( ) Probable cause established on condition(s) ______
( ) Probable cause not established on condition(s) ______
(✓) Probable cause to detain established on new criminal charge(s) Aggravated Assault
( ) Probable cause to detain not established.

EVIDENCE RELIED UPON

( ) Parolee's admission to condition(s) ______
(✓) Parole Agent's testimony as to condition(s)/new charges Agg Assault
( ) Witness testimony as to condition(s)/new charges ______
(✓) Documentation as to condition(s)/new charges ✓
( ) Waiver of Preliminary/Detention Hearing.

DISPOSITIONAL INFORMATION

( ) Not applicable for Preliminary Hearing.
(✓) ~~Violation~~ Arrest Report dated 12-2-93 indicates overall adjustment is: generally good until arr.

Ms Kedden said Mr. Jefferson was a good father who was needed at home.

RECOMMENDATION

( ) Detain pending disp. of criminal charge(s).
( ) Schedule Violation Hearing.
( ) Schedule Panel Violation Hearing.
( ) Continue on parole to:

– Please send Rhode Island warrant

REASONS

( ) Arrest occurred within short time of releas[e]
(✓) TPV/New Charges serious (assaultive).
( ) Parolee considered a threat to community.
( ) Poor adjustment under supervision.
(✓) Probable cause established.
( ) Other:

HEARING EXAMINER: R S Thl

Date: 12/29/93

Sent to ~~Hearing Review~~ Mr Larsen 12/29/93

Sent to Hearing Examiner ______

HEARING MATERIAL CHECK FORM

✓ PBPP 257A dated: 12/2/93 (S-1)

✓ Waiver Form dated: 12/13/93

__ Continuances dated: ______

PBPP 257B dated: ______

PBPP 340 dated: 41824

Board Warrants dated: 11/30/93

__ Affidavits/Statements from: ______ PETITIONER"S ~~EXHIBIT~~

Criminal complaint / magistrate docket (S-2) EXHIBIT "M-2"

COMMENTS: Case held open for 30 days to allow for Mr. Jefferson to provide for a witness to give testimony ...

THE WESTERN PENNSYLVANIA HOSPITAL

OBSTETRIC TRIAGE RECORD

827635
WEBB, ANDREAU
10/22/55 F

| Admit Date 10/27/93 | Admit Time 2:45 am / pm |
|---|---|

Primary Complaint "hit in abd c bat"

Membranes are ☐ Intact ☐ Bulging ☐ Ruptured / / @ : am

| G 4 | T 2 | P 0 | A 1 | L 2 | LMP 6/23/93 | EDC 4/1/94 |
|---|---|---|---|---|---|---|
| AGE 38 | Ht 5'9" | Wt 159 | BP 171/63 | T 37 | P 75 | R |

Allergies: ☐ None ☐ Specify

Status

| I Admission | | | II Discharge |
|---|---|---|---|
| Date | Time | Status | Accompanied by: |

Fetal Evaluation
Fundal Height
FHR
Dilatation

Estimated weeks gestation
NST ☐ Reactive ☐ Non-reactive

Urine: Alb Glu
Lab Work

Contractions:

| DATE | TIME | NURSING DIAGNOSIS/FOCUS | NURSING PROGESS NOTES |
|---|---|---|---|

10/27/93 2^45 A Admitted to L&D 3 from ER [illegible] assault by boyfriend. Hit in abd, head [illegible] ... [illegible] ... Dr Breckbank [illegible] ... Dr Breckbank in to see pt [illegible] 3A
3^15 Head injury cleansed [illegible] ... [illegible] ... 3^30 Dr [illegible] called pt seen ... 3^45 Pt states she felt a pain occasionally ... no CTX noted on monitor [illegible] 4a

