# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LEONARD C. JEFFERSON,
    Plaintiff,

v.                             C.A. NO. 04-44 ERIE

WILLIAM WOLFE et al.,
    Defendants

### PLAINTIFF'S REQUEST FOR ADMISSIONS FROM DEFENDANT MCQUOWN

AND NOW comes plaintiff LEONARD C. JEFFERSON, pursuant to Fed.R.Civ.P. Rule 36, and asks the above-named defendant to either admit or deny the truth of each of the following statements under oath within thirty (30) days of service of this request:

1. Michael Anderson, an African-American, was acting in the capacity of a chaplain for inmates who follow the teachings of the Nation of Islam on 10/24/02.

2. Barbara Brannon, a Caucasian, was acting in the capacity of a secretary in the Chapel Office on 10/24/02.

3. Plaintiff was employed in the capacity of an inmate Chapel Clerk throughout the entire month of October, 2002.

4. Plaintiff's immediate supervisor during October, 2002 was Imam Alhafiz Abdalla.

5. In October 2002 Imam Abdalla was employed in the capacity of a chaplain for inmates who adhere to Sunni Islamic Traditions.

6. At certain times during the afternoon of 10/24/02 Mr. Anderson, Ms. Brannon and Plaintiff were all present, simultaneously, within six (6) feet of Ms. Brannon's desk.

7. Mr. Anderson and Plaintiff were in an adjoining office prior to the first time both approached Ms. Brannon's desk that afternoon.

8. Mr. Anderson was talking on the telephone during the time when Plaintiff was in the adjoining office with him.

9. Inmate Wayne Bair, III, CQ-0475, worked in the capacity of a Chapel Clerk for Mr. Anderson during October 2002.

10. At sometime around 1:10 or 1:15 PM on 10/24/02 Inmate Bair entered the office where Plaintiff was sitting and Mr. Anderson was talking on the telephone.

11. Inmate Bair informed Mr. Anderson that his presence was required in

the Multi-purpose Room to begin the (Nation of Islam) services.

12. While exiting the office, Mr. Anderson asked Plaintiff to allow him to make a photocopy of a photocopied newspaper article that Plaintiff had in his possession.

13. Plaintiff complied with Mr. Anderson's request and handed the article to Mr. Anderson while they were walking out of the office.

14. The headline on the article stated: "Pa. imprisons blacks at highest rate: Study by reform group finds it's 14 times that of whites."

15. Said article was written by Post-Gazette Harrisburg correspondent John M. R. Bull.

16. The article appeared in print in the Pittsburgh Post-Gazette in July of 200~~2~~1.(2001)

17. Ms. Brannon's desk sat directly, and less than six (6) feet, in front of the office door which Mr. Anderson, Plaintiff and inmate Bair exited.

18. As Mr. Anderson was passing the desk he handed the article to Ms. Brannon and asked her to make one (1) copy of the article for him and to return the original to Plaintiff.

19. Mr. Anderson was not aware that there was anything on the backside of the piece of paper that he handed to Ms. Brannon.

20. Ms. Brannon nodded, indicating she would do as Mr. Anderson asked.

21. Mr. Anderson and inmate Bair kept walking until they entered the Multi-purpose Room and Plaintiff kept walking until he entered the Chapel sanctuary.

22. At sometime between 1:15 and 2:30 Ms. Brannon went to another office, to use the photocopier, to make the copy for Mr. Anderson.

23. Ms. Brannon copied both sides of Plaintiff's original.

24. Ms. Brannon read the poetry that was typed on the backside of Plaintiff's original copy of the article.

25. Ms. Brannon made an unknown number of additional two-sided copies of Plaintiff's original.

26. At sometime around 2:30 when Mr. Anderson and Plaintiff were both within six (6) feet of her desk, Ms. Brannon handed the original and one copy to Ms. Anderson.

27. Ms. Brannon did not utter a single word to anyone as she extended her arm to hand Mr. Anderson the two sheets of paper.

28. Mr. Anderson thanked Ms. Brannon while receiving the two sheets of paper in his hand.

29. Immediately upon receiving the papers from Ms. Brannon Mr. Anderson handed one of the papers to Plaintiff.

30. While extending his arm to hand Plaintiff the original Mr. Anderson noticed there was something typed on the back side of the articles.

31. Mr. Anderson immediately read the typewritten poems that were on the backside of the article while standing near the desk.

32. Mr. Anderson interrupted his initial reading of the poetry to make the comment (to Ms. Brannon, to Plaintiff, or maybe to himself) that "this is some smoking poetry here!"

33. Upon completing his reading of the poetry Mr. Anderson stated, as a question, "You know, I distribute things?"

34. Plaintiff responded by asking Mr. Anderson to go in the Chapel sanctuary to continue the conversation and Mr. Anderson complied.

35. In the sanctuary Plaintiff informed Mr. Anderson he was free to do as he pleased with the article but he did not have Plaintiff's permission to distribute the poems.

36. At some time after making the copies Ms. Brannon caused copies of the two-sided original to reach various program directors, superintendents and departments heads at SCI-Albion including Defendant McQuown.

37. Subparagraph 14 of Section B (Specific Rules and Regulations) of the PA DOC CODE OF ETHICS, (DC-174) was in full effect on 10/24/02.

