# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LEONARD C. JEFFERSON,
        Plaintiff,

V.                                                          C.A. NO. 04-44 ERIE

WILLIAM WOLFE et al.,
        Defendants

<u>PLAINTIFF'S REQUEST FOR ADMISSIONS FROM DEFENDANT BEARD</u>

    AND NOW comes plaintiff LEONARD C. JEFFERSON, pursuant to Fed.R.Civ.P. Rule 36, and asks the above-named defendant to either admit or deny the truth of each of the following statements under oath within thirty (30) days of service of this request:

    1. DC-ADM 801, INMATE DISCIPLINE, VI. (Procedures), A (Misconduct/Rule Violation Reports) indicates: "<u>All</u> rule violations are to be reported via a DC-141; 'Misconduct Report' Part 1 ... <u>any</u> inmate charged with <u>any</u> of the listed violations will receive a copy of the report." (Emphasis added.)

    2. DC-ADM 801 indicates that all of the following behaviors constitute an offense, a violation of said policy, for which a DC-141 Part 1 Misconduct Report must be written by at least one PA DOC employee who has witnessed or has become aware of the prohibited conduct: (1) engaging in, or encouraging unauthorized group activity, (2) possession of contraband ... or other items which in the hands of an inmate present a threat to the inmate, other or to the security of the facility, (3) failure to report the presence of contraband, and (4) possession of any items not authorized for retention or receipt by an inmate not specially numerated as Class 1 contraband.

    3. The PA DOC had not granted Plaintiff an exemption on 10/24/02, or at any other time, that would preclude the issuance of an appropriate Misconduct Report in the event that any prison official learned that Plaintiff had violated one or more prison rules.

    4. Plaintiff did not receive a Misconduct Report which alleged he and/or his poetry had violated any institutional rule of policy.

    5. Plaintiff did not receive a Misconduct Report which alleged he had engaged in or encouraged unauthorized group activity on 10/24/02 nor on any other day.

    6. Prior to the filing of the Complaint in this action PA DOC officials had never confiscated any poetry from Plaintiff.

    7. In the event that prison officials had determined that Plaintiff had violated a prison rule on 10/24/02, or on any other day, said officials were

duty-bound by PA DOC regulations to issue Plaintiff a Misconduct Report.

8. The theme of the poetry at issue is Racism in the Judicial System and Lynchings.

9. The United States of America does have an embarrassing and well-documented history of racial injustices in its Judicial system, and of lynchings, that pre-date the signing of the Declaration of Independence in 1776.

10. The PA DOC does not have any rule that prohibits Plaintiff from writing poetry.

11. The PA DOC encourages its inmates to express themselves via writing poems, essays and short stories.

12. PA DOC employees arrange and conduct poetry contest for inmates on a fairly regular basis.

13. The PA DOC prohibits its prisoners from possessing printed material which it deems to be racially inciteful.

14. PA DOC officials, beginning on 10/24/02 and continuing to this present day, have been, and remain, unable to demonstrate that the poetry copied by Ms. Brannon on 10/24/02 poses any threat the security.

15. There is no PA DOC policy that makes a prisoner who writes poetry, relating to sensitive social issues, inappropriate for employment as a Chapel Clerk.

16. PA DOC encourages inmates to adopt sincere religious beliefs and practices with full knowledge that most religions urge their adherents to speak out against, or to write about, the ills of society; including racism, poverty, abortion, war, homelessness, greed, unchecked materialist and shameful conduct.

17. Section A. 1. (Discrimination) of DC-174 -- which states: "The responsibility of all corrections employees is to act in relation to all citizens of the Commonwealth without regard to age, race, color, ancestry, creed, sex, and marital status, national origin, non-job related handicap, or political beliefs. This necessarily includes the inmates whom we supervise and fellow employees with whom we work." (Emphasis added.) -- prohibits PA DOC officials from making a determination that an African-American prisoner is "inappropriate" for the job of Chapel Clerk for no reason other than said prisoner has written poetry which addresses the injustices faced/endured by African-Americans in the courts of this Commonwealth.

