# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LEONARD C. JEFFERSON,
        Plaintiff,

    V.                      C.A. NO. 04-44 ERIE

WILLIAM WOLFE et al.,
        Defendants

<u>PLAINTIFF'S REQUEST FOR ADMISSIONS FROM DEFENDANT MCQUOWN</u>

AND NOW comes plaintiff LEONARD C. JEFFERSON, pursuant to

Fed.R.Civ.P. Rule 36, and asks the above-named defendant to either admit or

deny the truth of each of the following statements under oath within thirty

(30) days of service of this request:

1. Michael Anderson, an African-American, was acting in the capacity of a chaplain for inmates who follow the teachings of the Nation of Islam on 10/24/02.

2. Barbara Brannon, a Caucasian, was acting in the capacity of a secretary in the Chapel Office on 10/24/02.

3. Plaintiff was employed in the capacity of an inmate Chapel Clerk throughout the entire month of October, 2002.

4. Plaintiff's immediate supervisor during October, 2002 was Imam Alhafiz Abdalla.

5. In October 2002 Imam Abdalla was employed in the capacity of a chaplain for inmates who adhere to Sunni Islamic Traditions.

6. At certain times during the afternoon of 10/24/02 Mr. Anderson, Ms. Brannon and Plaintiff were all present, simultaneously, within six (6) feet of Ms. Brannon's desk.

7. Mr. Anderson and Plaintiff were in an adjoining office prior to the first time both approached Ms. Brannon's desk that afternoon.

8. Mr. Anderson was talking on the telephone during the time when Plaintiff was in the adjoining office with him.

9. Inmate Wayne Bair, III, CQ-0475, worked in the capacity of a Chapel Clerk for Mr. Anderson during October 2002.

10. At sometime around 1:10 or 1:15 PM on 10/24/02 Inmate Bair entered the office where Plaintiff was sitting and Mr. Anderson was talking on the telephone.

11. Inmate Bair informed Mr. Anderson that his presence was required in

the Multi-purpose Room to begin the (Nation of Islam) services.

12. While exiting the office, Mr. Anderson asked Plaintiff to allow him to make a photocopy of a photocopied newspaper article that Plaintiff had in his possession.

13. Plaintiff complied with Mr. Anderson's request and handed the article to Mr. Anderson while they were walking out of the office.

14. The headline on the article stated: "Pa. imprisons blacks at highest rate: Study by reform group finds it's 14 times that of whites."

15. Said article was written by Post-Gazette Harrisburg correspondent John M. R. Bull.

16. The article appeared in print in the Pittsburgh Post-Gazette in July of 2002. (2001)

17. Ms. Brannon's desk sat directly, and less than six (6) feet, in front of the office door which Mr. Anderson, Plaintiff and inmate Bair exited.

18. As Mr. Anderson was passing the desk he handed the article to Ms. Brannon and asked her to make one (1) copy of the article for him and to return the original to Plaintiff.

19. Mr. Anderson was not aware that there was anything on the backside of the piece of paper that he handed to Ms. Brannon.

20. Ms. Brannon nodded, indicating she would do as Mr. Anderson asked.

21. Mr. Anderson and inmate Bair kept walking until they entered the Multi-purpose Room and Plaintiff kept walking until he entered the Chapel sanctuary.

22. At sometime between 1:15 and 2:30 Ms. Brannon went to another office, to use the photocopier, to make the copy for Mr. Anderson.

23. Ms. Brannon copied both sides of Plaintiff's original.

24. Ms. Brannon read the poetry that was typed on the backside of Plaintiff's original copy of the article.

25. Ms. Brannon made an unknown number of additional two-sided copies of Plaintiff's original.

26. At sometime around 2:30 when Mr. Anderson and Plaintiff were both within six (6) feet of her desk, Ms. Brannon handed the original and one copy to Mr. Anderson.

27. Ms. Brannon did not utter a single word to anyone as she extended her arm to hand Mr. Anderson the two sheets of paper.

28. Mr. Anderson thanked Ms. Brannon while receiving the two sheets of paper in his hand.

29. Immediately upon receiving the papers from Ms. Brannon Mr. Anderson handed one of the papers to Plaintiff.

30. While extending his arm to hand Plaintiff the original Mr. Anderson noticed there was something typed on the back side of the articles.

31. Mr. Anderson immediately read the typewritten poems that were on the backside of the article while standing near the desk.

32. Mr. Anderson interrupted his initial reading of the poetry to make the comment (to Ms. Brannon, to Plaintiff, or maybe to himself) that "this is some smoking poetry here!"

33. Upon completing his reading of the poetry Mr. Anderson stated, as a question, "You know, I distribute things?"

34. Plaintiff responded by asking Mr. Anderson to go in the Chapel sanctuary to continue the conversation and Mr. Anderson complied.

35. In the sanctuary Plaintiff informed Mr. Anderson he was free to do as he pleased with the article but he did not have Plaintiff's permission to distribute the poems.

36. At some time after making the copies Ms. Brannon caused copies of the two-sided original to reach various program directors, superintendents and departments heads at SCI-Albion including Defendant McQuown.

37. Subparagraph 14 of Section B (Specific Rules and Regulations) of the PA DOC CODE OF ETHICS, (DC-174) was in full effect on 10/24/02.

38. Defendant McQuown knew, on 10/24/02, that subparagraph 14 of Section B of DC-174 required all employees of the PA DOC to "Promptly report to their supervisors any information which comes to their attention and indicates violation of law, rules and/or regulations of the Department of Corrections by either an employee or an inmate, and will maintain reasonable familiarity with the provisions of such directives."

39. Defendant McQuown knew, on 10/24/02 that subparagaph 22 of Section B of DC-174 required all employees to "submit any necessary and/or requested work elated reports in a timely manner in accordance with existing regulations."

40. Defendant McQuown knew, on 10/24/02, that subparagaph 22 of Section B of DC-174 required that "Reports submitted by employees shall be truthful and no employee shall knowingly enter or cause to be entered any inaccurate, false, or improper information or data, or misrepresentation of the facts in any record or report."

41. The terms of DC-801, INMATE DISCIPLINE, were in full effect on 10/24/02.

42. Plaintiff remained employed as a Chapel Clerk between 10/24/02, the day when Ms. Brannon copied the poetry, and 11/13/02, the day the Support Team

Meeting (Staffing) was conducted.

43. Plaintiff reported to work and performed his assigned duties without incident on each of the 13 working days between 10/24/02 and 11/13/02.

44. Plaintiff's immediate supervisor, Imam Abdalla, did not write an Unusual Occurrence Report, or any other type of report, on 10/24/02 about Plaintiff and/or his poetry.

45. Ms. Brannon gave Defendant McQuown one of the two-sided copies on 10/24/02.

46. Defendants Gamble, McQuown, and Snyder were the three prison officials who sat as Support Team Members at the Staffing for Plaintiff on 11/13/02.

47. During the Staffing Defendants Gamble, Snyder and McQuown each questioned Plaintiff about the poems at issue.

48. Plaintiff informed the Support Teams Members that the First Amendment of the U.S. Constitution gave him the right to write poetry.

49. During the Staffing Defendant McQuown told Plaintiff that the First Amendment did not give Plaintiff the right to yell "fire" in a movie theatre.

50. Plaintiff's response to Defendant McQuown indicated that the First Amendment does indeed give one the right to yell "fire" in a movie theatre if/when the theatre is, in fact, burning.

51. The SCI-ALBION JOB ASSIGNMENT NOTICE, that is attached to Plaintiff's Third Amendment Complaint (Doc. # 39) as Exhibit "A" is a genuine copy of said document.

52. The "Form DC-135A Inmate's Request To A Staff Member" that is attached to Doc. # 39 as Exhibit "B" is a genuine copy of said document.

53. Between 10/30/00 and 11/13/02 Plaintiff's rate of pay, as a Chapel Clerk, was 42¢ per hour and/or $2.52 per six hour day.

54. The SCI-ALBION JOB ASSIGNMENT NOTICE, Exhibit "A" of Doc. #39, indicates Plaintiff had been "released from Chapel Payroll," as of 11/14/02.

55. Records in SCI-Albion's Business Office indicate Plaintiff was paid $55.65 for the pay period between 08/04/02 and 09/07/02.

56. Records in SCI-Albion's Business Office indicate Plaintiff was paid $52.08 for the pay period between 09/08/02 and 10/05/02.

57. Records in SCI-Albion's Business Office indicate Plaintiff was paid $47.04 for the pay period between 10/06/02 and 11/02/02.

58. Records in SCI-Albion's Business Office indicate Plaintiff was paid $1.44 for the pay period between 10/20/02 and 11/16/02.

59. Records in SCI-Albion's Business Office indicate Plaintiff was paid

$17.64 for the pay period between 11/03/02 and 12/07/02.

60. Records in SCI-Albion's Business Office indicate Plaintiff was paid $16.59 for the pay period between 11/17/02 and 12/21/02.

