**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

LEONARD C. JEFFERSON,                }
                                     }
                Plaintiff,           }
                                     }    No. 1:04-cv-44
        vs.                          }    District Judge McLaughlin
                                     }    Magistrate Judge Baxter
WILLIAM WOLFE, et al.,               }
                                     }
                Defendants.          }

<u>MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

AND NOW, come the defendants, by their attorneys, Tom Corbett, Attorney General,

Christian D. Bareford, Deputy Attorney General, Susan J. Forney, Chief Deputy Attorney

General, Chief Litigation Section, and respectfully submit the following Brief in Support of their

Motion for Summary Judgment:

**I. STANDARD OF REVIEW**

In ruling on a motion for summary judgment, a threshold inquiry is conducted on the

need for a trial.  See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).  Summary

judgment is appropriate "if the pleadings, depositions, answers to interrogatories, admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact, and that the moving party is entitled to judgment as a matter of law."  Federal Rules of Civil

Procedure 56(c).  See <u>also</u>, <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 325 (1986).

The moving party bears an initial burden of showing the absence of any genuine issues of

fact; the non-moving party must set forth specific facts showing that there is a genuine issue for

trial.  The mere existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there is no

genuine issue of material fact.  See <u>Anderson</u>, 477 U.S. at 248.  Rule 56(e) does not allow the

non-moving party to rely merely upon bare assertions, conclusory allegations or suspicion. See Fireman's Insurance Company of Newark v. DeFresne, 676 F.2d 965, 969 (3d Cir. 1982). There is no issue for trial unless evidence in the record would permit a jury to return a verdict for the non-moving party. See Anderson, 477 U.S. at 248. In deciding a motion for summary judgment, the court construes all facts and inferences in the light most favorable to the non-moving party. See Pollack v. AT&T, 794 F.2d 860, 864 (3d Cir. 1986).

To apply the summary judgment test, the elements of a plaintiff's *prima facie* case under the substantive law are considered. See Anderson, 477 U.S. at 248. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corporation, 477 U.S. at 322.

## II. PLAINTIFF'S CLAIMS

Before this Court are four claims alleging violations of rights protected under the Constitution. See Doc. # 81.

### A. First Amendment Establishment Clause

Plaintiff alleges a violation of his rights protected under the Establishment Clause of the First Amendment. Paragraphs 75 – 94 of the Amended Complaint, Doc. # 39, detail the factual bases for this particular allegation. The essence of this claim is that the Department of Corrections in general, and a number of individual corrections officials in particular, has policies in place that establish "a state/DOC-sponsored religion, which [the Department of Corrections] compels its prisoners to adopt in order to obtain favorable parole reports, coveted housing assignments, lower custody levels, etc." Paragraph 83, Doc. # 39. Plaintiff's professed Islamic beliefs do not allow him, as a follower of the edicts contained in the Holy Qur'an, to listen to or

to even accept the teachings of "'non-believers' in matters pertaining to how one should act or think…"  Paragraph 76, Doc. # 39.  In July of 2003, as part of his annual custody review, Plaintiff's custody level was raised from custody level 2 to custody level 3.  Paragraph 87, Doc. # 39.  Three factors were given to Plaintiff justifying the change in his custody level: his record of misconduct, his lack of a job within the prison, and his refusal to participate in the treatment programs offered at the institution.  Paragraph 88, Doc. # 39.  It is his refusal to participate in the prescriptive programs being considered against him that Plaintiff alleges runs afoul of the Establishment Clause.

## B. First Amendment Free Exercise Clause

Intermingled within the allegations of violations of Plaintiff's protections under the Establishment Clause is an allegation of a violation of Plaintiff's protections under the Free Exercise Clause.  See generally, Paragraphs 75 – 94 of the Amended Complaint, Doc. # 39. More specifically, Plaintiff alleged that the Pennsylvania Department of Corrections, and by implication Defendants Boeh, McKissock, and Hametz, interferes with his right of the free exercise of his religion.  Id. at paragraph 85.  Plaintiff alleges that it was the free exercise of his religion in the form of refusing to participate in prescriptive programs that resulted in the change in his custody level and the transfer to a different portion of the prison.  Id.

## C. First Amendment Retaliation

In paragraphs 32 to 61 of the Amended Complaint, Plaintiff alleged that Defendants Gamble, Snyder, and McQuown retaliated against his expression of free speech by removing him from his position as Chapel Clerk in November of 2002.  Doc. # 39.  More specifically, Plaintiff alleged that these three defendants retaliated against him for his poetry, which was provided to a prison employee upon request, by removing him from his position as chapel clerk.  Id.

