### IN THE UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEONARD C. JEFFERSON, } | |
| } | |
| Plaintiff, } | |
| } | No. 1:04-cv-44 |
| vs. } | District Judge McLaughlin |
| } | Magistrate Judge Baxter |
| WILLIAM WOLFE, et al., } | |
| } | |
| Defendants. } | |

### CONCISE STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

AND NOW, come the defendants, by their attorneys, Tom Corbett, Attorney General, Christian D. Bareford, Deputy Attorney General, Susan J. Forney, Chief Deputy Attorney General, Chief Litigation Section, and respectfully submit the following undisputed and material facts:

### I. PLAINTIFF'S CLAIMS REGARDING RELIGION

1. It is the policy of the Pennsylvania Department of Corrections to provide counseling services to all inmates under the supervision of the Department. Appendix pages 1 - 3.

2. Counseling services include case management, inmate assessment and placement, reentry planning and specialized programming for offense related issues. Id.

3. The Bureau of Inmate Services is responsible for the development and evaluation of inmate treatment programs for the Pennsylvania Department of Corrections. App. pp. 4 - 24.

4. Pursuant to its function, the Bureau of Inmate Services provides standardized programs commensurate with an inmate's classification and prescribed treatment needs. Id.

5. The goal of every program offered is to have each inmate be able to:

a. Understand the effects and consequences that their criminal behavior had on victims, his family, and the community, and for the inmate to accept personal responsibility for his behavior;

b. Demonstrate an appropriate respect for authority, his fellow inmates, and for himself by better understanding what it means to be a member of a community;

c. Understand his high risk of re-offending;

d. Describe resources and intervention strategies for support to establish and maintain successful community adjustment.

Id.

6. Upon entry into the Department of Corrections, every inmate is assessed in order to determine the inmates' specific needs, and prescribes appropriate treatment programs. App. p. 8.

7. The assessment process is the first step in the process to prepare an inmate to return to the community. Id.

8. The results of the assessment are used to develop a Correctional Plan in order to reduce the inmate's risk of re-offending. Id.

9. The programs recommended as part of the Correctional Plan are memorialized on form DC-43, and are based on the inmate's classification and assessment needs. App. p. 1.

10. Programs offered by the Bureau of Inmate Services fall within one of five major categories: Work/Education, Citizenship, Family/Relationship/Self, Offense Related, and Re-entry. App. p. 1; See also, App. pp. 25 – 51.

11. "Work/Education" programs are academic or vocational programs designed to provide educational opportunities that will enable inmates to become responsible, sober, and productive members of society. App. p. 8.

12. "Citizenship" programs focus on building skills and "pro-social" values in order to assist the inmate in adjusting to incarceration as well as assist in the return to the community. App. p. 9.

13. The Citizenship category includes two programs: the Unit Based Citizenship course and the Character Development program. Id.

14. "Family/Relationship/Self" programs include programs such as parenting skills, as well as addressing specific needs of particular populations within the Department of Corrections, such as long-term offenders and elderly inmates. Religious programs fall within this category of programs. App. p. 10.

15. The Long-Term Offenders Program is designed to provide treatment programs, education, work opportunities and structured activities for inmates who are sentenced to 10 years or more. Id. at p. 12.

16. The focus of the long term offender program is on assisting inmates in dealing with the impact on their families, relationships and themselves that result from spending a large number of years in prison. Id.

17. "Offense Related" programs specifically address the inmate's offense or prior offense pattern and includes programs related to alcohol and other drugs, sex offenses, anger management, batterers, and victim awareness. App. pp. 12 - 16.

18. The Batterers Intervention Program is a 26 week course that focuses on addressing the battering behavior of inmates. Id. at p. 16.

19. "Re-entry" programs are designed to help inmates prepare for release back into the community. Id.

20. On July 20, 2001, Plaintiff received his annual Prescriptive Program Plan, DC-43, from Defendant Patricia Gamble, Unit Counselor at SCI-Albion. App. p. 52.

21. Plaintiff's 2001 Prescriptive Program Plan included the following recommended actions: remain misconduct free, receive positive misconduct reports, participate in the batterers intervention program, participate in stress and anger management program, participate in citizenship program, participate in the long term offenders program, and participate in other activities of his choosing (to include religious activities). Id.

22. Plaintiff's Prescriptive Program Plan also noted that Plaintiff was not interested in participating in programs at that time. Id.

23. Plaintiff's 2001 Prescriptive Program Plan noted the following:
While all participation in all programs is strictly voluntary, progress or lack of progress in dealing with weaknesses and/or problem areas will be one of the factors taken into consideration for all actions requiring staff support such as recommendations for program level changes, job changes, pre-release, commutation, and parole. Id.

24. Both Plaintiff and Defendant Gamble signed the Prescriptive Program Plan at the bottom of the "Recommended Actions" block of the DC-43. Id.

