## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

LEONARD C. JEFFERSON,                  )
                                       )
      Plaintiff,                    )
                                       )
                          No. 1:04-cv-44
      vs.                           )   District Judge McLaughlin
                          Magistrate Judge Baxter
WILLIAM WOLFE, et al.,                 )
                                       )
      Defendants.                   )

### DECLARATION OF MIKE CLARK

I, Mike Clark, hereby state that the following information is true and correct to the best of my personal knowledge or information and belief:

1. I am currently employed by the Pennsylvania Department of Corrections as the Corrections Classification and Program Manager, a position at the State Correctional Institution at Albion (SCI Albion) that I have held since April 20, 2006. Immediately prior to that, from May 17, 1998 until April 19, 2006, I was the Drug and Alcohol Treatment Specialist Supervisor at the State Correctional Institution at Albion.

2. It is, and it has been since my time working in the field of prescriptive programs, the policy of the Pennsylvania Department of Corrections and SCI-Albion to provide treatment programs for inmates with the goal of having the inmate:

a) Understand the effects and consequences that his criminal behavior has on victims, his family, the victim's family, and the community;

b) Accept personal responsibility for his behavior;

c) Demonstrate an appropriate level of respect for authority, peers, and himself by having a better understanding of what it means to be a member of the community;

55

d) Understand his high risk factor of re-offending;

e) To become aware of and to take advantage of resources and intervention strategies for support to establish and maintain successful community adjustment.

3. Not all treatment programs are designed exclusively to assist the inmate to prepare for his release from prison. There are treatment programs that are beneficial for inmates immediately upon their arrival at SCI-Albion, such as orientation programs, and that are beneficial during the time of incarceration, such as use of the library, the outdoor yard, intramural sports, in-cell art and music activities, and many other prison activity programs.

4. Such in-house prison activities are vital to the safety and security of the institution because, among other things, they provide a constructive outlet for energy, promote social interaction among the inmates, and encourage a support system with fellow inmates.

5. Inmate treatment programs that address criminogenic factors, which are factors in an inmate's life that are likely to increase the occurrence of crimes in the future, are also extremely important to treating the inmate.

6. Statistics have consistently shown that treatment programs that target criminogenic needs reduce the likelihood of recidivism after release from prison.

7. While religious programming is available to inmates, the vast majority of treatment programs are secular in nature and do not have religious tenets. In other words, they do not invoke the concept of a higher authority, nor do they require the inmate to prescribe to any manner of worship.

8. Regarding the long term offender program, the citizenship program (which is no longer offered at SCI-Albion), the stress and anger management program, and the batterers intervention, none are religious in nature.

2

5·6

9. In the case of an inmate objecting to participating in any program that is not specifically within the tenets of one religion, in this case Islam, there are only two possible alternatives that I see to accommodating that objection: to either only require the inmate to participate in Islamic treatment programs (or allow the inmate to choose what programs he would like to participate in), or to do away with the requirement to engage in treatment programs altogether.

10. While religious programs are considered to be a positive pursuit, they do not necessarily address the criminogenic factors that statistics show causes a person to commit crimes. Programs that do not address these factors are less likely to reduce future criminal behavior.

11. By the same token, dispensing with the requirement to engage in any treatment programs would defeat the purpose of the Department of Corrections of providing opportunities for inmates to acquire those skills necessary to become law-abiding citizens.

12. This statement and declaration is made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury, which provides that if I make knowingly false averments, I may be subject to criminal penalties.

_____
Mike Clark

Date: ___ 1-12-07

3

57

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
**Office of Planning, Research, Statistics and Grants**
Phone: (717) 731-7149

June 8, 2006

**SUBJECT:**    *Research in Review*

**TO:**         Executive Staff
               Superintendents
               Other Readers

**FROM:**       Gary Zajac, Ph.D.                    Kristofer Bret Bucklen
               Research and Evaluation Manager      Senior Research and Evaluation Analyst

Enclosed please find Volume 9, Number 1 of *Research in Review* (RIR). This issue presents a series of reviews dealing with various topics including the risk principle, the effects of prison growth on prison management, therapeutic communities for female inmates and evidence-based strategies for reducing prison misconducts. Most of these reviews were prepared by new staff within the Office of Planning, Research, Statistics and Grants – Dean Lategan and Debra Snyder, who are serving as Quality Improvement Auditors in the Quality Improvement Section, and Jennifer Pawling, who has completed several rotations with us this year as a Pennsylvania Management Associate and who is slated to join the office upon the completion of this program next month. We welcome their contributions to RIR and look forward to their continued participation in this forum.

The article by Useem and Piehl on prison disorder reviewed in this issue is especially timely in light of a report – *Confronting Confinement* - that was just released this morning by the Commission on Safety and Abuse in America's Prisons, under the auspices of the Vera Institute of Justice. This commission has examined issues of prison management nationwide over the past year, and has arrived at some provocative conclusions about the state of America's prisons. The Useem/Piehl article provides evidence that disorder within prisons has actually been *decreasing* over the past several decades, despite the rapid growth of prisons during this time, challenging some of the commission's findings. This will undoubtedly remain an issue of ongoing discussion in the academic and public policy arenas.

Upcoming issues of Volume 9 will continue to present findings from the ongoing study of parole violators and parole successes conducted by Bret Bucklen. RIR will also continue with article reviews and briefing papers on topics relevant to corrections, as well as discussing findings from PADOC evaluation studies as they are completed.

As always, we welcome your feedback on RIR.  We also welcome your suggestions for specific topical areas for future issues. While we cannot promise that we can produce an issue in response to all suggestions offered, we are very much interested in knowing what questions and topics are most interesting to our readers.

Thank you for your ongoing interest in *Research in Review* as we begin our ninth year of publication.

**Pennsylvania Department of Corrections**

# Research in Review

**Office of Planning, Research, Statistics and Grants**
Editors: Gary Zajac and Kristofer Bret Bucklen (717)731-7149

## *Summary and Major Findings of Articles Reviewed*

Christopher T. Lowenkamp, et al. 2006. "The Risk Principle in Action:     Page 2
What Have We Learned From 13,676 Offenders and 97 Correctional Programs?"
*Crime & Delinquency*, 52(1), 77-93.

This article provides additional support for the validity of the *risk principle*, which states that offender treatment programs should be targeted primarily towards offenders who have the greatest likelihood of recidivating. Data from 97 programs in Ohio found that the best outcomes were associated with those programs that targeted high risk inmates with intensive cognitive-behavioral treatment.

Burt Useem, et al. 2006. "Prison Buildup and Disorder." *Punishment & Society: The*     Page 4
*International Journal of Penology*, 8(1), 87-115.

This study examines the relationship between the growth of prisons and prison populations over the past several decades and measures of prison *disorder*, such as riots, escapes, violence and misconducts. Contrary to expectations, levels of prison disorder seemed to have *decreased* in spite of the rapid growth of prisons. The authors attribute this to the increasing professionalism and rationalization of corrections.

Clayton Moser, et al. 2006. "The Dynamics of a Prison-Based Therapeutic     Page 5
Community for Women Offenders: Retention, Completion, and Outcomes."
*The Prison Journal*, 86(1), 6-31.

This articles examines process and outcome issues for a therapeutic community (TC) for female offenders in the Washington State Department of Corrections. Challenges with the start-up and management of this TC are discussed. Evaluation results suggest that this program reduces recidivism by up to seventeen percentage points.

Sheila A. French, et al. 2006. "Reducing Prison Misconducts: What Works!"     Page 7
*Criminal Justice and Behavior*, 33(2), 185-218.

This articles reports on a review of research regarding effective approaches to reducing institutional misconducts. Behaviorally-based programs that target key criminogenic needs were found to be the most effective in reducing misconducts. This study concludes that "What Works" in reducing recidivism also works in reducing prison misbehavior. Implications for prison management are discussed.

59

Christopher T. Lowenkamp, Edward J. Latessa and Alexander M. Holsinger. 2006. "The Risk Principle in Action: What Have We Learned From 13,676 Offenders and 97 Correctional Programs?" *Crime & Delinquency*, 52(1), 77-93.

The authors examined the data from two separate studies in order to determine if, according to the *risk principle*, programs that provide more treatment to higher risk offenders are more effective and if providing the treatment for longer periods of time is also more effective. The risk principle, which maintains that supervision level and treatment should correspond to the individual offender's risk level, is assessed for significance through analyses. Prior empirical research has indicated that programs that are directed towards higher risk offenders produce lower rates of recidivism than programs that do not target these offenders.

A study by Lowenkamp and Latessa of halfway houses (HWH) and community-based correctional facilities (CBCF) in Ohio is included in the present research. Offenders were received in HWH if they were reentering the community and had been serving time in a state correctional institution or in CBCF if the offender was under probation supervision. A comparison group of offenders consisted of those who were either parolees or under other postrelease control (PRC) but who were not placed in HWH or CBCF. The 3,782 offenders in the treatment group were matched to offenders in the comparison group on the basis of county of supervision, sex, and risk level (utilizing a modified version of the Salient Factor Score). Fifty-three programs were included in the study.

Offender risk levels were reduced to two categories – lower risk and higher risk. In order to determine adherence to risk principle in reference to length of treatment, the difference in the length of stay for lower risk offenders and higher risk offenders was calculated. Additionally, for these two levels of offenders, the amount of services that were provided, the treatment model employed and the treatment setting were determined and coded accordingly.

The data from the second study included in the present research was also conducted by Lowenkamp and Latessa. Forty-four intensive supervision probation programs (39 nonresidential, 5 residential) in Ohio were included in the authors' analyses, and these programs served 3,056 offenders diverted from either prison or jail. Similar to the above-referenced study, each offender in the treatment group was matched with an offender by jurisdiction, sex and risk level. The matched group of offenders were those under regular supervision or those who were released from jail during the same time as the treatment group offenders.

The data from the two above studies were combined for analysis. Programs that met the principles of effective interventions were low in number. These principles, when adhered to, have been determined to result in effective programming. When related to the comparison groups, "the 97 programs were associated with a slight increase in recidivism rates." Residential programs were found to produce a reduction in recidivism rates while nonresidential programs, such as electronic monitoring and intensive supervision, showed an increase in rates. Although nonresidential programs were found to be less effective than residential ones, "neither type of program was associated with a reduction in recidivism on average." However, when factors associated with the risk principle were adhered to in regard to nonresidential programs, recidivism rates were reduced. "The correctional programs included in these analyses, whether residential of nonresidential, showed

increases in recidivism rates unless offenders who were higher risk were targeted and provided more services for a longer period of time."

In relation to services provided, 26 percent of the programs were targeted towards higher risk offenders, and higher risk offenders remained in programs longer in almost half of the programs studied. Conversely, in more than half of the programs, lower risk offenders participated for greater lengths of time than higher risk offenders. Due to factors such as learning antisocial behaviors and reinforcing criminal behaviors, it was determined that lower risk offenders' participation in structured programs may actually lead to an increase in recidivism rates.

The authors found that "[P]rograms that provided at least .5 more units of service or referrals to offenders who were higher risk compared to offenders who were lower risk were more effective as were those that kept offenders who were higher risk in the program as long as or longer than offenders who were lower risk."

This study found that 34 of the 97 programs contained cognitive behavioral therapy (CBT) or some other form of behavioral treatment. Programs employing some form of CBT were more effective than if some other method of treatment was used. Optimal outcomes were found for those programs utilizing CBT for longer periods of time on higher risk offenders.

Several recommendations from this study are presented. Offenders receiving correctional programming should be assessed utilizing "objective and standardized assessment tools to identify appropriate offenders for highly structured programs." When risk level is determined, it should be related to the length of a program as well as to the level of supervision and types of services necessary to reduce recidivism among the offenders. Offenders classified as higher risk should appropriately be provided with a range of services that "target the specific crime-producing needs of the offenders who are higher risk." Lastly, when judges sentence offenders, they should be aware of and make use of assessment tools in order to determine if the offender is a low or high risk.

