IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LEONARD C. JEFFERSON,
        Plaintiff,

        v.                          '07  FEB 26 CIVIL NO. 04-44 ERIE

WILLIAM WOLFE, et al.,
        Defendants.

## BRIEF IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION

### STATEMENT OF CASE

This is a § 1983 action filed by an inmate at the State Correctional In-
stitution at Albion, Pennsylvania (SCI-Albion) seeking damages, declaratory
judgments and injunctive relief based upon the actions of the Defendants
which violated Plaintiff's rights under the First and Fourteenth Amendments of
the U.S. Constitution. Defendants filed a Motion For Summary Judgment, Doc 115,
in this case on January 12, 2007 which is presently before the
court. Plaintiff submits this brief to support his argument that Defendants
are not entitled to summary judgment in this matter.

### STATEMENT OF FACTS

On May 15, 2006 Magistrate Judge Susan Paradise Baxter issued a Magis-
trate Judge's Report and Recommendation, Doc 81, which held "the following
claims set forth in Plaintiff's Amended Complaint [Document # 39] should be
allowed to proceed:

    a. First Amendment Establishment Clause claim against Defendants Beard,
       Boeh, McKissock, and Hametz;

    b. First Amendment free exercise of religion claim against Defendants
       Boeh, McKissock and Hametz:

    c. Retaliation claim regarding Plaintiff's termination from his job
       as Chapel Clerk against Defendants Gamble, Snyder and McQuown; and

    d. Fourteenth Amendment Equal Protection claim against Defendants Beard
       and Boeh.

Defendants' Motion seeks summary judgment on all of the above-mentioned claims

except the Equal Protection claims in section d..

## A. First Amendment Establishment Clause

Plaintiff alleges violations of rights pursuant to the Establishment Clause. ¶¶ 75 - 94 of the Third Amended Complaint, Doc. 39, detail the factual bases for these allegations as follows: (1) in December of 2001 prison officials told Plaintiff he was required to participate in certain programs, (2) Plaintiff informed the prison officials of his religious objections to those programs and asked for programs that were not offensive to his beliefs, (3) prison officials denied the request for alternative programs. In July of 2002 officials informed Plaintiff he was required to participate in the same programs that he'd previously raised the religious objection against, (4) Plaintiff exercised his right to refuse to participate in programs that offended his beliefs, and (5) in July of 2003 officials informed Plaintiff that his refusal to participate in "recommended" programs was a factor that contributed to the increase in his Custody Level from CL-2, Minimum Security, to CL-3, Medium Security. The Third Amended Complaint, Doc. 39, also alleges prison officials have set up a DOC/State sponsored religion which it coerced Plaintiff to embrace; and that prison officials recognize and reward participation in certain religious programs but refuse to recognize the merit of, and refuse to provide rewards for, participation in other religious programs.

## B. First Amendment Free Exercise Clause

Plaintiff alleges violations of rights pursuant to the free exercise clause. ¶¶ 75 - 94 of the Third Amended Complaint, Doc. 39, detail the factual bases for these allegations as follows: (1) Plaintiff is a Muslim, (2) it is a tenet of Plaintiff's religious beliefs that believers should neither listen to nor accept the teachings of non-believers concerning how one should act or think in matters wherein the Religion of al-Islam has legislated the way one

should act or think, (3) Plaintiff's beliefs require him to refuse to partici-
pate in PA DOC non-Islamic prescriptive programs, (4) on 07/16/03 Plaintiff
was transferred from a Honor Unit for CL-2 inmates to a non-honor unit for CL-3
inmates, and (5) Plaintiff was informed by prison officials that it was his
refusal to participate in programs that caused him to be removed from the
Honor Unit.

### C. Retaliation Claim

¶¶ 32 to 61 of the Third Amended Complaint, Doc. 39, allege the defendants
named therein retaliated against Plaintiff, by firing him from his Chapel
Clerk job, in response to Plaintiff exercising his Constitutional right to
produce and possess poetry that expresses the injustices he experienced, and
continues to experience, as an African-American defendant in the Courts of the
Commonwealth of Pennsylvania. Plaintiff's pay was reduced from the highest
possible hourly rate to the lowest as a consequence of being fired and the
firing was a factor that contributed to an increase in his Custody Level.

### ESTABLISHMENT CLAUSE

### ARGUMENT I

Defendants, in their Memorandum In Support Of Motion For Summary Judgment
(Defendants' Memo), Doc. 116, argue: "It is his refusal to participate in the
prescriptive programs being considered against him that Plaintiff alleges runs
afoul of the Establishment Clause." (Defendants' Memo, p. 3); "According to
the record the programs that Plaintiff is complaining about are secular in nature
and do not have a religious component." (id. at p. 6); and, similarly, in des-
cribing the Batterers, Citizenship, Stress And Anger, and Long Term Offenders
Groups prescribed on the DC-43s prepared for Plaintiff, Defendants argue that
"none of theses programs are religious in nature, there is no reference to a
higher authority; nor is there a requirement to subscribe to a particular manner

of worship." (id. at p. 7). These arguments seem to be designed to support an argument that the one and only way prison officials can violate the Establishment Clause is by coercing inmates to attend programs which have a religious component.

The most extensive definition of the Establishment Clause's latitude is to be found in <u>Everson v. Board of Education</u>, 330 U.S. 1, 15-16, 67 S.Ct. 504, 511-512, 91 L.Ed. 711 (1947):

> "The 'Establishment of Religion' clause of the First Amendment means at least this: neither a state nor the federal government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force or influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining of professing religious beliefs or disbeliefs, for church attendance or non-attendance..."

As early as December 2001 Plaintiff informed prison officials verbally and in writing (Appendix To Plaintiff's Brief In Opposition To Defendants' Motion For Summary Judgment (hereinafter P.A.) pps. 1 & 2) of religious beliefs which prohibited him from participating in non-Islamic prescriptive programs. (¶¶ 18, 24 & 25 of Plaintiff's Declaration In Opposition To Defendants' Motion For Summary Judgment (hereinafter P.D.)). Plaintiff's communications asked prison officials that Plaintiff's "D.O.C. file be made to reflect the fact that the teachings and practices of Islam meet and fulfill all of my so-called programming needs." The officials responded denying the requests and informed Plaintiff, among other things, that "We are done discussing this issue." (P.A. p. 1); and "You have your prescriptive program & know what is required of you. That is sufficient'" (P.A. 2).

At his 2002 Yearly Classification Review a DC-43 Prescriptive Program Plan was prepared by prison officials that "recommended" several non-Islamic prescriptive programs (P.A. p. 4). Plaintiff continued adhering to his beliefs

and exercising his Constitutional right to refuse to participate in programs
that were offensive to his religious beliefs. At his 2003 Yearly Review a DC-43
was prepared that, in addition to "recommending" several non-Islamic prescrip-
tive programs, informed Plaintiff his Custody Level had been raised from CL-2
to CL-3. (P.A. p. 5). In response to his request, Plaintiff was informed that
the "issue of your refusal to complete any programs" was one of the factors
that led to the increase in his Custody Level. (P.A. p. 8). Prison officials
added three (3) points to Plaintiff's Pennsylvania Additive Classification
Tool (PACT) score, for determining his Custody Level, as a result of his
refusal to participate in programs (Admissions of McKissock # 14). Thus the
documents on file before the court in this case create disputed issues of
material fact from which a reasonable finder-of-fact could find Plaintiff had
been punished by prison officials for: (1) professing beliefs which prohibited
him from participating in non-Islamic programs, (?) for exercising his Consti-
tutional right to refuse to participate in programs that are offensive to his
religious beliefs, and therefore, Defendants are not entitled to summary judg-
ment on this claim.

