IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LEONARD C. JEFFERSON,
        Plaintiff,

v.                          C.A. NO. 04-44 ERIE

WILLIAM WOLFE, et al.,
        Defendants.

FILED

'07 FEB 26

## DECLARATION IN OPPOSITION TO

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

    Leonard C. Jefferson hereby declares under penalty of perjury.

    1. I am the Plaintiff in the above-titled case. I make this Declaration In Opposition To Defendants' Motion For Summary Judgment on my claims concerning the Establishment Clause, the Free Exercise Clause and the Free Speech Clause of the First Amendment; and on the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

    2. Defendants' Motion, Declarations, Memorandum and the Appendix attached thereto put forth a claim, in summary, that, based upon the record, they are entitled to summary judgment, in their favor, on each of the claims stated above in ¶ 1.

    3. The Defendants are not entitled to summary judgment because there are genuine issues of material fact to be resolved. These issues are identified in the accompanying Statement of Disputed Facts filed by Plaintiff. The facts are set forth in this Declaration.

4. I embraced the Religion of al-Islam by making my Declaration of Faith in 1977.

5. The Pennsylvania Department of Corrections (PA DOC) took custody of me in July of 1994.

6. I have remained, continuously, in PA DOC custody from July, 1994 to the date of this Declaration.

7. I arrived at the State Correctional Institution at Albion (SCI-Albion) in late september of 1994 as a Custody Level three (CL-3) prisoner.

8. In October, 1995 my Custody Level was reduced from CL-3, Medium Security, to CL-2, Minimum Security.

9. I was transferred from housing on F/B, a CL-3 non-honor unit, to housing on A/A, an Honor Unit for CL-2 inmates, in August of 1996.

10. I remained on A/A until being transferred to the State Regional Correctional Facility at Mercer (SRCF-Mercer), a CL-2 Jail, in July of 1998.

11. In July of 1999 officials determined that my sentence from the State of Rhode Island caused me to be ineligible for confinement at SRCF-Mercer and thus raised my custody level, from CL-2 to CL-4, to facilitate my transfer from SRCF-Mercer back to SCI-Albion.

12. I arrived back at SCI-Albion in October of 1999.

13. In March of 2000 Ms Dantzler, the B/A unit-counselor, informed me my Custody Level had been returned to CL-2.

14. On or around 08/22/00 I was re-assigned from housing on B/A, a non-honor CL-3 unit, to housing on A/A, an Honor Unit for CL-2 inmates.

15. During the last days of October or the first days of November 2000 a SCI-Albion Job Assignment Notice informed me that an order had been issued for me to report to work as an Islamic Chapel Clerk at the rate of 42¢ per hour for up to six (6) hours per workday.

16. During the orientation, on my first day on the job, Imam Wael Almasri specifically informed me that I was permitted to bring personal reading material to work.

17. In July of 2001, at my Yearly Classification Review, Defendant Gamble prepared a Prescriptive Program Plan (DC-43) which indicated the officials' desire for me to "remain misconduct free," to continue obtaining "positive housing and work reports," and Defendant Gamble told me to get my name placed on the waiting lists for Batterers Intervention, Stress and Anger Mgmt, Citizenship Training, and Long Timers Group. The DC-43 also mentioned "activities of choice (walking, yard, religious, etc" and noted I was "not interested in programs at this time." (Plaintiff's Appendix (P.A.) p. 1).

18. I find the idea of being forced to attend non-Islamic programs to be at least as repulsive as non-Christians find the idea of being forced to drink the blood and eat the flesh of Christ; and to be at least as offensive as non-Muslims find the idea of being forced to prostrate to Allah in a Mosque with worshipping Muslims.

19. Because of the views stated in ¶ 18 I did not make any attempt to have my name placed on any list to attend any of the programs mentioned in ¶ 17.

20. During the first days of December Defendant Gamble informed me that I was required to attend the programs listed on the DC-43. I verbally informed her of my religious objections to participating in non-Islamic programs and, on 12/05/01, I sent her an Inmate's Request To Staff Member (DC-135A) along with verses of the Holy Qur'an which set forth the general principle that requires Muslims to avoid and reject teachings and programs that do not flow from the Holy Qur'an. The DC-135A also asked "that my D.O.C. file be made to reflect the fact that the teachings and practices of Islam meet and fulfill all of my

so-called programming needs." (P.A. p. 1).