| DATE | TIME | PROGRESS NOTES |
|---|---|---|

10/27/93 0300

38 yo G4 P2012 c LMP 6/23/93, EDC 4/1/94, @ 18 weeks EGA c/o assault c bat by boyfriend. Hit her on top of head, lower abd, (R) flank, (L) leg. pt denies visual Δ, N/V. Reports some cramping q 20" for 2-3" since trauma. Denies LOF/ROM/vag bleeding. pt reports following assault, was dragged "down the stoop."
PE Tearful ♀, alert, oriented x3, pleasant
HEENT WNL x lacerations of scalp in midline. Ø gross evidence of fracture
neck Ø LAD COR - RRR Lungs CTA (B) Abd NABS, SOFT, NT/ND
(R) flank c superficial abrasions + tenderness
(L) leg c 2 regions ecchymosis c marked edema + tenderness

PAGE ELEVEN

EXHIBIT "N"

EXHIBIT "O" (3 PAGES)

**الأول** : انتخاب أحسن التراجم الموجودة لتكون منطلقا للعمل ومرجعا أساسيا للجهود التي ستبذل ثم مراجعة معانى القرآن التى اعتمدتها تلك الترجمة وتصحيح مايلاحظ عليها .

**الثانى** : القيام بترجمة مستقلة غير مقتبسة من ترجمات سابقة فتبين أن هذا الأمر يحتاج إلى وقت طويل وجهود يصعب أن تتوفر فى هذا الوقت .

ولهذا ترجح الأخذ بالأمر الأول لتلبية الحاجة الملحة فى الوقت الحاضر ورغبة فى تحقيق الهدف بأسرع مايمكن .... وقد تم بموجب ذلك اختيار ترجمة الأستاذ / عبدالله يوسف على لما تمتاز به من قوة الأسلوب وجزالة المعانى والشروح الكثيرة ثم شرعت اللجنة فى تنقيحها مستعينة بالعبارات المثلى من التراجم الأخرى إضافة إلى مارأت هى أن تعتمده من ألفاظ جديدة فى الأماكن التى رأت ضرورة تصحيحها مع عنايتها بتحقيق الملاحظات التى وردت إلى الرئاسة من الهيئات والجامعات والمهتمين بهذا الأمر .

وقد حول عمل تلك اللجنة إلى عدة جهات وأفراد للنظر فى عمل اللجنة الأولى واستدراك مالم تنتبه إليه وإبداء المرئيات حول مافات نظر اللجنة الأولى .... ثم عهد إلى لجنة ثالثة مهمة النظر فى آراء الجهات التى استشيرت بعمل اللجنة الأولى ومقارنة الآراء الواردة فى موضوع معين وتنسيق العمل المطلوب واستخلاص نص واحد معتمد وسليم من الملاحظات قدر المستطاع ... وبعد ذلك تولت لجنة رابعة النظر فيما توصلت إليه اللجنة الثالثة وتطبيقه على مرئيات اللجان السابقة وتثبيت الأصح وإقرار النص الإقرار النهائى إضافة إلى مراجعة الحواشى مراجعة دقيقة وتخليصها من بعض المآخذ المتعلقة بالعقيدة وبعض الآراء الفقهية والاتجاهات الفكرية المخالفة للصواب .

وحيث إن بعض الألفاظ باللغة العربية مثل الزكاة وغيرها لايمكن ترجمتها ترجمة تؤدى المعنى الصحيح فى الإسلام ... لهذا فضلت اللجان أن تبقى هذه الألفاظ كما هى فى اللغة العربية مكتوبة بالحروف اللاتينية وعملت قائمة لهذه الألفاظ التى استعملت فى الترجمة على هذا النحو يجدها القارئ بعد هذه المقدمة وكذلك سيجد القارئ الكريم قائمة تبين طريقة النطق الصوتى للحروف العربية ومايقابلها باللغة الأجنبية وقائمة بالكلمات المختصرة التى تكرر استخدامها، وفى نهاية الترجمة فهرس عام يشمل الأسماء والأماكن والموضوعات التى ورد ذكرها فى القرآن الكريم .