38. Defendant McQuown knew, on 10/24/02, that subparagraph 14 of Section B of DC-174 required all employees of the PA DOC to "Promptly report to their supervisors any information which comes to their attention and indicates violation of law, rules and/or regulations of the Department of Corrections by either an employee or an inmate, and will maintain reasonable familiarity with the provisions of such directives."

39. Defendant McQuown knew, on 10/24/02 that subparagaph 22 of Section B of DC-174 required all employees to "submit any necessary and/or requested work elated reports in a timely manner in accordance with existing regulations."

40. Defendant McQuown knew, on 10/24/02, that subparagaph 22 of Section B of DC-174 required that "Reports submitted by employees shall be truthful and no employee shall knowingly enter or cause to be entered any inaccurate, false, or improper information or data, or misrepresentation of the facts in any record or report."

41. The terms of DC-801, INMATE DISCIPLINE, were in full effect on 10/24/02.

42. Plaintiff remained employed as a Chapel Clerk between 10/24/02, the day when Ms. Brannon copied the poetry, and 11/13/02, the day the Support Team

Meeting (Staffing) was conducted.

43. Plaintiff reported to work and performed his assigned duties without incident on each of the 13 working days between 10/24/02 and 11/13/02.

44. Plaintiff's immediate supervisor, Imam Abdalla, did not write an Unusual Occurrence Report, or any other type of report, on 10/24/02 about Plaintiff and/or his poetry.

45. Ms. Brannon gave Defendant McQuown one of the two-sided copies on 10/24/02.

46. Defendants Gamble, McQuown, and Snyder were the three prison officials who sat as Support Team Members at the Staffing for Plaintiff on 11/13/02.

47. During the Staffing Defendants Gamble, Snyder and McQuown each questioned Plaintiff about the poems at issue.

48. Plaintiff informed the Support Teams Members that the First Amendment of the U.S. Constitution gave him the right to write poetry.

49. During the Staffing Defendant McQuown told Plaintiff that the First Amendment did not give Plaintiff the right to yell "fire" in a movie theatre.

50. Plaintiff's response to Defendant McQuown indicated that the First Amendment does indeed give one the right to yell "fire" in a movie theatre if/when the theatre is, in fact, burning.

51. The SCI-ALBION JOB ASSIGNMENT NOTICE, that is attached to Plaintiff's Third Amendment Complaint (Doc. # 39) as Exhibit "A" is a genuine copy of said document.

52. The "Form DC-135A Inmate's Request To A Staff Member" that is attached to Doc. # 39 as Exhibit "B" is a genuine copy of said document.

53. Between 10/30/00 and 11/13/02 Plaintiff's rate of pay, as a Chapel Clerk, was 42¢ per hour and/or $2.52 per six hour day.

54. The SCI-ALBION JOB ASSIGNMENT NOTICE, Exhibit "A" of Doc. #39, indicates Plaintiff had been "released from Chapel Payroll," as of 11/14/02.

55. Records in SCI-Albion's Business Office indicate Plaintiff was paid $55.65 for the pay period between 08/04/02 and 09/07/02.

56. Records in SCI-Albion's Business Office indicate Plaintiff was paid $52.08 for the pay period between 09/08/02 and 10/05/02.

57. Records in SCI-Albion's Business Office indicate Plaintiff was paid $47.04 for the pay period between 10/06/02 and 11/02/02.

58. Records in SCI-Albion's Business Office indicate Plaintiff was paid $1.44 for the pay period between 10/20/02 and 11/16/02.

59. Records in SCI-Albion's Business Office indicate Plaintiff was paid

$17.64 for the pay period between 11/03/02 and 12/07/02.

60. Records in SCI-Albion's Business Office indicate Plaintiff was paid $16.59 for the pay period between 11/17/02 and 12/21/02.

61. Records in SCI-Albion's Business Office indicate Plaintiff was paid $12.96 for the pay period between 12/22/02 and 1/18/03.

62. The SCI-ALBION JOB ASSIGNMENT NOTICE, Exhibit "A" of Doc. # 39, indicates Plaintiff "has been assigned as follows: Job GLP, Rate 72¢ [per] day" as of 11/14/02.

63. On 11/18/02 Defendant McQuown indicated, by writing on Exhibit "B" of Doc. # 39, that his "reasons and justification for [his] decision and actions to remove [Plaintiff] from [his] job" ... were "Your poems which you stated you intended for all."

64. On 11/18/02 defendant McQuown indicated, by writing on Exhibit "B" of Doc. # 39, that he "found this to be a threat to the orderly running of the institution. It is inflammatory & disruptive."

65. Plaintiff's duties as an Islamic Chapel Clerk included maintaining attendance records for all Islamic activities at SCI-Albion and teaching other inmates how to read and write Arabic.

66. DOC policy required that Plaintiff be certified as an "Inmate Peer Leader" before Plaintiff would be allowed to give instructions to other inmates.

67. The statue of "Inmate Peer Leader" is the highest, most honorable, and trustworthy level that an inmate can attain in the Chaplaincy Department at SCI-Albion.

68. A Support Team Meeting was conducted by Defendant McQuown and others during the summer months of 2002 whereat the Support Team Members elevated Plaintiff to "Inmate Peer Leader" status.