18. The memo entitled "Appeal to Superintendent Grievance # 4161 that is attached to Plaintiff's Third Amended Complaint, Doc. # 39, as Exhibit "E" is a genuine copy of said document.

19. The memo "RE: DC-ADM 804 Final Review Grievance No. 58644 that is attached to Doc. # 39 is a genuine copy of said document.

20. DC-ADM 816 indicates that inmates who "do not have a work assignment

... will be placed in the General Labor Pool" (GLP).

21. Inmates who do not have any work assignment other than GLP are in fact unemployed.

22. Conduct by an inmate which poses a "threat to the orderly running of the institution" is conduct which is prohibited by DC-ADM 801.

23. DC-ADM 801 indicates that a staff member is required to issue a DC-141 Misconduct Report to an inmate whom the staff member has found to be engaged in conduct that poses "a threat to the orderly running of the institution."

24. Notwithstanding Defendant McQuown's written statement, which indicates he found Plaintiff's conduct "to be a threat to the orderly running of the institution," neither Defendant McQuown, nor any other prison official ever issue Plaintiff a Misconduct report for said alleged violation(s) of the prison's rules.

25. If the statements written by Defendant McQuown on 11/18/02 on Exhibit "B" of Doc. # 39 are true statements of his beliefs, Defendant McQuown was duty-bound by PA DOC policies DC-801 and DC-174 to cause Plaintiff to receive a DC-141 Misconduct Report for violating prison rules.

26. If the statements written by Defendant McQuown on 11/18/02 on Exhibit "E" were known to him to be false statements, he would be prohibited, by DC-801 and DC-174, from causing Plaintiff to receive a DC-141 Misconduct Report based upon a fabricated pretext in this matter.

27. The fact that no prison official ever issued a DC-141 Misconduct Report to Plaintiff related to his possession of poetry would cause most reasonable people to believe Plaintiff was removed from the Chapel Clerk job for some reason other than the reason that Defendant McQuown has written on Exhibit "B".

28. The most natural and logical inference -- that would occur to the mind of an unbiased fact-finder who has rejected, as ludicrous and obviously fabricated, the justification for an action that has been offered by a party -- is that the party fabricated the ludicrous-justification in an attempt to conceal the true, and most likely improper motivation, for the actions at issue.

29. Both Defendants McQuown and Gamble, in Exhibits "B" and "C-1" of Doc. # 39, respectively, wrote about "concerns that we had regarding the content of your poetry combined with our concerns about the extent of contact your job allowed you to have with outer inmates." (Quoting Exhibit "C-1".)

30. Defendants' act of reassigning Plaintiff from the Chapel Clerk job to GLP status could not, in any way, address any legitimate concern that prison official claimed they had about the content of the poetry nor any legitimate concern that prison officials claimed to have had about the number of prisoners with whom Plaintiff had contact.

31. The Defendants' act of reassigning Plaintiff from the Chapel to GLP

did not serve any legitimate penological purpose.

32. Inmates on GLP status are permitted to go to the yard every morning and afternoon year round, and are allowed to attend the yard every evening that it is open.

33. Defendant Beard is aware of the fact that the U. S. District Court for the Western District of Pennsylvania found, and the Third Circuit Court upheld the finding, that PA DOC officials had cited non-existent security concerns in a belated attempt to provide some semblance of justification for a blatant act of unconstitutional retaliation in Brooks v. Andolina, 826 F.2d 1266, 1268 (3rd Cir. 1987).

34. PA DOC officials would have immediately confiscated Plaintiff's poems and confined Plaintiff in the Hole, as is required by PA DOC policy, if said officials' alleged concerns about Plaintiff's intent and his poetry vis-a-vis the security of the jail were genuine.

35. The written reasons given by Support Team members Gamble and McQuown for removing Plaintiff from the Chapel Clerk job are different from the written reasons (for removing Plaintiff from that job) that were given by Robert Boeh on Exhibit "D" of Doc. # 39.