61. Records in SCI-Albion's Business Office indicate Plaintiff was paid $12.96 for the pay period between 12/22/02 and 1/18/03.

62. The SCI-ALBION JOB ASSIGNMENT NOTICE, Exhibit "A" of Doc. # 39, indicates Plaintiff "has been assigned as follows: Job GLP, Rate 72¢ [per] day" as of 11/14/02.

63. On 11/18/02 Defendant McQuown indicated, by writing on Exhibit "B" of Doc. # 39, that his "reasons and justification for [his] decision and actions to remove [Plaintiff] from [his] job" ... were "Your poems which you stated you intended for all."

64. On 11/18/02 defendant McQuown indicated, by writing on Exhibit "B" of Doc. # 39, that he "found this to be a threat to the orderly running of the institution. It is inflammatory & disruptive."

65. Plaintiff's duties as an Islamic Chapel Clerk included maintaining attendance records for all Islamic activities at SCI-Albion and teaching other inmates how to read and write Arabic.

66. DOC policy required that Plaintiff be certified as an "Inmate Peer Leader" before Plaintiff would be allowed to give instructions to other inmates.

67. The statue of "Inmate Peer Leader" is the highest, most honorable, and trustworthy level that an inmate can attain in the Chaplaincy Department at SCI-Albion.

68. A Support Team Meeting was conducted by Defendant McQuown and others during the summer months of 2002 whereat the Support Team Members elevated Plaintiff to "Inmate Peer Leader" status.

69. Chapel Clerks are confined to the Chapel Area every morning and afternoon and evening while they are on the job.

70. Officials at SCI-Albion maintain records on the numbers of inmates that attend each session of Yard Out.

71. SCI-Albion's records indicate a larger number on inmates actually attended the morning and afternoon sessions of the Yard in November 2002 than attended the morning and afternoon activities in the Chapel Area.

72. The authorized work areas for Chapel Clerks at SCI-Albion is limited to: (1) the Chapel Offices, (2) The Religious Service Area, i.e. the sanctuary, (3) the Multi-purpose Room in the Education Lobby, and (the Education Lobby Area.

73. The initial decision to reassign Plaintiff from the Chapel to GLP was made at some point prior to the Staffing on 11/13/02.

74. The initial decision to reassign Plaintiff from the Chapel to GLP was made by someone other than the members of the 11/13/02 Support Team.

75. Defendant McQuown (after a full assessment of the situation) on 10/24/02 believed there was no need to take any action against Plaintiff and, thus, he took none.

76. Defendant McQuown (after a full assessment of the situation) on 10/24/02 deemed the poems to be Ebonic echoes of the unpleasant reality which John M. R. Bull focused public attention upon with his article.

77. Defendant McQuown (after a full assessment of the situation) on 10/24/02 believed the events surrounding the request for Ms. Brannon to make one copy of the article were insignificant.

78. Defendant McQuown (after a full assessment of the situation) on 10/24/02 believed the events surrounding the poetry did not warrant writing a DC-121 Part 3 Unusual Occurrence Report.

79. Defendant McQuown, on 10/24/02, would have written a DC-121 Part 3 as required by PA DOC policy (whenever an employee perceives possible: (a) violations of law, (b) violations of institutional rules and regulations, and (c) threats to the security and/or orderly running of the institution) in the event he believed there was a need for write a report about the events of 10/24/02.

80. Defendant McQuown was pressured by others, who were embarrassed by and/or annoyed with the poetry, to write/file a DC-121 Part 3 on 10/28/02.

81. Defendant McQuown did not speak to Mr. Anderson, about the events of 10/24/02, prior to writing the DC-121 Part 3 on 10/28/02.

82. Defendant McQuown did not speak to Mr. Anderson prior to writing the 10/28/02 DC-121 because he (McQuown) viewed the events surrounding the poetry as being a non-incident, a mole hill which others were viewed as an erupting volcano.

83. Notwithstanding Defendant McQuown's statement: "Minister Anderson requested clerk Brannon make a copy of the attached document." the document attached to his 10/28/02 DC-121 is not a true copy of the original copies made by Ms. Brannon; it is an edited, altered and incomplete copy of the original.

84. The copy attached to the DC-121 is edited, altered and incomplete due to the obvious fact that (a) the portion of the headline which has been left intact is unreadable, and (b) the graph on its right side has been all but eliminated and is, thus, incomprehensible.

85. The copy of the article and poems attached to this Request For Admissions is a genuine, full-size, copy of the document copied by Ms. Brannon on 10/24/02.

86. The removal of the headline and graph from the article causes the document (which is attached to DEFENDANTS' AMENDED RESPONSE TO PLAINTIFF'S INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS, and in the DOC's files) to be unacceptable pursuant to the terms of subparagraph 22 of Section B of DC-174 which states, in pertinent part: "...and no employee shall knowingly enter or cause to be entered any inaccurate, false, or improper information or data, or misrepresentation of facts in any Department record or report."

87. The views expressed in Plaintiff's poems caused prison officials to deem Plaintiff to be (as Supt. Wolfe asserts in Exhibit "E" of Plaintiff's Third Amendment Complaint, Doc. # 39) inappropriate for the Clerk's position in the Chapel.

88. The PA DOC took custody of Plaintiff in July of 1994.

89. Plaintiff's employment record for the period between his commitment to DOC custody and the 11/13/02 Staffing is as follows:

| DATES | SUPERVISORS | JOB DESCRIPTION | TERMINATED FOR |
|---|---|---|---|
| 03/20/95 – 04/08/96 | Davis, Crosby | Floor Crew | New Assignment |
| 04/08/96 – 07/15/98 | Meyerhoff | Stained Glass | Sent to new jail |
| 12/03/98 – 07/15/99 | Hewett | Sign Shop | Sent to new jail |
| 10/30/00 – 11/13/02 | Abdalla | Chapel Clerk | Poems at issue |

90. Not one of the supervisors name above caused any negative comments about Plaintiff's conduct or performance on the job to be present in the permanent file that the PA DOC maintains on Plaintiff.

91. Plaintiff has never received anything less than "above-average" and "excellent" ratings on work evaluations at the above-mentioned jobs.

92. Plaintiff has maintained "above-average" and "excellent" ratings on every Housing Unit Report that has been made on Plaintiff in general population from 07/94 to 10/24/02.

93. Reports, evaluations and notes in PA DOC files on Plaintiff indicate Plaintiff maintained a uniform excellence of conduct and character from his first day in PA DOC custody until 10/24/02, the day prison officials discovered Plaintiff's poems.

94. Prison officials were embarrassed/annoyed, by the views expressed in the poems, to the point of taking improper actions against Plaintiff.

95. When an artist makes the statement that a piece of his/her work is intended for "everybody" or "all" a rational thinking person of normal intelligence would not interpret that artist's statement in a way that would indicate some intent of the artist to provide "everybody" or "all" with an individual copy of the artwork.

96. Mr. Anderson has an established practice of distributing written materials to prisoners confined in the RHUs of the prisons where he works.

97. The SCI-ALBION JOB ASSIGNMENT NOTICE, dated 04/05/04 and attached herein as Exhibit "J", is a genuine copy of said document.

98. Exhibit "J" indicates that, as of 04/05/04, Plaintiff was: (1) released from GLP payroll, (2) "assigned as follows: Job: Chapel/Clerk, rate: .33 [per] hour," (3) instructed to "report to Chaplain McQuown, who is your supervisor, on or before: 0800 the starting date shown above."

99. On 05/12/04 Plaintiff was performing his Chapel Clerk duties from around 0800 until he was escorted to RHU and placed on AC Status Pre-hearing confinement around 1100 hours that morning.

100. Defendant McQuown was Imam Abdalla's immediate supervisor at all times relevant to these matters.

101. On 04/05/04 neither Defendant McQuown nor Imam Abdalla expressed any concern that Plaintiff might have been inappropriate for the Chapel Clerk job.

102. There were no incidents or unusual occurrences reported in the Education Building between 1000 and 1100 hours on 05/12/04 other than the incident which is alleged on DC-141 Part 1 No. A453158 which is attached hereto as Exhibit "L".

103. The three sheets attached herein as Exhibit "K" are true copies of the Preface of the King Fahd translation of the Holy Qur'an. (Note: Imam Abdalla has copies of said Qur'an at SCI-Albion.)

104. The underlined sentences near the middle of page number "iii" of Exhibit "K" indicate: "It becomes incumbent upon each and every person who seeks the dignity of this world and the bliss of the Hereafter to regulate his life according to it [the Qur'an], to implement its commandments and to pay homage to the magnificence of the One Who revealed it."

105. The underlined sentences near the middle of page "iii" of Exhibit "K" indicate [the Qur'an's] contents are not confined to a particular theme or style, but contain the foundation for an entire system of life, covering a whole spectrum of issues, which range from specific articles of faith and commandments to general moral teachings, rights and obligations, crime and punishment, personal and public law, and a host of other private and social concerns. (Emphasis added).