### III.  ARGUMENT

**A. <u>Turner v. Safley</u> and legitimate penological objectives**

  The Supreme Court has recognized two legal concepts that set the parameters in cases of inmate litigation: the need to protect the constitutional rights of parties and the policy of judicial restraint. Courts must take cognizance over the valid constitutional claims of inmates.  <u>Procunier v. Martinez</u>, 416 U.S. 396, 405, 94 S.Ct. 1807 (1974).  However, any such constitutional claim by an inmate must be considered within the context of incarceration itself.  To this end, the Supreme Court has noted:

> "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." (<u>citation omitted</u>)  The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives – including deterrence of crime, rehabilitation of prisoners, and institutional security. (citations omitted)

<u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404 (1987).  Furthermore, the Supreme Court recognized that "courts are ill-equipped to deal with the increasingly urgent problems of prison administration and reform" in light of the fact that "the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree."  <u>Martinez</u>, 416 U.S. at 404-405.

  While protecting an inmate's constitutional rights, courts must be mindful of the policy of judicial restraint.   Such a policy is necessary because of the difficulty of running the prison itself, coupled with the recognition that the separation of powers has committed the responsibility of running prisons to other branches of government.  <u>Turner v. Safley</u>, 482 U.S. 78, 84-85, 107 S.Ct. 2254, 2259 (1987).

  The Supreme Court resolved the question of how to scrutinize the constitutionality of prison regulations with the decision in <u>Turner v. Safley</u>, 482 U.S. 78, 107 S.Ct. 2254 (1987).

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. Several factors are considered in determining the 'reasonableness' of challenged prison regulations:

> 1) Whether there is a legitimate rational connection between the prison regulation and the government interest;
>
> 2) Whether the prisoners have alternative means of exercising the constitutional right at hand;
>
> 3) The impact the accommodation of the constitutional right would have on other prisoners, guards, and prison resources in general; and
>
> 4) The availability of alternatives to the regulation.

Turner, 482 U.S. at 89-90. When a challenged regulation bears a rational relation to legitimate penological interests, the burden is on the inmate, and not the corrections officials, to disprove the validity of those regulations. Overton v. Bazzetta, 539 U.S. 126, 132,123 S.Ct. 2162, 2168 (2003). This analysis is relevant to the determinations regarding an inmate's Free Exercise clause claims, Establishment Clause claims, and First Amendment retaliation claims.

**B. Plaintiff's Religion Claims**

The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting free exercise thereof." The first portion of that clause, commonly referred to as the Establishment Clause, in this particular context, protects an inmate from being required to participate in programs with a religious component. The second part of this clause, commonly referred to as the Free Exercise Clause, allows an inmate to freely exercise religion so long as such practice is not limited or withdrawn by virtue of the incarceration itself or from other valid penological interests. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987)(quoting Price v. Johnston, 334 U.S. 266, 285 (1948)); see also Turner v. Safley, 482 U.S. 78, 89 (1987).

Plaintiff's raises claims under both clauses. He claims a violation of the Establishment Clause in that, "prisoners who participate in religious programs which the PA DOC has given its stamp of approval, such as A/A & N/A and others, are rewarded for their participation in religious programs." See Doc. # 39, paragraphs 83, and 91. Plaintiff also claims a violation of his rights to freely exercise his religion in that his religious beliefs do not allow him to "listen to and/or to accept the teachings of 'non-believers' in matters pertaining to how one should think or act", and that participating in prescriptive programs at the prison would cause him to violate that belief. Id. at paragraph 76.

While not doing so expressly, Plaintiff may also be raising a claim under section 3 of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 804, 42 U.S.C. §§ 2000cc-1(a)(1)-(2). Relevant to assertions made by Plaintiff that underlies his Free Exercise Clause claim, RLUIPA provides: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the burden furthers "a compelling governmental interest," and does so by the "least restrictive means." See Cutter v. Wilkinson, 544 U.S. 709, 712, 125 S.Ct. 2113, 2116 (2005). In the interest of prudence, the Defendants will also address Plaintiff's allegations under RLUIPA in addition to the claim under the Free Exercise Clause.

1. Establishment Clause

Plaintiff's constitutional rights under the Establishment Clause have not been violated. As this Court has already noted, "[t]he government violates the First Amendment's Establishment Clause when it requires a prisoner to participate in a drug or alcohol rehabilitation program with a religious component." See Doc. # 81. According to the record, the programs that Plaintiff is complaining about are secular in nature and do not have a religious component.