25. On July 24, 2002, the 2001 Prescriptive Program Plan was reviewed, and the "Results Achieved" block was completed. Id.

26. Of the results achieved noted in the year from July of 2001 until July of 2002, it was noted that Plaintiff participated in religious programs, physical fitness activities (walking), received one misconduct report, and received housing and work reports. Id.

27. Both Plaintiff and Defendant Gamble signed the Prescriptive Program Plan at the bottom of the "Results Achieved" block of the DC-43 on July 24, 2002. Id.

28. In addition to reviewing the results achieved from the 2001 Prescriptive Program Plan, on July 24, 2002, Plaintiff received a new Prescriptive Program Plan, DC-43. App. p. 53.

29. Plaintiff's 2002 Prescriptive Program Plan included the following recommended actions: employment, participation in the long term offenders program, participation in the citizenship program, and participation in the batterers intervention program. Id.

30. Plaintiff's Prescriptive Program Plan also noted that Plaintiff had "no real interest in programs". Id.

31. Plaintiff's 2002 Prescriptive Program Plan noted the following:
Progress or lack of progress on the Prescriptive Program Plan will be one of the factors taken into consideration for all actions requiring staff recommendations for job changes, pre-release, and parole. Id.

32. Both Plaintiff and Defendant Gamble signed the 2002 Prescriptive Program Plan at the bottom of the DC-43. Id.

33. Neither the 2001, 2002, nor 2003 Prescriptive Program Plans recommended that Plaintiff attend Alcoholics Anonymous, Narcotics Anonymous, or any other drug or alcohol treatment program. App. pp. 52 - 54.

34. The long term offenders program, the citizenship program, the stress and anger management program, and the batterers intervention program are secular in nature and have no tenets of religion. App. pp. 55 – 57.

35. Within the Pennsylvania Department of Corrections is the Office of Planning, Research, Statistics and Grants which, among other things, tracks empirical studies associated with topics relevant to corrections. App. pp. 58 - 94.

36. The DOC Office of Planning, Research, Statistics and Grants provides a compendium of the research to the DOC executive staff, superintendents, and others on a periodic basis in a publication entitled "Research in Review". Id.

37. Statistical research demonstrates that prison treatment programs do contribute to reductions of at least 10 percentage points in incidents of prison misconduct by inmates. App. pp. 65 -67.

38. Statistics reveal that reduction of prison misconduct is even greater in behavioral treatment programs, such as the DOC's "Thinking for a Change" program, with an average reduction by 26 points in the incidence of misconduct reports, as compared to non-behavioral programs (reduction of 10 points). Id.

39. The National Institute of Corrections defines those problem areas within an inmate's history that contribute to the inmate's risk of re-offending as "criminogenic needs". App. pp. 69 – 73.

40. Criminogenic needs include, alcohol and other drug abuse, low levels of education, few job skills/little work experience, impulsivity, and anti-social attitudes, beliefs, and attitudes. Id.

41. Statistics reveal that programs targeting criminogenic needs (such as anti-social behavior) reduce the occurrence of misconducts within the prison by at least 10 points, and those programs that target three criminogenic needs reduced misconducts by 30 points.  App. pp. 65 - 67.

42. Reducing levels of institutional misconduct results in prisons that are easier to run and safer for both staff and inmates.  Id.

43. Not only does inmate programming correlate to a reduction in the occurrence of prison misconduct reports, but the availability of such programs is an institutional variable that is used as a predictor of inmate misconduct activity.  App. pp. 74 - 77.

44. From 1998 to 2004, the annual number of offenders released from Pennsylvania state prisons increased by 54%.  App. pp. 78 - 94.

45. Of those released, nearly three fourths were conditionally released onto parole supervision, and of those, statistically, nearly 56 % will return to prison within three years of release, either for a technical violation of the conditions of parole or for the commission of a new crime.  Id.

46. During that same time period, admissions to Pennsylvania's prisons for parole violations has increased at twice the rate of new court commitments, 51 % as compared to 25 %, and as of 2005, more than one third of all DOC total admissions were for parole violations.  Id.

47. In response to these trends, in 2002, the DOC initiated a study of the recidivism process of parole violators.  Id.

48. The primary objective of this study was to explore the types of events that were happening in released offenders' lives while on parole that may have contributed to the parole violation/return to prison, in an attempt to examine the precursors of recidivism (such as the thoughts, feelings, and situations that occurred in the period leading up to the parole violation).  Id.

49. The policy goal of the study was to recognize the broad inventory of the offenders' reentry needs in order to prioritize departmental resources and design more effective treatment services for inmates, which in turn would better prepare the inmate for reintegration into the community.  Id.

50. The findings of the first phase of Pennsylvania's Parole Violation Study were released in 2005.  Id.

51. Evidence from the first phase suggested that the following mediating variables were the most common problems related to violating parole:  unrealistic post-release expectations of life outside of prison, an increased presence of anti-social/pro-criminal attitudes, and poor self-management/problem solving/coping skills.  Id.