There were a few limitations of the current study. The data that were analyzed resulted from quasi-experimental designs and included only adult offenders participating in programs in Ohio. In addition, there was a two-year limit on the follow-up period.

Even when taking into consideration the limitations, this study demonstrates a need to consider the significant role that the risk principle, when adhered to, plays when evaluating the effectiveness of correctional programming. If the risk is greater, more services and a greater length of stay may be required, and if the risk is lower, structured programming may actually increase recidivism rates. Therefore, taking into account the amount of treatment services that are provided as well as the length of stay could result in more effective programming and a subsequent reduction in recidivism rates.

Burt Useem and Anne M. Piehl. 2006. "Prison Buildup and Disorder." *Punishment & Society: The International Journal of Penology*, 8(1), 87-115.

With the buildup of prisons over the past 20 years, some critics and criminologists anticipated a situation of correctional crisis and disorder. Examples of projected prison disorder included increased violence and escapes, more prison disturbances and riots, deteriorating prison conditions, greater hostage taking and gang conflict, and increased inmate against inmate, inmate against staff, and staff against inmate violence.

To better understand the impact of buildup on prison order, prior research on the social dynamics of prisons proffered diverse perspectives. One view proposes that prisons are "systems of cooperation" with an entrenched and established hierarchy from the Governor to the Secretary, filtering down through the rank and file prison structure, with inmates at the bottom of this hierarchy. This view suggests that inmates accept and follow prison rules because if the roles were reversed and inmates were in charge, they (the inmates) would follow the same organizational set-up, thereby accepting the prison structure as a legitimate form of prison operations. The outcome is a system of cooperation whereby participants for the most part follow the rules by avoiding resistance in order to maintain a system of cooperation.

Another social dynamics view considers variation in the degree of order in prisons. At one end of the continuum are prisons that are tense, unpleasant and dangerous in which buildup creates the potential for disorder. At the other end of the continuum are prisons that are safe, orderly and productive, creating a sense of order which indicates that correctional and political leadership is meeting the challenge of prison buildup. A third social dynamics view advocates that prison order, or disorder, is affected by leadership and the relationship between prison management, staff, inmates and outside authorities.

Buildup critics proposed that a prison buildup would produce an ungovernable prison population. In contrast, the authors of this article disagree, presenting data supporting their position that the buildup over the past twenty years has resulted in sustained prison order, crediting this outcome to the quality of political and correctional leadership. More specifically, their research argues that the effects of prison buildup depend on the ability of correctional leaders to deal with problems associated with buildup, which is related to managerial effectiveness and quality of leadership.

Their supporting data indicates:

- Between 1973 and 2001 inmate homicides decreased.
- Between 1982 and 2001 staff killed by inmates and the ratio of staff killed to inmates decreased.
- Between 1984 and 2000 assaults against inmates and staff declined.
- Between 1982 and 2001 inmate escapes (an indicator of weak security) declined.
- Between 1983 and 2001 the number of inmates held in administrative custody declined.
- Between 1995 and 2000 major prison disturbances and arsons declined.

An opposing explanation proffers institutional leadership through improved governance may not be responsible for maintained order during a prison buildup. Invoking images of a correctional "Leviathan", this line of thought proposes that prison authorities use repression as a means of maintaining order. Examples of repression include housing inmates in maximum security prisons, administrative custody, or super maximum prisons. The evidence, however, does not support a correctional Leviathan. Between 1974 and 2000 the number of inmates housed in maximum security prisons declined by six percent and between 1983 and 2001 the number of inmates housed in administrative custody dropped by 3.6 percent. In addition, a study on the effect of super maximum prisons on order in correctional systems indicated supermaxes have little effect on reducing inmate-against-inmate assaults.

Considering the impact of the 20 year prison buildup, another view proposes that there have been adverse outcomes associated with this buildup, specifically, that inmate educational programming and substance abuse treatment have lost ground in favor of a focus on physical security for the purpose of avoiding disorder. Unfortunately, supporting data does demonstrate that between 1991 and 1997 released inmates have been participating in fewer prison vocation and education programs.

In sum, the findings from this article show that as prisons have grown, the level of prison order has actually improved. The past several decades of buildup has *not* created a milieu of prison disorder and mayhem. In the arena of prison order and disorder, the context of these findings certainly looks good for institutional and political leaders. One limitation of this article is that it does not seem to broach the issue of "fiscal disorder" that prison buildup creates within public sector budgets, which is another consequence of prison growth that many jurisdictions are struggling with.

Clayton Moser and Dretha Phillips. 2006. "The Dynamics of a Prison-Based Therapeutic Community for Women Offenders: Retention, Completion, and Outcomes." *The Prison Journal*, 86(1), 6-31.

This article begins with a review of the relationship between substance abuse and various types of criminal activity. It also points to the body of evidence that treatment in Therapeutic Communities (TCs) has positive outcomes that lead to lower levels of recidivism. Nevertheless, a large discrepancy exists between the number of individuals in the criminal justice system who need treatment and the number of slots available for treatment. There is further indication that women especially are under-served with respect to drug treatment. The research reported on in this article attempts to add to the small but slowly growing literature on the effectiveness of drug treatment for incarcerated women.

Research indicates women drug offenders constitute more than eight percent of all arrests with 62 percent of women in state prisons reporting drug use in the month before their arrest. Female inmates were also more likely than male inmates (40% vs. 32%) to have committed their offense while under the influence of drugs. Additional data from Washington State indicates that 70 percent of the 865 women incarcerated in 1996 were assessed as having a chemical dependency problem. Yet, of the few women offender programs available, it was found that they were merely clones of the male offender programs. Evidence also showed there was little consideration for whether the special

63

needs of the female offenders were being addressed (sexual abuse, physical/mental health issues, limited educational skills, and parenting/child care issues).

In 1996 the Washington State Department of Corrections implemented a holistic residential TC (New Horizons) for drug-addicted female offenders targeting 72 women with serious substance abuse problems and 12 months or less to serve in confinement. A reasonable attempt was made to obtain a cross-section of TC members with respect to phase of the program, age, and race/ethnicity of the participants. The New Horizons Program treats addiction as a biopsycosocial disease, the primary objective being to restructure prosocial cognitive, behavioral, and affective skills of drug addicted women offenders. Participants demonstrating compliance with set criteria progressed through five stages linked to the 12 steps to recovery in Alcoholics or Narcotics Anonymous programs and the 16 steps in Moral Reconation Therapy programs.

The authors undertook a basic process and outcome evaluation of the New Horizons program. In discussing the issues they discovered surrounding the start-up and operation of New Horizons, they note that many of these issues have been identified with TC evaluations in other jurisdictions. These include institutional resistance, severity of inmate problems, program inadequacies, budget planning, choice of facility, staff recruitment, client referrals, program autonomy, and over-reliance on institutional sanctions. Most critically at the New Horizons program, the TC staff resented having to answer to and accommodate multiple and often competing levels of oversight while being held accountable for the numbers in the program because they had no control over the referrals. Many of the referrals did not want to be in treatment, creating a deleterious effect on the overall TC environment.

Upon examining drug treatment literature in general and TC literature in particular, it is apparent that some researchers rely heavily on indirect program data to document program processes. The observation of the New Horizons program as it developed afforded the authors insight into external pressures, internal dynamics, and challenges faced by both inmates and staff in the program.

Looking at outcomes for New Horizons, more than 44 percent of the TC participants successfully completed all phases of the treatment program. Younger women, non-white offenders, and those convicted of violent offenses were less likely to complete the program while older women were more motivated and committed to correcting their drug use and criminal habits.

This study examined return to prison for New Horizons participants as well as for a comparison group of women who did not participate in the program. The average follow-up period was approximately 18 months. The results indicate a positive outcome for the New Horizons TC participants. The reincarceration rate for women who completed New Horizons was 12.9 percent, compared to 22.3 percent for women who spent some time in the program but who did not graduate and 29.7 percent for women in the control group. Women in the TC group also took longer to fail than did women in the comparison group. Thus, this study found that even some exposure to the program leads to lower levels of recidivism, and completion of the program even further reduces recidivism. The latter finding is at once intriguing and encouraging, in that there is evidence from other correctional treatment evaluations that program *non-completers* can have even higher recidivism rates than subjects in the comparison group. This study also concluded that aftercare may have enhanced the program effects discovered here, as success rates tended to drop off beyond two years at risk.

64

Although not all TCs will result in positive outcomes for all chemically dependent offenders, there is considerable evidence of positive outcomes for many individuals. The authors conclude that investments in developing more prison-based TCs with aftercare programs for women offenders would be correctional dollars well spent.

Sheila A. French and Paul Gendreau. 2006. "Reducing Prison Misconducts: What Works!" *Criminal Justice and Behavior*, 33(3), 185-218.

The past several decades have witnessed a tremendous growth in prison populations in the United States, accompanied by the development of an impressive body of research literature on offender rehabilitation. This research comes in the wake of the publication of the "nothing works" pieces by Martinson and others thirty years ago, which lead to the erroneous conclusion that offender rehabilitation was largely a myth. We understand now that the appropriate question is not, "does anything work?", but rather, "what works for whom and under what circumstances?".

Much of "what works" literature has focused upon the outcome of recidivism; in other words, "which correctional intervention strategies are most effective in reducing re-offending *in the community*?". This is without doubt an important criterion to consider; correctional agencies generally speaking are concerned first and foremost with public safety. Reducing the probability that released offenders will continue to commit crimes is a critical component of a public safety strategy. Research into the impact of prison treatment programs on recidivism has lead to several broad conclusions about what does work in reducing recidivism, often characterized as the "principles of effective offender intervention". To summarize the key points of these principles, the most effective programs are those that target criminogenic (crime-producing) needs of higher risk offenders using cognitive-behavioral approaches within the context of a high-integrity (i.e. well-run) program.

The centrality of the recidivism measure notwithstanding, there are other means of assessing the effectiveness of prison-based interventions. One that has received somewhat less attention in the literature is institutional misconduct – the extent to which inmates behave, or do not, *within the prison setting*. While institutional misconduct is typically of little note to the general public, it is of great concern to those work within, and manage, the prison setting. Reducing levels of institutional misconduct results in prisons that are easier to run and safer for both staff and inmates. The maintenance of safe and orderly prisons ultimately has a positive impact on public budgets.

The present study presents a review of existing studies on effective strategies for reducing prison misconduct. In particular, the authors explore whether the same principles of effective offender intervention that are associated with reductions in recidivism are also linked to reductions in misconducts (the second author of this study has contributed greatly to the literature on evidence-based treatment practice noted above). In theory, this linkage should exist, as the antisocial thinking that contributes to criminal behavior in the community should also be implicated in prison misbehavior. If so, this would lend further support to these principles as a guide to offender rehabilitation and would provide suggestions for managing inmate behavior within the prison.

The authors examined the literature on the relationship between prison treatment programs and misconducts from the past fifty years, and were able to include 68 studies in their review that met basic standards of methodological adequacy. The vast majority of these studies were conducted in the U.S., representing primarily male institutions/programs and including a mix of adult and juvenile settings. While the studies they reviewed often did not contain the full range of programmatic information they would like to have collected, they were able to arrive at basic conclusions about program type and integrity for a majority of the cases. Altogether, the studies they reviewed encompassed 21,467 inmates. Through the review of this body of existing research, the authors were able to draw some general conclusions about the effect of treatment on misconduct rates.

Overall, the authors found that prison treatment programs do contribute to reductions in misconducts, by at least 10 percentage points. Looking at this treatment effect in greater detail, behavioral treatment programs (for example, a program such as *Thinking for A Change*) reduced misconducts by at least 20 percentage points (an average reduction of 26 points), compared to an average reduction of only 10 percentage points for non-behavioral programs (for example, a purely didactic program or a "talking cure"). Behavioral treatments had a greater probability of reducing misconducts than non-behavioral treatments.