<u>ARGUMENT II</u>

Plaintiff asserts that, pursuant to the Equal Protection Clause of the
Fourteenth Amendment, the Establishment Clause protects him, as a "believer",
against state action forcing him to participate in secular life-skills pro-
grams in the exact same way it protects an "atheist" against state action forc-
participation in religious life-skills programs. When prison officials ordered
Plaintiff to participate in so-called secular programs, which are offensive to
and belittle his religious beliefs, the officials are endorsing their secular
beliefs over Plaintiff's religious beliefs and, thus, are not neutral on the
matter of religion. Additionally, the Establishment Clause, as defined by the

Court in Everson, Supra, specifically provides one cannot be "punished for en-
tertaining religious beliefs or disbeliefs." Plaintiff's beliefs cause him to
resist the PA DOC's coercive attempts to have him attend state programs
teaching so-called secular life-skills where and when the secular teachings not
only offend his religious beliefs but are intended to supplant, and replace,
his religious beliefs with the state's secular beliefs and practices. (P.D.
¶ 25).

For example: ¶ 2 of the Declaration of Mike Clark literally defines "re-
pentence" [i.e., "1. Remorse or contrition for one's past actions. 2. An act
or the process of being repentant; penitence." The Collins Concise Dictionary]
as being the goal of PA DOC policy by stating:

> "... the policy of the Pennsylvania Department of Corrections and SCI-
> Albion [is] to provide treatment programs for inmates with the goal of
> having the inmate: a) understand the effects and consequence that his
> criminal behavior had on victims, his family, the victim's family, and
> the community; b) accept personal responsibility for his behavior; c) de-
> monstrate an appropriate level of respect for authority, peers, and him-
> self by having a better understanding of what it means to be a member of
> the community; d) understand his high risk factor of re-offending; e) to
> become aware of and to take advantage of resources and intervention
> strategies for support to establish and maintain successful community ad-
> justment." (Appendix To Defendants' Motion For Summary Judgment (herein-
> after D.A.) p. 55).

Defendants admit Plaintiff was removed from housing on a Honor Unit and his
Custody Level was raised from CL-2 to CL-3 (P.A. pps 8 & 11 and Admissions of
McKissock ¶¶ 12 - 14). As a result of his refusal to participate in the PA DOC's
non-Islamic (repentance) programs, for his refusal to cast aside his Islamic
beliefs and practices concerning "repentance" which begins with one's sincere
request that Allah forgive him/her - as stated in the Holy Qur'an at 4:106,
"But seek forgiveness of Allah (P.A. p.23) - in order to accept the state's
beliefs and practices concerning "repentance".

The following verses of the Holy Qur'an are the basis for instructions

and traditions for believers and establish teachings which meet and go beyond
fulfilling the PA DOC's goals stated above in the corresponding lettered sub-
paragraphs of the Declaration of Mike Clark:

     a) Allah accepts the repentance of those who do evil in ignorance and re-
pent soon afterwards; to them will Allah turn in mercy: for Allah is full
of knowledge and wisdom. Of no effect is the repentance of those who con-
tinue to do evil, until death faces one of them, and he says, "Now have I
repented indeed;" nor those who die rejecting Faith; for them have We pre-
pared a punishment grevivos. (4:17-18, see P.A. p. 24); b) Say: "Shall I
seek for (my) Cherisher other than Allah, when He is the Cherisher of all
things (that exist)? Every soul draws the meed of its own acts on none
but itself: no bearer of burdens can bear the burden of another. Your
goal in the end is toward Allah: He will tell you the truth of the things
wherein ye disputed." (6:164, see P.A. p. 25); c) O Ye who Believe! Obey
Allah, and obey the Messenger and those charged with authority among you.
If ye differ in anything among yourselves, refer it to Allah and His
Messenger, if ye do believe in Allah and the Last Day: that is best, and
most suitable for final determination. (4:59, see P.A. p. 26). O Ye who
Believe! Stand out firmly for justice, as witnesses to Allah, even as
against yourselves, or your parents, or your kin, and whether it be
(against) rich or poor: for Allah can best protect both. Follow not the
lust (of your hearts), lest ye swerve, and if ye distort (justice) or de-
cline to do justice, verily Allah is well-acquainted with all that ye do.
(4:135, see P.A. p. 27); d) But man wishes to do wrong (even) in the time
in front of him. (75:5) and "It is bad enough not to repent of past sins.
But the evildoer who rejects a Day of Reckoning and has no conscience
wants to go on in his career of sin and jeopardize his future also." (f.n.
5813, see P.A. P 28); e) And keep thy soul content with those who call on
their Lord morning and evening, seeking His Face; and let not thine eyes
pass beyond them, seeking the pomp and glitter of this life; nor obey any
whose heart We have permitted to neglect the remembrance of Us, one who
follows his own desires, whose case has gone beyond bounds. (18:28 see
P.A. p. 29); Those who believe, then reject Faith, then believe (again)
and (again) reject Faith, and go on increasing in unbelief - Allah will
not forgive them nor guide them on the way. (4:137) f.n. 647 "Those who
go on changing sides again and again can have no real faith at any time.
Their motives are mere worldly double-dealing. How can they expect
Allah's grace of forgiveness? Here is a clear warning against those who
make their religion a matter of worldly convenience. True religion goes
far deeper. It transforms the very nature of man. After that transformation
it is as impossible for him to change as it is for light to become
darkness." (see P.A. p. 30).

Defendant Beard has indicated, in his response to Admission # 9 and ¶ 4 of
Plaintiff's Interrogatories And Request For Production of Documents (hereinaf-
ter First Request) that "The PA DOC has a public safety responsibility to of-
fer programs to inmates that are likely to reduce the chance of re-offending."

He has explained a process wherein "All inmates entering the Department of Cor-
rections undergoes an initial assessment which determines the inmates' specific
needs, and prescribes appropriate treatment programs to address their needs."

(Defendants' Memo p. 8). The facts presented by both parties point to a flawed
assessment process. Flawed by its failure to respect the religious rights of
inmates to programs that are not offensive to, nor directly contradict, some
inmates' religious beliefs. Flawed by its failure to take into consideration
the reality that one who has been "successfully rehabilitated" via a serious
religious conversion - such as that described in f.n. 647 above (P.A. p. 3C) -
would be compelled, by the fact that he had a serious religious conversion that
has rehabilitated him, to refuse to participate in programs that call for him
to violate and/or abandon his religious beliefs. And, instantly in Plaintiff's
situation, flawed by it failure to acknowledge and act upon the reality that
programs that are designed to reduce the likelihood of re-offending upon one's
release from prison are neither appropriate nor serve a rational correctional
goal related to prisoners who are sentenced to life without parole, such as
Plaintiff. (Admissions of Gamble #'s 12 & 15). Defendants have not and cannot
point to any legitimate correctional goal, that warrants this violation of the
Establishment Clause, or that would be served by requiring Plaintiff to parti-
cipate in a Batterers Group or by taking adverse action against him for re-
fusing to participate. Defendants have not offered any reason, beyond their
blanket assertion that rehabilitation programs serve a legitimate correctional
goal, to suggest why it is necessary to penalize Plaintiff for exercising his
Constitutional right to refuse to participate in programs that offend his re-
ligious beliefs. Plaintiff's refusal to attend non-Islamic prescriptive pro-
grams has neither prevented Plaintiff from maintaining excellent Housing Per-

formance Reports (P.A. pgs. 19, 20 & 23) nor posed any threat to security or the orderly operation of the jail.