21. Defendant Gamble, on 12/06/01, responded to my 12/05/01 DC-135A, denying my request.

22. On 12/09/01 I sent a letter to Supt. Wolfe along with pages 76-7 of VOICES OF RESURRGENT ISLAM, by John L. Esposito. The letter continued my argument for transfer to a prison closer to my family, and the pages of VOICES OF RESURGENT ISLAM provided documentation and support for my request for Islamic-based prescriptive programs.

23. Supt. Wolfe denied both requests and, via a handwritten note on my letter, stated: "You have your prescriptive program & know what is required of you. That is sufficient!" (P.A. p. 2).

24. My studies of the religion of al-Islam, and especially the teachings which warn against adopting the ways of non-believers, cause me to know that, in practice, Islam is a comprehensive system of guidance which provides instructions on how I should conduct myself, in a manner that pleases Allah, in each and every situation that I might possibly encounter in life.

25. My studies of the Religion of al-Islam, and especially the teachings which warn against adopting the ways of non-believers, cause me to recognize the requirement that I participate in non-Islamic programs as being part of a systematic attempt to supplant the moral teachings of so-called secular programs in the place of the moral teachings of Theistic religions, including Islam, concerning proper human conduct.

26. I did not receive a single Misconduct Report until February of 2002.

27. On or around 07/24/02, at my Yearly Classification Review, Defendant Gamble prepared a new DC-43 which informed me: (a) of the programs prison officials required me to participate in, (b) that I should enroll to participate in said programs, (c) that I had received "excellent" ratings on my Housing

Unit and Work Evaluations, and (d) that notwithstanding the February 2002 Misconduct Report, which caused my Custody Level to work out to be CL-3, a decision had been made to keep me at CL-2. The section of the DC-43 for "Comments on Recommendations for this Rating Period" indicated I should "continue positive adjustment." (P.A. p. 4).

28. I reminded Defendant Gamble of my religious objections at the 2002 Yearly Review and I acted upon my objection by not making any attempt to enroll in any non-Islamic program.

29. Around the same time as my 2002 Yearly Review Imam Abdalla, my immediate work supervisor, informed me that the Chaplaincy department was going to conduct a Support Team Meeting to determine whether or not they should elevate me to the position of "Inmate Peer Leader."

30. On July 26, 2002 Supt. Wolfe gave his written approval for me to be an "Inmate Peer Leader." (P.A. p. 21).

31. On 10/24/02 around 1315 hours Michael Anderson, the State-employed Nation of Islam (N.O.I.) Chaplain, asked me to allow him to make a photocopy of a newspaper article, headlined: "Pa. imprisons blacks at highest rate: Study by reform group find it's 14 times that of whites," that he saw me reading. (P.A. p. 34).

32. As a PA DOC employee the DOC Code of Ethics, DC-74, B., 14, required him to be familiar with all regulations and to report any violations he became aware of, however, Mr. Anderson did not inform me that I had violated any DOC policy by possessing the newspaper article on the job nor did he report a violation of DC-ADM 816 to any of his superiors. (P.A. pps. 35-6).

33. Mr. Anderson was not aware that two of my poems were typed on the backside of the article when I gave it to him to make the copy of the article that he sought.

34. Within five (5) seconds of receiving the article in his hand, Mr. Anderson asked a Caucasian State-employed secretary, Barbara Brannon, to make one copy of the article for him and to return the original to me; and when she nodded, indicating she would do so, he handed it to her, still unaware of the presence of the poetry.

35. At some time during the next 1½ hours Ms. Brannon made an unknown number of photocopies of both the article, which she had been asked to copy, and the poetry, which she had not been asked to copy.

36. At around 1430, in my presence, she gave Mr. Anderson the copy he'd requested and the original. He immediately handed the original to me.

37. As he was handing the original to me he noticed there was typing on the back of the article and, after handing it to me, he then read the poetry.

38. Ms. Brannon distributed an unknown number of copies of the article/poetry to supervisory prison officials that day.

39. The prison officials were aware that the poetry had been copied, literally, by accident, and that I did not have any intention of distributing the poetry to anyone.

40. Prison officials were fully aware on 10/24/02 that I gave the article to Mr. Anderson upon his request to allow him to make a copy of the article for himself, not the poetry.