وحسب التوجيه السامى رقم ١٢٤١٢ المؤرخ فى ٢٧ / ١٠ /١٤٠٥هـ ، طبعت هذه الترجمة فى مجمّع الملك فهد لطباعة المصحف الشريف بالمدينة المنورة ، بالتنسيق مع الرئاسة العامة لإدارات البحوث العلمية والإفتاء والدعوة والإرشاد .

وانطلاقا من توجيهات خادم الحرمين الشريفين حفظه الله فى نشر كتاب الله وتوزيعه وترجمة معانيه إلى كل لغة ينطق بها المسلمون فى الأصقاع .... وبناء على التعاون القائم بين الأمانة العامة لمجمع الملك فهد لطباعة المصحف الشريف والرئاسة العامة لإدارات البحوث العلمية والإفتاء والدعوة والإرشاد فى سبيل ترجمة معانى القرآن الكريم ترجمة علمية أمينة ودقيقة .

يسرنا أن نقدم لجميع المسلمين والباحثين عن النور ممن يتكلمون باللسان الإنجليزى هذه الترجمة التى تأتى ضمن سلسلة تراجم تفسير معانى القرآن الكريم إلى اللغات المختلفة التى تم طباعتها فى المجمع بالمدينة المنورة ... داعين الله أن يجزل المثوبة لمن كان وراء هذا العمل المبارك .

**الرئاسة العامة**

**لإدارات البحوث العلمية والإفتاء والدعوة والإرشاد**



بِسْمِ اللَّهِ الرَّحْمَٰنِ الرَّحِيمِ

**PREFACE**

Praise be to Allah, the Cherisher and Sustainer of the worlds, Who has said in His Noble Book:

> There has come to you from Allah
> Light and a Perspicuous Book. (1)

And may peace and blessings be upon the Seal of the Prophets, Muḥammad, who has said that:

> The best among you is he who learned
> the Qur-ān and then taught it. (2)

May the peace and blessings of Allah be upon him, his family and all his Companions.

The Glorious Qur-ān is the Book of Allah, the Wise and Worthy of all Praise, Who has promised to safeguard it from any violations in its purity. It becomes incumbent upon each and every person who seeks the dignity of this world and the bliss of the Hereafter to regulate his life according to it, to implement its commandments and to pay homage to the magnificence of the One Who revealed it. This can be an easy task for those favoured with guidance from Allah, especially those blessed by an understanding of Arabic, the language of the divine communication. But for those not acquainted with Arabic, their ignorance is a barrier between them and this source of guidance and illumination. A translation of the message of Allah is thus a task not to be taken lightly or performed superficially.

Before the reader begins to study the Qur-ān, he must realise that unlike all other writings, this is a unique book with a supreme author, an eternal message and a universal relevance. Its contents are not confined to a particular theme or style, but contain the foundations for an entire system of life, covering a whole spectrum of issues, which range from specific articles of faith and commandments to general moral teachings, rights and obligations, crime and punishment, personal and public law, and a host of other private and social concerns. These issues are discussed in a variety of ways, such as direct stipulations, reminders of Allah's favours on His creation, admonitions and rebukes. Stories of past communities are narrated, followed by the lessons to be learned from their actions and subsequent fates.

The Qur-ān enjoys a number of characteristics unique to it alone, some of which are as follows:

(1) Sūrat Al-Ma'ida: 15. (2) Narrated by the six ones except Muslim.

(To your aid) whomsoever ye can
Other than Allah, if ye speak
The truth. (9)

And again:

Or do they say: he forged it?
Say: Bring then a chapter like
Unto it and call (to your aid)
Anyone ye can besides Allah,
If it be ye speak the truth. (10)

6. It has been revealed to re-establish the sincere worship of Allah alone, without association of any partners with Him.