69. Chapel Clerks are confined to the Chapel Area every morning and afternoon and evening while they are on the job.

70. Officials at SCI-Albion maintain records on the numbers of inmates that attend each session of Yard Out.

71. SCI-Albion's records indicate a larger number on inmates actually attended the morning and afternoon sessions of the Yard in November 2002 than attended the morning and afternoon activities in the Chapel Area.

72. The authorized work areas for Chapel Clerks at SCI-Albion is limited to: (1) the Chapel Offices, (2) The Religious Service Area, i.e. the sanctuary, (3) the Multi-purpose Room in the Education Lobby, and (the Education Lobby Area.

73. The initial decision to reassign Plaintiff from the Chapel to GLP was made at some point prior to the Staffing on 11/13/02.

74. The initial decision to reassign Plaintiff from the Chapel to GLP was made by someone other than the members of the 11/13/02 Support Team.

75. Defendant McQuown (after a full assessment of the situation) on 10/24/02 believed there was no need to take any action against Plaintiff and, thus, he took none.

76. Defendant McQuown (after a full assessment of the situation) on 10/24/02 deemed the poems to be Ebonic echoes of the unpleasant reality which John M. R. Bull focused public attention upon with his article.

77. Defendant McQuown (after a full assessment of the situation) on 10/24/02 believed the events surrounding the request for Ms. Brannon to make one copy of the article were insignificant.

78. Defendant McQuown (after a full assessment of the situation) on 10/24/02 believed the events surrounding the poetry did not warrant writing a DC-121 Part 3 Unusual Occurrence Report.

79. Defendant McQuown, on 10/24/02, would have written a DC-121 Part 3 as required by PA DOC policy (whenever an employee perceives _possible_: (a) violations of law, (b) violations of institutional rules and regulations, and (c) threats to the security and/or orderly running of the institution) in the event he believed there was a need for write a report about the events of 10/24/02.

80. Defendant McQuown was pressured by others, who were embarrassed by and/or annoyed with the poetry, to write/file a DC-121 Part 3 on 10/28/02.

81. Defendant McQuown did not speak to Mr. Anderson, about the events of 10/24/02, prior to writing the DC-121 Part 3 on 10/28/02.

82. Defendant McQuown did not speak to Mr. Anderson prior to writing the 10/28/02 DC-121 because he (McQuown) viewed the events surrounding the poetry as being a non-incident, a mole hill which others were viewed as an erupting volcano.

83. Notwithstanding Defendant McQuown's statement: "Minister Anderson requested clerk Brannon make a copy of the attached document." the document attached to his 10/28/02 DC-121 is not a true copy of the original copies made by Ms. Brannon; it is an edited, altered and incomplete copy of the original.

84. The copy attached to the DC-121 is edited, altered and incomplete due to the obvious fact that (a) the portion of the headline which has been left intact is unreadable, and (b) the graph on its right side has been all but eliminated and is, thus, incomprehensible.

85. The copy of the article and poems attached to this Request For Admissions is a genuine, full-size, copy of the document copied by Ms. Brannon on 10/24/02.

86. The removal of the headline and graph from the article causes the document (which is attached to DEFENDANTS' AMENDED RESPONSE TO PLAINTIFF'S INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS, and in the DOC's files) to be unacceptable pursuant to the terms of subparagraph 22 of Section B of DC-174 which states, in pertinent part: "...and no employee shall knowingly enter or cause to be entered any inaccurate, false, or improper information or data, or misrepresentation of facts in any Department record or report."

87. The views expressed in Plaintiff's poems caused prison officials to deem Plaintiff to be (as Supt. Wolfe asserts in Exhibit "E" of Plaintiff's Third Amendment Complaint, Doc. # 39) inappropriate for the Clerk's position in the Chapel.

88. The PA DOC took custody of Plaintiff in July of 1994.

89. Plaintiff's employment record for the period between his commitment to DOC custody and the 11/13/02 Staffing is as follows:

| DATES | SUPERVISORS | JOB DESCRIPTION | TERMINATED FOR |
|---|---|---|---|
| 03/20/95 - 04/08/96 | Davis, Crosby | Floor Crew | New Assignment |
| 04/08/96 - 07/15/98 | Meyerhoff | Stained Glass | Sent to new jail |
| 12/03/98 - 07/15/99 | Hewett | Sign Shop | Sent to new jail |
| 10/30/00 - 11/13/02 | Abdalla | Chapel Clerk | Poems at issue |

90. Not one of the supervisors name above caused any negative comments about Plaintiff's conduct or performance on the job to be present in the permanent file that the PA DOC maintains on Plaintiff.

91. Plaintiff has never received anything less than "above-average" and "excellent" ratings on work evaluations at the above-mentioned jobs.

92. Plaintiff has maintained "above-average" and "excellent" ratings on every Housing Unit Report that has been made on Plaintiff in general population from 07/94 to 10/24/02.

93. Reports, evaluations and notes in PA DOC files on Plaintiff indicate Plaintiff maintained a uniform excellence of conduct and character from his first day in PA DOC custody until 10/24/02, the day prison officials discovered Plaintiff's poems.

94. Prison officials were embarrassed/annoyed, by the views expressed in the poems, to the point of taking improper actions against Plaintiff.

95. When an artist makes the statement that a piece of his/her work is intended for "everybody" or "all" a rational thinking person of normal intelligence would not interpret that artist's statement in a way that would indicate some intent of the artist to provide "everybody" or "all" with an individual copy of the artwork.