36. The memo of 03/20/03 from Supt. Wolfe to Plaintiff, which is attached to Doc. # 39 as Exhibit "E" is a genuine copy of said document.

37. On 03/20/03 Supt. Wolfe responded in Appeal to Superintendent Grievance # 41961.

38. The reasons that Supt. Wolfe has presented, on Exhibit "E", for removing Plaintiff from the Chapel Clerk job differ from the written reasons of Defendants Gamble and McQuown for removing Plaintiff from that job.

39. The reasons presented by Supt. Wolfe, on Exhibit "E", for removing Plaintiff from the Chapel Clerk job differ from the reasons given by Robert Boeh on the DC-804 Part 2 dated 03/07/03.

40. Supt. Wolfe's written statements, on Exhibit "E" do not in any way indicate that security concerns were a factor in the decision to reassign Plaintiff from the Chapel to GLP.

41. Supt. Wolfe's statement, on Exhibit "E" -- that he "will stand by the decision that you are not appropriate for the clerks position in the Religious Service Area" -- indicates that a decision, that Plaintiff was no longer appropriate for that job, had been made.

42. DC-ADM 816, WORK ASSIGNMENTS, allows an inmate who has been removed from a particular job to be reassigned to that same job at a later date.

43. Imam Abdalla, Plaintiff's immediate supervisor in the Chapel, and Defendant McQuown, Imam Abdalla's immediate supervisor in the Chapel, both sought to have Plaintiff returned to the Chapel Clerk job during the early months of 2004.

44. Plaintiff was reassigned to the Chapel Clerk position on 04/05/04.

45. Plaintiff was removed from the Chapel Clerk job as the result of a Misconduct Report on 05/12/04 which caused Plaintiff to be escorted from the Chapel to RHU pre-hearing confinement.

46. The form DC-141 Part 1, bearing the number A453158, attached herein as Exhibit "L" is a genuine copy of said document.

47. Exhibit "L" indicates that a Misconduct Report was filed against Plaintiff on 05/12/04 at some time around 1100 hours.

48. The STAFF MEMBER'S VERSION on Exhibit "L" (which begins with the statement: "On 5/12/04 at 10:45 Inmate Jefferson was sitting in the Lobby reading a Koran, I asked Jefferson why he was in the Lobby and not in the chapel where he works") indicates Plaintiff was in an unauthorized area.

49. In A453158 Plaintiff has not been charged with being in an unauthorized area.

50. A453158 does not accuse Plaintiff of being present in an unauthorized area due to the fact that the Lobby Area is part of the authorized work area of Chapel Clerks.

51. When C.O. 1 Barry Lobdell wrote the STAFF MEMBER'S VERSION on A453158 he was fully aware that Chapel Clerks (1) were authorized to, and (2) had a long standing practice of sitting in the Lobby Area reading religious books while other Faith Groups were using the Chapel sanctuary for a program, service, band practice, etc. and thus, C.O. Lobdell did not include a presence in an unauthorized area charge in the Misconduct Report.

52. At around 1045 hours on 05/12/04 while in his assigned work area reading a Qur'an; C.O. Lobdell, with full knowledge that Plaintiff was in his authorized work area, asked Plaintiff why he was sitting in his authorized area as though Plaintiff were not authorized to sit in the Lobby Area and read.

53. C.O. Lobdell has, both prior to and after 05/12/04 almost on a daily basis, observed other Chapel Clerks in the Lobby Area with books, papers, pencils and pens, tables, typewriter and tape players without ever asking any of these Chapel Clerks why they were in the Lobby and not in the chapel where they work?.

54. C.O. Lobdell fabricated Misconduct Report A453158 as a pretext to remove Plaintiff from the Chapel Clerk position when, by C.O. Lobdell's own words in the Misconduct Report, Plaintiff (1) was not violating any rule, (2) was engaged in what Lodbell knew to be an authorized activity for Chapel Clerks in an area that Lobdell knew to be an authorized area for Chapel Clerks when (3) Lobdell, with the malicious intent of writing a fabricated Misconduct Report, initiated an unwarranted interrogation as a pretext for the Misconduct Report he intended to write before his spoke his first word to Plaintiff around 1045 hours on 05/12/04.