106. Paragraph number 7 on page number "v" of Exhibit "K" indicates; [The Qur'an] contains a complete code which provides for all areas of life, whether spiritual, intellectual, political, social or economic. It is a code which has no boundaries of time, place or nation. Verily this Qur'an doth guide to that which is most right." (Emphasis added).

107. All of the major religions of the World — and especially Judiasm, Christianity and Islam — present value judgments, respectively, of what is right and of what is wrong; of what is sinful and of what is saintly, to adherents who are willing to be indoctrinated by the belief systems of their choice.

108. Judaism, Christianity and Islam, respectively, teach Jews, Christians and Muslims who refuse to accept their Faith's dogma — of what is right/wrong and saintly/sinful — that they should look forward to adverse consequences in actions taken against them by the congregation they belong to and from their God in the Hereafter, such as eternal damnation in the Fires of Hell.

109. According to the above-mentioned major religions, "unbelievers" are heathens who have rejected and continue to reject God's authority to determine the best way for humans to conduct their affairs in this world.

110. The 23rd verse of Chapter 45 of the Holy Qur'an, as translated by Yusuf Ali states: "Then seest thou such a one [who rejects what God has revealed through His Prophets] as takes as his god his own vain desire? Allah has, knowing (him as such) left him astray, and sealed his hearing and his heart (and understanding), and put a cover on his sight. Who, then, will guide him after Allah (has withdrawn guidance)? Will ye not then receive admonition?"

111. The concept of worship in the three above-mentioned major religions includes, if not mandates, the worshippers' obedience to the edicts of God; in the same way that one who has taken his/herself as his/her god (and thus worships his/herself or other humans) is obedient to the commands of his/her human idol.

112. Historians believe and report that a man named George Fox founded the Religious Society of Friends in England in 1652.

113. George Fox founded the Religious Society of Friends based upon his experiences, perceptions and personal opinions of what he believed to be wrong and/or right with the Christians in England.

114. Defendant McQuown is not aware of a single incident wherein Plaintiff expressed any racial hatred or animosity toward any person in the R.S.A..

115. Defendant McQuown is well aware of the fact that Plaintiff always maintained a pleasant and dignified relationship with all of the employees in the Chapel Area; inmates and staff, Black and White.

October 29 , 2006

*Leonard C. Jefferson*

Leonard C. Jefferson, CL-4135
10745 Rt. 18
Albion, PA 16475-0002

## STATE CORRECTIONAL INSTITUTION AT ALBION
## JOB ASSIGNMENT NOTICE

NAME: _Jefferson_                          NUMBER: _CL- 4135_

HAS BEEN ASSIGNED AS FOLLOWS:                          HOUR: _✓_

JOB: _Chap /Clerk_          RATE: _.33_          DAY: _____

STARTING DATE: _4/5/04_          DAYS OFF: _____

REPORT TO: _Chaplain McQuown_, WHO IS YOUR SUPERVISOR,

ON OR BEFORE: _0800_          THE STARTING DATE SHOWN ABOVE.

RELEASED FROM _GLP_          PAYROLL

## ***FAILURE TO REPORT WILL RESULT IN DISCIPLINARY ACTION.***

APPROVED BY: _C. Mitchell_

### MS. C. MITCHELL
### CORRECTIONS EMPLOYMENT AND
### VOCATIONAL COORDINATOR

****LISTED BELOW IS A JOB ORIENTATION ACKNOWLEDGEMENT FORM FOR JOB DUTIES AND SAFETY POLICIES. JOB SUPERVISOR SHOULD REVIEW JOB DESCRIPTION AND SAFETY POLICIES WITH THE ABOVE NAMED INMATE. BOTH THE WORK SUPERVISOR AND INMATE MUST SIGN AND RETURN THE ENTIRE FORM TO THE INMATE EMPLOYMENT OFFICE AS SOON AS POSSIBLE. THANK YOU FOR YOUR COOPERATION.

### ORIENTATION ACKNOWLEDGEMENT FORM

I HAVE RECEIVED INSTRUCTIONS FOR JOB DUTIES AND SAFETY POLICIES FOR THE JOB ASSIGNMENT LISTED BELOW.

_Chap. Clerk_
JOB ASSIGNMENT

_Leonard C. Jefferson_                    _ENS_  _4/05/04_
INMATE'S SIGNATURE – DATE          SUPERVISOR'S SIGNATURE - DATE

_EXHIBIT "J"_

بسم الله الرحمن الرحيم

## PREFACE

Praise be to Allah, the Cherisher and Sustainer of the worlds, Who has said in His Noble Book:

There has come to you from Allah
Light and a Perspicuous Book. (1)

And may peace and blessings be upon the Seal of the Prophets, Muhammad, who has said that:

The best among you is he who learned
the Qur-an and then taught it. (2)

May the peace and blessings of Allah be upon him, his family and all his Companions.

The Glorious Qur-an is the Book of Allah, the Wise and Worthy of all Praise, Who has promised to safeguard it from any violations in its purity. It becomes incumbent upon each and every person who seeks the dignity of this world and the bliss of the Hereafter to regulate his life according to it, to implement its commandments and to pay homage to the significance of the One Who revealed it. This can be an easy task for those involved with guidance from Allah, especially those blessed by an understanding of Arabic, the language of the divine communication. But for those not acquainted with Arabic, their ignorance is a barrier between them and this source of guidance and illumination. A translation of the message of Allah is thus a task not to be taken lightly or performed superficially.

Before the reader begins to study the Qur-an, he must realize that unlike all other writings, this is a unique book with a supreme author, an eternal message and a universal relevance. Its contents are not confined to a particular theme or style, but contain the foundations for an entire system of life, covering a whole spectrum of issues, which range from specific articles of faith and commandments to general moral teachings, rights and obligations, crime and punishment, personal and public law, and a host of other private and social concerns. These issues are discussed in a variety of ways, such as direct stipulations, reminders of Allah's favours on His creation, admonitions and rebukes. Stories of past communities are narrated, followed by the lessons to be learned from their actions and subsequent ideas.

The Qur-an enjoys a number of characteristics unique to it alone, some of which are as follows:

(1) Sūra Al-Mā-ida: 15.   (2) Narrated by the an most excerpt Muslim.

- iii -

EXHIBIT "K" (3 PAGES)

1. It is the actual Word of Allah; not created but revealed for the benefit of all mankind.
   Blessed is He Who sent down the Criterion
   To His servant, that it may be
   An admonition to all creatures. (3)

2. It is complete and comprehensive. The Almighty says:
   Nothing have We omitted from the Book. (4)
   In another place we read,
   And We have sent down to thee
   The Book explaining all things. (5)

3. It is a theoretical and a practical Book, not only maximising but also defining specifically the permissible and the forbidden. The importance of understanding the message of the Qur'an is undeniable, but simply reciting it with the intention of seeking Allah's pleasure and reward is also an act of worship and meritorious in itself. Allah Almighty says:
   So take what the Prophet gives you.
   And refrain from what he prohibits you. (6)

4. Allah has perfected His religion for all mankind with the revelation of this Book. He says:
   This day have I perfected your religion for you,
   Completed my favour upon you and have chosen
   For you Islam as your religion. (7)

5. It is Allah's eternal miracle revealed to the Prophet Muhammad for all succeeding generations. In response to those who doubt the authorship of the Qur'an, Allah Almighty has challenged the most articulate Arabs to produce a whole book, ten chapters or even one solitary chapter which can be remotely comparable to the Qur'an. But to this day, no one has succeeded in meeting the challenge of the Almighty. The critics of the Qur'an have been struck dumb by its ineffable eloquence and surpassing beauty.
   Say, if the whole of mankind and jinns
   Were to gather together to produce the
   Qur'an, they could not
   Like of this Qur'an, they could not
   Produce the like thereof; even if they
   Backed up each other with help and support. (8)

The Almighty also says:
   Or, they may say; he forged it.
   Say: Bring ye then ten chapters
   Forged, like unto it and call

(3) Sūra Al-Furqān 1.    (5) Sūra An-Nahl 89    (7) Sūra Al-Mā'ida 3
(4) Sūra Al-An'ām 38    (6) Sūra Al-Hashr 7    (8) Sūra Al-Isrā 88.

- iv -

(To your aid) whomsoever ye can
Other than Allah, if ye speak
The truth. (9)

And again:
Or do they say; he forged it?
Say, Bring then a chapter like
Unto it and call (to your aid)
Anyone ye can besides Allah,
If it be ye speak the truth. (10)

6. It has been revealed to re-establish the sincere worship of Allah alone, without association of any partners with Him.
   This is a Book with verses basic or
   Fundamental (of established meaning),
   Further explained in detail;-
   From One who is Wise and Well-Aware,
   (it teaches) that you should worship
   None but Allah. (11)
   And they have been commanded no more
   Than this: to worship Allah,
   Offering Him sincere devotion, being true
   In faith, to establish regular prayer
   And to give Zakat; and that is
   The religion Right and Straight. (12)

7. It contains a complete code which provides for all areas of life, whether spiritual, intellectual, political, social or economic. It is a code which has no boundaries of time, place or nation.
   Verily this Qur'an doth guide
   To that which is most right. (13)

8. Allah Almighty has taken upon Himself the duty of preserving the Qur'an for ever in its entirety, as He says:
   We have without doubt sent down
   The Message; and We will assuredly
   Guard it (from corruption). (14)

So well has it been preserved, both in memory and in writing, that the Arabic text we have today is identical to the text as it was revealed to the Prophet. Not even a single letter has yielded to corruption during the passage of the centuries. And so it will remain for ever, by the consent of Allah.