Concise Statement of Material Fact, paragraphs 1 - 34.   More specifically, at different times, it was recommended to Plaintiff to maintain a prison work assignment, and attend programs related to long term offenders, stress and anger management, citizenship, and batterers intervention.  Id. at paragraphs 19 – 34.  None of these programs are religious in nature; there is no reference to a higher authority; nor is there a requirement to subscribe to a particular manner of worship.  Concise Statement of Material Fact 34.  Furthermore, to the extent that religious programs are offered by the Department of Corrections, see Appendix pp. 4 - 24 and pp. 25 – 51, many other secular alternatives are provided.

Although Plaintiff was not recommended to participate in any substance abuse program, see Appendix pp. 52, 53, and 54, had he been so, he would have had a host of alternatives beyond A/A or N/A, with programs including Basic Drug and Alcohol (D&A) Education Group, Cocaine Recovery, D&A Stress and Anger Management Group, Rational Recovery, and Relapse Prevention.  App. pp. 25 - 51.  The availability of these secular approaches to recovery, coupled with the fact that the specific programs recommended for Plaintiff are entirely secular in nature, entitles Defendants to summary judgment on Plaintiff's Establishment Clause claims.

2. Free Exercise Clause

Inmates do not forfeit all of their constitutional protections by reason of their confinement, and retain the First Amendment right to the free exercise of religion.  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987).    Courts apply the standard announced in Turner v. Safley, 482 U.S. 78 (1987), in determining whether or not challenged prison regulations infringe upon an inmate's constitutional rights.  O'Lone, 482 U.S. at 348-49.  Regulations are valid if "reasonably related to legitimate penological objectives."  Id.; Turner, 482 U.S. at 89.

With respect to the first element, this Court has decided as a matter of law that the prescriptive programs at issue in this case do advance valid penological objectives given their rehabilitative nature. Doc. # 85. By way of further response, the Defendants note that the Department of Corrections is specifically charged with the responsibility with providing "academic education, vocational education, recreation services, library services and special education for school-age inmates and adult inmates incarcerated in State correctional institutions". 71 P.S. § 310-6. Within the Department of Corrections, and under the authority of Defendant Beard as the Secretary of the Department (see 71 P.S. § 310-1), is established the Bureau of Inmate Services which is responsible for the development and evaluation of inmate treatment programs. App. p. 1; see also 71 P.S. § 310-5; Concise Statement of Material Facts, paragraphs 35 - 55.

With respect to the second element, Plaintiff freely admits being an "active participant in Islamic services, programs, and activities made available", (see paragraph 77 of Doc. # 39, see also, paragraph 26 of Doc. # 3). Further, the following Muslim programs are available at SCI-Albion:

a) Jumah Prayer – An Islamic religious service led by the Imam and held weekly on Friday at 1:00 p.m.;

b) Nation of Islam religious service – An Islamic religious service led by a minister;

c) Muslim counseling service – in which the Imam counsels Muslims in their religious life, educates them in the proper practice of Islam in family life, social conduct and others;

d) Islamic Educational Weekend Retreat – a three day short course in the basic tenet of the Islamic religion offered twice a year;

e) Nation of Islam Day – a three hour meeting the first Wednesday of each month;

f) Qur'anic Studies – an extensive look into the Qur'an in which every verse is studied;

g) Seerah – a biographical class of the Prophet Muhammad that studies how he lived his life according to the Qur'an;

h) Shariah – the study of Islamic law;

i) Talim – a study of the Qur'an led by the Imam for an hour and a half each week.

See App. pp. 25 - 51. This list of alternative means of exercising his religion, coupled with Plaintiff's own assertion that he actively practices his religion, supports the position of the Defendants that there was no constitutional violation. As far as a consideration of the third and fourth factor under the Turner standard, those are more thoroughly addressed under the subsequent RLUIPA analysis. Nevertheless, there remains no genuine issue of material fact that there has been no violation of Plaintiff's rights under the Free Exercise Clause under the First Amendment.

3. Religious Land Use and Institutionalized Persons Act

Essentially, RLUIPA requires the government to prove that a burden on an inmate's practice of his religion is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a). For purposes of this motion, Defendants concede that RLUIPA protects institutionalized persons, the Pennsylvania Department of Corrections receives federal financial assistance, and that Plaintiff's asserted beliefs fall within the broadly defined "religious exercise" under RLUIPA. See 42 U.S.C. § 2000cc-1(b)(1) and § 2000cc-5(7)(A). As far as Plaintiff's requirement to produce prima facie evidence that the Department of Corrections policy regarding participation in prescriptive programming imposes a "substantial burden" on his exercise of religious beliefs,[1] Plaintiff has done nothing beyond simply asserting the notion that