52. In view of these findings, the Department of Corrections has refocused inmate programming to the underlying themes of the commission of offenses, namely anti-social attitudes and poor problem solving skills.  Id.

53. Much like reducing the occurrence of incidents of prison misconduct, programs that target criminogenic needs such as anti-social behavior and poor problem solving skills, are statistically more likely to reduce occurrences of recidivism. App. pp. 68 - 73.

54. Secretary Beard, a defendant in this action, has a public safety duty to offer appropriate treatment programs to inmates to address issues that led to criminal behavior and, thus, reduce the likelihood of further criminal behavior upon release to the community. App. pp. 95 – 100.

55. The alternatives to providing neutral and balanced inmate treatment programs would be to either forgo the inmate treatment programs altogether, or to allow inmates to choose to attend Muslim only programs. App. pp. 55 – 57.

## II. PLAINTIFF'S RETALIATION CLAIM

56. The following is the Department of Corrections policy statement regarding inmate compensation:

It is the policy of the Department to compensate inmates for participating in work and education programs. Inmate compensation services shall include the coordination of work and educational placement and processing inmate payroll however, inmates are not employees of the Department. The compensation and opportunities to advance provide positive reinforcement for developing good work habits that are important for reintegration into the community upon release.

App. p 103.

57. Within each inmate's copy of the inmate handbook is an explanation of the work assignment policy. App. pp. 113 - 121.

58. The Inmate Handbook Supplement from SCI-Albion supplements the Department of Corrections Inmate Handbook. App. pp. 122 - 126.

59. The Inmate Handbook Supplement from SCI-Albion specifically prohibits inmates from bringing reading material, radios, and edible Commissary items of any kind to the job site. App. p. 124.

60. Plaintiff's copy of the newspaper article with the poetry reproduced on the back was unrelated to his positions as a Chapel Clerk and considered personal. App. pp. 127 - 128; see also, App. p. 129; and App. pp. 130 - 131 .

61. On October 24, 2002, Plaintiff was at his work assignment as the chapel clerk with his poetry. App. pp. 132 – 134; see also, Doc. # 39, paragraphs 35 – 44..

62. The piece of paper containing the poetry was provided to Minster Michael Anderson, who made a copy of the contents. Id.

63. The poem entitled, "21st Century's Dawn's Early Light" is a narrative that asserts that there "there ain't no justice for you here if you ain't white", describes the criminal prosecutions as "lynchings" performed at "Police State-style trials", and as a result that prisons hold "the lynched children of America's slaves".  App. p. 135.

64. The poem entitled, "Self- Healing" is a narrative that describes the criminal justice system in terms of "State-sponsored hate crimes against the black man", "the only thing missing in their courtrooms is their hanging tree", and "courts remain one of America's most racist places". App. p. 136.

65. On November 13, 2002, a Support Team Meeting, attended by Plaintiff, Defendant McQuown, Defendant Gamble, and Defendant Snider, in which Plaintiff's poetry was discussed. Doc. # 39, paragraph 44.

66. Following that meeting, plaintiff was released from his inmate position in the chapel and reassigned to the general labor pool.  App. p. 137.

67. Subsequently, Plaintiff requested and received an explanation for his reassignment from both Defendant McQuown and Defendant Gamble.  App. pp. 132, 133 - 134.

68. Several avenues exist for inmates within the Pennsylvania Department of Corrections to express themselves via poetry, including inmate poetry contests and an inmate poetry publication.  Doc. # 39, paragraph 47.

69. Plaintiff was warned prior to October 24, 2002, by his direct supervisor, Imam Abdalla, about voicing his concerns about racial injustice in the work site.  App. p. 138.

70. Plaintiff was removed from his possession because, in the minds of the members of the Support Team, having such material at the work site is disruptive.  App. pp. 133- 134; see also, App. p. 130 – 131.

                Respectfully submitted:

                Tom Corbett
                Attorney General

                \s\ Christian D. Bareford
                Christian D. Bareford
                Deputy Attorney General
                PA. I.D. No. 83982

                Susan J. Forney
                Chief Deputy Attorney General
                Litigation Section

January 12, 2007

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEONARD C. JEFFERSON, } | |
| } | |
| Plaintiff, } | |
| } | No. 1:04-cv-44 |
| vs. } | District Judge McLaughlin |
| } | Magistrate Judge Baxter |
| WILLIAM WOLFE, et al., } | |
| } | |
| Defendants. } | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within **Concise Statement of Material Facts** was electronically filed with the Court and served upon the following via first-class mail:

LEONARD JEFFERSON
CL-4135
SCI-Albion
10745 Route 18
Albion, PA 16475-0001

                                             /s/ Christian D. Bareford
                                             CHRISTIAN D. BAREFORD
                                             Deputy Attorney General

OFFICE OF ATTORNEY GENERAL
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA  15219

(412) 565-7680

Date:   January 12, 2007