Similar results were found when examining the extent to which programs targeted criminogenic needs (such as anti-social attitudes) as opposed to non-criminogenic needs (such as physical conditioning or self-image). Programs targeting at least three criminogenic needs reduced misconducts by nearly 30 percentage points. Programs targeting non-criminogenic needs produced only very small reductions in misconducts, and in some cases *increased* misconducts. Even targeting only one criminogenic need reduced misconducts by approximately 10 percentage points. Again, programs focused on criminogenic needs had the best chance of reducing misconducts.

The integrity of the treatment program (i.e. how well it was implemented in accordance with its design) also turned out to be an important variable. Programs with a high degree of integrity reduced misconducts by an average of 38 percentage points. Programs with lower levels of integrity reduced misconducts by an average of 13 percentage points, although in some cases the treatment effects for low integrity programs nearly vanished. While this study did find some modest effects even from the less well run programs, it is clear that one can generate a threefold improvement in results through proper program implementation. Once again, high integrity programs had a greater probability of reducing misconducts than low integrity programs.

Finally, approximately one-quarter of the studies reviewed for this article also reported outcomes related to post-release recidivism. The authors examined the relationship between misconduct outcomes and recidivism outcomes; in other words, do programs that reduce misconducts also reduce recidivism? Those programs that had a large effect on reducing misconducts also reduced recidivism by an average of 13 percentage points. These high performing programs were predominantly behavioral, targeted primarily criminogenic needs and had high levels of program integrity. Those programs that had small effects on misconducts either produced very small reductions in recidivism, or actually increased recidivism. These low performing programs were predominantly non-behavioral, targeted many non-criminogenic needs and had lower levels of program integrity.

The authors conclude that their findings largely support the findings of two previous meta-analysis of the impact of correctional treatment on misconducts conducted by other researchers. Prison treatment *in general* can produce some modest, positive impacts on in-prison behavior. The programs that are *most likely* to reduce misconducts are those that follow the key principles of effective offender intervention – target only criminogenic needs; use cognitive-behavioral approaches; and rigorously monitor program integrity. This of course is the same formula for reducing post-release recidivism.

This study provides some basic guidance on managing inmate behavior within the prison setting. *Appropriate* treatment is endorsed as a response to disruptive inmates. This is not an unexpected finding, given the logical connection between the etiology of anti-social behavior inside of, and external to, the prison environment. The primary limitation to this study is the lack of information about offender risk level available in the research reports reviewed by the authors. This made it difficult to test the importance of attention to offender risk level in strategies to reduce inmate misconduct. The risk principle is another key principle of effective offender intervention. The studies included in this review also often contained gaps in information about program integrity, limiting the authors' ability to identify the most critical features of program integrity for reducing prison misconduct. This article does, however, provide valuable insight into another important aspect of what works in changing offender behavior.

Editor's note: The PADOC's own ongoing study of outcomes related to its prison-based Therapeutic Communities (TC's) [see RIR Volume 6, Numbers 1 & 4 for a summary of results so far] has also explored the impact of these TC's on inmate behavior within the prison setting. A forthcoming article by Welsh and Zajac on these findings will be reviewed in a future issue of RIR.

**Pennsylvania Department of Corrections**

# Research in Review

**Bureau of Management Information Services**          **Division of Planning, Research, Statistics and Grants**
Editor: Gary Zajac (717)730-2725

## Special Focus on *What Works* and *Sex Offender Treatment*

This issue of *Research in Review* includes two special research briefing papers, inaugurating a new direction for RIR. Building upon the established format of reviewing specific corrections related research articles, RIR will begin to feature more in-depth synthesis and analysis of the body of literature concerning specific topics in corrections. These papers offer the reader insight into the latest and best research available on the treatment and management of offenders.

The first paper, *Offender Treatment Programs: What Works and How,* presents an overview of the principles of effective intervention with offender populations. This paper discusses problems that are common to offenders, approaches to offender assessment, effective treatment modalities and the development of an overall strategy for treatment and rehabilitation. This piece also provides a broad overview of issues that will be woven throughout the other special research briefing papers featured in future editions of RIR. Forthcoming papers will expand upon themes found in this paper.

The second paper concerns the treatment and management of sex offenders. This paper discusses issues such as the assessment and evaluation of sex offenders, the success of specific approaches to treatment, aftercare in the community and coordination between agencies that are charged with the custody and supervision of these offenders. This paper provides useful and interesting insight into the challenges of dealing with this difficult population.

Finally, an index to the articles reviewed in Volume 3 (2000) of RIR is included with this issue.

Upcoming issues of RIR will include briefing papers on prison and community-based therapeutic communities, correctional education programs, aftercare and other issues. We at RIR hope that you find these papers to be informative, practical and relevant to your work in corrections.

## OFFENDER TREATMENT PROGRAMS - WHAT WORKS AND HOW

by

Gary Zajac, Ph.D.

Research and Evaluation Manager

Division of Planning, Research, Statistics and Grants

A consensus has developed about the principles of effective offender treatment, reflected in a growing body of "what works" literature (see Sherman, et alii, 1997). The primary question that presently drives most of the research into correctional program effectiveness is not "does treatment work?", but rather "what works for whom and under what circumstances?". There is little evidence that incarceration or post-release supervision, absent any treatment interventions, actually produce positive outcomes (see MacKenzie, 2000). The research literature strongly indicates that simply monitoring offender behavior (whether in prison or after release) will produce no lasting reductions in recidivism (see Fulton, et alii, 1997). Treatment is identified as essential to reducing the rates of re-offending among inmates.

Evaluations of correctional treatment programs have repeatedly pointed out the importance of conducting comprehensive and detailed assessments of the *risk, need* and *responsivity factors* of the individual inmate (see Andrews, et alii, 1990). *Risk* refers to the likelihood that an inmate will re-offend upon release to the street. All things being equal, treatment should be targeted to moderate to high risk inmates. Low-risk offenders will probably succeed even with minimal treatment; whereas extremely high-risk offenders will probably fail regardless of the interventions offered to them. *Need* refers to the severity of a particular problem facing an inmate, such as substance abuse. *Responsivity factors* are personal characteristics that influence the success of treatment, such as level of cognitive functioning and learning styles. For example, a low functioning inmate will not likely respond well to a treatment setting that requires extensive reading or journal writing. Effective inmate treatment plans achieve a balance between these three domains, targeting treatment to inmates who are most in need of it *and* who are most likely to benefit from it.

There is also a strong consensus that effective correctional treatment programs should target problem areas that have been found to contribute to re-offending; these are known as *criminogenic needs* (see National Institute of Corrections, 1998). Critical needs include alcohol and other drug abuse, low levels of education, few job skills and little work experience, impulsivity and anti-social attitudes, beliefs and values. The anti-social needs are found to be especially related to re-offending. Interventions designed to address these needs are generally referred to as cognitive-behavioral therapy. Increasingly, correctional researchers advocate incorporating cognitive-behavioral components into all types of correctional programs, including alcohol and other drug treatment (see Gendreau, 1996).

The evaluation research on correctional treatment programs has produced some broad conclusions about how best to structure programs. Effective programs are intensive and cognitive-behavioral in nature (see Gendreau, 1996; MacKenzie, 2000). An intensive program is one that lasts from three to twelve months, and which occupies at least half of the offender's time while in the

69

program. The actual length of a program is driven by the specific behavioral objectives targeted by the program. A cognitive-behavioral program is one that is designed to remedy an offender's anti-social cognitions, values, and behavioral patterns. Such programs place a strong emphasis on problem solving, reasoning, self-control and behavior modification.

The integration of programs is also increasingly seen as a critical part of the correctional treatment process. Many inmates enter the correctional system with a host of needs, such as a long history of substance abuse, low educational achievement, little or no job experience, poor socialization, criminal thinking patterns, etc. Addressing these needs in a coordinated and comprehensive manner will reduce the likelihood of recidivism. Effective programs build upon one another and reinforce a common set of pro-social skills, contributing to successful inmate reentry.

A continuum-of-care treatment model is emphasized in the correctional evaluation literature (see Gendreau, 1996). In this model, treatment is begun in prison, and continues with aftercare programs upon release of the inmate to the street. Aftercare includes interventions such as relapse prevention, designed to assist the inmate in applying the skills learned in the prison-based treatment setting to the street. Effective aftercare programs help offenders understand that treatment in prison is only the first step, and that they will be expected to continue to use the tools acquired in treatment for the rest of their lives. There is a compelling body of evidence that a continuum-of-care model produces significant reductions in recidivism (see Wexler, et alii, 1999).

The link between aftercare and employment has also been explored. Employment is seen as especially critical, given the need of ex-offenders both to earn a living and to reenter the social mainstream. A comprehensive approach to assisting inmates with reentry to the community and with preparing them to find and keep a job is identified as essential to reducing recidivism rates (see Wexler, 2001). Program integration is emphasized here again, as an intensive job readiness intervention may do little for an offender still engaged in significant anti-social thinking patterns.

A good model of an intensive, behavioral treatment program is a residential therapeutic community (TC) for the treatment of alcohol and other drug abuse. A growing body of research supports the conclusion that TC's are a highly effective approach to treating addicted inmates.

Research on the Amity prison TC in California found that only 27 percent of inmates who completed both the TC and aftercare returned to prison within three years of release, compared to 75 percent of similar inmates who had no such treatment (Wexler, et alii, 1999). A cost-benefit analysis conducted on this program by the California legislature concluded that if the impacts of this TC could be replicated more broadly throughout the California prison system, projected prison expansion over the next seven years could be reduced by 4,700 beds, for an annual savings of over $80 million (Mullen, et alii, 2001).

An evaluation of the KEY-CREST prison TC and community aftercare program in Delaware found that inmates who completed all phases of treatment had a rearrest rate of only 31 percent after three years, compared with 71 percent for similar inmates without treatment (Martin, et alii, 1999).

A separate evaluation also found that inmates who had completed KEY-CREST had significantly higher levels of employment and legitimate income after release than was the case for untreated ex-offenders (Butzin, et alii, 1999).

Studies of the Kyle New Vision ITC prison-based TC in Texas concluded that this program had a significant impact on the most severely addicted inmates. The three year reincarceration rate for inmates who completed all phases of ITC treatment was 26 percent, compared with 52 percent for similar inmates who had no treatment (Knight, et alii, 1999). A cost-effectiveness analysis conducted as a companion piece to this evaluation concluded that, given the reductions in recidivism that resulted from completion of the prison-based treatment and aftercare, this regimen is a cost-effective alternative to providing no treatment to seriously addicted inmates (Griffith, et alii, 1999).

Based upon the success of these and other TC's, researchers have concluded that an integrated continuum of corrections-based TC treatment works best for seriously drug-involved offenders (see Inciardi et alii, 1994; Martin et alii, 1999). This continuum involves three stages of TC treatment, tied to an inmate's changing correctional status: prison→work release→release to the community. The first stage of treatment consists of a prison-based TC designed to modify deviant lifestyles and behavior patterns. Ideally, this stage lasts 9-12 months. The second stage is a transitional TC, such as a therapeutic community work release center, with a program composition similar to that of the traditional TC. In Pennsylvania, this would equate to release to a Community Corrections Center (CCC) while continuing to participate in treatment. In the third stage, clients have completed treatment in a CCC and are living in the community. Treatment in the third stage can involve outpatient counseling and group therapy.

Educational and vocational programs are also increasingly identified as important for reducing recidivism rates among inmates. While the body of evaluation inquiry into these types of programs is not yet as definitive as is the case with substance abuse treatment, the overall trend of this research is promising. The Correctional Education Association is presently conducting studies of prison-based education programs in four states (including Pennsylvania). Preliminary results from their study in Maryland indicate that the recidivism rate for inmates who participated in educational programs while incarcerated was 31 percent, compared with 38 percent for inmates who had no educational programming. This translates into a potential cost savings of approximately $24 million (Corrections Education Association, 2001).