Plaintiff's conduct was exemplary. He did not receive a single Misconduct Report between his commitment to DOC custody in 1993 and February 2002. (Admission of Gamble # 23 and P.D. ¶ 26), and the 2002 Misconduct Report was deemed to be of no significance five months later at his Yearly Review (Admission of Gamble # 26); his conduct was such that Supt. Wolfe approved him to be an "Inmate Peer Leader" in the Chaplaincy Department on 07/26/02 (P.A. p. 22); and his Custody level was Minimum Security and he had been housed on a Honor Unit for several years with no problems prior to the 2003 Yearly Review whereat some one deemed he needed to participate in an Anger Management/Violence Prevention Group. The only event occurring between his 2002 and 2003 Yearly Reviews that could possibly has caused DOC assessors to deem Plaintiff needed to participate in an Anger Management/Violence Prevention Group was the Support Team Meeting on 11/13/02 whereat Plaintiff stood his ground against prison officials attack upon his right to produce and possess the poetry discussed in the last arguments in this brief. Plaintiff was a low-risk prisoner.

The Bureau of Inmate Services research study, titled THE RISK PRINCIPLE IN ACTION (Defendants' Appendix p. 61) states the premise that:

"...due to factors such as learning antisocial behaviors and reinforcing criminal behaviors, it was determined that lower risk offenders' participation in structured programs may actually lead to an increase in recidivism rates."

This indicates Defendants' experts awareness that Plaintiff's participation in structured programs could have been counterproductive to the DOC's alleged interest, rather than serving them.

The evidence before the court on this issue contains factual disputes, on material matters, which would allow reasonable jurors to conclude Defendants violated the Establishment Clause by coercing Plaintiff to: (1) abandon his

Islamic beliefs and practices concerning repentance, and (2) to accept the PA
DOC's beliefs and practices concerning repentance, and, therefore, Defendants
are not entitled to summary judgment.

## ARGUMENT III

The Establishment Clause of the First Amendment guarantees that "govern-
ment may not coerce anyone to support or participate in religion or its exer-
cise, or otherwise act in a way which 'establishes a [state] religion or re-
ligious faith, or tends to do so.'" Lee V. Weisman, 505 U.S. 577, 587, 112 S.
Ct. 2649, 2655, 120 L.Ed.2d 467 (1992) Quoting Lynch V. Donnelly, 465 U.S. 668,
678, 104 S.Ct. 1355, 1361-61, 79 L.Ed.2d 604 (1984).

In his article for ENCYCLOPEDIA AMERICANA, 1993, Robert J. Wright, for-
mer Editor of AMERICAN JOURNAL OF CORRECTIONS, discusses "Early American Pri-
sons." Specifically, Mr. Wright sets forth the following historical facts: (1)
"Quakers in the colonies of West Jersey and Pennsylvania rejected capital pun-
ishment, except for murder, and corporal punishment as well, believing that
offenders could be reformed through hard labor and meditation."; (2) The Quak-
ers developed a combination of features of jails and workhouses that is con-
sidered by some authorities to have been the first true prison."; (3) "After
the American Revolution, Pennsylvania Quakers and other humanitarians, led by
Dr. Benjamin Rush ... urged the state legislature to reform the Walnut Street
Jail."; "In 1790 a separate cell house for felons was added to the Walnut
Street Jail, and this became the first penitentiary in the United States. Hard
labor was substituted for corporal punishment, and inmates received payment for
their work. Prisoners were classified, the more refractory ones being placed
in solitary confinement."; and (4) "As with all Quaker institutions, there was
religious instruction." (P.A. p. 31). Plaintiff believes Defendants should be

willing to stipulate to the well-known and commonly-accepted historical facts about the roots of modern correctional institutions. This history makes it clear that the roots of reformation and rehabilitation in Pennsylvania are, without question, religious roots. The arguments presented below indicate that, notwithstanding the passing of more than two centuries, the reformation/rehabilitation/prescriptive programs of the PA DOC continue the practice, without question, of coercing inmates to accept state-sponsored religious instruction.

Instantly, Plaintiff has alleged "...the defendants named in this complaint and other PA DOC officials have established a defacto State/DOC sponsored religion ... and have attempted to impose [it] upon plaintiff in the guise of a 'prescriptive program'" (Third Amended Complaint, Doc. 39, ¶ 84).

Defendants Memo, Doc. 116, does not present any argument against the merits of Plaintiff's claim that Defendants have violated the Establishment Clause by establishing a state-sponsored religion via its prescriptive programs. Defendants argue, exclusively, that no violation of the Establishment Clause has occurred since "the programs that Plaintiff is complaining about are secular in nature and do not have a religious component." (Defendants Memo, Doc. 116, p. 16), and consequently, they go on, are entitled to summary judgment on Plaintiff's Establishment Clause claims.

Plaintiff points to the factual dispute wherein Defendants allege PA DOC prescriptive programs are "secular" while Plaintiff alleges said programs "constitute a religion," as being an issue for trial and, therefore, a matter which requires the Court to refuse to grant Defendants Motion for Summary Judgment on the Establishment Clause claims.

Defendants have presented close to one hundred (100) pages of documents, produced by the PA DOC, in support of their argument that the programs at issue are secular, with no religious tenets. (See Defendants' Appendix). As the

Court will note below, Plaintiff cites portions of the documents present in the Defendants Appendix to provide support for his arguments that PA DOC programs do, in fact, constitute a religion.

In Malnak v. Yogi, 592 F.2d 197 (1979) the Third Circuit Court of Appeals stated:

> "It seems unavoidable, from Seeger, Welsh, and Torcaso, the Theistic formulation presumed to be applicable in the late nineteenth century cases is no longer sustainable. Under the modern view, 'religion' is not confined to the relationship of man with his Creator, either as a matter of law or as a matter of theology. ... The modern approach thus looks to the familiar religions as models in order to ascertain, by comparison, whether the new set of ideas or beliefs is confronting the same concerns, or serving the same purposes, as unquestioned and accepted 'religions.'"

> "But it is one thing to conclude 'by analogy' that a particular group or cluster of ideas is religious; it is quite another to explain what indicia are to be looked to in making such an analogy and justifying it. There appear to be three useful indicia that are basic to our traditional religions and that are themselves related to the values that undergird the first amendment."

592 F.2d at 207-8.

The court goes on to explain that "the first and most important of these indicia is the nature of the ideas in question. This means that a court must ...determine whether the subject matter it comprehends is consistent with the assertion that it is, or is not, a religion." 592 F.2d at 208. The Third Circuit and other courts have adopted the view of "Dr. Paul Tillich, who expressed his view on the essence of religion in the phrase 'ultimate concern.' Tillich perceived religion as intimately connected to concepts that are of the greatest depth and utmost importance." Id. The Court has specifically defined the phrase "ultimate concerns" as follows:

> "One's views, be they orthodox or novel, on the deeper and more imponderable questions - the meanings of life and death, man's role in the Universe, the proper moral code of right and wrong - are likely to be the most 'intensely personal' and important to the believer. They are his ultimate concerns. As such, they are to be carefully guarded from governmental interference, and never converted into official government doctrine."

592 F.2d at 208.

Instantly, Plaintiff contends the PA DOC has attempted to compile what it believes to be the proper moral code, of what is right and wrong, and to convert that moral code into government doctrine and to propagate its moral code via its prescriptive programs. In support of this contention Plaintiff asserts: (1) the PA DOC Mission Statement, as it appears on DOC documents including Exhibits "E" and "I" of Plaintiff's Third Amended Complaint, Doc. 39, and at p. 5 of Defendants' Appendix, publicly announces the PA DOC's intention to provide what the DOC deems to be "the skills and values necessary to become productive law-abiding citizens"; (2) the explanation that:

> "The goal of every program offered is to have each inmate be able to: a. understand the effects and consequences that their criminal behavior had on his victims, his family, and the community, and for the inmate to accept personal responsibility for his behavior; b. Demonstrate an appropriate respect for authority, his fellow inmates, and for himself by better understanding what it means to be a member of a community; c. Understand his high risk of re-offending; d. Describe resources and intervention strategies for support to establish and maintain successful community adjustment."