41. No Misconduct Report concerning the poetry was issued to me on 10/24/02 nor on any other day.

42. No poetry was confiscated from me on 10/24/02 nor on any other day.

43. No one questioned me about the poetry between the time when Ms. Brannon copied it on 10/24/02 until 11/13/02.

44. I reported to work each working day between 10/24/02 and 11/13/02 and performed my Chapel Clerk duties, and read my personal books and papers on the

job, without incident.

45. On 11/13/02 I was interrogated about the poetry at a Support Team Meeting conducted by Defendants Gamble, McQuown and Snider.

46. The Support Team members told me that I did not have any right to write such poetry.

47. I responded saying the First Amendment of the United States Constitution gave me the right to produce poetry which expresses and communicates the injustices that I experienced as an African-American defendant in Pennsylvania's courts.

48. Defendant McQuown argued saying the First Amendment did not give me the right to yell fire in a theater and I responded saying the First Amendment did give me the right to yell fire in a theater if/when the theater was in fact on fire, and in this case (referring to the subject of the poetry) the theater is burning. (P.A. p. 37).

49. When asked "who's the poetry intended for?" I responded "all" in the same way that Michael Angelo would have answered such a question about his work in the Sistine Chapel by saying "all," "everybody" or "the world", without intending to or expressing any intent to provide a single copy of the work to anyone.

50. No Support Team Member mentioned DC-ADM 816 nor informed me that I had violated any policy by possessing the newspaper and/or the poetry at work.

51. I have observed every Islamic Chapel Clerk that I know and many of the Christian Chapel Clerks bringing personal books and papers to work and openly reading them in plain view of Chapel staff and Correctional Officers, during working hours, almost every day that I was employed as a Chapel Clerk.

52. Prison officials, at SCI-Albion, did not routinely or strictly enforce DC-ADM 816's prohibition against personal reading material at the job site.

(Declarations of Ronald Johnson, Thomas Twillie and Alonzo Robinson at pps. 62 - 68 of P.A.).

53. On 11/14/02 I received a SCI-Albion Job Assignment Notice that informed me I had been re-assigned from the Chapel payroll to General Labor Pool (GLP) and that my hourly pay rate had been reduced from 42¢ per hour/6 hours per day to 18¢ per hour/4 hours per day, or, restated for clarity, from $2.52 per day to 72¢. (Exhibit "A" of Third Amended Complaint, Doc # 39).

54. I was paid around $640.00 from the PA DOC during the one-year period between 11/01/01 and 11/01/02 while assigned to the Chapel Payroll. (Admission of McQuown # 8).

55. I was paid around $163.00 from the PA DOC during the one-year period between 11/01/02 and 11/01/03 while assigned to GLP (Admission of McQuown # 9).

56. I sent DC-135As to Defendants McQuown and Gamble on 11/18/02 and 11/20/02, respectively, asking to be informed of the reason(s) why I had been fired. (P.A. pps. 37 & 38).

57. Defendants McQuown and Gamble responded on 11/18/02 and 11/21/02, respectively, with written responses that indicated the views in the poems, along with their concerns that I intended to distribute the poems in the face of the officials failure to take any action to thwart such a plot, as the reasons I had been fired. Neither response mentioned a violation of DC-ADM 816 or any other DOC policy. (P.A. pps. 37, 38 & 39).

58. On 12/08/02 I filed a formal Inmate Grievance in an attempt to get my job back. This Grievance was assigned # 38293. (P.A. pps. 40 - 41).

59. Notwithstanding the provisions of DC-ADM 804, VI.,B.,1.,e, which state: "The Facility Coordinator shall not designate a staff member to serve as a Grievance Officer who was identified by the inmate as being involved in the issue," and notwithstanding the fact that Part 1 of Grievance # 38293 (P.A.

pps. 40 - 41) identifies Defendant McQuown "as being involved in the issue," the Facility Coordinator designated Defendant McQuown to serve as the Grievance Officer to investigate a grievance filed against himself.

60. As prison officials continued to process # 38293 I filed another Grievance on 01/17/03, which was assigned # 41961 (P.A. pps. 45 - 46), to (a) disqualify the conflicted Grievance Officer in # 38293, and (b) to attempt to get my job back.

61. Around 02/27/03 I received a DC-804 Part 3 which informed me that the Grievance Coordinator had forwarded Grievances #'s 38293 and 41961 to Defendant Boeh for review. (P.A. p. 47).