This is a Book with verses basic or
Fundamental (of established meaning),
Further explained in detail,–
From One who is Wise and Well-Aware.
(It teaches) that you should worship
None but Allah. (11)

And they have been commanded no more
Than this: to worship Allah,
Offering Him sincere devotion, being true
In faith, to establish regular prayer
And to give Zakat, and that is
The religion Right and Straight. (12)

7. It contains a complete code which provides for all areas of life, whether spiritual, intellectual, political, social or economic. It is a code which has no boundaries of time, place or nation.

Verily this Qur-ān doth guide
To that which is most right. (13)

8. Allah Almighty has taken upon Himself the duty of preserving the Qur-ān for ever in its entirety, as He says:

We have without doubt sent down
The Message, and We will assuredly
Guard it (from corruption). (14)

So well has it been preserved, both in memory and in writing, that the Arabic text we have today is identical to the text as it was revealed to the Prophet. Not even a single letter has yielded to corruption during the passage of the centuries. And so it will remain for ever, by the consent of Allah.

Given the depth as well as the sublimity of the Qur-ānic text, a faithful

(9) Sūrat Hūd: 13.
(10) Sūrat Yūnus: 38.
(11) Sūrat Hūd: 1-2.
(12) Sūrat Al-Bayyina: 5.
(13) Sūrat Al-Isrāa: 9.
(14) Sūrat Al-Ḥijr: 9.



1. It is the actual Word of Allah; not created but revealed for the benefit of all mankind.

Blessed is He Who sent down the Criterion
To His servant, that it may be
An admonition to all creatures. (3)

2. It is complete and comprehensive. The Almighty says:

Nothing have We omitted from the Book. (4)

In another place we read,

And We have sent down to thee
The Book explaining all things. (5)

3. It is a theoretical and a practical Book, not only moralising but also defining specifically the permissible and the forbidden. The importance of understanding the message of the Qur-ān is undeniable, but simply reciting it with the intention of seeking Allah's pleasure and reward is also an act of worship and meritorious in itself. Allah Almighty says:

So take what the Prophet gives you
And refrain from what he prohibits you. (6)

4. Allah has perfected His religion for all mankind with the revelation of this Book. He says:

This day have I perfected your religion for you,
Completed my favour upon you and have chosen
For you Islam as your religion. (7)

5. It is Allah's eternal miracle revealed to the Prophet Muḥammad for all succeeding generations. In response to those who doubt the authorship of the Qur-ān, Allah Almighty has challenged the most articulate Arabs to produce a whole book, ten chapters or even one solitary chapter which can be remotely comparable to the Qur-ān. But to this day, no one has succeeded in meeting the challenge of the Almighty. The critics of the Qur-ān have been struck dumb by its ineffable eloquence and surpassing beauty.

Say, if the whole of mankind and jinns
Were to gather together to produce the
Like of this Qur-ān, they could not
Produce the like thereof; even if they
Backed up each other with help and support. (8)

The Almighty also says:

Or they may say: he forged it.
Say: Bring ye then ten chapters
Forged, like unto it and call

(3) Sūrat Al-Furqān: 1.
(4) Sūrat Al-An'am: 38.
(5) Sūrat An-Naḥl: 89.
(6) Sūrat Al-Ḥashr: 7.
(7) Sūrat Al-Ma'ida: 3.
(8) Sūrat Al-Isrāa: 88.

translation of it into another language is virtually impossible. The various translations that exist today, however accurate they may be, cannot be designated as the Qur-ān, since they can never hope to imitate the diction or the style of the Book of Allah. But as translation is one of the few ways to export the message of the Qur-ān to allow those lacking in knowledge of Arabic to share this priceless gift, it becomes a duty for those in a position to fulfil this task.