96. Mr. Anderson has an established practice of distributing written materials to prisoners confined in the RHUs of the prisons where he works.

97. The SCI-ALBION JOB ASSIGNMENT NOTICE, dated 04/05/04 and attached herein as Exhibit "J", is a genuine copy of said document.

98. Exhibit "J" indicates that, as of 04/05/04, Plaintiff was: (1) released from GLP payroll, (2) "assigned as follows: Job: Chapel/Clerk, rate: .33 [per] hour," (3) instructed to "report to Chaplain McQuown, who is your supervisor, on or before: 0800 the starting date shown above."

99. On 05/12/04 Plaintiff was performing his Chapel Clerk duties from around 0800 until he was escorted to RHU and placed on AC Status Pre-hearing confinement around 1100 hours that morning.

100. Defendant McQuown was Imam Abdalla's immediate supervisor at all times relevant to these matters.

101. On 04/05/04 neither Defendant McQuown nor Imam Abdalla expressed any concern that Plaintiff might have been inappropriate for the Chapel Clerk job.

102. There were no incidents or unusual occurrences reported in the Education Building between 1000 and 1100 hours on 05/12/04 other than the incident which is alleged on DC-141 Part 1 No. A453158 which is attached hereto as Exhibit "L".

103. The three sheets attached herein as Exhibit "K" are true copies of the Preface of the King Fahd translation of the Holy Qur'an. (Note: Imam Abdalla has copies of said Qur'an at SCI-Albion.)

104. The underlined sentences near the middle of page number "iii" of Exhibit "K" indicate: "It becomes incumbent upon each and every person who seeks the dignity of this world and the bliss of the Hereafter to regulate his life according to it [the Qur'an], to implement its commandments and to pay homage to the magnificence of the One Who revealed it."

105. The underlined sentences near the middle of page "iii" of Exhibit "K" indicate [the Qur'an's] contents are not confined to a particular theme or style, but contain the foundation for an entire system of life, covering a whole spectrum of issues, which range from specific articles of faith and commandments to general moral teachings, rights and obligations, crime and punishment, personal and public law, and a host of other private and social concerns. (Emphasis added).

106. Paragraph number 7 on page number "v" of Exhibit "K" indicates; [The Qur'an] contains a complete code which provides for all areas of life, whether spiritual, intellectual, political, social or economic. It is a code which has no boundaries of time, place or nation. Verily this Qur'an doth guide to that which is most right." (Emphasis added).

107. All of the major religions of the World -- and especially Judiasm, Christianity and Islam -- present value judgments, respectively, of what is right and of what is wrong; of what is sinful and of what is saintly, to adherents who are willing to be indoctrinated by the belief systems of their choice.

108. Judaism, Christianity and Islam, respectively, teach Jews, Christians and Muslims who refuse to accept their Faith's dogma -- of what is right/wrong and saintly/sinful -- that they should look forward to adverse consequences in actions taken against them by the congregation they belong to and from their God in the Hereafter, such as eternal damnation in the Fires of Hell.

109. According to the above-mentioned major religions, "unbelievers" are heathens who have rejected and continue to reject God's authority to determine the best way for humans to conduct their affairs in this world.

110. The 23rd verse of Chapter 45 of the Holy Qur'an, as translated by Yusuf Ali states: "Then seest thou such a one [who rejects what God has revealed through His Prophets] as takes as his god his own vain desire? Allah has, knowing (him as such) left him astray, and sealed his hearing and his heart (and understanding), and put a cover on his sight. Who, then, will guide him after Allah (has withdrawn guidance)? Will ye not then receive admonition?"

111. The concept of worship in the three above-mentioned major religions includes, if not mandates, the worshippers' obedience to the edicts of God; in the same way that one who has taken his/herself as his/her god (and thus worships his/herself or other humans) is obedient to the commands of his/her human idol.

112. Historians believe and report that a man named George Fox founded the Religious Society of Friends in England in 1652.

113. George Fox founded the Religious Society of Friends based upon his experiences, perceptions and personal opinions of what he believed to be wrong and/or right with the Christians in England.

114. Defendant McQuown is not aware of a single incident wherein Plaintiff expressed any racial hatred or animosity toward any person in the R.S.A..

115. Defendant McQuown is well aware of the fact that Plaintiff always maintained a pleasant and dignified relationship with all of the employees in the Chapel Area; inmates and staff, Black and White.

October 29, 2006

*Leonard C. Jefferson*
Leonard C. Jefferson, CL-4135
10745 Rt. 18
Albion, PA 16475-0002

# STATE CORRECTIONAL INSTITUTION AT ALBION
## JOB ASSIGNMENT NOTICE

NAME: _Jefferson_   NUMBER: _CL- 4135_

HAS BEEN ASSIGNED AS FOLLOWS:   HOUR: _/_

JOB: _Chap/Clerk_   RATE: _.33_   DAY: _____

STARTING DATE: _4/5/04_   DAYS OFF: _____

REPORT TO: _Chaplain McQuown_, WHO IS YOUR SUPERVISOR,

ON OR BEFORE: _0800_ THE STARTING DATE SHOWN ABOVE.