55. Defendant Beard has, during visits at SCI-Albion, observed Chapel Clerks with tables, typewriters books, etc. performing their Chapel Clerk duties in the Lobby Area where Plaintiff was sitting/reading around 1045 hours on 05/12/04.

56. Defendant Beard agrees that harassment of inmates by staff is prohibited by PA DOC policy.

57. Defendant Beard agrees that when a correctional officer interrogates a prisoner about why the prisoner is engaged in an authorized activity in an authorized area that correctional is harassing the inmate.

58. Plaintiff has been on GLP status from 11/14/02 until around 10/20/06 with the exception of the period between 04/05/04 and 05/12/04.

59. A fabricated report is more likely to be inconsistent with itself than a truthful report.

60. The report on DC-141 Part 1 No. A453158 is inconsistent with itself.

61. The author of a fabricated statement usually has an ulterior motive for presenting a fabricated statement instead of a true statement.

62. The written statements of Defendant McQuown, on Exhibit "B", which indicate he believed Plaintiff and his poems posed a threat to security, are fabricated statements.

63. The written statements of Defendant Gamble, on Exhibit "C-1", which indicate she believed Plaintiff and his poems posed a threat to security, are fabricated statements.

64. The written statements of Defendant Boeh, on Exhibit "D", which indicate Plaintiff distributed racially inciteful poems, is a false statement.

65. The 03/20/03 written statement of Supt. Wolfe, on Exhibit "E", that Plaintiff is "not appropriate for the clerks position in the Religious Service Area" is belied by subsequent decisions which led to Plaintiff being reassigned to the Chapel Clerk job on 04/05/04.

66. In June of 2004, after Plaintiff was returned to general population from the Hole, Imam Abdalla (Plaintiff's immediate supervisor in the Chapel) informed Plaintiff of his intent to rehire Plaintiff in the Clerk's position.

67. Defendant Beard is aware that the Free Speech Amendments of the State and Federal Constitutions guarantee prisoners' right to speak freely about abuses which are committed by State and Federal officials, including abuses based upon race or any other factor.

68. During the one-year period between 11/01/01 and 11/01/02, while Plaintiff was employed as a Chapel Clerk, he received $640.53 from Pay Group 1.

69. During the one-year period between 11/01/02 and 11/01/03, while Plaintiff was on GLP status, he received $163.57 from Pay Group 3.

70. Defendant Beard is aware that according to the July 2001 article written by John M. R. Bull, that was copied by Ms. Brannon on 10/24/04, Blacks, at that time, were incarcerated in Pennsylvania at a rate that was fourteen times that of Whites.

71. Defendant Beard is aware that according to the statistics presented on page 126 of the FINAL REPORT OF THE PENNSYLVANIA SUPREME COURT COMMITTEE ON RACIAL AND GENDER BIAS IN THE JUSTICE SYSTEM (2003) (hereinafter THE REPORT) Blacks' incarceration rate in Pennsylvania is 18.4 times that of Whites.

72. Defendant Beard is aware that according to page 320 of THE REPORT, in Allegheny County African-Americans often plead guilty to crimes that they did not commit because they know there ain't no justice for you there if you are not White.

73. Defendant Beard is aware that violations of criminal defendants' Constitutional rights increase the likelihood that those who are innocent will be wrongfully convicted.

74. Defendant Beard is aware of the fact that Plaintiff is in PA DOC custody as the result of a conviction obtained in the Allegheny county Court of Common Pleas.

75. Defendant Beard does not believe that a victim of a hate-crime spreads hate when he/she informs the public, and/or authorities, about the crime.

76. Defendant Beard respects the Free Speech rights of prisoners, who have been abused in State court proceedings, to produce and possess poetry on the subject of the race-based injustices that facilitated the abuses of the prisoners rights to life, liberty and the pursuit of happiness.