Given the depth as well as the sublimity of the Qur'anic text, a faithful

(9) Sūra Hūd. 13    (11) Sūra Hūd 1-2.    (13) Sūra Al-Isrā. 9
(10) Sūra Yūnus. 38.    (12) Sūra Al-Bayyina. 5.    (14) Sūra Al-Hijr. 9

- v -

translation of it into another language is virtually impossible. The various translations that exist today, however accurate they may be, cannot be designated as the Qur-an, since they can never hope to imitate the diction or the style of the Book of Allah. But as translation is one of the few ways to export the message of the Qur-an to allow those lacking in knowledge of Arabic to share this precious gift, it becomes a duty for those in a position to fulfil this task.

A number of individuals have in the past ventured to translate the Qur-an, but their works have generally been private attempts, greatly influenced by their own prejudices. In order to produce a reliable translation free from personal bias, a Royal decree (No. 19888, dated 16/8/1400 AH) was issued by the Custodian of the Two Holy Mosques, King Fahd Ibn Abdul Aziz, at that time the deputy prime minister , authorizing the General Presidency of the Departments of Islamic Researches, Ifta , Call and Guidance to undertake the responsibility of revising and correcting a particular translation which would be selected for this purpose and made publicly available later.

To accomplish this enormous task, a number of committees were formed, comprising scholars well-qualified both in Islamic Shari'a and the English language. Some of these scholars were associated with the General Presidency of the Departments of Islamic Researches, Ifta, Call and Guidance.

The first committee was given the task of examining the existing translations and choosing the most suitable one from among them. The committee discovered that there was no translation free from defects and so there were two options open for consideration: the first was to select the best translation available and then adopt it as a base for further work as well as a source of reference, with the objective of revising its contents and correcting any faults in view of the objections raised against it; the second was to prepare a fresh and independent translation, starting from scratch.

It became obvious from studying these translations that the second option demanded much time and effort, neither of which were available at the time.

The first option was therefore considered to be more practical, since it met the existing urgent requirements and helped to achieve the desired goal in a comparatively short period of time. The translation by the late Ustadh ABDULLAH YUSUF ALI was consequently chosen for its distinguishing characteristics, such as a highly elegant style, a choice of words close to the meaning of the original text, accompanied by scholarly notes and commentaries.

The committee began revising and correcting this translation with the aid of other translations available, by comparing and then adopting best expressions as well as by introducing fresh expressions where necessary. The committee was fully aware of all the criticisms that had been directed against this translation and which had been carefully brought to the notice of the presidency by a num-

- vi -

ber of academic bodies and other involved parties. In the second stage, the entire work of this committee was referred to a number of individuals and organisations who then augmented any deficiencies in the work of the committee.

A third committee was set up to collate all their suggestions. It then compared all such views regarding specific issues, selected the appropriate one (s) and arrived at it at as authentic and defect-free as was humanly possible.

Finally, a fourth committee was formed to look into the findings of the second and third committees and to implement the recommendations made by them. Furthermore, this committee had to finalise the text by adopting the most accurate expression where needed, besides checking the notes vigilantly so as to clear any misconceptions regarding the articles of faith, varying juristic opinions and thoughts not in conformity with the sound Islamic point of view.

In the course of its work, the committee came across some Arabic words which could not be translated correctly, such as Zakat and Tagut. It was therefore decided to give a transliteration of these words in English with a brief explanatory note for each one at its first occurrence in the text. The reader will find a list of such words at the end of this preface, as well as a list containing an English transliteration of Arabic letters. A list of the abbreviations used in this work is also provided. Finally, the reader will find at the end of the text a comprehensive list containing references to proper names of people, places and important topics, dealt with either in the text or in the accompanying notes.

According to the Royal decree (No. 12412, dated 27/10/1405 AH), this translation is printed at King Fahd Holy Qur-an Printing Complex in Al-Madinah Al-Munawwarah and also with coordination of the General Presidency of the Departments of Islamic Researches, Ifta Call and Guidance.

To implement the directions of the Custodian of the Two Holy Mosques (May Allah preserve him) concerning the Propagation of the Book of Allah, its distribution and translation into every language spoken by Muslims the worldwide, and due to the cooperation between the General Secretariat of King Fahd Holy Qur-an Printing Complex and the Presidency of Islamic Researches, Ifta, Call and Guidance regarding a faithful, specific and scholarly translation of the meanings of the Holy Qur-an, we are pleased to present to all Muslims and those seeking spiritual light among English - speaking people this translation which comes as one of the Series of the translations of the meanings of the Holy Qur-an into various languages printed by the Complex in Al-Madinah Al-Munawarah.

May Allah reward bounteously those who were behind this blessed work.

THE PRESIDENCY OF ISLAMIC RESEARCHES, IFTA, CALL AND GUIDANCE.

- vii -



FORM DC-141   PART 1
Rev 3/00

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

**A** 453158

☐ MISCONDUCT REPORT   ☐ OTHER   ☐ DC-ADM 801  INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| CL 4135 | Jefferson, Leonard | SCI-A | 1045 | 5/12/04 | 5/12/04 |

| Quarters | Place of Incident |
|---|---|
| FB-62 | Centralized Services Lobby |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| Staff | Ofcr Clement | / | | Staff | LT Eddy | / | |
| | Sgt Eliason | / | | | MS Brannon | | / |
| | Ofcr Rollingwood | / | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**   Class 1 No. 1 Assault  Class 1 No. 35 Refusing To obey an order.

**STAFF MEMBER'S VERSION**   On 5/12/04 at 1045 he's Inmate Jefferson was sitting in The Lobby reading a Koran, I asked Jefferson why he was in The Lobby and not in The chapel where he works. He said the music's To loud and his work supervisor said its his work area. When The music was over I gave Jefferson several direct orders to go in the chapel. He became very argumentive and refused all my orders. He pushed me with his shoulder and chest To enter The chaplins office. At This Time I ordered him To place's his hands on The wall To pat search him. During The search he Took his hands off The wall, officer clement ordered Jefferson To place his hands back on The wall until he was ordered To remove his hands. He was hand cuffed and escorted To RHU by LT Eddy and Sgt Eliason.

**IMMEDIATE ACTION TAKEN AND REASON**   Inmate placed in RHU AC status pending a hearing.

**PRE-HEARING CONFINEMENT**

- IF YES

| | TIME | DATE |
|---|---|---|
| ☑ YES | 1056 | 5-12-04 |
| ☐ NO | | |

**FORMS GIVEN TO INMATE**
☑ REQUEST FOR WITNESSES AND REPRESENTATION   ☐ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY   SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| J. Rodgers COI | Capt Crowe | DATE: 05/12/04   TIME 24 HOUR BASE: 1315 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
|---|---|---|---|
| DATE: 05/12/04   TIME: 1325 | | ☑ CLASS 1   ☐ CLASS 2 | |

**NOTICE TO INMATE**

You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have will be removed.

WHITE — DC-15      YELLOW — Inmate      PINK — Reporting Staff Member      GOLDENROD — Deputy Superintendent Facility Management

**DC-ADM 801 Inmate Discipline Policy, Attachment B**

EXHIBIT "L"

# SELF-HEALING

Practiced before man began recording history
The art of self-healing ain't no real mystery
The best doctors with perfected visions in their minds
Can't help those who're determined to remain blind

Those who go out of their way to trivialize
Their lost of focus upon a very important prize
Living a nightmare unaware running out of time
Oblivious victims of State-sponsored hate crimes

The only thing missing in their courtrooms is their hanging tree
And justice for people with black skin like you and me
Courts remain one of America's most racist places
Please don't try to deny it when its
right up in all of our faces

**One hundred and seventeen per one hundred thousand**
    is White folk's incarceration rate
**One thousand six hundred and seventy-three per hundred thousand**
    is Black's rate in this racist scena
Doubt has been dispelled by computerized light
Black's incarceration rate is fourteen times that of Whites

Social scientist produce these stats then they tell you humongous lies
Which you'll accept as true if you're determined to remain blind
Will you act upon the facts upon which these stats stand
To end State-sponsored hate crimes against the Black man

Even blind eyes must see our apathy as being beyond strange
Educated and wealthy now that are we doing to make this situation change
Could it be that doctorate degrees and surplus personal wealth
Destroy the vision of those who have not learnt
    we must show love to ourselves