---

[1] As recently noted by the Court of Appeals for the Fourth Circuit:
RLUIPA itself does not define "substantial burden", but the Supreme Court has defined the term in the related context of the Free Exercise Clause. According to the Court, a "substantial burden" is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," (citations omitted), or one that forces a

listening to non-Muslims would violate the tenets of his belief. There is no specific citation to the passage within the Qur'an, nor is there any attempt to explain how participating in the long-term offender program violates his faith. For instance, is he suggesting that these religiously neutral, cognitive-based recovery programs require him to abjure Muslim dietary restrictions? Do they prohibit him from utilizing the physical movements a believer is enjoined to use in saying his prayers correctly? One may be forgiven for entertaining a high degree of wonder if not outright skepticism regarding how it is that overtly secular inmate treatment programs could burden the practice of a religious belief as remarkably and notably abstemious as Islam. One would sensibly imagine them as mutually reinforcing things. There is a subtle but distinct difference between simply asserting that participating in non-Muslim treatment programs would be a substantial burden (which the Plaintiff attempts to do), as opposed to showing how participating in non-Muslim treatment programs would be a substantial burden (which the Plaintiff has failed to do).

In the alternative, even assuming that Plaintiff has met his prima facie burden, the Defendants are entitled to summary judgment. The Department of Corrections policy of providing inmate treatment programs consistent with an inmate's assessment needs and Correctional Plan furthers two compelling government interests: 1) to satisfy the Department's inherent responsibility under the law to provide opportunities for inmates to acquire the skills and education necessary to become productive law abiding citizens, and 2) the safety and

---

person to "choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion … on the other hand," (citations omitted). <u>Lovelace v. Lee</u>, --- F.3d ---, 2006 WL 3823127 (C.A. 4(Va.)(December 29, 2006). Accordingly, the Court of Appeals for the Fourth Circuit, like the Courts in the 5th Circuit, the 7th Circuit, the 9th Circuit, and the 11th Circuit, articulated a definition of "substantial burden" under RLUIPA consistent with the definition of "substantial burden" under the Free Exercise Clause. <u>Id.</u>

security of the institution itself.  In considering a compelling government interest, the Supreme

Court has noted:

> "Context matters" in the application of that standard.  (citation omitted)
> Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order,
> safety, and security in penal institutions.  See, e.g., 139 Cong.Rec. 26190
> (1993)(remarks of Sen. Hatch).  They anticipated that courts would apply the
> Act's standard with "due deference to the experience and expertise of prison and
> jail administrators in establishing necessary regulations and procedures to
> maintain good order, security and discipline, consistent with consideration of
> costs and limited resources."  (citation omitted).

Cutter v. Wilkinson, 544 U.S. 709, 723, 125 S.Ct. 2113, 2123 (2005).  The Court of Appeals for

the Fourth Circuit recently described the government's showing of the "compelling government

interest" as the "unremarkable step of providing an explanation for the policy's restrictions that

takes into account *any* institutional need to maintain good order, security, and discipline or to

control costs."  Lovelace v. Lee, --- F.3d ---, 2006 WL 3823127 (C.A. 4(Va.)(December 29,

2006) at *9 (emphasis added).

RLUIPA must be applied in a balanced way that avoids elevating a religious practice

over other significant interests.  Cutter, 544 U.S. at 722.  These significant interests include not

providing "unyielding" weight to one particular religious sect.  Id., referencing Estate of

Thornton v. Caldor, Inc., 472 U.S. 703, 710, 105 S.Ct. 2914, 2918.

Participation in treatment programs developed by the Bureau of Inmate Services furthers

the compelling government of the inherent public safety responsibility of the Department of

Corrections.  As noted above, the Department of Corrections is specifically charged with the

responsibility with providing "academic education, vocational education, recreation services,

library services and special education for school-age inmates and adult inmates incarcerated in

State correctional institutions", see 71 P.S. § 310-6, with programs developed by the Bureau of

Inmate Services, see 71 P.S. § 310-5.  Concise Statement of Material Facts, paragraphs 35 – 55.

As explicitly explained by Defendant Beard, the Secretary of Corrections:

> All inmates are assessed upon entry into the PA DOC relative to programming needs and to formulate a correctional plan.  This plan is reviewed and revised as necessary each year during the annual review.  Programming needs are determined based upon a variety of factors such as instant offense, criminal history, nature of offenses, institutional behavior, social history, assessed education level, work history, psychological report and interview by staff.  The psychological objective being to offer appropriate programs to the individual that will address issues that led to criminal behavior and, thus, reduce the likelihood of further criminal behavior and victimization upon release to the community.  This as much our public safety responsibility as are the fences and walls that hold those committed to our care.

Id.; see also, App. pp. 95 - 100.  It is important to note that this policy applies to all inmates, not just inmates espousing a particular belief, Muslim inmates, or Plaintiff himself.