Similar research in the Texas state prison system found that inmates who had achieved literacy as a result of prison-based education had a recidivism rate of 19 percent two years after release, as opposed to a 30 percent rate for inmates who remained illiterate. Prison GED programs also produced significant decreases in recidivism. The impact of prison-based vocational training was less clear. (Martinez and Eisenberg, 2000).

In general, though, the available research on vocational education provided in prisons indicates that these programs are effective in reducing recidivism. Research has also shown that programs that begin job search assistance and preparation for employment prior to leaving prison,

*and continue assistance after release*, hold promise for reducing recidivism. As discussed above, this may be even more important for offenders with a high-risk for recidivating (MacKenzie. 2000).

Clearly, while more research is needed into the effectiveness of all types of correctional education programs, the existing evidence suggests that education and vocational training do contribute to an overall strategy of treatment. Again, these educational interventions should be based upon a valid assessment of an inmate's educational needs and be linked to a comprehensive plan of treatment for the inmate.

In sum, the existing body of evaluation literature on correctional treatment supports the conclusion that treatment can reduce recidivism rates and produce other positive impacts for many offenders. There is also increasing focus in the evaluation literature on the importance of aftercare following TC treatment, both within the institution and on the street. Clearly, an intensive, comprehensive and integrated treatment regimen in prison, coupled with follow-up care, offers a reasonable chance for rehabilitation of criminal offenders.

## Sources

Andrews, Donald A.; Zinger, Ivan; Hoge, Robert D.; Bonta, James; Gendreau, Paul and Cullen, Francis T. 1990. "Does Correctional Treatment Work? A Clinically Relevant and Psychologically Informed Meta-Analysis." *Criminology*, 28, 369-404.

Butzin, Clifford A.; Scarpitti, Frank R.; Nielsen, Amie L.; Martin, Steven S. and Inciardi, James A. 1999. "Measuring the Impact of Drug Treatment: Beyond Relapse and Recidivism." *Corrections Management Quarterly*, 3(4), 1-7.

Corrections Education Association. 2001. "CEA Releases Preliminary Findings of Multi-State Recidivism, Education Study." *Correctional Education Bulletin*, January, 1-6.

Fulton, Betsy; Latessa, Edward J.; Stichman, Amy; and Travis, Lawrence. 1997. "The State of ISP: Research and Policy Implications." *Federal Probation*, December.

Gendreau, Paul. 1996. "The Principles of Effective Intervention with Offenders." In Harland, Alan T. (ed.). *Choosing Correctional Options That Work: Defining the Demand and Evaluating the Supply*. Thousand Oaks, CA: Sage.

Griffith, James D.; Hiller, Matthew L.; Knight, Kevin; Simpson, D. Dwayne. 1999. "A Cost-Effectiveness Analysis of In-Prison Therapeutic Community Treatment and Risk Classification." *The Prison Journal*, 79(3), 352-368.

Inciardi, James A.; Martin, Steven S. and Lockwood, D. 1994. "Therapeutic Communities in Prison and Work Release: Some Clinical and Policy Implications." *Therapeutic Community:*

*Advances in Research and Application*, 259-267.

Knight, Kevin; Simpson, D. Dwayne and Hiller, Matthew L. 1999. "Three Year Reincarceration
Outcomes for In-Prison Therapeutic Community Treatment in Texas." *The Prison Journal*,
79(3), 337-351.

Martin, Steven S.; Butzin, Clifford A.; Saum, Christine A. and Inciardi, James A. 1999. "Three
Year Outcomes of Therapeutic Community Treatment for Drug-Involved Offnders in
Delaware: From Prison to Work Release to Aftercare." *The Prison Journal*, 79(3), 294-320.

Martinez, Alma I.; and Eisenberg, Michael. 2000. *Does Educational Achievement in Prison
Lead to Lower Post-Release Recidivism Rates?* Texas Department of Criminal Justice
And the Texas Department of Public Safety.

MacKenzie, Doris L. 2000. "Evidence-Based Corrections: Identifying What Works." *Crime and
Delinquency*, 46(4), 457-471.

Mullen, Rod; Rowland, James; Arbiter, Naya; Yablonsky, Lew and Fleishman, Bette. 2001.
"California's First Prison Therapeutic Community: A 10-Year Review." *Offender Substance
Abuse Report*, 1(2), 17-30.

National Institute of Corrections. 1998. *Public Protection Through Offender Risk Reduction:
Putting Research into Practice*. Washington, DC: U.S. Department of Justice.

Sherman, Lawrence W.; Gottfredson, Denise; MacKenzie, Doris; Eck, John; Reuter, Peter and
Bushway, Shawn. 1997. *Preventing Crime: What Works, What Doesn't, What's Promising.*
Washington, DC: U.S. Department of Justice, Office of Justice Programs.

Wexler, Harry K. 2001. "An Integrated Approach to Aftercare and Employment for Criminal
Justice Clients." *Offender Substance Abuse Report*, 1(2), 17-25.

Wexler, Harry K.; Melnick, Gerald; Lowe, Lois and Peter, Jean. 1999. "Three-Year
Reincarceration Outcomes for Amity In-Prison Therapeutic Community and Aftercare in
California." *The Prison Journal*, 79(3), 321-336.

## TREATING AND MANAGING THE INCARCERATED SEX OFFENDER

Pennsylvania Department of Corrections

# Research in Review

**Bureau of Management Information Services**          **Office of Planning, Research and Statistics**

Editor: Gary Zajac (717)730-2725

## *Summary and Major Findings of Articles Reviewed in This Issue*

James A. Inciardi, et. alii. 1997. "An Effective Model of Prison-Based          Page 3
Treatment for Drug-Involved Offenders." *Journal of Drug Issues*, 27(2),
261-278.

This study finds that inmates receiving a full continuum of treatment, including aftercare upon release, were more successful at remaining drug and arrest-free than inmates receiving a more limited spectrum of treatment. This study provides an interesting evaluation of the relative benefits of providing an increasingly intense range of treatment modalities for the drug-addicted inmate.

Ron Sipe, et alii. 1998. "Adolescent Sexual Offenders Grown Up:          Page 3
Recidivism in Young Adulthood." *Criminal Justice and Behavior*,
25(1), 109-124.

This study finds that non-violent juvenile sexual offenders show much lower recidivism rates than violent juvenile sexual offenders. Thus, non-violent juvenile sexual offenders may be more amenable to structured interventions designed to reverse their deviant sexual impulses. This study is well conducted, although with limited generalizability. While it does advance a policy agenda, it contributes to the understanding of recidivism among a particularly critical class of offender.

Paul Gendreau, et alii. 1997. "Predicting Prison Misconducts."          Page 4
*Criminal Justice and Behavior*, 24(4), 414-431.

This study finds that inmate age, antisocial attitudes, criminal history and availability of inmate programs were the most powerful predictors of misconducts. This article offers a useful summary of research into attempts to predict prison misconducts. While this piece is oriented primarily towards academics, it is also of interest to corrections administrators.

Dorothy S. McClellan, et alii. 1997. "Early Victimization,          Page 5
Drug Use, and Criminality: A Comparison of Male and
Female Prisoners." *Criminal Justice and Behavior*, 24(4), 455-476.

This study finds a link between childhood abuse, emotional distress, substance abuse, and criminality in female inmates. This study is a well constructed and reported piece of empirical research. While the article does seem to have a policy agenda, it provides useful insight into how variations in life history contribute to

criminal deviance.

Steven A. Gilham, et alii. 1997. "The Impact of Drug Education  Page 6
and Prevention Programs: Disparity Between Impressionistic
and Empirical Assessments." *Evaluation Review*, 21(5), 589-613.

This article provides insight into the differing perceptions of the impact of drug prevention and awareness programs. This article finds that staff who provide drug education programs view their programs as successful, although data on behavioral changes among program participants suggests mixed program results. While this article focuses upon drug awareness programs in schools, its findings have implications for any programmatic attempt to alter attitudes towards drugs.

Robert W. Gallagher, et alii. 1997. "Inmate Views About the  Page 7
Purpose and Use of the MMPI-2 at the Time of Correctional Intake."
*Criminal Justice and Behavior*, 24(3), 360-369.

This study explores inmate perceptions of psychometric testing, providing insight into how inmates understand a central element of the classification process. The study finds that inmates generally understand the purpose behind such testing, although some attempts at deception are found. Other than the use of a limited sample of inmates, this study is well constructed.

Glenn D. Walters, et alii. 1998. "Use of the Psychological  Page 8
Inventory of Criminal Thinking Styles in a Group of Female
Offenders." *Criminal Justice and Behavior*, 25(1), 125-134.

This study finds that a new psychometric tool (PICTS) is equally valid and reliable with both male and female inmates. While this article seems to be directed primarily toward psychology researchers, it does provide interesting insight into a psychometric tool which can be of use to prison administrators, particularly those with custody of female inmates.

Christina A. Pietz, et alii. 1998. "Psychology Internship  Page 8
Training in a Correctional Facility." *Criminal Justice and
Behavior*, 25(1), 99-108.

This study finds that graduate students participating in psychology internships in state and federal prisons report positive experiences. Insight is provided into the components of a successful internship program. This research appears to be well done, oriented towards corrections professionals and provides interesting insight into career development within an occupational sub-sector of corrections.

Lynne Goodstein and Henry Sontheimer. 1997. "The Implementation  Page 9
of an Intensive Aftercare Program for Serious Juvenile Offenders."
*Criminal Justice and Behavior*, 24(3), 332-359.

This article presents an interesting case study of planned organizational change within a local criminal justice setting. The second author (Sontheimer) is a staff member with the Pennsylvania Commission on Crime and Delinquency, and has interacted extensively with the Department.

This research compares the adult recidivism rates for non-violent juvenile sexual offenders with the rates of non-sexual juvenile offenders. The authors note that previous research into this topic has found high recidivism rates for juvenile sexual offenders, leading to "get tough" policies on such offenders which focus upon longer incarceration. The assumption is that juvenile sexual offenders can generally be assumed to be at high risk for re-offense.

The authors examine the arrest history of a sample of non-violent, male juvenile sexual offenders, and of a comparison group of non-sexual male juvenile offenders, in Idaho. They found that, compared to non-sexual juvenile offenders, juvenile sex offenders were significantly more likely to be arrested as adults for sex crimes. The non-sexual juvenile offenders, however, were far more likely to be arrested as adults for non-sex crimes. The adult sex offense recidivism rate for the juvenile sex offenders, though, was less than 10 percent. Thus, the commission of a non-violent sex crime as a juvenile, as opposed to a non-sexual offense, does predict adult sex offending, but only weakly. The vast majority of the sex offending male juveniles included in this study did not reoffend sexually as adults during the period covered by the study. Another finding is that a history of non-sexual, violent juvenile offenses does not appear to be related to adult violent crime.

The authors conclude that studies of juvenile sexual offenders must be careful to separate violent and non-violent sexual offenses. They argue that while there is a body of data which suggests that violent juvenile sexual offenders are at significant risk for re-offending, non-violent sexual offenders show much lower recidivism rates. They also argue that sentencing decisions for juvenile sex offenders should be based upon the exact nature of the offense. Non-violent sexual offenders may be more amenable to structured interventions designed to reverse their deviant sexual impulses.

Paul Gendreau, et alii. 1997. "Predicting Prison Misconducts." *Criminal Justice and Behavior*, 24(4), 414-431.

**This article offers a useful summary of research into attempts to predict prison misconducts. While this piece is rather densely written and oriented towards academics, it is also of interest to corrections administrators.**

This article presents a meta-analysis (a review of existing research literature) on studies of prison misconduct to isolate significant correlations between misconducts and variables which might contribute to misconducts. The authors' objective is to identify misconduct predictors which can be most useful to prison administrators in maintaining safe institutions.

The authors note that previous meta-analyses identified the following factors as being good predictors of misconducts: inmate age, marital status, employment, criminal history, education, and prison crowding. The review conducted by the authors sorted the predictor variables into three types or domains: personal domains (e.g. age), situational domains (e.g. crowding) and actuarial domains

(the use of psychometric measures to predict misconduct).