(Defendants Concise Statement, Doc. 117, # 5 a – d; and ¶ 2 a) – e) of the Declaration of Mike Clark at pps. 55-6 of Defendants' Appendix); and (4) the name DEPARTMENT OF CORRECTIONS is the clearest of clear indicators/proclamations that the subject matter of the prescriptive programs [which were designed and implemented for the specific purpose of providing answers to fundamental questions and moral issues and a vehicle to guide prisoners to the PA DOC's vision of what is right and/or wrong] addresses the ultimate concern of what is right and/or wrong, squarely, openly, consistently and religiously. A factual dispute, which necessitates the denial of Defendant's Motion for Summary Judgment, exists on this point since Defendant Beard refused to concede that "PA DOC prescriptive programs address fundamental questions and moral issues such as what is right and/or wrong." (Admission of Beard # 22).

"Comprehensiveness" is the second useful indicia, that the Malnak Court
identified, for making the determination of whether or not a set of beliefs or
ideas are, in fact, religious. The Court states:

> "Certain isolated answers to "ultimate" questions, however, are not neces-
> sarily 'religious' answers, because they lack the element of comprehensive-
> ness, the second of the three indicia. A religion is not generally con-
> fined to one question or moral teaching; it has a broader scope. ... Moral
> or patriotic views are not by themselves 'religious,' but if they are
> pressed as divine law or a part of a comprehensive belief system that pre-
> sents them as 'truths,' they might well rise to the religious level."

597 F.2d at 209.

Instantly, Plaintiff contends that each of the PA DOC's prescriptive pro-
grams were designed and implemented as an integral part of a larger system. In
support of this contention Plaintiff asserts: (1) "Programs offered by the
Bureau of Inmate Services fall within one of five major categories: Work/Edu-
cation, Citizenship, Family/Relationship, Self, Offense related, and Re_entry."
(Defendants' Appendix pps. 25 - 51; and Defendants' Concise Statement, Doc 117,
# 10; (2) the programs listed on Plaintiff's DC-43s address more than one
question or moral teaching since said program's subject matter includes:
Violence Prevention, Citizenship, Batterers Intervention, Long Term Offenders
and Personal Responsibility programs (Defendants' Appendix p. 95, ¶ 1; and the
2001, 2002, and 2003 DC-43s of Plaintiff at pps. 52 - 54 of Defendants'
Appendix); (3) statements of Gary Zajac, Ph. D., Research and Evaluation Mana-
ger, of the DOC's Bureau of Management Information Service, in his article,
OFFENDER TREATMENT PROGRAMS-WHAT WORKS AND HOW, including the following:

> "The integration of programs is also increasingly seen as a critical
> part of the correctional treatment process. Many Inmates enter the cor-
> rectional system with a host of needs, such as a long history of substance
> abuse, low educational achievement, little or no job experience, poor
> socialization, criminal thinking patterns, etc. Addressing these needs in
> a coordinated and comprehensive manner will reduce the likeness of reci-
> divism. Effective programs build upon one another and reinforce a common
> set of pro-social skills, contributing to successful inmate reentry."
> (emphasis added) (Defendants' Appendix at p. 70).

Mr. Zajac's statement provides support for Plaintiff's argument that "comprehensiveness" is a goal that Defendants are working to attain, if they have not attained it as of this time.; and (4) it must be noted that ((while: (a) Charles J. Adams of McGill University, in his article on ISLAM/LAW that appears on page 499 of ENCYCLOPEDIA AMERICANA, 1993, states: "There has been no more far reaching effort to lay out a complete pattern of human conduct than Islamic Sharia." (P.A. p.32); (b) the comments in the Preface of King Fadh's translation of the Holy Qur'an which state: "Its [the Qur'an] contents are not confined to a particular theme or style, but contain the foundation for an entire system of life, covering a whole spectrum of issues, which range from specific articles of faith and commandments to general moral teachings, rights and obligations, crime and punishment, personal and public law, and a host of other private and social concerns." (P.A. p. 33); and (c) the comments of John L. Esposito's book, VOICES OF RESURGENT ISLAM, which state: "Comprehensiveness (shumul):The third characteristic of the Islamic vision is its comprehensive nature. Man himself is never able to provide an equivalent substitute, due in large part to his finitude and his limitation in time and place. Man is unable to provide a complete system that takes into account all considerations and aspects. 'It is impossible that a human concept or a human devised system would ever personify comprehensiveness. It will always be temporary or fragmentary.'" (P.A. back of p. 2) )) in ascertaining whether or not Defendants have established a DOC/State-sponsored religion by comparison, the comprehensiveness which Mr. Zajac extols for DOC programs is identical to the comprehensive nature of the teachings and practices of Islam, a recognized traditional religion.

Finally, the Court notes:

>"A third element to consider in ascertaining whether a set of
>ideas should be classified as a religion is any formal, external, or sur-
>face signs that may be analogized to accepted religions. Such signs might
>include formal services, ceremonial functions, the existence of clergy,
>structure and organization, efforts at propagation ... Of course, a re-
>ligion may exist without any of these signs, so they are not determinative,
>at least by their absence, in resolving a question of definition."

592 F.2d at 209.

Instantly, Plaintiff contends the PA DOC exhibits external signs that are

all but identical to the external signs of recognized religions. In support of

this contention Plaintiff points to the research findings provided by Defen-

dants, specifically, in an article by Burt Useem and Anne M. Piehl. 2006.

PRISON BUILDUP AND DISORDER. Punishment & Society: The International Journal

of Penology, 8(1), 87-115., have written:

>"To better understand the impact of buildup on prison order, prior re-
>search on the social dynamics of prisons proffered diverse perspectives.
>One view proposes that prisons are 'systems of cooperation' with an en-
>trenched and established hierarchy from the Governor to the Secretary,
>filtering down through the rank and file prison structure, with inmates
>at the bottom of this hierarchy." (Defendants' Appendix p. 62).

Plaintiff asserts the above-mentioned hierarchy accommodates the idea that the

hierarchy of the PA DOC can be viewed as being identical to the hierarchy of

the Catholic Church, for example, with Secretary Beard being the Pope; the

Superintendents being the Cardinals; the Deputy Superintendents being Bishops;

the Majors, Captains and Lieutenants being priest; the Correctional Officers

being Lay Persons; and Inmates being parishoners at the bottom. The 25-page

SCI-Albion Inmate Program Catalog, which appears at pages 25 - 51 of Defendants'

Appendix, stands as an undeniable propagation tool, and the employees who

actually conduct the prescriptive programs, that appear on inmates' DC-43s,

being/serving as clergy and teachers who give life to the propagation of this

DOC/State-sponsored religion.

Thus, Defendants are not entitled to summary judgment. The facts set

forth above are sufficient to allow reasonable finders-of-fact to conclude: (1) PA DOC prescriptive programs address fundamental questions and moral issues such as what is right and/or wrong, (2) the programs, themselves, and the ideas and beliefs presented by said programs are either comprehensive or are at least intended to be comprehensive, (3) the organizational structure or hierarchy of the PA DOC is an external sign that is all but identical to that of recognized religions, and (4) therefore, pursuant to the standard established by the Third Circuit Court of Appeals in Malnak v. Yogi, Supra, and applied in Africa v. Commonwealth of Pennsylvania, 662 F.2d 1025 (3rd Cir. 1981), the PA DOC has violated the Establishment Clause's guarantee that "government may not ... act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" Lee v. Weisman, Supra.