62. On 03/07/03 Mr. Boeh informed me of his findings and, since his findings indicated I had been "dismissed from your employment as a chaplain clerk because of the fact that you distributed your poetry which was racially inciteful and completely inappropriate to be distributed in the correctional setting" ... and indicated his "finding that the dismissal from your employment was appropriate and should stand.", I signed the DC-804 Part 2 on the line which indicated it remained "unresolved." (P.A. p. 48) Mr. Boeh did not mention DC-ADM 816 at all.

63. I timely appealed to Supt. Wolfe in Grievances #'s 38293 and 41961 and he affirmed the Grievance Officer's findings in both, writing in his response in 41961 - with full knowledge that I had agreed to allow Mr Anderson to copy the article and not the poetry - that he would "stand by the decision that you are not appropriate for the clerks position in the Religious Service area. We must all strive to remove hatred, not encourage it, The poetry you tried to pass is inappropriate." Supt. Wolfe did not mention DC-ADM 816 at all in his 03/20/03 memo. ((P.A. p. 49).

64. I timely filed Appeals to Final Review in the Secretary's Office in

#'s 38293 and 41961. Thomas L. James, Chief Grievance Coordinator, affirmed the lower decisions on 04/09/03, (P.A. pps. 50 - 51) and, thus, I exhausted all administrative remedies prior to filing the Complaint in this case with the Clerk's Office of the U.S. District Court.

65. On or around 07/11/03 Defendant Snider prepared a new DC-43 (P.A. p. 5), which recommended that: I obtain a job; participate in Citizenship Program; and contact Ms. Crawford for Violence Prevention and Batterers Intervention Groups. The DC-43 also indicated my Custody Level had been raised from CL-2 to CL-3.

66. Because of my religious beliefs, as stated above in ¶¶ 18, 24 & 25, I neither participated in the Citizenship Program no made any attempt to contact Ms. Crawford for Violence Prevention and/or Batterers Intervention Group.

67. On 07/12/03 I sent a DC-135A to Defendant McKissock asking for "a written statement which sets forth the reasons for this change" in my Custody Level. (P.A. p. 8).

68. On the morning of 07/16/03 the A/A unit officer told me to pack my property and, upon completion of said task, I was transferred from housing on A/A, an Honor Unit for CL-2 inmates, to F/B, a non-honor unit.

69. On 01/16/03 Defendant McKissock responded to my 07/12 DC-135A writing: "There are several factors that affect your level. Those factors include a misconduct record, the fact that you do not have a job and the issue of your refusal to complete any programming." (P.A. p. 8).

70. On 08/04/03 I filed a formal Inmate Grievance in an attempt to regain my honor block status and CL-2; # 58644 was assigned to identify this Grievance. (P.A. pps. 9 - 10).

71. In his 08/06/03 response, Defendant Hametz did not make any comments concerning the reasons for the increase of my Custody Level, but responded,

writing: "Bottom line, all inmates who are housed on AA will be required to comply with their recommended programming or risk loss of honor housing. Your refusal to participate in programs is the reason you were moved off the honor unit. You would have been moved even if you were a custody level 2, which you are not at this time. (P.A. p. 11).

72. I timely appealed the findings of Defendant Hametz to Supt. Wolfe and then to Final Review in the Secretary's Office where Defendant Hametz's findings were affirmed by Sharon M. Burks, Chief Grievance Coordinator, on 10/06/03. In her response Ms Burks stated, among other things: "You were removed from AA honor unit status due to your failure to comply with your prescriptive programming. Your rationale for your non-participation has no bearing on department policy and the resulting change in your housing status. You have not been retaliated against due to your religious beliefs in this matter." (P.A. p. 16).

73. As indicated above in ¶ 72, I exhausted all available administrative remedies in Grievance # 59644 prior to filing the Complaint in this civil action.

74. I have observed, and continue daily to observe, inmates who participate in prescriptive programs, including religious programs such as AA, NA and the T.C. programs, receive favorable treatment upon the orders of prison officials who refuse to make similar favorable treatment available to me for my participation in religious programs of my choice.

75. During the first days of April 2004 I received a Job Assignment Notice which ordered me to report to work, on 04/05/04, as a Chapel Clerk. (P.A. p. 52).

76. During my orientation on 04/05/04 Imam Abdalla, my immediate supervisor, did not make any mention of the prohibitions of DC-ADM 816 while informing me of what was required of me upon my return to the Chapel Clerk job.