A number of individuals have in the past ventured to translate the Qur-ān, but their works have generally been private attempts, greatly influenced by their own prejudices. In order to produce a reliable translation free from personal bias, a Royal decree (No. 19888, dated 16/8/1400 AH) was issued by the Custodian of the Two Holy Mosques, King Fahd ibn Abdul Aziz, at that time the deputy prime minister , authorising the General Presidency of the Departments of Islamic Researches, Ifta, Call and Guidance to undertake the responsibility of revising and correcting a particular translation which would be selected for this purpose and made publicly available later.

To accomplish this enormous task, a number of committees were formed, comprising scholars well-qualified both in Islamic Shari'a and the English language. Some of these scholars were associated with the General Presidency of the Departments of Islamic Researches, Ifta, Call and Guidance.

The first committee was given the task of examining the existing translations and choosing the most suitable one from among them. The committee discovered that there was no translation free from defects and so there were two options open for consideration: the first was to select the best translation available and then adopt it as a base for further work as well as a source of reference, with the objective of revising its contents and correcting any faults in view of the objections raised against it; the second was to prepare a fresh and independent translation, starting from scratch.

It became obvious from studying these translations that the second option demanded much time and effort, neither of which were available at the time.

The first option was therefore considered to be more practical, since it met the existing urgent requirements and helped to achieve the desired goal in a comparatively short period of time. The translation by the late Ustadh ABDULLAH YUSUF ALI was consequently chosen for its distinguishing characteristics, such as a highly elegant style, a choice of words close to the meaning of the original text, accompanied by scholarly notes and commentaries.

The committee began revising and correcting this translation with the aid of other translations available, by comparing and then adopting best expressions as well as by introducing fresh expressions where necessary. The committee was fully aware of all the criticisms that had been directed against this translation and which had been carefully brought to the notice of the presidency by a num-



ber of academic bodies and other involved parties. In the second stage, the entire work of this committee was referred to a number of individuals and organisations who then augmented any deficiencies in the work of the committee.

A third committee was set up to collate all their suggestions. It then compared all such views regarding specific issues, selected the appropriate one (s) and arrived at a text as authentic and defect-free as was humanly possible.

Finally, a fourth committee was formed to look into the findings of the second and third committees and to implement the recommendations made by them. Furthermore, this committee had to finalise the text by adopting the most accurate expression where needed, besides checking the notes vigilantly so as to clear any misconceptions regarding the articles of faith, varying juristic opinions and thoughts not in conformity with the sound Islamic point of view.

In the course of its work, the committee came across some Arabic words which could not be translated correctly, such as Zakat and Ṭaġūt. It was therefore decided to give a transliteration of these words in English with a brief explanatory note for each one at its first occurrence in the text. The reader will find a list of such words at the end of this preface, as well as a list containing an English transliteration of Arabic letters. A list of the abbreviations used in this work is also provided. Finally, the reader will find at the end of the text a comprehensive list containing references to proper names of people, places and important topics, dealt with either in the text or in the accompanying notes.

According to the Royal decree (No. 12412, dated 27/10/1405 AH), this translation is printed at King Fahd Holy Qur-an Printing Complex in Al-Madinah Al-Munawarah and also with coordination of the General Presidency of the Departments of Islamic Researches, Ifta Call and Guidance.

To implement the directions of the Custodian of the Two Holy Mosques (May Allah preserve him) concerning the Propagation of the Book of Allah, its distribution and translation into every language spoken by Muslims the worldwide, and due to the cooperation between the General Secretariat of King Fahd Holy Qur-ān Printing Complex and the Presidency of Islamic Researches, Ifta, Call and Guidance regarding a faithful, specific and scholarly translation of the meanings of the Holy Qur-ān, we are pleased to present to all Muslims and those seeking spiritual light among English - speaking people this translation which comes as one of the Series of the translations of the meanings of the Holy Qur-ān into various languages printed by the Complex in Al-Madinah Al-Munawarah .

May Allah reward bounteously those who were behind this blessed work.

**THE PRESIDENCY OF ISLAMIC RESEARCHES, IFTA,**
**CALL AND GUIDANCE**