RELEASED FROM _GLP_ PAYROLL

***FAILURE TO REPORT WILL RESULT IN DISCIPLINARY ACTION.***

APPROVED BY: _C. Mitchell_

**MS. C. MITCHELL
CORRECTIONS EMPLOYMENT AND
VOCATIONAL COORDINATOR**

****LISTED BELOW IS A JOB ORIENTATION ACKNOWLEDGEMENT FORM FOR JOB DUTIES AND SAFETY POLICIES. JOB SUPERVISOR SHOULD REVIEW JOB DESCRIPTION AND SAFETY POLICIES WITH THE ABOVE NAMED INMATE. BOTH THE WORK SUPERVISOR AND INMATE MUST SIGN AND RETURN THE ENTIRE FORM TO THE INMATE EMPLOYMENT OFFICE AS SOON AS POSSIBLE. THANK YOU FOR YOUR COOPERATION.

## ORIENTATION ACKNOWLEDGEMENT FORM

I HAVE RECEIVED INSTRUCTIONS FOR JOB DUTIES AND SAFETY POLICIES FOR THE JOB ASSIGNMENT LISTED BELOW.

_Chap. Clerk_
JOB ASSIGNMENT

_Leonard C. Jefferson_
INMATE'S SIGNATURE – DATE

_[signature]_   _4/05/04_
SUPERVISOR'S SIGNATURE - DATE

EXHIBIT "J"

بِسْمِ اللَّهِ الرَّحْمَنِ الرَّحِيمِ

## PREFACE

Praise be to Allah, the Cherisher and Sustainer of the worlds, Who has said in His Noble Book:

> There has come to you from Allah
> Light and a Perspicuous Book. (1)

And may peace and blessings be upon the Seal of the Prophets, Muḥammad, who has said that:

> The best among you is he who learned
> the Qur-ān and then taught it. (2)

May the peace and blessings of Allah be upon him, his family and all his Companions.

The Glorious Qur-ān is the Book of Allah, the Wise and Worthy of all Praise, Who has promised to safeguard it from any violations in its purity. It becomes incumbent upon each and every person who seeks the dignity of this world and the bliss of the Hereafter to regulate his life according to it, to implement its commandments and to pay homage to the magnificence of the One Who revealed it. This can be an easy task for those favoured with guidance from Allah, especially those blessed by an understanding of Arabic, the language of the divine communication. But for those not acquainted with Arabic, their ignorance is a barrier between them and this source of guidance and illumination. A translation of the message of Allah is thus a task not to be taken lightly or performed superficially.

Before the reader begins to study the Qur-ān, he must realise that unlike all other writings, this is a unique book with a supreme author, an eternal message and a universal relevance. Its contents are not confined to a particular theme or style, but contain the foundations for an entire system of life, covering a whole spectrum of issues, which range from specific articles of faith and commandments to general moral teachings, rights and obligations, crime and punishment, personal and public law, and a host of other private and social concerns. These issues are discussed in a variety of ways, such as direct stipulations, reminders of Allah's favours on His creation, admonitions and rebukes. Stories of past communities are narrated, followed by the lessons to be learned from their actions and subsequent fates.

The Qur-ān enjoys a number of characteristics unique to it alone, some of which are as follows:

---

(1) Sūrat Al-Ma'ida: 15.    (2) Narrated by the six ones except Muslim.

- iii -

- ii -


EXHIBIT "K" (3 PAGES)

1. It is the actual Word of Allah; not created but revealed for the benefit of all mankind.

    Blessed is He Who sent down the Criterion
    To His servant, that it may be
    An admonition to all creatures. (3)

2. It is complete and comprehensive. The Almighty says:

    Nothing have We omitted from the Book. (4)

    In another place we read,

    And We have sent down to thee
    The Book explaining all things. (5)

3. It is a theoretical and a practical Book, not only moralising but also defining specifically the permissible and the forbidden. The importance of understanding the message of the Qur-ān is undeniable, but simply reciting it with the intention of seeking Allah's pleasure and reward is also an act of worship and meritorious in itself. Allah Almighty says:

    So take what the Prophet gives you
    And refrain from what he prohibits you. (6)

4. Allah has perfected His religion for all mankind with the revelation of this Book. He says:

    This day have I perfected your religion for you,
    Completed my favour upon you and have chosen
    For you Islam as your religion. (7)

5. It is Allah's eternal miracle revealed to the Prophet Muhammad for all succeeding generations. In response to those who doubt the authorship of the Qur-ān, Allah Almighty has challenged the most articulate Arabs to produce a whole book, ten chapters or even one solitary chapter which can be remotely comparable to the Qur-ān. But to this day, no one has succeeded in meeting the challenge of the Almighty. The critics of the Qur-ān have been struck dumb by its ineffable eloquence and surpassing beauty.

    Say, if the whole of mankind and jinns
    Were to gather together to produce the
    Like of this Qur-ān, they could not
    Produce the like thereof, even if they
    Backed up each other with help and support. (8)

    The Almighty also says:

    Or they may say: he forged it.
    Say: Bring ye then ten chapters
    Forged, like unto it and call

(3) Sūrat Al-Furqān: 1.   (5) Sūrat An-Nahl: 89.   (7) Sūrat Al-Mā'ida: 3.
(4) Sūrat Al-An'ām: 38.   (6) Sūrat Al-Hashr: 7.   (8) Sūrat Al-Isrāa: 88.