77. Defendants failure to confiscate all copies of the poems at issue is evidence of Defendants' awareness that the poems were/are protected speech.

78. Defendant Beard believes that speech, including poetry, which exposes abusive acts of government officials and all other people should be encouraged and applauded, not punished.

79. Defendant Beard knows that, pursuant to PA DOC policy and the State and Federal Constitutions, prison officials' actions which raise the custody level of a prisoner who exercised Constitutional rights, for no valid reason other than the exercise of his/her rights, are illegal actions.

80. Defendant Beard knows that the provisions of the Federal AEDPA and State PCRA statutes cause an unknown number of prisoners in PA DOC custody to be procedurally bared from obtaining relief from their convictions that they are otherwise eligible to apply for.

81. Defendant Beard believes that prisoners who are procedurally bared from applying for legal redress, that they are otherwise entitled to, have a legitimate grievance about a judicial system that is incapable of producing the most basis and fundamental justice in their cases.

82. Defendant Beard knows the poetry at issue does nothing more than repeat, as "Ebonic echoes," facts and figures that are presented via "academic discourse" in the reports of official government bodies and highly-respected social scientists.

83. Defendant Beard does not view the reports of government bodies and social scientists, on the subject of racial discrimination in the courts, as spreading hate.

84. Prisoners in general population in the PA DOC have the right to obtain, possess and read reports on the subject of racial injustice in the courts.

85. Prisoners in PA DOC custody have the right to write poetry on the subject of racial injustices in the courts.

86. Pursuant to PA DOC policy, the mere fact that Plaintiff obtained/possessed/read reports and articles about racial injustice in the courts and then wrote poetry on that subject cannot, alone, make Plaintiff inappropriate for any DOC work assignment.

87. Previous court decisions in this jurisdiction cause Defendant Beard to be aware that the free exercise clause of the First Amendment prohibits Defendants from raising Plaintiff's custody level, and from taking other adverse actions against Plaintiff, for refusing to participate in prescriptive programs that are offensive to his religious beliefs.

88. Previous court rulings in this jurisdiction cause Defendant Beard to be aware that the Establishment Clause of the First Amendment prohibits Defendants from raising Plaintiff's custody level, and from taking any other adverse actions against Plaintiff, for refusing to participate in religious and secular programs that are offensive to his religious beliefs.

89. The PA DOC does not presently offer any prescriptive programs that are based upon Islamic beliefs and traditions.

90. The PA DOC does not presently offer any prescriptive programs that are taught from an Islamic perspective.

91. The only option presented to Plaintiff by Defendants, that would allow Plaintiff to earn the two (2) or three (3) point deduction of his PACT score for participating in PA DOC prescriptive programs, has been that Plaintiff must either violate or abandon his Islamic beliefs.

92. The diet served by the DOC to inmates in general population is not a religious diet.

93. The non-religious diet served by the DOC contains food items that are

offensive to Muslims and members of other Faith groups.

94. The DOC provides alternative protein items to/for Muslims if/when pork is the meat item in a meal.

95. The DOC provides the alternative protein to allow Muslims to maintain a properly balanced nutritious diet without having to eat foods that are offensive to their religious beliefs.

96. Defendants assert the following programs are not religious in nature: Violence Prevention, Citizenship, Batterers Intervention, Long Term Offenders, and Personal Responsibility.

97. Defendants have not asserted that the above-mentioned alleged-non-religious programs do not contain elements that are prohibited and/or offensive to Muslims.

98. In the same way that Defendants cannot truthfully state the DOC's non-religious diet does not contain food items that are offensive to Muslims, Defendants cannot truthfully state the DOC's so-called non-religious programs do not contain elements that are prohibited and/or offensive to Muslims.

99. Defendant Beard is aware of the fact that the Religion of al-Islam promotes high moral standards.

100. Defendant Beard is aware that the Religion of al-Islam promotes healthy lifestyles.

101. Defendant Beard is aware that the Religion of al-Islam promotes a non-criminal lifestyle.

102. Defendant Beard is aware that the Religion of al-Islam promotes respect for the rights and dignity of everything in creation.