Practiced before man began recording history
The art of self-healing ain't no real mystery
The best doctors with perfected visions in their minds
Can't help those who're determined to remain blind

## 21ST CENTURY'S DAWN'S EARLY LIGHT

My Country tis of thee
This is about your reality
By the 21st Century's Dawn's early light
There ain't no justice for you here if you ain't white

Sweet land of liberty
Bitter was the taste of your slavery
And that putrid taste remains strong in all of our mouths
As we now see you lynching us downtown in your courthouses

The whole world watched you beat down Rodney King
Then we saw White jurors who could not see what we were seeing
With their open eyes their closed minds saw the police were right
You know there ain't no justice for you here if you ain't white

Today's lynchings are performed at Police State-style trials
Perpetuating this injustice American-style
Highlighting the unstated semantic reality
That lynchings don't require bodies hanging from the trees

Oh say can you see
Strange fruit no longer hangs in America's trees
Now in the land of the free the home of the brave
Prisons conceal the lynched children of America's slaves

Remember Martin told us to let Freedom ring
So my Country tis of thee that I sing
Now in the land of the free the home of the brave
Prisons conceal the lynched children of America's slaves

# Pa. imprisons blacks at highest rate

## Study by reform group finds it's 14 times that of whites

By John M.R. Bull
Post-Gazette Harrisburg Correspondent

HARRISBURG — Pennsylvania incarcerates a larger percentage of its minority population than any other state, according to a new study.

For more than a decade, the state has had one of the highest disparities in the nation at which it incarcerates minorities, mainly blacks, compared with the state's minority population, according to a study done by the Justice Policy Institute of Washington, D.C. The results of the study were published recently by the liberal magazine Mother Jones.

"This is not shocking news," said Ernie Preate Jr., a former state at-

### STUDY PAGE C-2

- The nation's oldest prison advocacy group scores for inmates because notices are cited. Page C-2

torneys general who served time in prison on corruption charges and pressed as a rate of 14 times that of whites.

The study compared the number of minorities in state prisons with the number of minorities in the state and measured the results against other states based on 2000 figures.

Over all, blacks make up 55 percent of the state prison population.

but 10 percent of the state's population.

The study concluded that, for every 100,000 blacks in the state, are in prison, compared with 117 for whites. That means that it would mean that blacks are imprisoned at a rate 14 times that of whites.

Add in the number of Hispanics that are also imprisoned, with blacks make up less than 1 percent of the state's population and are incarcerated at a lower rate than blacks, and the state incarcerates minorities never at 11 times the rate of whites.

That disparity is larger than in any other state, according to the study.

Other states that incarcerate minorities more than 10 times the rate of white defendants are Minneso-

Wisconsin, Connecticut and New Jersey.

Sixteen states do not incarcerate as great a percentage of their minority populations, as do many. Incarceration states, Texas had the lowest incarceration disparity. In prisons, minorities at 3 times the rate of whites, the study showed.

"Why is something we really don't know," said Jason Ziedenberg, who spent policy analyst at the Justice Policy Institute.

"That's an intriguing question," said Alfred Blumstein, a professor of criminal systems and operations research at Carnegie Mellon University who has published two works on racial imbalance in incarceration rates.

### Incarceration disparity

Pennsylvania's rate...

#### Top states

1. Pennsylvania
2. District of Columbia
3. Wisconsin
4. Connecticut
5. Minnesota
6. New Jersey
7. New York
8. Maryland
9. Illinois
10. Ohio
11. Texas

Source: MotherJones.com



Pennsylvania's incarceration rates

years have been sentenced to prisons all that blacks is not known. The latest study merely compares the number of blacks in each state prisons with the number of blacks in each state, highlighting the disparity in sentencing rates as a percentage of each state's minority population.

The turning war of the past 20 contributed greatly to that disparity, Preate said.

Drug sweeps are more often conducted in cities, where the population of African-Americans and Latinos is currently group members tend to be higher, and that means more blacks are arrested on drug charges, even though a variety of studies show that blacks and whites use illegal drugs at the same rate, Preate said.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LEONARD C. JEFFERSON,
        Plaintiff,

      V.                              C.A. NO. 04-44 ERIE

WILLIAM WOLFE et al.,
        Defendants

PLAINTIFF'S REQUEST FOR ADMISSIONS FROM DEFENDANT BEARD

    AND NOW comes plaintiff LEONARD C. JEFFERSON, pursuant to

Fed.R.Civ.P. Rule 36, and asks the above-named defendant to either admit or

deny the truth of each of the following statements under oath within thirty

(30) days of service of this request:

    1. DC-ADM 801, INMATE DISCIPLINE, VI. (Procedures), A (Misconduct/Rule Violation Reports) indicates: "All rule violations are to be reported via a DC-141; 'Misconduct Report' Part 1 ... any inmate charged with any of the listed violations will receive a copy of the report." (Emphasis added.)

    2. DC-ADM 801 indicates that all of the following behaviors constitute an offense, a violation of said policy, for which a DC-141 Part 1 Misconduct Report must be written by at least one PA DOC employee who has witnessed or has become aware of the prohibited conduct: (1) engaging in, or encouraging unauthorized group activity, (2) possession of contraband ... or other items which in the hands of an inmate present a threat to the inmate, other or to the security of the facility, (3) failure to report the presence of contraband, and (4) possession of any items not authorized for retention or receipt by an inmate not specially numerated as Class 1 contraband.

    3. The PA DOC had not granted Plaintiff an exemption on 10/24/02, or at any other time, that would preclude the issuance of an appropriate Misconduct Report in the event that any prison official learned that Plaintiff had violated one or more prison rules.

    4. Plaintiff did not receive a Misconduct Report which alleged he and/or his poetry had violated any institutional rule of policy.

    5. Plaintiff did not receive a Misconduct Report which alleged he had engaged in or encouraged unauthorized group activity on 10/24/02 nor on any other day.

    6. Prior to the filing of the Complaint in this action PA DOC officials had never confiscated any poetry from Plaintiff.

    7. In the event that prison officials had determined that Plaintiff had violated a prison rule on 10/24/02, or on any other day, said officials were

duty-bound by PA DOC regulations to issue Plaintiff a Misconduct Report.

8. The theme of the poetry at issue is Racism in the Judicial System and Lynchings.

9. The United States of America does have an embarrassing and well-documented history of racial injustices in its Judicial system, and of lynchings, that pre-date the signing of the Declaration of Independence in 1776.

10. The PA DOC does not have any rule that prohibits Plaintiff from writing poetry.

11. The PA DOC encourages its inmates to express themselves via writing poems, essays and short stories.

12. PA DOC employees arrange and conduct poetry contest for inmates on a fairly regular basis.

13. The PA DOC prohibits its prisoners from possessing printed material which it deems to be racially inciteful.

14. PA DOC officials, beginning on 10/24/02 and continuing to this present day, have been, and remain, unable to demonstrate that the poetry copied by Ms. Brannon on 10/24/02 poses any threat the security.

15. There is no PA DOC policy that makes a prisoner who writes poetry, relating to sensitive social issues, inappropriate for employment as a Chapel Clerk.

16. PA DOC encourages inmates to adopt sincere religious beliefs and practices with full knowledge that most religions urge their adherents to speak out against, or to write about, the ills of society; including racism, poverty, abortion, war, homelessness, greed, unchecked materialist and shameful conduct.

17. Section A. 1. (Discrimination) of DC-174 -- which states: "The responsibility of all corrections employees is to act in relation to all citizens of the Commonwealth without regard to age, race, color, ancestry, creed, sex, and marital status, national origin, non-job related handicap, or political beliefs. This necessarily includes the inmates whom we supervise and fellow employees with whom we work." (Emphasis added.) -- prohibits PA DOC officials from making a determination that an African-American prisoner is "inappropriate" for the job of Chapel Clerk for no reason other than said prisoner has written poetry which addresses the injustices faced/endured by African-Americans in the courts of this Commonwealth.

18. The memo entitled "Appeal to Superintendent Grievance # 4161 that is attached to Plaintiff's Third Amended Complaint, Doc. # 39, as Exhibit "E" is a genuine copy of said document.

19. The memo "RE: DC-ADM 804 Final Review Grievance No. 58644 that is attached to Doc. # 39 is a genuine copy of said document.

20. DC-ADM 816 indicates that inmates who "do not have a work assignment

... will be placed in the General Labor Pool" (GLP).

21. Inmates who do not have any work assignment other than GLP are in fact unemployed.

22. Conduct by an inmate which poses a "threat to the orderly running of the institution" is conduct which is prohibited by DC-ADM 801.

23. DC-ADM 801 indicates that a staff member is required to issue a DC-141 Misconduct Report to an inmate whom the staff member has found to be engaged in conduct that poses "a threat to the orderly running of the institution."

24. Notwithstanding Defendant McQuown's written statement, which indicates he found Plaintiff's conduct "to be a threat to the orderly running of the institution," neither Defendant McQuown, nor any other prison official ever issue Plaintiff a Misconduct report for said alleged violation(s) of the prison's rules.