This explanation for the policy, made by the government official vested with the responsibility for implementing said policy by the Pennsylvania legislature, should be afforded the "due deference" recognized by both the legislators in enacting RLUIPA and the Supreme Court considering RLUIPA.  See Cutter, 544 U.S. at 723.  The very notion of deferring to the experience and expertise of prison administrators in considering the articulated government interest itself harkens to the underlying rationale in Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254 (1987).  Of particular importance in the matter before this Court, that is the review of the articulated policy of the Secretary of Corrections in the implementation of a duty specifically assigned by the legislature, is the notion of judicial restraint.  As the Supreme Court specifically noted in Turner:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are *peculiarly within the province of the legislative and executive branches* of government.  Prison administration is, moreover, *a task that has been committed to the responsibility of those branches*, and separation of powers concerns a policy of judicial restraint.

482 U.S. at 84-85 (emphasis added). To be clear, the Defendants do not mean to suggest that deference, in of itself, should control the review of courts. However, Defendants are entitled to summary judgment with respect to Plaintiff's claim, considered either as a challenge under the Free Exercise Clause or as a claim under RLUIPA, in the face of the articulated rationale by the person assigned by the legislature the very responsibility challenged by the Plaintiff's claim. The policy furthers the compelling government interest of public safety, is promulgated in a neutral and balanced fashion, and does not have the purpose of advancing any particular religion.

A second compelling government interest exists to justify the inmate treatment programs offered at SCI-Albion, that is the safety and security of the institution. Statistical research demonstrates that prison treatment programs do contribute to reductions of incidents of prison misconduct. See Concise Statement of Material Facts, paragraphs 35 – 55. More specifically, an inmate's participation in treatment programs that target "criminogenic needs" reduce the occurrence of prison misconduct incidents by 10 points, and participation in programs that target three criminogenic needs (such as low levels of education, anti-social behavior, little job skills, and impulsive decision making) reduced incidents of misconduct by 30 points. Id. Reducing levels of institutional misconduct results is prisons that are easier to run and safer for both staff and inmates. Id.

There are no lesser alternatives to the policy of providing inmate treatment programs that will satisfy the compelling government interests outlined above. See Concise Statement of Material Facts paragraphs 35 - 55. The only two alternatives would be to dispense with treatment programs altogether or to provide Muslim-only programming. The first would wholly abdicate the duty imposed by the legislature to provide inmate education and training. The second runs afoul of the Establishment Clause, in that it would go well beyond having an

incidental or remote effect of advancing religion. See, e.g., Caldor, 472 U.S. at 710. By design, such a policy would impermissibly advance a particular religious practice.

Respecting the Free Exercise Clause under the terms of RLIUPA does not require the DOC to establish an explicitly Islamic fundamentalist treatment program for an inmate who adheres to that faith, but only not to set one up that compels him to violate its central tenets. Treating a non-Muslim's statements with contempt, no matter how non-conflictual or even resonant they might be with Islamic law and practices, just because they emanate from unbeliever would not seem to be a tenet of Islamic practice, and certainly does not appear to be one where obtaining necessary medical care and treatment from non-Muslims is concerned. If it were, however, the prison system's manifold and obvious compelling interests in a variety of things combined with the Establishment Clause to mean that the least restrictive alternative still would be that, so long as a Muslim was not being compelled to violate the central tenets of his faith, he can be told what to do by a non-Muslim in proper secular authority over him. Otherwise the logical endpoint of the contrary position is a prison whose guards must be from the Islamic prisoner's sect of the religion. Plaintiff cannot demand that the free exercise of his religion requires, in effect, the paradox of its establishment.

## C. First Amendment retaliation: Chapel Clerk position removal

In the complaint, plaintiff alleges that prison officials at the State Correctional Institution at Albion took action against him in retaliation for exercising his right of freedom of expression protected under the First Amendment. See Doc. 39, ¶ 110. More specifically, Plaintiff alleges that Defendants McQuown, Gamble, and Snyder conspired in the conduct of the "biased Support Team meeting on 11/13/02" that resulted in Plaintiff's removal from his position as Chapel Clerk. Id. There is no doubt that retaliation is a violation of a prisoner's constitutionally

protected rights.  See Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001); White v. Napoleon, 897 F.2d

103, 112 (3d Cir. 1990).   Yet mere allegations of retaliation are insufficient to show a

constitutional violation.

1. First Amendment retaliation: burden shifting test under *Mt. Healthy*

With a First Amendment retaliation claim brought under 42 U.S.C. § 1983, courts'

analyses are premised upon decisions of the Supreme Court, notably Pickering v. Bd. of Educ. of

Township High Sch. Dist., 391 U.S. 563, 568, 88 S.Ct. 1731 (1968), Mt. Healthy City Sch. Dist.

Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568 (1977), and Connick v. Myers, 461 U.S. 138,

103 S.Ct. 1684 (1983).  As an initial matter, a court determines whether the plaintiff's speech

was constitutionally protected conduct.  The plaintiff must then establish that the speech was a

substantial or motivating factor in the adverse action.  If plaintiff does so, the burden shifts to the

defendants to demonstrate that it would have taken the same disciplinary action in the absence of

the protected activity.  Mt. Healthy, 429 U.S. at 287.

2. Burden shifting test applied to the prison setting

Typically, First Amendment retaliation claims arise in the context of public employment

actions.  As this Court well knows, the Court of Appeals for the Third Circuit also applies this

analysis in inmate cases of claims of First Amendment retaliation albeit with a slight variation.

See, e.g., Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), Carter v. McGrady, 292 F.3d 152,

157-58 (3d. Cir. 2002); Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001).  In recognition of the

difficulty of the task of prison administration, and in order to afford proper deference to the

decisions of prison officials, the Circuit incorporates the balancing test announced by the

Supreme Court in Turner v. Safley, 482 U.S. 78 (1987), into the Mount Healthy burden shifting

framework.  In order for Plaintiff to bring a proper retaliation claim, he must show:  (1) that he

was engaged in a constitutionally protected activity; (2) that he was subjected to adverse actions; and (3) that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse actions.  See Mitchell v. Horn, 318 F.3d at 530.  See also Rauser, 241 F.3d at 334; adopting Mt. Healthy City Board of Educ. v. Doyle, 429 U.S. 274, 287 (1977).  Once done, the burden shifts to the prison officials to prove "that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334.

3. Step 1: Did Plaintiff engage in constitutionally protected conduct?

Measuring what constitutes a violation of the First Amendment requires more that the notion that everything that is said is a protected form of free speech.  The right to comment does not, in of itself, automatically establish that every such comment is constitutionally protected activity.  Taking into account the state's interest as an defendant in First Amendment retaliation claims made in the public employment setting, the Supreme Court specifically noted that there requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Connick, 461 U.S. at 140. More specifically, the plaintiff must show that the value of the speech outweighs the government's interest "in the effective and efficient fulfillment of its responsibilities to the public." Id. at 150.

a. Step 1, Part 1: Was the poetry a matter of public concern?

To determine whether the speech is protected by the First Amendment, "[t]he threshold issue is whether plaintiff's speech was a matter of public concern." Swineford v. Snyder County, 15 F.3d 1258, 1270 (3d Cir. 1994).  The Third Circuit considers speech by public employees as

matters of public concern "when it relates to their employment so long as it is not speech 'upon matters of only personal interest'".  Swineford, 15 F.3d at 1271.  If the communication in question cannot be characterized as speech on a matter of public concern, it becomes "unnecessary for [the Court] to scrutinize the reasons" for the employment action.  Connick, 461 U.S., at 146.  The Defendants agree with the Plaintiff that, in light of the content, form, and context of the poetry provided to Minister Anderson, that the content of the poems were a matter of public concern.

> b. Step 1, Part 2: Speech must outweigh state's countervailing interests

Just as the speech must address a matter of public concern, the value of the speech must also outweigh "the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees."  Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001).  In making this determination in a public employment claim, a court must consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  Rankin v. McPherson, 483 U.S. 378, 388, 107 S.Ct. 2891 (1987).  Much like the Third Circuit noted that analysis of the content, form, and context of the speech is useful in determining whether it touches a matter of public concern, Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993), the manner, time, and place of the speech is important in the inquiry of weighing the government's interests.  Rankin, 483 U.S. at 388.

In the prison context, some courts consider this balance by requiring an inmate to show that he exercised his First Amendment right consistent with his status as a prisoner.  See, Freeman v. Texas Dept. of Crim. Justice, 369 F.3d 854, 664 (5th Cir,. 2004).  Just as prison

officials may legitimately punish inmates who verbally confront institutional authority without violating the First Amendment, a Support Team can effectively fire an inmate for his inmate job in the chapel for bringing racially inflammatory material to the job site, particularly when other avenues existed for Plaintiff to exercise his rights.  Id.; see also, Goff v. Dailey, 991 F.2d 1437, 1439 (8th Cir. 1993).

        c. Plaintiff's actions were not constitutionally protected expressions of free speech