This review found the following personal domain variables to be the most powerful predictors of inmate misconduct activity: age (younger inmates at greater risk for misconduct), antisocial attitudes and criminal history. Regarding situational domains, institutional variables, such as availability of programming, were the most powerful predictors of misconducts; crowding was not a significant predictor. Regarding the use of standard psychological assessment instruments, the Level of Service Inventory-Revised (LSI-R) (not currently used by the Department) was the most powerful predictor of future misconduct. Finally, the authors found that the studies included in their review were more successful at predicting violent misconducts than non-violent misconducts.

Dorothy S. McClellan, et alii. 1997. "Early Victimization, Drug Use, and Criminality: A Comparison of Male and Female Prisoners." *Criminal Justice and Behavior*, 24(4), 455-476.

**This study is a well constructed and reported piece of empirical research. While the article does seem to have a policy agenda, it provides useful insight into how variations in life history contribute to criminal behavior in male and female offenders.**

This article present the results of a study of the childhood history of maltreatment in male versus female prison inmates in Texas. The objective is explore links between maltreatment as youths and subsequent delinquent and criminal behavior.

The authors note that previous research has indicated that there exists a correlation between childhood victimization and later substance abuse and criminality. Other research indicates that females tend to experience more abuse as children than males, particularly sexual abuse. In females, such childhood abuse leads to depression, substance use and self-destructive behaviors. In males, such abuse tends to lead to violent acting out as adults. Subsequent criminal behavior in female victims tends to be mediated through substance abuse. In other words, the childhood abuse leads to substance abuse, which leads to criminal activity. For males, the connection between childhood abuse and subsequently criminality may be more directly, and less reliant upon intervening variables such as drug use.

The authors test hypotheses related to these propositions using data collected from 1,500 inmates in the Texas state prison system. They conclude that their study confirms previous findings that indicate that female inmates report higher levels of childhood abuse, subsequent emotional distress and substance abuse, and criminality linked to the substance abuse, than is the case for male inmates. The authors support counseling and empowerment-building for such female inmates.

Steven A. Gilham, et alii. 1997. "The Impact of Drug Education and Prevention Programs: Disparity Between Impressionistic and Empirical Assessments." *Evaluation Review*, 21(5), 589-613.

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
**Office of Planning, Research, Statistics and Grants**
Phone: (717) 731-7149

July 15, 2005

**SUBJECT:**     *Research in Review*

**TO:**     Executive Staff
     Superintendents
     Other Readers

*Gary Zajac*                                           *Kristofer Bret Bucklen*

**FROM:**     Gary Zajac, Ph.D.                    Kristofer Bret Bucklen
     Research and Evaluation Manager          Research and Evaluation Analyst

     Enclosed please find Volume 8, Number 1 of *Research in Review* (RIR). With this issue of RIR, we summarize findings from the first phase of the Department's in-house study of its parole violator (PV) population.

     The Department's Parole Violator Study was initiated in late 2002 in response to trends of increasing PV admissions to Pennsylvania's prison. The purpose of the study was to identify factors contributing to success or failure on parole, in order to inform the design of more effective programs and treatment services for offenders preparing to return to the community. In order to examine these issues, a three-phase study was conceptualized, two phases of which have been completed to date. The first phase of the study, summarized in this issue of RIR, included the administration of a detailed survey to nearly 550 PVs returning to twelve State Correctional Institutions (SCIs). After compiling results from the survey, recurring themes were further explored through focus groups of approximately 60 PVs at four SCIs. The second phase of the study consisted of a survey of a comparison group of parolees who have remained successfully in the community. Results from the survey of parole successes were also followed up with a focus group and phone interviews to further explore recurring themes. The third phase of the study, not yet conducted, will include interviews and focus groups with parole officers and community corrections providers to gain their perspective on factors relating to success or failure on parole.

     The results of the first phase of the PADOC Parole Violator Study suggest three primary factors relating to success or failure on parole. First, PVs tend to hold unrealistic expectations of how life outside of prison will be. Second, PVs tend to maintain anti-social attitudes, values, and beliefs that support offending or violating behavior. Third, PVs tend to possess inadequate coping or social problem-solving skills, especially when faced with emotional uneasiness or daily life problems.

     We welcome your feedback on RIR. We also welcome your suggestions for specific topical areas for future issues. While we cannot promise that we can produce an issue in response to all suggestions offered, we are very much interested in knowing what questions and topics are most interesting to our readers. Future issues of RIR will continue with a review of our own departmental evaluation projects, as well as article reviews, book reviews, and other relevant pieces.

     Thank you for your continued interest in *Research in Review*.

**Pennsylvania Department of Corrections**

# Research in Review

**Office of Planning, Research, Statistics and Grants**
Editors: Gary Zajac and Kristofer Bret Bucklen (717)731-7149

## Special Focus on PADOC's Parole Violator Study (Phase 1)

The first issue of Volume 8 of *Research in Review* features a summary of the first phase of the Pennsylvania Department of Correction's (PADOC) Parole Violator Study. This study was initiated in late 2002 in response to growing numbers of parole violator admissions to the PADOC. The intent of the study was to determine the factors relating to success or failure on parole and to assemble a broad inventory of the needs of released offenders in order to prioritize departmental resources and develop more effective treatment services.

The first phase of the study involved administering a detailed survey to nearly 550 parole violators who were recently returned to prison. After survey results were compiled, recurring themes were further explored through focus groups of approximately 60 parole violators at four State Correctional Institutions (SCIs).

The results of the first phase of this study revealed three underlying factors that are most evident among those that violate parole. First, violators tend to hold unrealistic expectations of how life outside of prison will be. Second, violators tend to maintain anti-social attitudes, values, and beliefs that support their offending or violating behavior. Third, violators tend to possess inadequate coping or social problem-solving skills, especially when faced with emotional instability or daily life problems.

Future issues of RIR will summarize later phases of the PADOC Parole Violator Study, including an analysis of a comparison group of successful parolees and an analysis of interviews/focus groups with parole officers and community corrections providers to gain their perspectives on the factors relating to success or failure on parole. Upcoming issues of RIR will also continue to feature summaries of other PADOC research projects, as well as reviews of new and interesting journal articles and books. We at RIR hope that you find these topics to be informative, practical, and relevant to your work in corrections.



# THE PENNSYLVANIA DEPARTMENT OF CORRECTION'S PAROLE VIOLATOR STUDY (PHASE 1)

by

Kristofer Bret Bucklen

Research and Evaluation Analyst

Office of Planning, Research, Statistics and Grants

Introduction and Background

In Pennsylvania, as in many other states, the number of offenders being released from prison back into communities has increased significantly in recent years. From 1998 to 2004, the annual number of offenders released from Pennsylvania state prisons increased by 54%. Consistently during this time period, the majority of those who were released (nearly three-fourths of releases) were conditionally released onto parole supervision. The most current available statistics indicate that over half (56%) of those released onto parole supervision will return to prison within three years of being released, either for a technical violation of the condition(s) of their parole or for a new crime. Indeed, admissions to Pennsylvania's prisons for parole violations have increased at double the rate of new court commitments over the past seven years (51% versus 25%, respectively). The 13% overall increase in the Pennsylvania Department of Correction's (PADOC) inmate population over the past seven years has been in large part attributed to this trend of increasing parole violator (PV) admissions. Altogether, more than one-third of the Department's total admissions are now for parole violations.

In late 2002, in response to these trends, the PADOC initiated a study of the recidivism process of PVs. The primary objective of this study was to explore the types of events that were happening in released offenders' lives while out on parole that may have contributed to their eventual failure on parole and return to prison. Expanding upon the work of a similar Canadian study conducted in the late 1990s (Zamble and Quinsey, 1997), this study represented an attempt to move beyond the general determinants of recidivism and examine the more dynamic precursors of recidivism (e.g., the thoughts, feelings, and situations that occurred in the days and moments leading up to a parole violation). From a policy perspective, the study served as a broad inventory of offender reentry needs, with the goal of prioritizing departmental resources and designing more effective treatment services for inmates so as to better prepare them for the types of issues and situations that might present obstacles to their successful reintegration into the community.

The study was conducted in two phases, with the first phase involving an analysis of a sample of PVs who were recently returned to a State Correctional Institution (SCI) and the second phase involving an analysis of a comparison group sample of successful parolees. The following article is a summary of the findings from the first phase of the study involving the PV group. For this first phase, a detailed 85-question survey was administered to all PV admissions who were received at 12 SCIs

over a two-month period (from December 2002 to January 2003), representing approximately 75% of all parole violators received by the PADOC during that time period. The survey instrument incorporated questions on several central domains including personal background information, living arrangements, financial situation, employment, leisure activities, marital/family relationships, alcohol and other drug (AOD) use, emotional/mental/physical health, thoughts/feelings/actions related to the events of the violation, and parole/community supervision experience. Reoccurring themes from the survey results were further explored through focus groups that were conducted with approximately 60 PVs at four of the participating institutions. Results from the survey were also matched with external data sources in order to examine the consistency of respondents' answers as a measure of reliability.

In order to elicit fresh recollections of the events surrounding their violation, PVs were targeted to complete a survey as soon as possible after returning to incarceration for violating parole. On average, participants completed a survey within two to three months of being returned. By the end of the data collection period, a total of 542 surveys were collected. Table 1 contains summary statistics on various demographic characteristics of the PVs in the study sample. Male PVs comprised the majority of the sample (93%). While female PVs only comprised 7% of the sample, this still represented a slight over-sampling of female PVs, given that female PVs typically represent 4% of admissions to the PADOC. The average age of those surveyed was 35 years old. A breakdown of survey

TABLE 1. Demographic Statistics

| Age | N | % |
| --- | --- | --- |
| 24 or younger | 52 | 11.0 |
| 25-34 | 195 | 41.1 |
| 35-44 | 158 | 33.3 |
| 45-54 | 63 | 13.3 |
| 55 or older | 6 | 1.3 |
| TOTAL* | 474 | 100.0 |
| **Race** | | |
| White | 140 | 28.2 |
| Black | 293 | 59.1 |
| Hispanic | 61 | 12.3 |
| Other | 2 | 0.2 |
| TOTAL* | 496 | 100.0 |
| **Gender** | | |
| Male | 468 | 93.4 |
| Female | 33 | 6.6 |
| TOTAL* | 501 | 100.0 |
| **Parole Violation Status** | | |
| Technical Violator (TPV) | 297 | 69.1 |
| Convicted Violator (CPV/TCPV) | 133 | 30.9 |
| TOTAL* | 430 | 100.0 |
| **Primary Offense** | | |
| Robbery | 96 | 19.6 |
| Burglary/Theft/Property Crime | 117 | 23.9 |
| Murder/Homicide/Manslaughter | 25 | 5.1 |
| Drugs | 165 | 33.7 |
| Assault | 31 | 6.3 |
| Sex Offense/Rape | 4 | 0.8 |
| TOTAL* | 490 | 100.0 |
| **City Last Paroled To** | | |
| Philadelphia | 218 | 41.3 |
| Pittsburgh | 45 | 8.5 |
| Erie | 30 | 5.7 |
| Reading | 28 | 5.3 |
| Allentown | 17 | 3.2 |
| Harrisburg | 14 | 2.7 |
| Chester | 12 | 2.3 |
| Other | 164 | 31.1 |
| TOTAL* | 528 | 100.0 |

* Totals do not equal across demographic categories and do not match the total sample size of 542 because unique identifiers or certain demographic info was not available for some respondents

respondents' violation status revealed that approximately 69% of PVs in the sample were violated for breaking a technical condition of parole such as changing residence without permission or failing to report, while approximately 31% were violated for committing a new crime (including those who were violated for both committing a new crime and breaking a technical condition of parole). A breakdown of the primary offense for which PVs were last incarcerated revealed a variety of offense types represented in the sample, with the majority being drug offenses (34%). Half of those in the sample resided in either Philadelphia or Pittsburgh while last on parole. On average, PVs in the sample were out on parole for 16 months before returning to prison for a violation.