### FREE EXERCISE CLAIM

### ARGUMENT I

As set forth in the accompanying Declaration of Plaintiff:

In December 2001 Plaintiff asked Ms. Gamble, his unit-counselor, that his "D.O.C. file be made to reflect the fact that the teachings and practices of Islam meet and fulfill all of my so-called programming needs." (P.A. p. 1). Ms. Gamble responded, in writing, saying: "I commend that you are committed to your religion, practices and beliefs. However this commitment does not replace institutional programming." (Id.). Plaintiff asserts the existing Islamic programs at SCI-Albion could easily be used to meet his programming needs. (Third Amended Complaint, ¶ 85). However, Defendants reject this idea and state their opinion that: "While involvement in religious activities is certainly a positive pursuit ... such activity does not address the criminogenic factors that caused individuals to commit criminal acts." (Plaintiff's Interrogatories and Request

for Production of Documents (First Request) # 4). Plaintiff sent an article,
titled VOICES OF RESURGENT ISLAM, and a letter to Supt. Wolfe on 12/09/01
repeating his request to have the Religion of al-Islam listed in his records as
his prescriptive program. Supt. Wolfe denied this request on 12/10/01, writing:
"You have your prescriptive program & know what is required of you. That is
sufficient!" (P.A. p. 2 front and back). A Yearly Classification Review was
conducted for Plaintiff on 07/24/02 and a DC-43, Prescriptive Program Plan, was
prepared for him. (P.A. p. 4). This DC-43 indicates Plaintiff should "continue
positive adjustment" and that he has "no real interest in programs." (Id.).
The DC-43 also listed "Long Term Offenders," "Citizenship/Personal Responsibil-
ity," and "Batterers Intervention" as programs "recommended" for Plaintiff to
attend. Plaintiff's religious beliefs prohibited him from participating in non-
Islamic programs and, since none of the programs listed on the DC-43 were Islam-
based programs, Plaintiff made no attempt to enroll, or to participate, in
said programs. (P.D. ¶¶ 18, 24, 25, 80 & 84; and P.A. pps. 6 & 7). A DC-43 was
prepared by Unit-counselor Snider at Plaintiff's next Yearly Review, on
07/11/03. In addition to restating the "recommendations" that Plaintiff attend
the "Citizenship" and "Batterers Intervention" Groups, "Long Term Offenders" had
been omitted and "Violence Prevention" added. The DC-43 also instructed Plain-
tiff to get a "Facility Job" and informed him that his Custody Level had been
raised from CL-2 to CL-3. (P.A. p. 5). On 07/12/03 Plaintiff addressed a DC-135A
to Defendant McKissock asking to be informed of the reasons for the increase
in his Custody Level. (P.A. p. 8). On 07/16/03 Plaintiff was transferred from
housing on a Honor Unit, for CL-2 inmates, to a non-Honor Unit for CL-3
inmates. (Admissions of Gamble # 21; P.D. # 68, and P.A. p. 8). Defendant Mc-
Kissock responded, on 07/16/03, saying, among other things: "...the issue of
your refusal to complete any programming" is a factor that affected Plaintiff's

Custody Level. (P.A. p. 8). Plaintiff filed a formal Inmate Grievance on 08/04/03. This Grievance concerned the decisions to remove Plaintiff from the Honor Unit and to increase his Custody Level; number 58644 was assigned to this Grievance. (P.A. pps. 9 - 10). On 08/06/03 Defendant Hametz responded, on a DC-804 Part 2, stating: "Bottom line, all inmates who are housed on AA will be required to comply with their recommended programming or risk loss of honor housing. Your refusal to participate in programs is the reason you were moved off the honor unit." (P.A. p. 11). Plaintiff timely appealed to the Superintendent and to Final Review in the Secretary's Office. (P.A. pps. 12 - 16). Sharon Burks, Chief Grievance Coordinator in the Secretary's Office, responded to the Appeal to Final Review stating, among other things: "You were removed from the AA honor unit status due to your failure to comply with your prescriptive programming. Your rationale for non-participation has no bearing on Department policy and the resulting change in your housing status." (P.A. p. 16). Ms. Burks concluded her statement by stating: "You have not been retaliated against due to your religious beliefs in this matter." Plaintiff disagrees with Ms. Burk's final statement.

It is only when an individual practices a unique or unrecognized system of belief or practices a personal variation of a recognized faith that there arise conflicts between the state and the individual over First Amendment applications. Instantly, the practice is an Islamic belief that Muslims should follow only Islamic teachings much like the practice that U.S. Federal Courts follow only the rulings of U.S. Federal Courts.

The United States Supreme Court has explained the application of the Free Exercise Clause in its opinion in Frazee v. Illinois Dept. of Employment Security, 489 U.S. 829 (1989). The Court found the State of Illinois denied unemployment benefits to Frazee because, in light of his particular Christian be-

liefs, he refused a temporary retail job which would have required him to work
on the "Lord's Day." 489 U.S. at 831. The Supreme Court reversed, holding that
Illinois had violated Frazee's free exercise rights by conditioning the re-
ceipt of unemployment benefits on his abandonment of sincerely held religious
beliefs. 489 U.S. at 835.

Instantly, Plaintiff argues that the documents in evidence present facts
from which a reasonable fact-finder could conclude Defendants have impermissibly
conditioned Plaintiff's receipt of a benefit, i.e., continued residence on AA
honor unit, upon him abandoning his sincerely held religious beliefs which
prohibited him from participating in PA DOC non-Islamic prescriptive programs;
and therefore, Defendants are not entitled to summary judgment in their favor on
Plaintiff's Free Exercise Claim.

## RETALIATION CLAIM

### ARGUMENT I

Defendants' Motion for Summary Judgment on Plaintiff's Retaliation claim
must be denied due to Defendants failure to meet their burden, pursuant to
Rauser v. Horn, 241 F.3d 330  (3d Cir. 2001), to demonstrate by a preponderance
of the evidence that they would have fired Plaintiff from his job as a Chapel
Clerk even if he had not engaged in the Constitutionally protected activity of
writing poetry. The documents in this case indicate that, with the exception
of the views expressed in the poetry, prison officials had no grounds for any
complaint about Plaintiff's conduct generally and with his performance of his
assigned work duties specifically.

The DC-48 B, Inmate Progress Report, prepared by Defendant McQuown con-
cerning Plaintiff's performance of his Chapel Clerk duties rate his performance
as being "excellent" in 12 of the 20 factors considered, and "very good" in
the remaining 8. (P.A. p. 18). The Housing Performance Reports indicate his

conduct on his housing unit was consistent with his conduct on his job as is
demonstrated by comments of staff such as: "no problem on unit," "quiet no
problem," and "Couldn't ask for a more well behaved individual." (P.A. pps. 20
- 21). Similarly, and specifically related to his performance of his work, the
Memo dated 07/22/02 (three months prior to officials discovery of the poetry)
indicates Plaintiff's performance was such that Supt. Wolfe had approved him
to serve as an "Inmate Peer Leader," an assistant to the facilitating Islamic
classes. (P.A. p. 21). There was no confrontation or disturbance of any kind
when Plaintiff's poetry was discovered by officials on 10/24/02. No Misconduct
Report and no Unusual Occurrence Report was written concerning the poetry that
day. (First Request # 12). DC-ADM 801, INMATE DISCIPLINE, section VI.A.1
states: "All rule violations are to be reported via a DC-141, Misconduct
Report, Part 1" (P.A. pps. 74 - 75) and the PA DOC CODE OF ETHICS, DC-74, B.14
states: "Employees will promptly report to their supervisors any information
which comes to their attention and indicates violations of the law, rules,
and/or regulations..." (P.A. pps. 35 -36); but no Unusual Occurrence Report
was written until 10/28/02, four (4) days after officials copied the poetry.
(Defendants' Amended Response to Plaintiff's Interrogatories and Request for
Production of Documents # 12; see P.A. p.76). This timeline indicates the of-
ficials, who were fully aware that there was no legitimate reason to take any
action against Plaintiff from the outset, "stewed" for a few days in their
shame and/or disgust over the views expressed via the poetry, prior to making
their decision to fabricate a pretext to retaliate. It appears that comments
made by ex-slave Frederick Douglas during his Fourth of July speech in Roches-
ter, New York in 1852, remain valid today. He said:

> "What to the American slave is your Fourth of July? I answer, a day
> that reveals to him more than all other days of the year, the gross in-
> justice and cruelty to which he is the constant victim. To him your cele-
> bration is a sham; your boasted liberty an unholy license; your national

greatness, swelling vanity; your sounds or rejoicing are empty and heart-
less; your denunciation of tyrants, brass-fronted impudence; your shouts
of liberty and equality, hollow mockery; your prayers and hymns, your
sermons and thanksgivings, with all your religious parade and solemnity;
are to him mere bombast, fraud, deception, impiety and hypocrisy — a thin
veil to cover up crimes which would disgrace a nation of savages. There
is not a nation on the earth guilty of practices more shocking and bloody
than are the people of these United States..."