77. Imam Abdalla specifically informed me, on 04/05/04, that my authorized work areas included: the Chapel sanctuary, Chapel offices, Multi-Purpose room, and Education Lobby. (Declarations of Ronald Johnson, Thomas Twillie, Alonzo Robinson, Nanya Rashiyd Z. El, George Elliott and Chris Ireland (P.A. pps 62 - 72).

78. At around 1040 on 05/12/04 C.O. Lobdell wrote a fabricated Misconduct Report (# A453158) which caused me to be immediately escorted from the Chapel to the hole, where I remained for the next thirty-five (35) days, and caused me to be removed, for a second time, from the Chapel Clerk job. (P.A. p. 73).

79. I was not called to be present at a Yearly Classification Review nor did I receive a copy of a DC-43 in 2004.

80. At my Yearly Review on 08/05/05 Defendant Gamble gave me a DC-43 that recommended I participate in Batterers Group, Citizenship, and Violence Prevention. The 08/05/05 DC-43 also indicates: "no current enrollments and "no previously completed programs." (P.A. p. 6).

81. During the first days of December I received a memo and a consent form from Sara J. Crawford, Psychological Services Associate, which informed me that I had been scheduled to participate in the next Batterers Group. I indicated my refusal to participate, on the form, writing: "I refuse to participate, on religious grounds, in Batterers Group and all other DOC prescriptive programs which are not presented from an Islamic point of view." and returned it to Ms. Crawford on 12/05/05. (P.A. pps. 53 - 54).

82. During the last days of July 2006 I received a memo from Shannon Randall, Corrections Counselor II, which informed me I had "been approved to attend Violence Prevention Group to fulfill Correctional Plan criteria." (P.A. p. 55).

83. I sent Ms. Randall a DC-135A on 07/28/06 which advised her that "I

have religious-based objections to attending and/all groups and/or programs which are not taught from the Islamic perspective, and, therefore I will not be attending your group." (P.A. p. 56).

84. In late July of 2006 at my Yearly Classification Review Defendant Gamble gave me a DC-43 that recommended I participate in Batterers Group and Violence Prevention. This DC-43 also indicated: "No Current Enrollments" and "No Previously Completed Programs." (P.A. p. 7).

85. On 08/09/06 Shannon Randall prepared a "Correctional Plan-Evaluation" which restated my objection presented above in ¶ 83. (P.A. p. 57).

86. Around the end of September 2006 I received a "Questionnaire" from Sara Crawford which was designed to "evaluate individuals who are recommended for Batterers Group according to their Correctional Plan." I returned the Questionnaire on 10/02/06 after causing it to reflect my belief "that there is no god other than Allah and that Muhammad is God's Messenger" and "therefore I will not participate in any group that is not taught on the principles stated in the Holy Qur'an and/or the Sunnah of the Prophet. (P.A. pps 58 - 59).

87. On 11/09/06 Ms. Crawford prepared a "Correction Plan-Evaluation" which restated my objection presented above in ¶ 86. (P.A. p. 60).

88. In response to my Rule 37 Motion, the Court ordered Defense Counsel, on 01/31/07, to give me a copy of the DC-46 Vote Sheet which set forth the basis for each of the Support Team Members 11/13/02 decision to remove me from the Chapel Clerk position. I received a copy of said document that same day.

89. The DC-46 is dated 11/5/02 (sic) and gives the following "comments" as the reasons for each Support Team Members decision: Defendant Gamble has written: "promoting racism/potentially inflamatory poetry (possible intent to distribute);" Defendant McQuown has written: "Acknowledges he is angry at correctional system & asserts his right to speak & write his truth. Creates dis-

ruption to orderly management of institution;" Defendant Snider has written: "Sensitive material that could present a unstable [or unsafe] situation;" and Mr. Bentley has written: "Remove from job - attempt at distribution of inflamatory material." In the section of the DC-46 for "Staff Recommendations" someone has written: "Mr. Jefferson had in his possession inflammatory information, specifically poetry of racism, promoting racism and hatred. Inmate has access to the presentation of a potential serious situation." (sic) (P.A. p. 61).

90. The 11/05/02 DC-46 Vote Sheet does not mention DC-ADM 816 nor any violation of a PA DOC policy. (P.A. p. 61).

Dated: 02/22/07

*Leonard C. Jefferson*

Leonard C. Jefferson, CL-4135
10745 Rt. 18
Albion, PA 16475-0002