- iv -

---

(To your aid) whomsoever ye can
Other than Allah, if ye speak
The truth. (9)

And again:

Or do they say: he forged it?
Say: Bring then a chapter like
Unto it and call (to your aid)
Anyone ye can besides Allah,
If it be ye speak the truth. (10)

6. It has been revealed to re-establish the sincere worship of Allah alone, without association of any partners with Him.

    This is a Book with verses basic or
    Fundamental (of established meaning),
    Further explained in detail,—
    From One who is Wise and Well-Aware.
    (It teaches) that you should worship
    None but Allah. (11)

    And they have been commanded no more
    Than this: to worship Allah,
    Offering Him sincere devotion, being true
    In faith, to establish regular prayer
    And to give Zakat, and that is
    The religion Right and Straight. (12)

7. It contains a complete code which provides for all areas of life, whether spiritual, intellectual, political, social or economic. It is a code which has no boundaries of time, place or nation.

    Verily this Qur-ān doth guide
    To that which is most right. (13)

8. Allah Almighty has taken upon Himself the duty of preserving the Qur-ān for ever in its entirety, as He says:

    We have without doubt sent down
    The Message, and We will assuredly
    Guard it (from corruption). (14)

    So well has it been preserved, both in memory and in writing, that the Arabic text we have today is identical to the text as it was revealed to the Prophet. Not even a single letter has yielded to corruption during the passage of the centuries. And so it will remain for ever, by the consent of Allah.

    Given the depth as well as the sublimity of the Qur-ānic text, a faithful

(9) Sūrat Hūd: 13.        (11) Sūrat Hūd: 1-2.        (13) Sūrat Al-Isrāa: 9.
(10) Sūrat Yūnus: 38.     (12) Sūrat Al-Bayyina: 5.   (14) Sūrat Al-Hijr: 9.

- v -

translation of it into another language is virtually impossible. The various translations that exist today, however accurate they may be, cannot be designated as the Qur-ān, since they can never hope to imitate the diction or the style of the Book of Allah. But as translation is one of the few ways to export the message of the Qur-ān to allow those lacking in knowledge of Arabic to share this priceless gift, it becomes a duty for those in a position to fulfil this task.

A number of individuals have in the past ventured to translate the Qur-ān, but their works have generally been private attempts, greatly influenced by their own prejudices. In order to produce a reliable translation free from personal bias, a Royal decree (No. 19888, dated 16/8/1400 AH) was issued by the Custodian of the Two Holy Mosques, King Fahd ibn Abdul Aziz, at that time the deputy prime minister , authorising the General Presidency of the Departments of Islamic Researches, Ifta, Call and Guidance to undertake the responsibility of revising and correcting a particular translation which would be selected for this purpose and made publicly available later.

To accomplish this enormous task, a number of committees were formed, comprising scholars well-qualified both in Islamic Shari'a and the English language. Some of these scholars were associated with the General Presidency of the Departments of Islamic Researches, Ifta,Call and Guidance.

The first committee was given the task of examining the existing translations and choosing the most suitable one from among them. The committee discovered that there was no translation free from defects and so there were two options open for consideration: the first was to select the best translation available and then adopt it as a base for further work as well as a source of reference, with the objective of revising its contents and correcting any faults in view of the objections raised against it; the second was to prepare a fresh and independent translation, starting from scratch.

It became obvious from studying these translations that the second option demanded much time and effort, neither of which were available at the time.

The first option was therefore considered to be more practical, since it met the existing urgent requirements and helped to achieve the desired goal in a comparatively short period of time. The translation by the late Ustadh ABDULLAH YUSUF ALI was consequently chosen for its distinguishing characteristics, such as a highly elegant style, a choice of words close to the meaning of the original text, accompanied by scholarly notes and commentaries.

The committee began revising and correcting this translation with the aid of other translations available, by comparing and then adopting best expressions as well as by introducing fresh expressions where necessary. The committee was fully aware of all the criticisms that had been directed against this translation and which had been carefully brought to the notice of the presidency by a num-

ber of academic bodies and other involved parties. In the second stage, the entire work of this committee was referred to a number of individuals and organisations who then augmented any deficiencies in the work of the committee.

A third committee was set up to collate all their suggestions. It then compared all such views regarding specific issues, selected the appropriate one (s) and arrived at a text as authentic and defect-free as was humanly possible.

Finally, a fourth committee was formed to look into the findings of the second and third committees and to implement the recommendations made by them. Furthermore, this committee had to finalise the text by adopting the most accurate expression where needed, besides checking the notes vigilantly so as to clear any misconceptions regarding the articles of faith, varying juristic opinions and thoughts not in conformity with the sound Islamic point of view.

In the course of its work, the committee came across some Arabic words which could not be translated correctly, such as Zakat and Tagūt. It was therefore decided to give a transliteration of these words in English with a brief explanatory note for each one at its first occurrence in the text. The reader will find a list of such words at the end of this preface, as well as a list containing an English transliteration of Arabic letters. A list of the abbreviations used in this work is also provided. Finally, the reader will find at the end of the text a comprehensive list containing references to proper names of people, places and important topics, dealt with either in the text or in the accompanying notes.

According to the Royal decree (No. 12412, dated 27/10/1405 AH), this translation is printed at King Fahd Holy Qur-an Printing Complex in Al-Madinah Al-Munawarah and also with coordination of the General Presidency of the Departments of Islamic Researches, Ifta Call and Guidance.