103. Defendant Beard is aware that the Religion of al-Islam prohibits the possession, sale and use of any/all intoxicants.

104. Defendant Beard is aware that the Religion of al-Islam prohibits fornication and adultery.

105. Defendant Beard is aware that the Religion of al-Islam prohibits all sexual activity outside of the bonds of marriage.

106. Defendant Beard is aware that the Religion of al-Islam prohibits stealing and prescribes cutting off the hand of the thief.

107. Defendant Beard is aware that the Religion of al-Islam condemns all criminal and anti-social conduct in the strongest terms.

108. Defendant Beard is aware that in the Religion of al-Islam lying is considered to be a major sin, as serious as murder.

109. Defendant Beard is aware that the moral code of the Religion of al-Islam is generally viewed as being much stricter than the moral code of

non-Muslims.

110. Defendant Beard knows that homosexual conduct is acceptable in most non-Muslim nations.

111. Defendant Beard is aware that homosexual conduct is viewed as an unacceptable abomination, and is not tolerated, by the Religion of al-Islam.

112. Defendant Beard is aware that many behaviors that lead to crime and degradation of human dignity are permissible in non-Islamic societies while said behaviors are prohibited and not tolerated in Islamic societies.

113. The full complement of PA DOC prescriptive programs were designed with the specific intent of providing direction and guidance, in a comprehensive fashion, in each and every area of an inmate's life, and especially in the areas where the inmate must modify his/her behavior in order to reduce the likelihood of further criminal conduct upon release from custody.

114. Defendant Beard has studied and is familiar with the genesis and the evolution of penitentiaries and prisons.

115. Defendant Beard is aware that Members of the Religious Society of Friends were commonly known as Quakers in 1681 and are commonly known as Quakers today.

116. Defendant Beard is aware that Pennsylvania is commonly known as The Quaker State.

117. Defendant Beard is aware that history indicates William Penn established Pennsylvania as a "religious" or "holy" experiment.

118. Defendant Beard is aware that the Christian beliefs of 17th & 18th Century Quakers caused Quakers in the United States to reject the idea that capital punishment (except in cases of murder) and corporal punishment were acceptable forms of punishment.

119. Defendant Beard is aware that the Quakers who governed Pennsylvania during the 17th & 18th Centuries believed offenders could be reformed to accept Christian ethics and morals through hard labor and silent meditation.

120. Defendant Beard is aware that the Quaker who governed Pennsylvania in the 17th & 18th Centuries developed and established the features of jails and workhouses that are considered by some authorities to be the first true penitentiaries.

121. Defendant Beard knows the first penitentiary system developed and established by the Quakers to reform criminals became, and is still, know as The Pennsylvania System.

122. Defendant Beard is aware that the original plan of The Pennsylvania System was based upon the complete isolation of prisoner with work limited to crafts that were allowed to be done in one's cell.

123. Defendant Beard is aware that by the mid-1820s Quakers in Albany, NY developed and established a different method for attempting to reform their prisoners.

124. Defendant Beard is aware that the system developed and established at Albany is commonly known today as The Albany System.

125. In The Albany System prisoners were permitted to work together in groups but were required to remain absolutely silent while working and while in their small single-occupant cells.

126. Defendant Beard is aware that, originally, in both systems the Quakers forbade their prisoners to communicate with each other.

127. Defendant Beard is aware that silent meditation is a form of worship that was practiced by 17th & 18th Century Quakers and continues to be their practice today.

128. Defendant Beard is aware that the Quakers used brutal force and strict disciplinary measures to compel their prisoners to engage in silent meditation.

129. Defendant Beard is aware that Quakers, as a Religious Group, do not have a written creed.

130. Defendant Beard is aware that most so-called correctional institutions in the United States today are based upon a modified version of The Albany System.

131. The PA DOC's Super-Maxes and Long Term Segregation Units (LTSU) clearly represent slightly modified versions of the original Pennsylvania System.