25. If the statements written by Defendant McQuown on 11/18/02 on Exhibit "B" of Doc. # 39 are true statements of his beliefs, Defendant McQuown was duty-bound by PA DOC policies DC-801 and DC-174 to cause Plaintiff to receive a DC-141 Misconduct Report for violating prison rules.

26. If the statements written by Defendant McQuown on 11/18/02 on Exhibit "E" were known to him to be false statements, he would be prohibited, by DC-801 and DC-174, from causing Plaintiff to receive a DC-141 Misconduct Report based upon a fabricated pretext in this matter.

27. The fact that no prison official ever issued a DC-141 Misconduct Report to Plaintiff related to his possession of poetry would cause most reasonable people to believe Plaintiff was removed from the Chapel Clerk job for some reason other than the reason that Defendant McQuown has written on Exhibit "B".

28. The most natural and logical inference — that would occur to the mind of an unbiased fact-finder who has rejected, as ludicrous and obviously fabricated, the justification for an action that has been offered by a party — is that the party fabricated the ludicrous-justification in an attempt to conceal the true, and most likely improper motivation, for the actions at issue.

29. Both Defendants McQuown and Gamble, in Exhibits "B" and "C-1" of Doc. # 39, respectively, wrote about "concerns that we had regarding the content of your poetry combined with our concerns about the extent of contact your job allowed you to have with outer inmates." (Quoting Exhibit "C-1".)

30. Defendants' act of reassigning Plaintiff from the Chapel Clerk job to GLP status could not, in any way, address any legitimate concern that prison official claimed they had about the content of the poetry nor any legitimate concern that prison officials claimed to have had about the number of prisoners with whom Plaintiff had contact.

31. The Defendants' act of reassigning Plaintiff from the Chapel to GLP

did not serve any legitimate penological purpose.

32. Inmates on GLP status are permitted to go to the yard every morning and afternoon year round, and are allowed to attend the yard every evening that it is open.

33. Defendant Beard is aware of the fact that the U. S. District Court for the Western District of Pennsylvania found, and the Third Circuit Court upheld the finding, that PA DOC officials had cited non-existent security concerns in a belated attempt to provide some semblance of justification for a blatant act of unconstitutional retaliation in Brooks v. Andolina, 826 F.2d 1266, 1268 (3rd Cir. 1987).

34. PA DOC officials would have immediately confiscated Plaintiff's poems and confined Plaintiff in the Hole, as is required by PA DOC policy, if said officials' alleged concerns about Plaintiff's intent and his poetry vis-a-vis the security of the jail were genuine.

35. The written reasons given by Support Team members Gamble and McQuown for removing Plaintiff from the Chapel Clerk job are different from the written reasons (for removing Plaintiff from that job) that were given by Robert Boeh on Exhibit "D" of Doc. # 39.

36. The memo of 03/20/03 from Supt. Wolfe to Plaintiff, which is attached to Doc. # 39 as Exhibit "E" is a genuine copy of said document.

37. On 03/20/03 Supt. Wolfe responded in Appeal to Superintendent Grievance # 41961.

38. The reasons that Supt. Wolfe has presented, on Exhibit "E," for removing Plaintiff from the Chapel Clerk job differ from the written reasons of Defendants Gamble and McQuown for removing Plaintiff from that job.

39. The reasons presented by Supt. Wolfe, on Exhibit "E", for removing Plaintiff from the Chapel Clerk job differ from the reasons given by Robert Boeh on the DC-804 Part 2 dated 03/07/03.

40. Supt. Wolfe's written statements, on Exhibit "E" do not in any way indicate that security concerns were a factor in the decision to reassign Plaintiff from the Chapel to GLP.

41. Supt. Wolfe's statement, on Exhibit "E" — that he "will stand by the decision that you are not appropriate for the clerks position in the Religious Service Area" — indicates that a decision, that Plaintiff was no longer appropriate for that job, had been made.

42. DC-ADM 816, WORK ASSIGNMENTS, allows an inmate who has been removed from a particular job to be reassigned to that same job at a later date.

43. Imam Abdalla, Plaintiff's immediate supervisor in the Chapel, and Defendant McQuown, Imam Abdalla's immediate supervisor in the Chapel, both sought to have Plaintiff returned to the Chapel Clerk job during the early months of 2004.

44. Plaintiff was reassigned to the Chapel Clerk position on 04/05/04.

45. Plaintiff was removed from the Chapel Clerk job as the result of a Misconduct Report on 05/12/04 which caused Plaintiff to be escorted from the Chapel to RHU pre-hearing confinement.

46. The form DC-141 Part 1, bearing the number A453158, attached herein as Exhibit "L" is a genuine copy of said document.

47. Exhibit "L" indicates that a Misconduct Report was filed against Plaintiff on 05/12/04 at some time around 1100 hours.

48. The STAFF MEMBER'S VERSION on Exhibit "L" (which begins with the statement: "On 5/12/04 at 10:45 Inmate Jefferson was sitting in the Lobby reading a Koran, I asked Jefferson why he was in the Lobby and not in the chapel where he works")  indicates Plaintiff was in an unauthorized area.

49. In A453158 Plaintiff has not been charged with being in an unauthorized area.

50. A453158 does not accuse Plaintiff of being present in an unauthorized area due to the fact that the Lobby Area is part of the authorized work area of Chapel Clerks.

51. When C.O. 1 Barry Lobdell wrote the STAFF MEMBER'S VERSION on A453158 he was fully aware that Chapel Clerks (1) were authorized to, and (2) had a long standing practice of sitting in the Lobby Area reading religious books while other Faith Groups were using the Chapel sanctuary for a program, service, band practice, etc. and thus, C.O. Lobdell did not include a presence in an unauthorized area charge in the Misconduct Report.

52. At around 1045 hours on 05/12/04 while in his assigned work area reading a Qur'an; C. O. Lobdell, with full knowledge that Plaintiff was in his authorized work area, asked Plaintiff why he was sitting in his authorized area as though Plaintiff were not authorized to sit in the Lobby Area and read.

53. C. O. Lobdell has, both prior to and after 05/12/04 almost on a daily basis, observed other Chapel Clerks in the Lobby Area with books, papers, pencils and pens, tables, typewriter and tape players without ever asking any of these Chapel Clerks why they were in the Lobby and not in the chapel where they work?.

54. C. O. Lobdell fabricated Misconduct Report A453158 as a pretext to remove Plaintiff from the Chapel Clerk position when, by C. O. Lobdell's own words in the Misconduct Report, Plaintiff (1) was not violating any rule, (2) was engaged in what Lodbell knew to be an authorized activity for Chapel Clerks in an area that Lobdell knew to be an authorized area for Chapel Clerks when (3) Lobdell, with the malicious intent of writing a fabricated Misconduct Report, initiated an unwarranted interrogation as a pretext for the Misconduct Report he intended to write before his spoke his first word to Plaintiff around 1045 hours on 05/12/04.

55. Defendant Beard has, during visits at SCI-Albion, observed Chapel Clerks with tables, typewriters books, etc. performing their Chapel Clerk duties in the Lobby Area where Plaintiff was sitting/reading around 1045 hours on 05/12/04.

56. Defendant Beard agrees that harassment of inmates by staff is prohibited by PA DOC policy.

57. Defendant Beard agrees that when a correctional officer interrogates a prisoner about why the prisoner is engaged in an authorized activity in an authorized area that correctional is harassing the inmate.

58. Plaintiff has been on GLP status from 11/14/02 until around 10/20/06 with the exception of the period between 04/05/04 and 05/12/04.

59. A fabricated report is more likely to be inconsistent with itself than a truthful report.

60. The report on DC-141 Part 1 No. A453158 is inconsistent with itself.

61. The author of a fabricated statement usually has an ulterior motive for presenting a fabricated statement instead of a true statement.

62. The written statements of Defendant McQuown, on Exhibit "B", which indicate he believed Plaintiff and his poems posed a threat to security, are fabricated statements.

63. The written statements of Defendant Gamble, on Exhibit "C-1", which indicate she believed Plaintiff and his poems posed a threat to security, are fabricated statements.

64. The written statements of Defendant Boeh, on Exhibit "D", which indicate Plaintiff distributed racially inciteful poems, is a false statement.

65. The 03/20/03 written statement of Supt. Wolfe, on Exhibit "E", that Plaintiff is "not appropriate for the clerks position in the Religious Service Area" is belied by subsequent decisions which led to Plaintiff being reassigned to the Chapel Clerk job on 04/05/04.

66. In June of 2004, after Plaintiff was returned to general population from the Hole, Imam Abdalla (Plaintiff's immediate supervisor in the Chapel) informed Plaintiff of his intent to rehire Plaintiff in the Clerk's position.

67. Defendant Beard is aware that the Free Speech Amendments of the State and Federal Constitutions guarantee prisoners' right to speak freely about abuses which are committed by State and Federal officials, including abuses based upon race or any other factor.