While writing poetry may be an exercise in the freedom of expression protected under the First Amendment, bringing copies of that poetry to an inmate work site and distributing that poetry to others is not.  Under a program within the Department of Corrections, inmates are allowed to work and attend classes and to be compensated for such participation.  Concise Statement of Material Fact paragraphs 56 - 70.  Such a program furthers legitimate penological interests in that "[t]he compensation and opportunities to advance provide positive reinforcement for developing good work habits that are important for reintegration into the community upon release."  Id.; see also App. pp. 130 - 131.  As such, there are various rules that inmates are expected to follow consistent with this penological interest.  For example, an inmate is expected to "carry [his] share of the work, and to do any task assigned", and is not permitted to leave the workplace without approval of his work supervisor.  Id.  Inmates are also not permitted to bring personal items such as radios, edible commissary items, or reading material to their work site.  Id.  Plaintiff was not told to bring either his poems or the newspaper articles upon which his poems were written to the work site.  Id.

Granted, the balancing test associated with step 1 of the three step Mt. Healthy analysis has been largely litigated in public employment actions.  However, one Supreme Court decision in such a case utilized a rationale that is very similar to the rationale that controls the analysis of

the constitutionality of prison regulations under the <u>Turner v. Safley</u> standard. In <u>Waters v. Churchill</u>, 511 U.S. 661, 114 S.Ct. 1878 (1994), a four justice plurality held that the government could fire an employee for disruptive speech based on the government's reasonable belief of what the employee said. In other words, in order to be protected, the speech must be on a matter of public concern, and the employee's interest in expressing himself must not be outweighed by any injury the speech could cause to the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees". <u>Waters</u>, 511 U.S. at 668 (citations omitted). This much of the decision mirrors the analysis of <u>Connick</u>. However, the plurality then explained that, in applying this test, the extent of the injury by the employee's speech need not be actual; rather, the government's burden is just to show that the speech *threatened* to interfere with government operations. <u>Waters</u>, 511 U.S. at 673, 680. As such, <u>Waters</u> permits a government employer to fire an employee for speaking on a matter of public concern if: (1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech. <u>See Waters</u>, 511 U.S. at 674, 677 – 680. The <u>Waters</u> holding thus supplements and broadens the <u>Connick</u> rule to take into consideration also the potential that the employee's speech has to disrupt the employer's operations, whether or not the harm remains inchoate.

The question of whether the potential disruptiveness of speech would render it unprotected under the <u>Waters</u> analysis is a question of law. <u>Waters</u>, 511 U.S. at 681. Furthermore, as to the determination whether or not a procedure used to arrive at the determination the speech was disruptive was itself reasonable, "only procedures outside the range of what a reasonable manager would use may be condemned as unreasonable." <u>Id.</u> at 678.

The very question of reasonableness will often involve "situations in which reasonable employers would disagree about who is to be believed, or how much investigation needs to be done, or how much evidence is needed to come to a particular conclusion." Id. In such cases, "many different courses of action will necessarily be reasonable." Id.

Just as "public employees do not have the unfettered right to express themselves on matters related to their official responsibilities, and courts must give due weight to the government's interest in efficient employment decision-making when evaluating First Amendment retaliation claims", Waters, 511 U.S. at 675, Plaintiff in this situation should not have the unfettered right to express himself on matters related to his incarceration when such an expression runs afoul of prison regulations. "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner, 482, U.S. at 89. As noted above, the burden falls to the inmate to disprove the validity of those regulations, and not to the prison officials to prove them. Overton v. Bazzetta, 539 U.S. 126, 132, 123 S.Ct. 2162, 2168 (2003); Banks v. Beard, 126 S.Ct. 2572 (2006).

The prison regulation in effect with this situation did not permit Plaintiff to bring personal reading material to the work site, which he did anyway. Concise Statement of Material Facts, paragraphs 56 – 70. It was that reading material (the newspaper article with the poetry reproduced on the back), handed over to Minister Anderson, which Plaintiff attempts to establish as constitutionally protected conduct. Id. Accordingly, the manner, time, and place in which the expression was made in violation of the rules weigh in favor of the Defendants and do not justify constitutional protection. The deference afforded to prison officials over matters such as prison security (as explained Turner), coupled with the affects of an individual's potentially disruptive

behavior on the efficient operation of the government agency (as in <u>Waters</u>), tip the balance of the question over whether the Plaintiff's acts were constitutionally protected in favor of the prison's countervailing interest.

Exclusively considering the content of the poetry itself, Plaintiff has failed to carry his burden to disprove the concern of Defendants McQuown, Gamble, and Snider, that expressing such opinions from his position as Chapel Clerk is disruptive to the security concerns of the prison.