<u>Technical Versus Convicted Parole Violators</u>

A preliminary consideration in the analysis of the study results was whether or not the inclusion of both technical parole violators (TPVs) and convicted parole violators (CPVs) represented a homogenous group of parole violators. An examination of the given charges for technical violators revealed that 40% of the TPVs in the sample were charged with at least one technical violation that indicated that some sort of criminal activity had in fact occurred. For instance, one of the conditions of parole requires parolees to notify supervision staff within 72 hours of being arrested. A violation of this condition can be written up as a technical violation but also implies that a new crime has occurred, even if the offender is returned to prison as a TPV instead of as a CPV. A comparison of the assessed criminal risk levels of TPVs and CPVs, as measured by the Level of Service Inventory-Revised (LSI-R), revealed a very similar distribution of criminal risk for both groups (see Figure 1). The average risk score for TPVs was 26 while the average risk score for CPVs was 27, both of which fall in the "medium risk" category according to risk cutoffs established by the PADOC and the Pennsylvania Board of Probation and Parole (PBPP). Finally, a statistical comparison of TPVs and CPVs on demographics and on all of the answers on the survey revealed only two significant differences: 1) CPVs indicated that money management problems more strongly contributed to their failure on parole than did TPVs, and 2) TPVs were more likely than CPVs to report trouble finding a place to live upon last being released. Other than these two marginally significant differences, answers on all of the remaining questions on the survey did not differ by parole violation status. All of this analysis led to the conclusion that in fact the study sample of TPVs and CPVs represented a homogenous group of recidivists with similar precursors to violating parole.



FIGURE 1. LSI-R Risk Levels (n=260)

TPV Average = 26
(T)CPV Average = 27

Overview Questions

A starting point for analyzing the survey data was to examine results from overview questions that asked respondents to rank what areas caused them the most problems while on parole, what programs they received while last in prison that addressed some of these problems, and how well they felt that prison programming prepared them to address such problems. In the first question, respondents were provided with a list of areas that are typically recognized in the reentry literature as problem areas for offenders returning to the community, and asked to rate on a scale of 1 to 10 how much each area contributed to their parole violation, with 1 meaning that the area did not contribute to the parole violation and 10 meaning that the area strongly contributed to the parole violation (see Figure 2). The strongest reported contributors were parole supervision problems, money management problems, and emotional problems. At the lower end were problems with child support and friends. Interestingly, however, the minimum average rating (child support) was 2 and the maximum average rating (parole supervision problems) was 4. This represents a very narrow range of problem significance for the various areas that were rated. In essence, all of the areas were similarly ranked. Furthermore, all of the areas were ranked, on average, at the lower end of the scale. The strongest contributing factor (parole supervision problems) had an average rating of 4, which fails to even cross the halfway point of 5. A rating at the halfway point of 5 might be thought of as representing a "run-of-the-mill" problem; respondents therefore seem to be indicating that no potential problem area stood out as especially troubling. These results may indicate two conclusions: 1) it is the combination of multiple risk factors that leads to parole violations, not any one stand-alone risk factor, and/or 2) PVs may hold unrealistic views or provide inadequate assessments of their situation and the degree to which problem areas presented obstacles to their success on parole. The second conclusion will be important to return to later in this paper.



FIGURE 2. Problems Contributing to Violation

| | Contributed To Violation (Scale of 1 to 10) |
|---|---|
| Child Support Problems | 2.0 |
| Problems w/ Friends | 2.2 |
| Debt Problems | 2.4 |
| Health Problems | 2.6 |
| Alcohol Problems | 2.7 |
| Family Problems | 2.7 |
| Leisure Problems | 2.9 |
| Work Problems | 3.2 |
| Housing Problems | 3.2 |
| Drug Problems | 3.3 |
| Emotional Problems | 3.5 |
| Money Management Problems | 3.5 |
| Parole Problems | 4.0 |

The second overview question asked PVs to indicate what prison programs they had participated in while previously incarcerated. A list of programs was provided, representing all of the major programs offered within the PADOC at the time of the survey including: Thinking For A Change (TFC), therapeutic communities, anger management, sex offender treatment, batterer intervention, Community Oriented Reintegration (COR), Residential Substance Abuse Treatment (RSAT), other alcohol and other drug (AOD) treatment, citizenship, GED/basic education, vocational education programming, parenting programs, religious programming, and individual counseling. Results indicated that the majority of PVs received some AOD treatment, anger management, and basic education and that these three types of programming had the highest participation rate of all of the programs offered (see Figure 3). A few of the programs with the lowest participation rate were presumably programs that could have benefited a wider range of offenders. For example, only 22% of PVs indicated that they participated in COR, which is the PADOC's primary reentry initiative that provides a refresher on treatment received while incarcerated and also provides specific community reintegration planning. Only 11% of PVs indicated that they participated in TFC, a cognitive-behavioral program with the potential for being broadly applied to various problem behaviors relating to criminal offending. Low participation in these two programs (COR and TFC) may be partially explained by the fact that both programs were relatively new to the PADOC and may not have been available when some of these PVs in the sample were last in prison.



The third overview question asked PVs to indicate how well PADOC programming prepared them to address various potential problem areas (see Figure 4). PVs responded that they felt the most prepared by prison programming to deal with AOD problems, their employment situation, and their living arrangements. PVs felt the least prepared to deal with emotional concerns and their financial situation. As with the first overview question, this question still provides little insight into differentiating the importance of problem areas since a fairly high percentage of PVs felt moderately to well prepared across all areas. This may again suggest that PVs provide an unrealistic self-assessment of how prepared they are for the problems that they will face while on parole and of the factors contributing to their parole violation.



**FIGURE 4. How Well Prepared by Prison Programming?**

□ Moderately To Well Prepared?    ■ Not At All Or Very Little Prepared?

A more in-depth analysis of survey responses to individual questions was clearly needed in order to gain more precise insight into the factors relating to violating parole. For analysis purposes, the detailed results from the questions on the survey were grouped into five domains: 1) social network and living arrangements, 2) employment and financial situation, 3) alcohol or other drug use, 4) thoughts, feelings, and actions while on parole, and 5) community supervision experience. Focus group questions also centered around these five domains.

Social Network and Living Arrangements

In the "social network and living arrangements" domain, evidence suggested that finding a place to live was not a significant reentry problem. Only 18% of PVs indicated that it was somewhat hard or very hard to find a place to live post-release. In the focus groups, PVs reaffirmed this finding, indicating very few difficulties with identifying a place to live upon release from prison. The majority of PVs lived with a family member or a significant other upon release from prison. Approximately 17% of PVs lived on their own. While finding some sort of place to live did not appear to be a major concern, the survey provided no measure of the quality of the living situation (e.g., whether or not the living situation was dysfunctional or a pro-criminal environment). Some evidence from the focus groups suggested that living arrangements for some PVs presented problems and was a source of stress. Further, several PVs from the focus groups did report a certain degree of difficulty in attaining approval from the Parole Board for their living arrangements because of the criminal record of others living at their proposed residence. Still, going back to the overview findings, PVs reported that living arrangements was one of the areas where they felt most prepared by prison programming. Overall, it appears that living arrangements, and specifically finding a place to live post-release, is not a significant reentry concern or factor contributing to violating parole. This finding may indicate that current services and programming for offenders are adequate to address living arrangement needs.

Problems with family relationships did not appear to be a factor that significantly contributed to parole violations. For the most part, PVs reported maintaining a solid support network of family to turn to for help or support. Seventy-two percent of PVs indicated that they were either legally married (17%) or had a girlfriend/boyfriend (55%) while last on parole. Of those who were in such a relationship, 89% indicated that the relationship was working out mostly good to excellent. Also, 89% said that they could go to their partner for help with a personal problem.

Eighty percent of PVs reported remaining in contact with at least one parent while last on parole. Eighty-nine percent said that they could go to a family member for help with a personal problem. Furthermore, PVs indicated that they spent the majority of their free time involved in family activities and with family members. From the focus groups, family members were also typically acknowledged as a valuable resource for identifying employment opportunities and reintegrating into the community.

Some indications of positive programming effects were noted for PADOC's parenting programs as well. Of those who participated in a parenting program, 33% reported feeling well prepared to deal with family relationships, while only 18% of those who did not participate in a parenting program reported feeling well prepared to deal with family relationships.

No clear pattern emerged concerning the extent of PV's criminal associations while on parole, other than that older PVs appeared to maintain less criminal associations than younger PVs. An inverse and statistically significant relationship was noted between the age of PVs and the extent of the criminal relationships that they maintained while last on parole. Confirmatory evidence of this finding was noted in the focus groups, as many older PVs spoke of losing contact with pro-criminal friends/family members over the years, most often as a result of imprisonment or death. Overall, 83% of survey respondents indicated that at least one of their family members or friends with whom they were in contact while last on parole had been arrested in the past. Further, some qualitative evidence from the focus groups did suggest that maintaining criminal associations posed a significant problem for a handful of PVs of all ages. As a measure of the reliability of the answers to the survey questions that were intended to gauge the extent of criminal association, two external measures of criminal association that were previously administered to a sub-set of this sample (i.e., the Identification with Criminal Others (ICO) sub-scale on the Criminal Sentiments Scale-Modified (CSS-M) and the Antisocial Associates (AA) sub-scale on the Hostile Interpretation Questionnaire (HIQ)) were matched with the survey results. It was determined that PVs indeed seemed to report fairly consistently across several measures about the extent of their criminal association, with an estimated potential deception rate between 12% and 19%.

## Employment and Financial Situation

In the "employment and financial situation" domain, evidence suggested that simply finding employment was not a significant reentry concern related to violating parole. While 59% of PVs indicated that they had a somewhat hard or very hard time getting a job after last being released from prison, 83% were legally employed at some point while last on parole and 76% indicated that legal

86

employment was their primary source of income. Additionally, only 23% indicated that the job search process frequently or always stressed them out. From the focus groups, a reoccurring theme was that getting a job was not difficult. As with the finding that living arrangements did not pose a significant reentry problem, this finding on employment may in part indicate that currently offered programs and services are adequate to help the majority of returning offenders find employment.

What was more evident in the area of employment was that PVs tended to demonstrate negative attitudes towards their jobs and unrealistic job expectations. A common complaint in the focus groups was that the types of available jobs for parolees were unsuitable and provided insufficient income to make ends meet. To a certain degree, this represents a legitimate concern for the types of employment that are available and that parolees are eligible to obtain upon release from prison. On the other hand, the weight of the evidence from the focus groups suggested that PVs simply refused to take certain low end jobs and work their way up. Many PVs felt entitled to move right into higher-paying jobs straight out of prison, disregarding the realities of having a criminal record and of the workforce ethic of earning increased job responsibilities.

Significant financial management difficulties were noted among PVs, further compounding the problem of low-paying employment. Going back to the survey overview findings, PVs rated money management problems as one of the strongest problems contributing to their parole violation. One measure of money management is whether or not an individual has a bank account. Sixty-one percent of PVs responded that they did not have a bank account while last on parole. From the focus groups, many PVs reported difficulties with maintaining a budget and managing their financial resources in order to pay bills and debts. Many PVs spoke of simply being overwhelmed by the financial situation that they faced. Underlying the issues of money management seemed to be a more general issue of inadequate problem-solving skills among PVs.

While simply finding a job was not identified as a significant reentry concern related to violating parole, job retention seemed to pose more of a problem. Over half of those who worked while on parole (52%) did not consistently remain employed from the time that they attained employment upon last being released until the time that their parole was revoked. In addition, the majority of focus group participants who reported being employed while last on parole described frequent job turnover. When asked whether finding a job or keeping a job posed more of a problem, focus group participants most frequently responded that keeping a job was a bigger problem. Again, the issue of job retention seemed to be indicative of larger issues of inadequate problem-solving skills among PVs, as well as poor attitudes towards employment.