Newspaper accounts of how Black's in Pennsylvania are incarcerated at a rate
that is 14 times that of Whites and the history of African people in America's
Courts remains so shocking to some that the mere mention of facts related to
these subjects in Plaintiff's poetry provoked an unwarranted and exaggerated
unconstitutional response, notwithstanding the fact the poetry posed no real
threat, imagined or perceived, to the security of the prison. (P.A. p. 34 back
and front). The fabricated pretexts began to make their first appearances in
documents produced by prison officials on 10/28/02, four days after Ms. Brannon
photocopied the poetry and distributed it to prison officials. No Misconduct
Report was ever issued concerning the poetry. (First Request # 12).

    Each and every response provided by Defendants, to Plaintiff's  requests
to be told the reasons why he'd been fired, identified those reasons as
being either: (1) the poetry itself, (2) the views expressed by the poetry,
or (3) a scenario wherein prison officials had interrupted an alleged plot
to disrupt the orderly operation of the prison by distributing the poetry
to other inmates. (P.A. pps. 37 - 38, 48 - 50 & 61). The reasons stated on
these documents, for example, that of Mr. Bentley: "Remove from job - attempt
at distribution of inflamatory (sic) material" (P.A. p. 61), identifies a
serious violation of DOC rules and regulations which mandates the issuance of
a Misconduct Report pursuant to DC-ADM 801, VI.A. (P.A. p. 75). However, De-
fendants would have this Court believe DC-ADM 801 did not make Misconduct Proceed-
ings mandatory following the violations set forth by Mr. Bentley, and others,
because, as Defendants argue in their Brief: "An inmate may be removed from a

work assignment by a unit management team action or misconduct proceeding."
(Defendants' Brief p. 22). The undisputed fact that officials did not issue a
Misconduct Report points away from a legitimate penological need to discipline
Plaintiff for alleged illegal conduct and points directly to an improper in-
tent to retaliate against Plaintiff, for exercising his Constitutional right to
write poetry, by removing him from his job.

Paragraph 61 of Defendants' Concise Statement of Material Facts Not In
Dispute, Doc. # 117, admits ¶¶ 35 - 44 of Plaintiff's Third Amended Complaint,
Doc. # 39, are true. Defendants have, by making this admission, at this late
date, admitted that Mr. Anderson did not ask Ms. Brannon to photocopy the poetry
and that he was actually unaware of the existence of the poetry until after she
gave him the photocopy and the original (see also Declaration of Wayne Bair,
III at P.A. p. 77) and therefore a reasonable fact-finder could conclude from
these facts that: (1) prison officials were, from the outset, fully aware that
Plaintiff had not made any attempt to distribute the poetry as Mr. Bentley has
written, (2) copies of the poetry were made without Plaintiff's knowledge or
consent, and (3) that Defendants fabricated pretexts, related to a concern
about a possible intent to distribute the poetry, in order to retaliate against
Plaintiff for expressing views, exclusively in his poetry and nowhere else, that
annoyed Defendants. The evidence before the court on this issue precludes the
grant of summary judgment in Defendants' favor.

More than four (4) years after memorializing their pretexts for firing
Plaintiff on DOC documents the Defendants perceived a need to change horses, or
more specifically; disingenuous theories of culpability, in the middle of the
race since it was not likely that the court would fail to recognize the inherent
fatal (legal) flaws of Defendants original stated reasons for firing him. As
stated in Defendants' Memo, Doc. 116, their new theories include a claim that:

"It was the reading material (the newspaper article with the poetry reproduced
on the back), handed over to Minister Anderson, which Plaintiff attempts to
establish as constitutionally protected conduct." (Defendants' Memo p. 20).
Defendants do not point to any pleading filed by Plaintiff wherein Plaintiff
makes any such claim or argument. Plaintiff's claim is clearly stated in ¶ 43
of the Third Amended Complaint, Doc. 39, as follows:

> "...the directors, department heads and superintendents who had been
> given copies of the poetry conspired to retaliate against plaintiff for
> expressing views in his poetry which did not violate any PA DOC rule, but
> which Caucasian secretary and administrators found distasteful and un-
> flattering." (Id.).

(See also ¶¶ 44 - 49 of the Third Amended Complaint and P.A. pps. 40 - 44).

Plaintiff agrees that the Declarations of Defendant McQuown and Cindy Mit-
chell, concerning the prohibitions of DC-ADM 816, are true and correct. However,
the policy and the practice at SCI-Albion are two different things. Therefore,
Plaintiff disagrees with Defense Counsel's argument that: "The prison regula-
tion in effect with this situation did not permit Plaintiff to bring personal
reading material to the work site, which he did anyway." (Defendants' Memo p. 20).

In addition to ¶¶ 16, 32, 50 - 52, 62 - 63, 76 and 90 of Plaintiff's
Declaration; the Declarations of Ronald Johnson, Thomas Twillie and Alonzo
Robinson (P.A. pps. 62 - 68) indicate DC-ADM 816's prohibitions against personal
reading material at the work site were relaxed and/or ignored by staff at SCI-
Albion. There are no jobs at SCI-Albion where prisoners have the proverbial
endless supply of big rocks that must be hammered into little rocks. Most jobs
leave prisoners to spend the majority of their working hours idle, including
the Chapel Clerk position, and, because there is literally nothing for the in-
mate workers to do, their supervisors do not enforce the prohibitions against
personal reading material in the work place. The Court should note that even

when C.O. Lobdell was fabricating Misconduct Report A453158 on 05/12/04, his references to the fact that Plaintiff was reading indicate that reading was not deemed prohibited at the job site. (P.A. P. 73).

It is likely that fair-minded fact-finders could find, from the evidence presently before the court on this issue, that Plaintiff had received permission to bring personal reading material to the job and that it would be inappropriate to fire him for engaging in an activity that his immediate supervisors expressly permitted him to engage in. The disputed factual matters on this issue preclude the granting of Defendants' Motion for Summary Judgment.

Plaintiff does not raise any challenge against the validity of DC-ADM 816 as Defendants have asserted, at page 20 of Defendants' Memo, and it follows that Plaintiff does not bear any burden, under any law or statute, to disprove the validity of DC-ADM 816. Nor does Plaintiff seek "...the unfettered right to express himself on matters related to his incarceration when such an expression runs afoul of prison regulations." (Quoting Defendants' Memo at p. 20). Defendants failure to issue Plaintiff a Misconduct Report in November 2002, or at any other time, concerning his poetry, stands as incontovertible proof that prison officials did not believe Plaintiff's poetry had run afoul of prison regulations.

In light of these facts Defendants cannot now argue they believed the poetry "threatened to interfere with government operations," as that phrase is defined in Waters v. Churchill, 511 U.S. 661, 680, 114 S.Ct. 1878 (1994). Prison officials at SCI-Albion seem to be annoyed by, and over-react to, African-Americans' discussions of racism in our daily lives, and annoyed by groups of African-American inmates watching videos (which were purchased by the DOC) of Minister Louis Farakhan give speeches and lectures in the Chapel Area. (Declaration of Nanya Rashiyd Z. E1 ¶¶ 5 - 7, P.A. p. 67) in the same way that offi-

cials were annoyed by and over-reacted to Plaintiff's poems, which are nothing
more than Ebonic-Echoes of well-documented and commonly-known historical facts.