To implement the directions of the Custodian of the Two Holy Mosques (May Allah preserve him) concerning the Propagation of the Book of Allah, its distribution and translation into every language spoken by Muslims the worldwide, and due to the cooperation between the General Secretariat of King Fahd Holy Qur-ān Printing Complex and the Presidency of Islamic Researches, Ifta, Call and Guidance regarding a faithful, specific and scholarly translation of the meanings of the Holy Qur-ān, we are pleased to present to all Muslims and those seeking spiritual light among English - speaking people this translation which comes as one of the Series of the translations of the meanings of the Holy Qur-ān into various languages printed by the Complex in Al-Madinah Al-Munawarah .

May Allah reward bounteously those who were behind this blessed work.

THE PRESIDENCY OF ISLAMIC RESEARCHES, IFTA,<br>CALL AND GUIDANCE

| FORM DC-141 PART 1 Rev 3/00 | COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS | | | A 453158 | |
|---|---|---|---|---|---|
| ☒ MISCONDUCT REPORT ☐ OTHER ☐ DC-ADM 801 INFORMAL RESOLUTION | | | | | |
| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
| CL4135 | Jefferson, Leonard | SCI-A | 1045 | 5/12/04 | 5/12/04 |
| Quarters | Place of Incident | | | | |
| FB-62 | Centralized Services Lobby | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| STAFF | Ofcr Clement | ✓ | | STAFF | LT Eddy | | ✓ |
| | SGT Eliason | ✓ | | | MS. Brannon | | ✓ |
| | Ofcr Collingwood | ✓ | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION** Class 1 No. 1 Assault Class 1 No. 35 Refusing to obey an order.

**STAFF MEMBER'S VERSION** On 5/12/04 at 1045 hrs Inmate Jefferson was sitting in the lobby reading a Koran. I asked Jefferson why he was in the lobby and not in the chapel where he works. He said the music's to loud and his work supervisor said its his work area. When the music was over I gave Jefferson several direct orders to go in the chapel. He became very argumentative and refused all my orders. He pushed me with his shoulder and chest to enter the chaplin's office. At this time I ordered him to place his hands on the wall to pat search him. During the search he took his hands off the wall. Officer Clement ordered Jefferson to place his hands back on the wall until he was ordered to remove his hands. He was handcuffed and escorted to RHU by LT Eddy and SGT Eliason.

**IMMEDIATE ACTION TAKEN AND REASON** Inmate placed in RHU AC status pending hearing.

| PRE-HEARING CONFINEMENT | | | | |
|---|---|---|---|---|
| | --IF YES | | | |
| ☒ YES | TIME | DATE | | |
| ☐ NO | 1056 | 5-12-04 | FORMS GIVEN TO INMATE ☒ REQUEST FOR WITNESSES AND REPRESENTATION ☐ INMATE'S VERSION | |
| REPORTING STAFF MEMBER SIGNATURE AND TITLE | | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY | |
| [signature] CO1 | | Capt Crowe | DATE | TIME 24 HOUR BASE |
| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | Signature of Person Serving Notice | |
| DATE | TIME | ☒ CLASS 1 ☐ CLASS 2 | | |
| 05/13/04 | 1325 | | | |

**NOTICE TO INMATE**
You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have will be removed.

WHITE — DC-15   YELLOW — Inmate   PINK — Reporting Staff Member   GOLDENROD — Deputy Superintendent Facility Management

DC-ADM 801 Inmate Discipline Policy, Attachment B

EXHIBIT "L"

## 21ST CENTURY'S DAWN'S EARLY LIGHT

My Country tis of thee
This is about your reality
By the 21st Century's Dawn's early light
There ain't no justice for you here if you ain't white

Sweet land of liberty
Bitter was the taste of your slavery
And that putrid taste remains strong in all of our mouths
As we now see you lynching us downtown in your courthouses

The whole world watched you beat down Rodney King
Then we saw white jurors who could not see what we were seeing
With their open eyes their closed minds saw the police were right
You know there ain't no justice for you here if you ain't white

Today's lynchings are performed at Police State-style trials
Perpetuating this injustice American-style
Highlighting the unstated semantic reality
That lynchings don't require bodies hanging from the trees

Oh say can you see
Strange fruit no longer hangs in America's trees
Now in the land of the free the home of the brave
Prisons conceal the lynched children of America's slaves

Remember Martin told us to let Freedom ring
So my Country tis of thee that I sing
Now in the land of the free the home of the brave
Prisons conceal the lynched children of America's slaves

## SELF-HEALING

Practiced before man began recording history
The art of self-healing ain't no real mystery
The best doctors with perfected visions in their minds
Can't help those who're determined to remain blind

Those who go out of their way to trivialize
Their lost of focus upon a very important prize
Living a nightmare unaware running out of time
Oblivious victims of State-sponsored hate crimes

The only thing missing in their courtrooms is their hanging tree
And justice for people with black skin like you and me
Courts remain one of America's most racist places
Please don't try to deny it when its
    right up in all of our faces

**One hundred and seventeen per one hundred thousand**
    is White folk's incarceration rate
**One thousand six hundred and seventy-three per hundred thousand**
    is Black's rate in this racist state
Doubt has been dispelled by computerized light
Black's incarceration rate is fourteen times that of Whites

Social scientist produce these stats then they tell you humongous lies
Which you'll accept as true if you're determined to remain blind
Will you act upon the facts upon which these stats stand
To end State-sponsored hate crimes against the Black man

Even blind eyes must see our apathy as being beyond strange
Educated and wealthy now what are we doing to make this situation change
Could it be that doctorate degrees and surplus personal wealth
Destroy the vision of those who have not learnt
    we must show love to ourselves

Practiced before man began recording history
The art of self-healing ain't no real mystery
The best doctors with perfected visions in their minds
Can't help those who're determined to remain blind

# Pa. imprisons blacks at highest rate

## Study by reform group finds it's 14 times that of whites

By John M.R. Bull
Post-Gazette Harrisburg Correspondent

HARRISBURG — Pennsylvania incarcerates a larger percentage of its minority population than any other state, according to a new study.