132. PA DOC records indicate that Plaintiff spent the thirty-five (35) days between 05/12/04 and 06/15/04 in the Hole (RHU) as a result of DC-141 A453158.

133. Defendant Beard is aware that the Quakers developed and established the Pennsylvania and Albany Systems with the specific intent of reforming prisoners in the mold of penitent God-fearing people whose skin "quaked" upon the mention of or thought of God.

134. Defendant Beard is aware that the Quakers developed and established the Pennsylvania and Albany Systems with the specific intent of reforming prisoners by imposing Quaker beliefs and practices (to the exclusion of all other beliefs and practices of all other non-Quaker philosophies) upon their prisoners.

135. Defendant Beard is aware that it is a commonly accepted fact that terms such as "penitentiary" and "correctional institution" imply places of isolated confinement wherein prisoners are exposed to harsh conditions which are intended to cause the prisoner to experience feelings of regret for some specific allegedly-condemnable act the prisoner has allegedly committed.

136. Defendant Beard is aware that being housed in a penitentiary or correctional institution for a sufficient amount of time may cause a person who has not committed any crime to become penitent.

137. Defendant Beard is aware that PA DOC policy causes religious books, such as Holy Qur'ans and Holy Bibles, to be among the few items that prisoners in PA DOC Super-Max and LTSU custody are permitted to retain in their cells.

138. Defendant Beard believes that religious activities are a positive pursuit since they may help prisoners develop and maintain a more pro-social lifestyle while incarcerated and after release.

139. Defendant Beard is aware that 17th & 18th Century Quakers knew, and utilized the knowledge, that two inherent results of prolonged and unnatural isolation are inner-reflection and spiritual awakenings.

140. Defendant Beard, and other 21st Century penologist, know and utilize the knowledge that two inherent results of incarceration in modern day prisons are inner-reflection and spiritual awakenings.

141. The PA DOC's decisions to make programs available which are clearly religious (such as Christian and Islamic worship services) to prisoners is an indication that said officials recognize and desire the rehabilitative benefits that flow from a prisoner's genuine spiritual awakening.

142. Defendant Beard is aware that the objective on PA DOC prescriptive programs is to permanently replace a prisoners sinful/criminal behavior with saintly/non-criminal behavior.

143. The intent of PA DOC prescriptive programs -- such a Violence Prevention, Citizenship, Batterers Intervention, Long Term Offenders, and Personal Responsibility -- is to present dogma that extols PA DOC values of what is right and/or wrong in an attempt to change prisoners' thinking in such a way that he/she acquires what the PA DOC believes to be the "values necessary to become law-abiding citizens."

144. PA DOC officials and staff have determined that Plaintiff should participate in the above-mentioned prescriptive programs in order to absorb what the PA DOC believes to be the values necessary to become a productive law-abiding citizen.

145. Defendant Beard and other PA DOC officials and staff assert that Plaintiff cannot be rehabilitated by the teachings and practices of the Religion of al-Islam but that Plaintiff can be rehabilitated by PA DOC prescriptive programs.

146. Defendant Beard is aware that each and every one of the PA DOC's prescriptive programs presents the PA DOC's value judgments of what is right and/or wrong for the specific purpose of indoctrinating prisoners.

147. Defendant Beard is aware of/supports the practice wherein prisoners who disagree (on religious grounds) with and refuse to accept being indoctrinated by the PA DOC are subjected to adverse consequences that are not

imposed upon those who submit to, fake acceptance of, or actually accept the PA DOC's indoctrination.

148. Defendant Beard is aware that Theistic religions and the PA DOC both offer good results and rewards for good conduct and threaten, and impose, punishments for perceived bad conduct.

149. Plaintiff has not been issued any Misconduct Report(s) for his refusal to participate if PA DOC prescriptive programs.

150. The mere fact that Plaintiff is not participating in PA DOC prescriptive programs in no way poses or presents a threat to the security of Defendant's prison.