68. During the one-year period between 11/01/01 and 11/01/02, while Plaintiff was employed as a Chapel Clerk, he received $640.53 from Pay Group 1.

69. During the one-year period between 11/01/02 and 11/01/03, while Plaintiff was on GLP status, he received $163.57 from Pay Group 3.

70. Defendant Beard is aware that according to the July 2001 article written by John M. R. Bull, that was copied by Ms. Brannon on 10/24/04, Blacks, at that time, were incarcerated in Pennsylvania at a rate that was fourteen times that of Whites.

71. Defendant Beard is aware that according to the statistics presented on page 126 of the FINAL REPORT OF THE PENNSYLVANIA SUPREME COURT COMMITTEE ON RACIAL AND GENDER BIAS IN THE JUSTICE SYSTEM (2003) (hereinafter THE REPORT) Blacks'incarceration rate in Pennsylvania is 18.4 times that of Whites.

72. Defendant Beard is aware that according to page 320 of THE REPORT, in Allegheny County African-Americans often plead guilty to crimes that they did not commit because they know there ain't no justice for you there if you are not White.

73. Defendant Beard is aware that violations of criminal defendants' Constitutional rights increase the likelihood that those who are innocent will be wrongfully convicted.

74. Defendant Beard is aware of the fact that Plaintiff is in PA DOC custody as the result of a conviction obtained in the Allegheny county Court of Common Pleas.

75. Defendant Beard does not believe that a victim of a hate-crime spreads hate when he/she informs the public, and/or authorities, about the crime.

76. Defendant Beard respects the Free Speech rights of prisoners, who have been abused in State court proceedings, to produce and possess poetry on the subject of the race-based injustices that facilitated the abuses of the prisoners rights to life, liberty and the pursuit of happiness.

77. Defendants failure to confiscate all copies of the poems at issue is evidence of Defendants' awareness that the poems were/are protected speech.

78. Defendant Beard believes that speech, including poetry, which exposes abusive acts of government officials and all other people should be encouraged and applauded, not punished.

79. Defendant Beard knows that, pursuant to PA DOC policy and the State and Federal Constitutions, prison officials' actions which raise the custody level of a prisoner who exercised Constitutional rights, for no valid reason other than the exercise of his/her rights, are illegal actions.

80. Defendant Beard knows that the provisions of the Federal AEDPA and State PCRA statutes cause an unknown number of prisoners in PA DOC custody to be procedurally bared from obtaining relief from their convictions that they are otherwise eligible to apply for.

81. Defendant Beard believes that prisoners who are procedurally bared from applying for legal redress, that they are otherwise entitled to, have a legitimate grievance about a judicial system that is incapable of producing the most basis and fundamental justice in their cases.

82. Defendant Beard knows the poetry at issue does nothing more than repeat, as "Ebonic echoes," facts and figures that are presented via "academic discourse" in the reports of official government bodies and highly-respected social scientists.

83. Defendant Beard does not view the reports of government bodies and social scientists, on the subject of racial discrimination in the courts, as spreading hate.

84. Prisoners in general population in the PA DOC have the right to obtain, possess and read reports on the subject of racial injustice in the courts.

85. Prisoners in PA DOC custody have the right to write poetry on the subject of racial injustices in the courts.

86. Pursuant to PA DOC policy, the mere fact that Plaintiff obtained/possessed/read reports and articles about racial injustice in the courts and then wrote poetry on that subject cannot, alone, make Plaintiff inappropriate for any DOC work assignment.

87. Previous court decisions in this jurisdiction cause Defendant Beard to be aware that the free exercise clause of the First Amendment prohibits Defendants from raising Plaintiff's custody level, and from taking other adverse actions against Plaintiff, for refusing to participate in prescriptive programs that are offensive to his religious beliefs.

88. Previous court rulings in this jurisdiction cause Defendant Beard to be aware that the Establishment Clause of the First Amendment prohibits Defendants from raising Plaintiff's custody level, and from taking any other adverse actions against Plaintiff, for refusing to participate in religious and secular programs that are offensive to his religious beliefs.

89. The PA DOC does not presently offer any prescriptive programs that are based upon Islamic beliefs and traditions.

90. The PA DOC does not presently offer any prescriptive programs that are taught from an Islamic perspective.

91. The only option presented to Plaintiff by Defendants, that would allow Plaintiff to earn the two (2) or three (3) point deduction of his PACT score for participating in PA DOC prescriptive programs, has been that Plaintiff must either violate or abandon his Islamic beliefs.

92. The diet served by the DOC to inmates in general population is not a religious diet.

93. The non-religious diet served by the DOC contains food items that are

offensive to Muslims and members of other Faith groups.

94. The DOC provides alternative protein items to/for Muslims if/when pork is the meat item in a meal.

95. The DOC provides the alternative protein to allow Muslims to maintain a properly balanced nutritious diet without having to eat foods that are offensive to their religious beliefs.

96. Defendants assert the following programs are not religious in nature: Violence Prevention, Citizenship, Batterers Intervention, Long Term Offenders, and Personal Responsibility.

97. Defendants have not asserted that the above-mentioned alleged-non-religious programs do not contain elements that are prohibited and/or offensive to Muslims.

98. In the same way that Defendants cannot truthfully state the DOC's non-religious diet does not contain food items that are offensive to Muslims, Defendants cannot truthfully state the DOC's so-called non-religious programs do not contain elements that are prohibited and/or offensive to Muslims.

99. Defendant Beard is aware of the fact that the Religion of al-Islam promotes high moral standards.

100. Defendant Beard is aware that the Religion of al-Islam promotes healthy lifestyles.

101. Defendant Beard is aware that the Religion of al-Islam promotes a non-criminal lifestyle.

102. Defendant Beard is aware that the Religion of al-Islam promotes respect for the rights and dignity of everything in creation.

103. Defendant Beard is aware that the Religion of al-Islam prohibits the possession, sale and use of any/all intoxicants.

104. Defendant Beard is aware that the Religion of al-Islam prohibits fornication and adultery.

105. Defendant Beard is aware that the Religion of al-Islam prohibits all sexual activity outside of the bonds of marriage.

106. Defendant Beard is aware that the Religion of al-Islam prohibits stealing and prescribes cutting off the hand of the thief.

107. Defendant Beard is aware that the Religion of al-Islam condemns all criminal and anti-social conduct in the strongest terms.

108. Defendant Beard is aware that in the Religion of al-Islam lying is considered to be a major sin, as serious as murder.

109. Defendant Beard is aware that the moral code of the Religion of al-Islam is generally viewed as being much stricter than the moral code of

non-Muslims.

110. Defendant Beard knows that homosexual conduct is acceptable in most non-Muslim nations.

111. Defendant Beard is aware that homosexual conduct is viewed as an unacceptable abomination, and is not tolerated, by the Religion of al-Islam.

112. Defendant Beard is aware that many behaviors that lead to crime and degradation of human dignity are permissible in non-Islamic societies while said behaviors are prohibited and not tolerated in Islamic societies.

113. The full complement of PA DOC prescriptive programs were designed with the specific intent of providing direction and guidance, in a comprehensive fashion, in each and every area of an inmate's life, and especially in the areas where the inmate must modify his/her behavior in order to reduce the likelihood of further criminal conduct upon release from custody.

114. Defendant Beard has studied and is familiar with the genesis and the evolution of penitentiaries and prisons.

115. Defendant Beard is aware that Members of the Religious Society of Friends were commonly known as Quakers in 1681 and are commonly known as Quakers today.

116. Defendant Beard is aware that Pennsylvania is commonly known as The Quaker State.

117. Defendant Beard is aware that history indicates William Penn established Pennsylvania as a "religious" or "holy" experiment.

118. Defendant Beard is aware that the Christian beliefs of 17th & 18th Century Quakers caused Quakers in the United States to reject the idea that capital punishment (except in cases of murder) and corporal punishment were acceptable forms of punishment.

119. Defendant Beard is aware that the Quakers who governed Pennsylvania during the 17th & 18th Centuries believed offenders could be reformed to accept Christian ethics and morals through hard labor and silent meditation.

120. Defendant Beard is aware that the Quaker who governed Pennsylvania in the 17th & 18th Centuries developed and established the features of jails and workhouses that are considered by some authorities to be the first true penitentiaries.

121. Defendant Beard knows the first penitentiary system developed and established by the Quakers to reform criminals became, and is still, know as The Pennsylvania System.

122. Defendant Beard is aware that the original plan of The Pennsylvania System was based upon the complete isolation of prisoner with work limited to crafts that were allowed to be done in one's cell.

123. Defendant Beard is aware that by the mid-1820s Quakers in Albany, NY developed and established a different method for attempting to reform their prisoners.

124. Defendant Beard is aware that the system developed and established at Albany is commonly known today as The Albany System.

125. In The Albany System prisoners were permitted to work together in groups but were required to remain absolutely silent while working and while in their small single-occupant cells.