<u>4. Step 2: Was the Plaintiff subjected to an "adverse action"?</u>

Assuming *arguendo*, that Plaintiff's possession/distribution of his poems in his work site was constitutionally protected activity, the Defendants agree with this Court's opinion that removal from his position as a result of that activity would deter an inmate of ordinary firmness from exercising his First Amendment rights. <u>See</u> Doc. # 85. As such, Plaintiff can establish the second part of the three part <u>Mt. Healthy</u> test.

<u>5. Step 3: Was the protected activity a substantial or motivating factor in the removal?</u>

Once again, assuming *arguendo*, that Plaintiff's possession/distribution of his poems in his work site was constitutionally protected activity, the Defendants concede that it was the content of the poems brought to the work site and distributed by Plaintiff that was a substantial or motivating factor in the decision to remove him from the Chapel Clerk position. <u>Id.</u> As such, Plaintiff can establish the third part of the three part <u>Mt. Healthy</u> test.

<u>6. Burden shifts to the prison officials</u>

"Once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenging decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons

reasonably related to a legitimate penological interest." <u>Rauser</u>, 241 F.3d at 334. As the record reveals, Plaintiff was not permitted to have the poetry in the work site, he had previously been warned regarding voicing concerns about racial inequality in prisons, and he had other avenues in which he can exercise his right to generate poetry. Concise Statement of Material Fact, paragraphs 56 – 70. The Support Team, Defendants McQuown, Gamble, and Snider were concerned about Plaintiff's poetry being in the work site, discussed the matter with Plaintiff on November 13, 2002, and decided to release him from his duties. <u>Id.</u> As Defendant McQuown specifically explained to Plaintiff:

> Your poem which you stated you intended for "all". You stated that a person could "*yell fire in a theater if the theater was burning and the theater is burning*." I found this to be a threat to the orderly running of the institution. It is inflammatory, and disruptive. *In your position*, in your position you had access to many inmates to spread this disruptive material and view.

App. p. 132 (emphasis added).

To the extent that Plaintiff points out that he received no misconduct report as a result of having the poetry in the work site, there is no requirement for him to receive any such misconduct. Department of Corrections policy specifically addresses this suggestion, and notes in relevant part, "An inmate may be removed from a work assignment by a unit management team action *or* misconduct proceeding." App. p. 106.

**D. Plaintiff's Equal Protection Claim**

For the same reasons expressed in the argument related to Plaintiff's religion claims, Defendants are entitled to summary judgment on the Equal Protection claim. The inmate treatment programs provided at SCI-Albion further legitimate penological interests and are applied in a neutral and balanced fashion (to wit: they are offered to all inmates). Concise Statement of Material Facts, paragraphs 1 -34.

## IV. QUALIFIED IMMUNITY

Arguing in the alternative, all Defendants are entitled to qualified immunity.  Under the doctrine of qualified immunity, governmental officials performing discretionary functions are entitled to qualified immunity from liability arising out of conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).  The analysis of whether qualified immunity protects an official from liability for allegedly unlawful actions by turns on the "objective reasonableness" of the action "assessed in light of legal rules that were clearly established at the time action was taken." See Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).  The contours of the right must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 640. The doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).  In this case, in order to be liable, the Court must conclude that the Defendants should have known that particular actions complained of by Plaintiff violated Plaintiff's clearly established rights under the First Amendment.  In light of the record provided, and the facts of this complaint, it cannot be said that providing inmate treatment programs or removing an inmate from his position due to his disruptive conduct were knowing violations of the law.

WHEREFORE, Defendant respectfully requests summary judgment of all claims be granted in favor of the Defendants.

Respectfully submitted:

Tom Corbett
Attorney General


\s\ Christian D. Bareford
Christian D. Bareford
Deputy Attorney General
PA. I.D. No. 83982

Susan J. Forney
Chief Deputy Attorney General
Litigation Section

OFFICE OF ATTORNEY GENERAL
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA 15219

Date: January 12, 2007

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

LEONARD C. JEFFERSON,           }
                                }
          Plaintiff,            }
                                }        No. 1:04-cv-44
          vs.                   }        District Judge McLaughlin
                                }        Magistrate Judge Baxter
WILLIAM WOLFE, et al.,          }
                                }
          Defendants.           }

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within **Memorandum in Support of**

**Defendants' Motion for Summary Judgment** was electronically filed with the Court and

served upon the following via first-class mail:

LEONARD JEFFERSON
CL-4135
SCI-Albion
10745 Route 18
Albion, PA 16475-0001

                              /s/ Christian D. Bareford
                              CHRISTIAN D. BAREFORD
                              Deputy Attorney General

OFFICE OF ATTORNEY GENERAL
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA  15219

(412) 565-3570

Date:   January 12, 2007