Indicators of positive programming effects on employment were noted for PADOC's vocational-education programs. From the survey findings, vocational-education participants felt significantly better prepared than non-participants to both find and keep a job. Further, focus group participants who went through a vocational-education program described their experience in such programs as a positive experience that helped them in their employment situation outside of prison.

Alcohol or Other Drug Use

In the area of "alcohol or other drug use", 66% of PVs reported having a drug or alcohol problem at some point in the past and 57% reported drinking or using drugs while last out on parole. Of those who indicated some sort of AOD use while last on parole, 67% reported drinking alcohol, 45% reported using crack/cocaine, 26% reported using marijuana, and 15% reported using heroin. Fifty-four percent of PVs who drank or used drugs while last on parole first did so more than a month before receiving a violation. On average, those who drank or used drugs did so three days a week. Coupled with findings from the focus groups, this evidence suggested that a significant proportion of PVs drank or used drugs while last on parole and seemed to do so both regularly throughout the week and consistently from the time of their initial relapse until receiving a violation. For those who relapsed, the initial relapse occurrence did not appear to be something that happened in the last days and moments leading up to the violation but more often appeared to be initiated weeks or months before the violation. Yet, slightly over one-third of PVs (35%) reported drinking or using more than their usual amount during their last week out before returning to prison for a parole violation, indicating an increased level of AOD use in the last days and moments before the violation. Put together, the evidence from both the surveys and focus groups suggested that AOD problems were clearly related to violating parole for a significant proportion of PVs. Interestingly however, qualitative evidence from analysis of the focus group interviews suggested that there existed somewhat of a dichotomy between PVs with high need AOD problems and low need AOD problems. For a significant proportion of those who drank or used drugs while on parole, AOD use represented a major obstacle that appeared to significantly contribute to their failure on parole. These individuals represented the classic addicts. On the other hand, for another group of PVs who reported AOD use while last on parole, their violation did not appear to be the immediate result of their substance use but instead, for these individuals, their substance use represented one of many symptoms of more profound problems of antisocial values, attitudes and beliefs and inadequate problem-solving skills. An examination of scores from the TCU and PACSI AOD screening instruments confirmed this dichotomy, as slightly over one-quarter of those who reported drinking or using drugs while last on parole (26%) were not previously assessed to have an AOD dependence problem.

Seventy percent of PVs indicated that they received some sort of AOD treatment in the past. For those who participated in AOD treatment while last in prison, some positive programming effects were reported, specifically for therapeutic communities (TCs). Those who had participated in a TC indicated feeling significantly better prepared than non-participants to deal with AOD problems post-release. Interestingly, however, TC participants were slightly more likely than non-participants to report AOD use while last on parole. This may in part result from the fact that TC treatment is an intensive treatment option for mostly higher need AOD cases. It might therefore be expected that TC participants would report a higher prevalence of AOD use post-release, given that relapse is a common process among individuals with significant substance abuse problems, even if progress in treatment has been achieved.

## Thoughts, Feelings, and Actions While on Parole

Perhaps the most significant and relevant findings from this study resulted from the domain examining PVs thoughts, feelings, and actions leading up to their violation. An examination of the emotional experiences of PVs in the last 48 hours preceding their parole violation overwhelmingly revealed a variety of dysphoric or unpleasant emotional experiences. A whole 74% of PVs indicated on the survey that some sort of dysphoric emotion was the strongest emotion experienced in the last 48 hours preceding their violation. In fact, PVs reported that emotional problems, such as stress, depression, frustration, anger, and worry, contributed more to their failure on parole than any other contributor, including those factors in the previously examined domains. In the focus groups, the majority of PVs recalled that the moments leading up to their violation were characterized by a variety of confusing and unpleasant emotions. Taken together, this evidence raises the question of whether a causal relationship can be established between unpleasant emotional experiences and violating parole. However, establishing a causal relationship would appear to raise two problems. First, intuitively one would not expect a direct causal relationship since every person experiences negative emotions at some point in life but most people do not resort to criminal or anti-social behavior when experiencing such emotions. Second, the general consensus from the broader body of research on risk factors predicting criminal behavior is that personal distress factors such as anxiety or depression are fairly weak predictors of criminal behavior (see Andrews and Bonta, 2003). Thus, the preliminary suspicion upon identifying this apparent relationship between dysphoric emotional experiences and parole violations was that there were mediating variables that helped to explain this relationship.

Indeed, three mediating variables were identified: 1) unrealistic post-release expectations of life outside of prison, 2) an increased presence of anti-social/pro-criminal attitudes, and 3) poor self-management, problem-solving, or coping skills. While it is complicated to establish a causal relationship between these three factors and an increased probability of violating parole, especially absent having the context of a comparison group of parole successes (i.e., the second phase of this study), evidence from this first phase of the study suggested that these three mediating variables were the most common problems related to violating parole. On unrealistic post-release expectations, going back to the overview findings, the first indication that PVs held to a generally unrealistic assessment of their situation was observed when PVs reported that no single potential problem area significantly contributed to their parole violation. As seen in many of the findings from the previous domains, PVs reported inflated confidence in their ability to easily find and keep high-paying jobs, avoid risky situations and people, maintain friction-free relationships, and generally be successful on parole. While 89% of PVs reported that they were mostly to completely confident that they would successfully remain out of prison while last on parole, 100% of respondents did not successfully remain out prison, given that they were all included in the study sample because they were recently returned to prison for a parole violation. This large incongruency provides strong evidence that PVs failed to anticipate difficult situations and held unrealistic expectations of what life outside of prison would be like.

8 9

Several indicators provided evidence that PVs tended to hold anti-social/pro-criminal attitudes. On the survey, PVs were asked to indicate both the good things and the bad things that they thought would result from committing the act that led to their parole violation. Prior to committing whatever act that led to their parole violation, over two-thirds of PVs reported seeing some sort of positive benefit resulting from violating their parole, including such benefits as earning respect, getting money, releasing tension, attaining sexual pleasure, getting high or drunk, or attaining a feeling of power, control or excitement. Further, PVs tended to report that violating the conditions of their parole or committing a new crime was an acceptable way of attaining such benefits. While PVs also reported viewing a variety of negative consequences resulting from violating parole, the most commonly reported negative consequences indicated little acknowledgment of a negative impact on others (e.g., victims), suggesting a general lack of empathy. When PVs were asked to weigh the benefits and costs of their violation, only 31% of PVs reported viewing more bad things than good things resulting from a violation. The remaining 69% either saw more good things resulting from their violation or saw the good and bad things as being equal. Going back to findings from the employment domain, recall that attitudinal problems were also among the primary problems relating to employment. In the focus groups, another indicator of a generally anti-social outlook among PVs was external blame-shifting. When probed for reasons leading to their return to prison, the majority of PVs in the focus groups primarily blamed external factors such as bad parole officers or poorly run community corrections centers, failing to take much of the responsibility, if any, for their return to prison.

The most evident of the three variables that were found to mediate the effect of negative emotional experiences on parole violations was poor social problem-solving/coping skills. In fact, the most prevalent theme identified throughout the study, across all of the domains examined, was that PVs tended to possess poor problem-solving skills in the presence of emotional instability or the daily obstacles of life. Poor problem-solving skills were particularly evidenced by four specific traits among PVs: impulsivity, failure to generate alternative courses of action, failure to recognize the consequences of actions, and keeping problems to oneself or failing to take steps of avoidance. Poor financial management skills, a lack of long-term goals or strategies for maintaining and improving one's employment situation, inadequate or narrow solutions to problems in one's personal relationships, and a tendency to turn to AOD use when faced with stressful situations were all common themes among PVs that provided evidence of poor problem-solving skills. Nearly half of PVs (45%) said that they did not even consider alternatives to the sequence of events leading to their violation. Forty percent said they reached a point before their violation where they felt that they lost complete control of themselves and their situation. Seventy-seven percent did not tell anyone that they were having thoughts about acting on the events that led to their violation, which perhaps indicates two factors relating to poor problem-solving skills: 1) many violations were impulsive (i.e., the events surrounding the violation were not planned but instead were such spontaneous acts that PVs did not have time to consider turning to someone else for help or advice), and 2) many PVs failed to utilize personal relationships as a resource for solving dilemmas or generating alternatives to violating parole. From the focus groups, many PVs relayed stories of being tripped up by a multitude of events or experiences, such as a family illness or death, and subsequently violating a condition of parole in an attempt to either fill an emotional void or solve an immediate problem.

The last question that was always posed in the focus groups was "now that you have explained to us what factors you felt led to your parole violation, what will you do differently when next released from prison?" When asked this question, the majority of PVs could not articulate a clear strategy for remaining out prison and addressing their problems, despite often being able to describe their problems in great detail.

All three mediating variables are in fact closely related to each other. For example, it becomes more difficult for PVs to solve problem and manage negative emotional experiences when they tend to hold expectations that life outside of prison will be easy and that most things will go right for them. Anti-social attitudes and poor problem-solving skills go hand in hand in that often a PV's skill set for solving day-to-day problems may be a function of his or her general anti-social frame of mind, leading to primarily anti-social solutions to problems. As well, an interaction effect between unrealistic post-release expectations and anti-social attitudes may in fact exist, in that part of the explanation for PVs tending to come out of prison holding unrealistic expectations may be that their expectations are guided by anti-social beliefs. For instance, if a particular parolee does not view his or her substance abuse problem as in fact being a problem, then he or she may not expect to run into future problems relating to relapse or violating parole.

## Community Supervision Experience

In the area of "parole/community supervision", PVs indicated some specific problems relating to their halfway house experience, although it was unclear as to whether these problems contributed to their violation or simply made for a more difficult transition to the community. Nearly two-thirds (65%) of PVs in this sample reported going to some sort of transitional halfway house (i.e., a community corrections center or community contract facility) after last being released from prison. From the focus groups, PVs who were released to a halfway house consistently reported several themes including: 1) that the centers were often too restrictive and inflexible for allowing parolees to go to work or reunite with family members, 2) that many of the facilities were poorly maintained facilities and breeding places from criminal activity, given their location and some of the staff members employed there, 3) that paying rent to a center tended to be a source of financial stress, 4) that much of the treatment provided in centers was a one-size-fits-all approach with little consideration for individual needs, and 5) that the centers were often located too far way from family members, making it more difficult to reunite with family. Interestingly, when PVs in the focus groups were given a hypothetical option of serving the time that they spent in a halfway house in prison instead, the majority indicated that they would have rather served the time in a prison. While some of the complaints about the halfway house experience clearly amounted to griping and blame-shifting, representing further signs of anti-social attitudes among PVs, other complaints such as the ones mentioned above warranted further exploration and room for concern, given that they were commonly repeated themes across independent focus groups at different locations.

Even given the complaints about problems relating to transitioning through a halfway house, a larger percentage of PVs indicated that the halfway house experience helped them get along outside of prison than did their parole officer. While 43% of those who went through a halfway house

indicated that their experience in the halfway house helped them to better get along outside of prison, only 33% indicated that their experience with their parole officer helped them to better get along outside of prison. Also, 70% of TPVs indicated that their parole officer never cut them a break or gave them a warning before returning them to prison for a parole violation. While these statistics seem to indicate that PVs found little help from their parole officer in succeeding outside of prison, 59% of PVs still reported that they had a good to excellent relationship with their parole officer while last on parole. This finding did not seem to connect with findings from the focus groups, however, as many PVs in the focus groups complained about adversarial relationships with their parole officer. As with some of the complaints about the halfway house experience, some complaints about parole supervision again indicated anti-social attitudes towards authority and blame-shifting. Overall, it was unclear as to whether or not parole officers had an impact on success or failure on parole.