Defendants have argued, in ¶ 69 of the Material Facts Not In Dispute, that
Plaintiff "had previously been warned regarding voicing concerns about racial
inequities in prison..." (Defendants' Appendix p. 138). Plaintiff argues that
the DC-804 Part 2, at p. 138 of Defendants' Appendix, and each inference that
flows from it be struck from the record of these proceedings. The reasons for
Plaintiffs argument appear in detail in Grievance # 41961 (P.A. pps. 45 - 47).
The problem with said document is that it was produced in violation of DC-ADM
804, VI.B.1.e, by a conflicted Grievance Officer, and the comment, that Plain-
tiff "had previously been warned...", is hearsay and therefore inadmissible in
its present form since it refers to what Imam Abdalla allegedly did. Imam Ab-
dalla is an employee of the DOC and Defendants could easily have gotten a Dec-
laration from him if he had been willing to make such a statement. It must be
noted that Defendant McQuown is the conflicted Grievance Officer who produced
the bogus DC-804 Part 2; and it must be noted that Defendant McQuown, under
oath, "admits that he is not aware of a single incident wherein Plaintiff ex-
pressed any racial hatred or animosity toward another person." (Admission
of McQuown # 22).

The factual situations in all the cases cited by Defendants could not be
more different from the factual situation of the case at bar than night is from
day; and especially the two cases wherein the plaintiffs were inmates of cor-
rectional institutions seeking the protection of the Free Speech Clause. In
Goff v. Dailey, 991 F.2d 1437 (8th Cir. 1993) the inmate mocked and challenged
correctional officers by making crude personal statements about them in a
recreation room full of other inmates and then sought First Amendment protect-

ion for that conduct. 991 F.2d at 1439. Similarly, in Freeman v. Texas Dept. of Crim. Justice, 369 F.3d 854 (5th Cir. 2004), the inmate contended the First Amendment gave him the right to criticize prison officials publicly. 369 F.3d at 864.

Instantly, Plaintiff did not challenge nor criticize any prison official nor did he read his poetry to anyone. Plaintiff's poetry came to the attention of prison authorities via accidental photocopying. There was neither a confrontation nor an incident on 10/24/02 concerning Plaintiff's poetry. As is indicated by the undisputed facts in ¶¶ 35 - 44 of Plaintiff's Third Amended Complaint, Doc. 39, Minister Anderson asked Plaintiff to allow him to make a photocopy of the article. Plaintiff agreed to allowing him to make a copy of the article and gave it to him for him to copy the article. Instead of making the copy himself, Min. Anderson asked a secretary to make one copy of the article for him. The secretary then took it upon herself to make an unknown number of copies of the article and the poetry which she distributed to various supervisory prison officials. As previously stated, the failure of prison officials to issue a Misconduct Report indicates the officials' belief that the poetry did not pose an unacceptable threat to security. With such being the case, Plaintiff's poetry was/is entitled to the protection of the First Amendment, and Plaintiff is entitled exercise his right to write poetry without having that right chilled by retaliatory actions of prison officials who were embarrassed or annoyed by the views expressed in the poetry.

The First Amendment embodies and prevents government from intruding on individuals' rights of free expression absent a compelling justification. N.Y. Times C.. v. Sullivan, 376 U.S. 254, 265, 84 S.Ct. 710, 11 L.Ed.2d 696 (1964); Shelly v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). Mere offense or injury to sensibilities is insufficient. Texas v. Johnson, 491 U.S.

397, 408-09, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). As the Supreme Court has declared, "[a]t the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." Hustler Magazine v. Falwell 485 U.S. 46, 50, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). Instantly, Plaintiff agues, these precepts of the First Amendment protect the views expressed in the poetry at issue (P.A. p. 34 back) and these precepts protect Plaintiff against retaliation by government officials for exercising his Constitutional rights to express views, about racism in the courts, which annoy prison officials but do not pose any unacceptable threat to prison security.

The evidence presently before the court, shows that Plaintiff suffered a substantial pay cut and loss of wages and an increase in his Custody Level that is undisputed. During the 12-month period between 11/01/01 and 11/01/02 while he was assigned to the Chapel payroll, Plaintiff received approximately $640.00 in wages. During the 12-month period between 11/01/02 and 11/01/03 while he was assigned to General Labor Pool (GLP), Plaintiff received approximately $163.00 in wages. (Admissions of McQuown # 8 - 9). While Plaintiff was employed in the Chapel, his above-average work performance caused three (3) points to be deducted in the equation which produced his total PACT score at his Yearly Classification Review on 07/29/02. (Admission of McKissock # 21). However, Plaintiff re-assignment to GLP on 11/14/02 caused him to be deprived of the three (3) point deduction, and thus increased his PACT score at his Yearly Review in July of 2003. (id. #'s 18 - 23). These facts indicate Plaintiff has been subjected to "adverse actions" which were "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." Allah v. Al-Hafeez, 208 F. Supp.2d 520, 535 (E.D. Pa. June 24 2002), quoting Allah v. Seiverling, 229 F.3d at 255. See also Dixon v. Brown, 38 F.3d 379, 379 (8th

Cir. 1994)(a plaintiff "need not show a separate, independent injury as an element of the case ... because the retaliatory disciplinary charge strikes at the heart of an inmate's constitutional right to seek redress of grievances, [and] the injury to his right inheres in the retaliatory conduct itself.").

Accordingly, there is presently sufficient evidence before the court to allow a reasonable fact-finder to conclude Defendants retaliated against Plaintiff for exercising his Constitutional right to write poetry, and thus, Defendants are not entitled to summary judgment in their favor on Plaintiff's Retaliation Claim.

## EQUAL PROTECTION CLAIMS

Defendants are not entitled to summary judgment on Plaintiff's Equal Protection Claims.

In the Magistrate Judge's Report and Recommendation, Doc. 81, Magistrate Baxter wrote:

> "The burden, thus falls upon Defendants to establish that the disparate treatment of which Plaintiff complains is reasonably related to a legitimate penological interest. Defendants have not attempted to meet this burden at this stage of the proceeding. As a result, Defendants' motion to dismiss Plaintiff's equal protection claim should be denied."

(Magistrate Judge's Report and Recommendation, Doc. 81, at p. 22).

Instantly, Plaintiff argues the Defendants have not met their burden, to set forth a legitimate correctional goal that warrants the disparate treatment Plaintiff has complained of. Defendants' complete argument for summary judgment on the Equal Protection Claim is as follows:

> "For the same reason expressed in the argument related to Plaintiff's religious claims, Defendants are entitled to summary judgment on the Equal Protection claim. The inmate treatment programs at SCI-Albion further legitimate penological interest and are applied in a neutral and balanced fashion (to wit: they are offered to all inmates). Concise Statement of Material Facts, paragraphs 1 - 34."

(Defendants' Brief at p. 22).

According to Defendants' logic, if the court finds Defendants are entitled to summary judgment on the religious claims then the court must also grant summary judgment on the Equal Protection claims. Similarly, if Plaintiff has presented evidence of factual disputes on material issues on the religious claims which require the court to deny Defendants summary judgment on the religious claims then the court must also deny Defendants summary judgment on the Equal Protection claims. Plaintiff argues he has introduced sufficient evidence of factual disputes, on his religious claims, which preclude the granting of summary judgment, in Defendants' favor, on the religious claims and therefore on the Equal Protection claims also.

The "neutral and balanced", one-size-that-does-not-fit-all application of prescriptive programs described in Defendants' Brief and Appendix is an approach that, as set forth in pages 3 - 19 herein: (1) has nullified Plaintiff's First Amendment right to refuse to participate in programs which offend his religious beliefs, (2) has caused Plaintiff to be punished for exercising said Constitutional right, and (3) has indicated the PA DOC's Assessment process, which turns blind eyes upon the religious rights and the religious needs of each inmate being assessed, is a flawed assessment process, an exaggerated and biased response, wherein prison officials clearly are not remaining neutral on matters of religion, and are acting in a way that tends to establish a state-sponsored religion. The disputed factual matters stated above herein and in Plaintiff's Statement of Disputed Facts necessitate a trial on these matters which precludes the granting of summary judgment, in Defendants favor, on Plaintiff's religious and Equal Protection claims.