For more than a decade, the state has had one of the highest disparities in the rate at which it incarcerates minority inmates compared with the state's minority population, but now it is the worst, according to a study done by the prison reform group the Justice Policy Institute in Washington, D.C. The results of the study were published recently by the liberal magazine Mother Jones.

"This is not shocking news," said Ernie Preate Jr., a former state attorney general who served time in prison on corruption charges and who is now a crusader for prison reform.

"This has been evident the last several years. This certainly should cause some red flags in the governor's office."

The study compared the number of minorities in state prisons with the number of minorities in the state and measured the results against other states, based on 2000 figures.

Overall, blacks make up 55 percent of the state prison population, but 10 percent of the state's general population.

The study concluded that 673 of every 100,000 blacks in the state are in prison, compared with 47 of every 100,000 whites. That would mean that blacks are imprisoned at a rate 14 times that of whites.

Add in the number of Hispanic and Asian prisoners, who make up less than 1 percent of the state's population and are incarcerated at a lower rate than blacks, and the state incarcerates minorities overall at 11 times the rate of whites.

That disparity is larger than in any other state, according to the study.

Other states that incarcerate minorities more than 10 times the rate of white defendants are Minnesota,

□ The nation's oldest prison advocacy group speaks for inmates because nobody else does. Page C-2

Wisconsin, Connecticut and New Jersey.

Southern states do not incarcerate as great a percentage of their minority populations as do many Northeastern states. Texas had the lowest incarceration disparity, imprisoning minorities at 2.5 times the rate of whites, the study showed.

"Why" is something we really don't know," said Jason Ziedenberg, senior policy analyst at the Justice Policy Institute.

"That's an intriguing question," said Alfred Blumstein, a professor of urban systems and operations research at Carnegie Mellon University who has published two well-researched studies on racial disparity in incarceration rates.

SEE STUDY, PAGE C-2

### Incarceration disparity

Pennsylvania has the highest disparity between the black and non-black incarceration rates in the United States for 2000.

**Top states** — Pennsylvania's incarceration rates

1. Pennsylvania
2. District of Columbia
3. Wisconsin
4. Connecticut
5. Minnesota
6. New Jersey
7. New York
8. Maryland
9. Illinois
10. Ohio
51. Hawaii

"Incarceration rates represent prisoners per 100,000 residents of each racial/ethnic group"

Whites / Non-white / Black / Hispanic / Asian / Native

□ 1990
■ 2000

Source: motherjones.com

Steve Thomas/Post-Gazette

---

### STUDY FROM PAGE C-1

If you assume that states lock up their most violent offenders at the same rate, it may be that the more conservative "law and order" Southern states lock up more people for nonviolent crimes, Blumstein said.

Because whites commit those crimes at the same rates as blacks, that would mean whites would be incarcerated at the same rate, he said.

Less conservative states tend to allow more discretion in the sentencing of nonviolent crimes, and subtle forms of racism could appear in the rates in which minorities are sentenced to prison, Blumstein said.

He said he was "somewhat surprised" that Pennsylvania would have such a disparate rate of incarceration of its black population, and he couldn't say why Pennsylvania is not considered one of the "liberal" states such as Minnesota and Connecticut, which have less-stringent sentencing provisions, or to a lesser degree, New Jersey, Blumstein said.

Judges render sentences on a case-by-case basis. An Associated Press investigation revealed last year that blacks in Pennsylvania tended to more often receive prison sentences, or longer ones, than white defendants accused of the same crimes.

Statistics, however, are not kept on the sentences issued by individual judges.

As of June 30, 34 percent of the state's 37,081 inmates were white, 55 percent were black and 10 percent were Hispanic, according to the state Department of Corrections.

"We don't have anything to do with who's sentenced or how long they're sentenced," said Lisa Auron, spokeswoman for the department.

A study done last year by Human Rights Watch placed Pennsylvania sixth in the country in its rate of racial disparity in incarceration, based on 1998 figures. That study identified Minnesota, New Jersey and Connecticut and other Northeastern states as having the largest racial disparities in incarceration rates, as was found by the Justice Policy Institute.

That blacks over the past 20 years have been sentenced to prisons at high rates is not news. The latest study merely compared the number of blacks in each state's prisons with the number of blacks in each state, highlighting the disparity in sentencing rates as a percentage of each state's minority population.

The drug war of the past 20 years contributed greatly to that disparity, Preate said.

Drug sweeps are more often conducted in cities, where the proportion of African-Americans and the minority group members tend to be higher, and that means more blacks are arrested on drug charges, even though a variety of studies show that blacks and whites use illegal drugs at the same rate, Preate said.