151. Defendant Beard is aware that the celibacy which the PA DOC imposes upon its prisoners is identical to the celibacy which the Quakers introduced via the Pennsylvania System.

152. The PA DOC has intentionally selected remote locations to construct its prisons.

153. Defendant Beard is aware that prisons in remote locations isolate prisoners from society more effectively than prisons that are located in urban areas.

154. Defendant Beard is aware that, in the business world, programs which fail to produce the desired results are modified, and in the event that the modification fails to produce the desired results, the unproductive programs are replaced by others.

155. Defendant Beard is aware that the high number of prisoners who successfully complete PA DOC prescriptive program and go into the community where they reoffend by committing the same offense is an undeniable indication that PA DOC prescriptive programs have a poor record for producing the desired results.

156. Defendant Beard is aware that, in the world of business, a company with programs with failure to success ratios similar to that of PA DOC prescriptive programs would be deemed repulsive by/to even the most unsophisticated investors.

157. Defendant Beard is aware that Plaintiff has been, and continues to be, subjected to adverse consequences for no reason other that Plaintiff has refused to violate or to abandon his faith in and obedience to Allaah in order to accept faith in and to become obedient to the dictates of the men and women who (believing they could improve upon the moral system revealed by God) created the prescriptive programs employed by the PA DOC.

October 29, 2006

*Leonard C. Jefferson*
Leonard C. Jefferson, CL-4135
10745 Rt. 18
Albion, PA 16475-0002

| FORM DC-141 PART 1 | COMMONWEALTH OF PENNSYLVANIA | A 453158 |
|---|---|---|
| Rev 3/00 | DEPARTMENT OF CORRECTIONS | |

☑ MISCONDUCT REPORT ☐ OTHER ☐ DC-ADM 801 INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| CL4135 | Jefferson, Leonard | SCI-A | 1045 | 5/12/04 | 5/12/04 |
| Quarters | Place of Incident | | | | |
| FB-62 | Centralized Services Lobby | | | | |

### OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| Staff | Ofcr Clement | | ✓ | Staff | Lt Eddy | | ✓ |
| | Sgt Eliason | | ✓ | | Ins. Brannon | | ✓ |
| | Ofcr Collingwood | | ✓ | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION** Class 1 No. 1 Assault Class 1 No. 35 Refusing to obey an order.

**STAFF MEMBER'S VERSION** On 5/12/04 at 1045 hrs Inmate Jefferson was sitting in the Lobby reading a Koran, I asked Jefferson why he was in the Lobby and not in the Chapel where he works. He said the music's to loud and his work supervisor said its his work area. I said When the music was over I gave Jefferson several direct orders to go in the chapel. He became very argumentive and refused all my orders. He pushed me with his shoulder and chest to enter the chaplin's office. At this time I ordered him to place his hands on the wall to pat search him. During the search he took his hands off the wall, Officer Clement ordered Jefferson to place his hands back on the wall until he was ordered to remove his hands. He was hand cuffed and escorted to RHU by Lt Eddy and Sgt Eliason.

**IMMEDIATE ACTION TAKEN AND REASON** Inmate placed in RHU, AC status pending hearing.

**PRE-HEARING CONFINEMENT**

☑ YES   IF YES: TIME 1056   DATE 5-12-04
☐ NO

**FORMS GIVEN TO INMATE**
☑ REQUEST FOR WITNESSES AND REPRESENTATION   ☑ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY   SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| B. Iddell CO1 | Capt. Crowe | DATE 05/12/04  TIME 1325 |

**YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER**
DATE 05/13/04   TIME 1325

**MISCONDUCT CATEGORY**
☑ CLASS 1   ☐ CLASS 2

**Signature of Person Serving Notice**

**NOTICE TO INMATE**
You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have will be removed.

WHITE — DC-15   YELLOW — Inmate   PINK — Reporting Staff Member   GOLDENROD — Deputy Superintendent Facility Management

DC-ADM 801 Inmate Discipline Policy, Attachment B

EXHIBIT "L"