126. Defendant Beard is aware that, originally, in both systems the Quakers forbade their prisoners to communicate with each other.

127. Defendant Beard is aware that silent meditation is a form of worship that was practiced by 17th & 18th Century Quakers and continues to be their practice today.

128. Defendant Beard is aware that the Quakers used brutal force and strict disciplinary measures to compel their prisoners to engage in silent meditation.

129. Defendant Beard is aware that Quakers, as a Religious Group, do not have a written creed.

130. Defendant Beard is aware that most so-called correctional institutions in the United States today are based upon a modified version of The Albany System.

131. The PA DOC's Super-Maxes and Long Term Segregation Units (LTSU) clearly represent slightly modified versions of the original Pennsylvania System.

132. PA DOC records indicate that Plaintiff spent the thirty-five (35) days between 05/12/04 and 06/15/04 in the Hole (RHU) as a result of DC-141 A453158.

133. Defendant Beard is aware that the Quakers developed and established the Pennsylvania and Albany Systems with the specific intent of reforming prisoners in the mold of penitent God-fearing people whose skin "quaked" upon the mention of or thought of God.

134. Defendant Beard is aware that the Quakers developed and established the Pennsylvania and Albany Systems with the specific intent of reforming prisoners by imposing Quaker beliefs and practices (to the exclusion of all other beliefs and practices of all other non-Quaker philosophies) upon their prisoners.

135. Defendant Beard is aware that it is a commonly accepted fact that terms such as "penitentiary" and "correctional institution" imply places of isolated confinement wherein prisoners are exposed to harsh conditions which are intended to cause the prisoner to experience feelings of regret for some specific allegedly-condemnable act the prisoner has allegedly committed.

136. Defendant Beard is aware that being housed in a penitentiary or correctional institution for a sufficient amount of time may cause a person who has not committed any crime to become penitent.

137. Defendant Beard is aware that PA DOC policy causes religious books, such as Holy Qur'ans and Holy Bibles, to be among the few items that prisoners in PA DOC Super-Max and LTSU custody are permitted to retain in their cells.

138. Defendant Beard believes that religious activities are a positive pursuit since they may help prisoners develop and maintain a more pro-social lifestyle while incarcerated and after release.

139. Defendant Beard is aware that 17th & 18th Century Quakers knew, and utilized the knowledge, that two inherent results of prolonged and unnatural isolation are inner-reflection and spiritual awakenings.

140. Defendant Beard, and other 21st Century penologist, know and utilize the knowledge that two inherent results of incarceration in modern day prisons are inner-reflection and spiritual awakenings.

141. The PA DOC's decisions to make programs available which are clearly religious (such as Christian and Islamic worship services) to prisoners is an indication that said officials recognize and desire the rehabilitative benefits that flow from a prisoner's genuine spiritual awakening.

142. Defendant Beard is aware that the objective on PA DOC prescriptive programs is to permanently replace a prisoners sinful/criminal behavior with saintly/non-criminal behavior.

143. The intent of PA DOC prescriptive programs — such a Violence Prevention, Citizenship, Batterers Intervention, Long Term Offenders, and Personal Responsibility — is to present dogma that extols PA DOC values of what is right and/or wrong in an attempt to change prisoners' thinking in such a way that he/she acquires what the PA DOC believes to be the "values necessary to become law-abiding citizens."

144. PA DOC officials and staff have determined that Plaintiff should participate in the above-mentioned prescriptive programs in order to absorb what the PA DOC believes to be the values necessary to become a productive law-abiding citizen.

145. Defendant Beard and other PA DOC officials and staff assert that Plaintiff cannot be rehabilitated by the teachings and practices of the Religion of al-Islam but that Plaintiff can be rehabilitated by PA DOC prescriptive programs.

146. Defendant Beard is aware that each and every one of the PA DOC's prescriptive programs presents the PA DOC's value judgments of what is right and/or wrong for the specific purpose of indoctrinating prisoners.

147. Defendant Beard is aware of/supports the practice wherein prisoners who disagree (on religious grounds) with and refuse to accept being indoctrinated by the PA DOC are subjected to adverse consequences that are not

imposed upon those who submit to, fake acceptance of, or actually accept the
PA DOC's indoctrination.

148. Defendant Beard is aware that Theistic religions and the PA DOC both
offer good results and rewards for good conduct and threaten, and impose,
punishments for perceived bad conduct.

149. Plaintiff has not been issued any Misconduct Report(s) for his
refusal to participate if PA DOC prescriptive programs.

150. The mere fact that Plaintiff is not participating in PA DOC
prescriptive programs in no way poses or presents a threat to the security of
Defendant's prison.

151. Defendant Beard is aware that the celibacy which the PA DOC imposes
upon its prisoners is identical to the celibacy which the Quakers introduced
via the Pennsylvania System.

152. The PA DOC has intentionally selected remote locations to construct
its prisons.

153. Defendant Beard is aware that prisons in remote locations isolate
prisoners from society more effectively than prisons that are located in urban
areas.

154. Defendant Beard is aware that, in the business world, programs which
fail to produce the desired results are modified, and in the event that the
modification fails to produce the desired results, the unproductive programs
are replaced by others.

155. Defendant Beard is aware that the high number of prisoners who
successfully complete PA DOC prescriptive program and go into the community
where they reoffend by committing the same offense is an undeniable indication
that PA DOC prescriptive programs have a poor record for producing the desired
results.

156. Defendant Beard is aware that, in the world of business, a company
with programs with failure to success ratios similar to that of PA DOC
prescriptive programs would be deemed repulsive by/to even the most
unsophisticated investors.

157. Defendant Beard is aware that Plaintiff has been, and continues to
be, subjected to adverse consequences for no reason other that Plaintiff has
refused to violate or to abandon his faith in and obedience to Allaah in order
to accept faith in and to become obedient to the dictates of the men and women
who (believing they could improve upon the moral system revealed by God)
created the prescriptive programs employed by the PA DOC.

October 29, 2006

*Leonard C. Jefferson*
Leonard C. Jefferson, CL-4135
10745 Rt. 18
Albion, PA 16475-0002




FORM DC-141   PART 1
Rev 3/00

# COMMONWEALTH OF PENNSYLVANIA
## DEPARTMENT OF CORRECTIONS

**A** 453158

☐ MISCONDUCT REPORT   ☐ OTHER   ☐ DC-ADM 801  INFORMAL RESOLUTION

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| CL 4135 | Jefferson, Leonard | SCI-H | 1045 | 5/12/04 | 5/12/04 |

| Quarters | Place of Incident |
|---|---|
| FB-62 | Centralized Services Lobby |

### OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| Staff | Ofcr Clement | | ✓ | Staff | LT Eddy | | ✓ |
| | SGT Eliason | | ✓ | | Ins. Brannon | | ✓ |
| | Ofcr Collingwood | | ✓ | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION** Class 1 No. 1 Assault Class 1 No. 35 Refusing To obey an order.

**STAFF MEMBER'S VERSION** On 5/12/04 AT 1045 hrs Inmate Jefferson was sitting in The Lobby reading a koran, I asked Jefferson why he was in the Lobby and not in the chapel where he works. He said the music's To Loud and his work supervisor said it's his work area. I told when the music was over I gave Jefferson several direct orders To go in the chapel. He became very Argumentive and refused all my orders. He pushed me with his shoulder and chest To enter the chaplin's office. AT This Time I ordered him To place's his hands on The wall To pat search him. During The search he Took his hands off The wall, officer clement ordered Jefferson To place his hands back on The wall until he was ordered To remove his hands. He was hand cuffed and escorted To RHU by LT EDDY and SGT ELIASON.

**IMMEDIATE ACTION TAKEN AND REASON** Inmate placed in RHU, AC status pending hearing.

| PRE-HEARING CONFINEMENT | | IF YES | |
|---|---|---|---|
| | | TIME | DATE |
| ☐ YES | | 1056 | 5-12-04 |
| ☐ NO | | | |

☑ REQUEST FOR WITNESSES AND REPRESENTATION   ☑ INMATE'S VERSION
**FORMS GIVEN TO INMATE**

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY   SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY | |
|---|---|---|---|
| | | DATE | TIME 24 HOUR BASE |
| B. Fetzell COI | Capt. Crowe | 05/12/04 | 1325 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | MISCONDUCT CATEGORY | Signature of Person Serving Notice |
|---|---|---|---|
| DATE | TIME | ☑ CLASS 1   ☐ CLASS 2 | |
| 05/13/04 | 1325 | | |

**NOTICE TO INMATE**
You are scheduled for a hearing on the allegation on the date and time indicated or as soon thereafter as possible. You may remain silent if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law, if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class 1 misconduct, any pre-release status you have will be removed.

WHITE — DC-15     YELLOW — Inmate     PINK — Reporting Staff Member     GOLDENROD — Deputy Superintendent Facility Management

**DC-ADM 801 Inmate Discipline Policy, Attachment B**

EXHIBIT "L"