## Policy Implications

The results of the first phase of this study support four specific policy implications. First and foremost, offender programming should focus more attention and resources towards providing broader cognitive-behavioral treatment that aims to instill pro-social attitudes, values, and beliefs in offenders and strengthen or develop general problem-solving skills. As findings from this first phase of the study suggest, those that violate parole tend to demonstrate a variety of problems (e.g., poor financial management skills, unstable employment, substance use, emotional instability, etc.). These problems are symptomatic of common underlying themes, namely anti-social attitudes and poor problem-solving skills, which are more strongly related to violating parole and should therefore be considered primary targets for treatment. Previous research has established that cognitive-behavioral programming is an effective model of treatment for offenders (Andrews and Bonta, 2003). This study indicates that cognitive-behavioral programming which specifically concentrates on developing coping strategies and problem-solving skills, utilizing behavior rehearsal and relapse prevention techniques, may be particularly effective in discouraging parole violations. Resources should shift away from simply treating symptomatic issues and towards treating common underlying problems. For instance, offender programming should not focus on simply eliminating negative emotional experiences, but should instead focus on reinforcing pro-social behavioral reactions to negative emotional experiences. The emphasis should be that every person will undoubtedly and unavoidably experience unpleasant emotions at some point in life but when these uncontrollable experiences occur, an individual is able to control his or her behavioral response.

Second, reentry programming should focus more attention on teaching offenders specific and transferable life skills such as budgeting and money management techniques. Financial management seems to be one particular sub-set of life skills that presents difficulties for parolees. In order to succeed on parole, many parolees need to learn and rehearse the skills necessary to manage monthly bills and debt repayments, given the salaries that they are realistically able to obtain. This often requires advanced problem-solving skills, which we have already seen are lacking in many of those who fail on parole.

Third, due to the extent of reported substance use among PVs and to the severity of AOD problems experienced by a certain proportion of PVs, it is important that correctional systems continue to reinforce intensive AOD treatment programs that are known to be effective. Conversely, treatment staff should not make the assumption that all PVs who drink or use drugs while on parole must first and foremost receive intensive AOD treatment. In fact, in line with the first policy implication above, it is perhaps more appropriate that those PVs who use alcohol or other drugs while on parole but are assessed with a lower need for AOD treatment primarily receive a core cognitive-behavioral program that focuses on general attitudinal and behavioral skills that are transferable across various domains. In short, some sort of assessment of offenders should be utilized to determine whether AOD issues are primarily driving criminal behavior/parole violations or simply represent a symptom of more general problems such as poor problem-solving skills and anti-social attitudes.

Fourth, reentry programming should encourage offenders to stay "rooted in reality" upon release from prison and maintain realistic post-release expectations. Given the anti-social orientation of many offenders, incarceration itself may be viewed by offenders as their primary problem and simply being released from prison may be viewed as the solution to that problem. It then becomes important to help offenders realize that their problems don't stop at the prison gates but often become more complex upon release from prison. Offenders must come to understand that life outside of prison will not be easy and that a criminal record can make life all the more difficult. For instance, employability training should prepare offenders for the real possibility that they may need to start off working one or more low-end jobs and gradually work up to a promotion or better job. In-prison treatment may be more effective if it is able to simulate real world situations within the artificial environment of prison. Again, role-playing is a particularly useful tool for simulating such an environment and preparing offenders for realistic life expectations.

## Study Limitations

A few potential limitations to this first phase of the study must be noted. First, the findings from this phase of the study do not include a comparison group of parole successes to put in perspective these findings. Without a comparison group, how do we really know that the patterns that appear to relate to violating parole are indeed unique to PVs? The second phase of this study, which will be reported on in a future issue of RIR, includes findings from such a comparison group of "successful" parolees. This second phase builds upon the first phase, providing a clearer picture of the factors relating to success or failure on parole. Also, a third phase of the study is currently being conducted and will be summarized in a future issue of RIR, in which parole officers and community corrections providers will be surveyed/interviewed to gain their perspective on what they believe are the factors relating to success or failure on parole. This will provide another useful comparison.

Another potential limitation to this study is that the information gathered is primarily self-reported information. This calls into question the degree of confidence in PVs accurately and honestly reporting their experiences while last on parole. For example, the rate of self-reported legal employment among PVs while last on parole was surprisingly high from the survey results. Does this represent an accurate employment rate among PVs or did PVs over-report being legally

employed while last on parole? To answer such questions of reliability, official records and other data sources should be matched with self-reported information when possible. Future findings from this study will include such cross-reliability checks. For instance, to answer questions of reliability on employment data, a dataset containing official employment records, will be matched with this study's survey sample to examine consistency in reporting legal employment. Even with self-reported information alone, however, many researchers rely on such data and prior studies suggest that self-reported information among incarcerated offenders is mostly reliable (see Junger-Tas, 1999). In fact the richness of data gathered from self-reported information can actually be viewed as a strength of this study. One study on the self-report methodology in crime research makes the following observation: *"the self-report method is used all over the world to study opinions, attitudes, and behaviors concerning a great number of issues in the fields of health, education, employment, culture, leisure, and crime. In this respect, the controversial saying that "if you want to know something about people, just ask them" appears to have more truth in it than is commonly believed...the self-report method has outgrown its childhood diseases; it is now a true-and-tried method of research."*

### Conclusion

In conclusion, an aggregate needs assessment of PADOC's PV population and of the primary factors relating to parole violator behavior reveals that three underlying factors are most evident among those that violate parole. First, PVs tend to hold unrealistic expectations of how life outside of prison will be. Second, PVs tend to maintain anti-social attitudes, values, and beliefs that support offending or violating behavior. Third, PVs tend to possess inadequate coping or social problem-solving skills, especially when faced with emotional uneasiness or daily life problems. Resources for better preparing offenders for release from prison and for reducing PV admissions to prison should focus on addressing these three factors.

### REFERENCES

1. Andrews, D. and J. Bonta. 2003. *The Psychology of Criminal Conduct (Third Edition)*. Cincinnati: Anderson Publishing.

2. Junger-Tas, Josine. 1999. "The Self-Report Methodology in Crime Research." *Crime and Justice: A Review of Research*, University of Chicago Press: Vol. 25.

3. Zamble, E. and V.L. Quinsey. 1997. *The Criminal Recidivism Process*. United Kingdom: Cambridge University Press.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LEONARD C. JEFFERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-44 E |
| | ) | |
| WILLIAM WOLFE, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S
INTERROGATORIES AND REQUEST FOR PRODUCTION
OF DOCUMENTS**

1. Violence Prevention, Citizenship, Batterers Intervention, Long Term Offender, and Personal Responsibility.

2. All inmates are assessed upon entry into the PA DOC relative to programming needs and to formulate a correctional plan. This plan is reviewed and revised as necessary each year during the annual review. Programming needs are determined based upon a variety of factors such as instant offense, criminal history, nature of offenses, institution behavior, social history, assessed education level, work history, psychological report and interview by staff. The psychological objective being to offer appropriate programs to the individual that will address issues that led to criminal behavior and, thus, reduce the likelihood of further criminal behavior and victimization upon release to the community. This is as much our public safety responsibility as are the fences and walls that hold those committed to our care. Further, research indicates that exposure to appropriate programs can reduce the likelihood of re-offending.

3. All of these programs were developed in-house within the DOC and primarily within the Bureau of Inmate Services (BIS). Many of the employees who initiated, developed and/or

95

coordinated these programs are retired or no longer employed in Inmate Services or the DOC. The Violence Prevention program was developed by a committee including Joel Barrows, Lois Brown Velkoff, Melissa Cidade, Sara Crawford, Roxanna Dinesen, Elizabeth Eppley, Greg Gaertner, Rex Hildebrand, Barbara Hollibaugh, Eric Johnson, John Johnson, and Bob Wienckoski.

Citizenship is no longer an active program offered by the DOC; the primary staff coordinator for this program was Jim Tice who is no longer employed by the DOC. It was developed by the BIS with Dave Roberts, Geoff Lucas, Paul Thomas, and others (unknown). Prior to 2000 it was piloted at three institutions. In 2001, it was scheduled to begin at all remaining institutions.

The Batterers program is loosely based upon the "Duluth Model"- a program developed by the Domestic Abuse Intervention Project in Duluth MN approximately 20 years ago.

The Long Term Offenders Program was initiated by Harvey Bell after the inmate escapes at SCI-Dallas and SCI-Huntingdon; Mr. Bell oversaw this program until his retirement.    The following contributed information for the LTO Pilot Program, which has run since 10/05: Donna Giordano, Joan Mann, Rebecca Bollinger, and Amy Florence.

The responding defendants do not know who developed the Personal Responsibility Program which was never a standardized program within the DOC. It may have been a program that was developed and implemented by a particular State Correctional Institution independently from the BIS programming.

None of the noted programs are faith-based, and therefore it is not likely that any religious group was involved in or with the development of these programs.

4. The PA DOC has a public safety responsibility to offer programs to inmates that are likely to reduce the chance of re-offending. While involvement in religious activities is certainly a positive pursuit supported by staff and may help the individual adopt a more pro-social lifestyle upon release, such activity does not address the criminogenic factors that caused individuals to commit criminal acts. Research indicates that programs and/or activities which do not address these criminogenic factors are less likely to be effective in reducing future criminal behavior.

2

5.  See response to number 4 above.

6.  The programs referenced in #1 are not faith based, nor based upon any specific religion.

7.  No such consultation occurred because no religious teaching was a part of these programs.

8.  The responding defendants do not recall and they do not keep records of such information.

9.  Yes.

10.  This request is Objected to as it is over broad, unduly burdensome and seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence. Moreover, records are not kept in a manner that would make this information readily obtainable.

11.  No. As stated, these are not faith based programs. Defendant Beard further objects to plaintiff's mischaracterization of the prescriptive programs identified. There would not have been any purposeful intent to design or implement these programs without any consideration for religious requirements of Muslims or any other faith because the programs are not faith based.

12.  No.

13.  N/A.

14.  A response to this request has not yet been received. As soon the response is received, it will then be provided.

15.  Present were Tricia Gamble – counselor, Glenn McQuown – Chaplain, Michael Snider – Acting Unit Manager. The request for the vote sheet is Objected to as seeking information that is privileged and confidential. Providing this document could affect plaintiff's treatment program as the information contained within could be manipulated by the plaintiff.

3

16. A response to this request has not yet been received. As soon the response is received, it will then be provided.

17. A response to this request has not yet been received. As soon the response is received, it will then be provided.

18. This request is Objected to as seeking information that is irrelevant and not likely to lead to the discovery of admissible information. The book speaks for itself, in any event it appears that the plaintiff has seen or has possession of this publication.

19. This request is Objected to as seeking information that is privileged, confidential, irrelevant and not likely to lead to the discovery of admissible information as this relates to other inmates.

20. See response to number 19 above.

21. See response to number 19 above.

22. This request is Objected to as this seeks a copy of a publication. See also response to number 18 above.

4

23. A response to this request has not yet been received. As soon the response is

received, it will then be provided.

Respectfully submitted,

THOMAS W. CORBETT, JR.
Attorney General

Mary L. Friedline
Senior Deputy Attorney General
Attorney I.D. No. 47046

Office of Attorney General
6th Floor, Manor Complex
564 Forbes Ave.
Pittsburgh, PA 15219
Phone: (412) 565-3520
Fax:   (412) 565-3019

Susan J. Forney
Chief Deputy Attorney General

Date: September 19, 2006

VERIFICATION

I, Jeffrey A. Beard, hereby state that the answers that I have provided to Plaintiff's Interrogatories and Request for Production of Documents are true and correct to the best of my personal knowledge, information and/or belief. With regard to many of the 23 Interrogatories, I have relied on language and information provided by my Counsel that has been obtained in investigating this matter, in marshalling evidence and in Counsel's communication with other defendants and with third parties.

This statement and verification is made subject to the penalties of 28 U.S.C. §1746 relating to unsworn declarations under penalty of perjury, which provides that if I make knowingly false averments, I may be subject to criminal penalties.

Jeffrey A. Beard, Ph.D.
Secretary
Pennsylvania Department of Corrections

Date: 9/12/06