## QUALIFIED IMMUNITY

Defendants are not entitled to qualified immunity. They argue that the doctrine of Qualified Immunity shields them from liability for their decisions

to: deny Plaintiff's request for prescriptive programs that were not offensive
to his religious beliefs, coerce Plaintiff to participate in prescriptive pro-
grams that were offensive to his beliefs, raise his Custody Level because he
refused to participate in said programs, re-assign him from housing on a Honor
Unit for CL-2 inmates to a non-honor unit because he refused to abandon or to
violate sincerely held beliefs which prohibited him from participating in non-
Islamic based programming, retaliate against him for exercising his
Constitutional right to refuse to participate in programs that offended his
religious beliefs, granted benefits to other inmates who did not have religious
objections to said programs and denied similar benefits to Plaintiff because
of his religious objections against said programs , retaliated against him for
exercising his Constitutional right to write poetry, and reduced his rate of
pay from approximately $640.00 per year to approximately $160.00 per year as
punishment for exercising his Constitutional right to write poetry which may
have annoyed prison officials but did not violate any prison rule. As the Sup-
reme Court has explained, "qualified immunity seeks to ensure that defendants
'reasonably can anticipate when their conduct may give rise to liability,' by
attaching liability only if '[t]he contours of the right [violated are]
sufficiently clear that a reasonable official would understand that what he is
doing violates that right.'" United States v. Lanier, 520 U.S. 259, 270 (1997).
"This is not to say that an official action is protected by qualified immunity
unless the very action in question has been held unlawful, but it is to say that
in the light of preexisting law the unlawfulness must be apparent." Anderson v.
Creighton, 483 U.S. 635, 640 (1987).

Here, as set forth above herein, it was apparent by July 2003, when
Plaintiff's Custody Level was raised and he was removed from housing on a
Honor unit, that the Establishment Clause of the First Amendment prohibited

Defendants from subjecting Plaintiff to punishment for expressing and acting
upon religious beliefs (which posed no threat to the security of the prison).
Everson v. Board of Education, 330 U.S. 1, 15-16 (1947). As set forth in the
preceding paragraph, and in pages 3 - 19 herein, Plaintiff has been subjected
to punishment by prison officials for no reason other than his religious
beliefs and his religious objections to participating in what he argues are
State/DOC-sponsored religious programs, pursuant to Malnak v. Yogi, 597 F.2d
197 (3rd Cir. 1979); and this Brief, along with its Appendix and Plaintiff's
Declaration presents evidence that Defendants were coercing Plaintiff to
participate in State/DOC-sponsored religious/repentance practices which clearly
violate the prohibition against such governmental conduct as stated in Lynch
v. Donnelly, 465 U.S. 668, 678 (1984). Similarly, pages 20 - 29 of this Brief
present arguments and references to PA DOC documents which serve as proof for
Plaintiff's arguments, that prison officials retaliated against him in Novem-
ber of 2002 for exercising his Constitutional right to write poetry. "Retali-
ation for the exercise of constitutionally protected rights is itself a viola-
tion of rights secured by the Constitution actionable under section 1983." See
White v. Napolean, 897 F.2d 103, 111-12 (3d Cir. 1990). "Government actions,
which standing alone do not violate the Constitution, may nonetheless be con-
stitutional torts if motivated in substantial part by a desire to punish an
individual for exercise of a constitutional right." Mitchell v. Horn, 318 F.3d
523, 530 (3d Cir. 2003), quoting Allah v. Seiverling, 229 F.3d 220, 224-25
(3d Cir. 2000); "Although there is no right to a job or a particular position
in a prison, prison officials cannot punish or retaliate against a prisoner
who exercises his First Amendment rights ..." Hill v. Blum, 916 F. Supp. 470,
472-74 (E.D. Pa. 1996), citing Williams v. Meese, 926 F.2d 998 (10 Cir. 1991).

These precedents preclude entry of summary judgment against Plaintiff on

the ground of qualified immunity. Indeed, Plaintiff's case presents government conduct so egregious that any reasonable official would have known that it violates the Constitution, regardless of preexisting case law. As the Supreme Court has observed, "the easiest cases don't arise. There has never been ... a § 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability." Lanier, 520 U.S. at 271 (citation omitted). Defendants' motion should therefore be denied.

Dated: 02/22/ 07

*Leonard C. Jefferson*

Leonard C. Jefferson, CL-4135
10745 Rt. 18
Albion, PA 16475-0002

Leonard C. Jefferson, CL-4135
10745 Rt. 18
Albion, PA 16475-0002
February 22, 2007

Clerk's Office
U.S. District Court
P.O. Box 1820
Erie, PA 16507

RE: JEFFERSON V. WOLFE, C.A. NO. 04-44 ERIE

Dear Clerk:

Would you please file the following documents in the above-mentioned case.

1. BRIEF IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION,

2. APPENDIX TO PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,

3. DECLARATION IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,

4. PLAINTIFF'S STATEMENT OF DISPUTED FACTS,

5. DEFENDANTS' RESPONSE TO PLAINTIFF'S INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS, Dated 09/19/06:

    (a) DEFENDANTS' SUPPLEMENTAL RESPONSE, Dated 10/06/06,
    (b) DEFENDANTS' AMENDED RESPONSE, Dated 10/16/06,

6. DEFENDANTS' RESPONSE TO PLAINTIFF'S SECOND INTERROGATORY, Dated 10/16/06,

7. DEFENDANTS' RESPONSE TO PLAINTIFF'S THIRD INTERROGATORY AND SECOND REQUEST FOR PRODUCTION OF DOCUMENTS, Dated 11/30/06,

8. DEFENDANTS' RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS FROM DEFENDANT BOEH, Dated 11/30/06,

9. DEFENDANTS' RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS FROM DEFENDANT GAMBLE, Dated 11/30/06,

10. DEFENDANTS' RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS FROM DEFENDANT MCKISSOCK,

    (a) DEFENDANTS' AMENDED RESPONSE, Dated 01/09/07,

11. DEFENDANTS' RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS FROM DEFENDANT SNYDER, Dated 11/30/06,

12. DEFENDANTS' RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS FROM DEFENDANT HAMETZ, Dated 11/30/06,

13. DEFENDANTS' RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS FROM DEFENDANT BEARD, Dated 01/09/07,

14. DEFENDANTS' RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS FROM DEFENDANT MCQUOWN, Dated 01/09/07.

Thank you for your attention to this matter.

Respectfully

*Leonard C. Jefferson*

cc: Christian D. Bareford
    file

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LEONARD C. JEFFERSON,
            Plaintiff,

        v.                                        C.A. NO. 04-44 ERIE

WILLIAM WOLFE, et al.,
            Defendants.

CERTIFICATE OF SERVICE

The undersigned hereby certifies that he placed a true copy of the

following documents in the mailbox on B/B Unit at SCI-Albion:

1. BRIEF IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION,

2. APPENDIX TO PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (duplicates of documents possessed by Defendants are not
included in the copy of the Appendix sent to Defendants),

3. DECLARATION IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
and,

4. PLAINTIFF'S STATEMENT OF DISPUTED FACTS,

on February 22, 2007 for delivery via first class mail to:

Christian D. Bareford
Deputy Attorney General
Office of Attorney General
6th Floor, Manor Plaza
564 Forbes Avenue
Pittsburgh, PA 15219

*Leonard C. Jefferson*
Leonard C. Jefferson, CL-4135
10745 Rt. 18
Albion, PA 16475-0002