**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

LEONARD C. JEFFERSON,           )
              Plaintiff           )
                                      )
        v.                    )           **Civil Action No. 04-44 Erie**
                                      )           **District Judge McLaughlin**
WILLIAM WOLFE, et al.,          )           **Magistrate Judge Baxter**
              Defendants.       )

**OPINION AND ORDER**

Chief Magistrate Judge Susan Paradise Baxter.

**I.      INTRODUCTION**

      **A.      Relevant Procedural History**

      On February 17, 2004, Plaintiff Leonard C. Jefferson, an inmate incarcerated at the State

Correctional Institution at Albion ("SCI-Albion"), filed this *pro se* civil rights action pursuant to

42 U.S.C. § 1983.  Named as Defendants are:  William J. Wolfe ("Wolfe"), former

Superintendent at SCI-Albion; Jeffrey Beard ("Beard"), Secretary of the Pennsylvania

Department of Corrections ("DOC"); Robert Boeh ("Boeh"), Program Manager at SCI-Albion;

Glenn McQuown ("McQuown"), former Facility Chapel Program Manager at SCI-Albion;

Patricia Gamble ("Gamble"), Unit Counselor at SCI-Albion; Michael Snyder ("Snyder"), Unit

Counselor at SCI-Albion; Patricia McKissock ("McKissock"), Unit Manager at SCI-Albion;

Timothy Hametz ("Hametz"), Unit Manager at SCI-Albion; Thomas L. James ("James"), Chief

Grievance Coordinator at the DOC; Sharon M. Burks ("Burks"), Chief Grievance Coordinator

at the DOC; Barry Lobdell ("Lobdell"), Corrections Officer at SCI-Albion; Mr. Clement

("Clement"), Corrections Officer at SCI-Albion; Ivory Barnett ("Barnett"), former Misconduct

Hearing Examiner at SCI-Albion; and Zachary Moslak ("Moslak"), former Misconduct Hearing

Examiner at SCI-Albion.

      On October 24, 2005, Defendants filed a Motion to Dismiss Plaintiff's Third Amended

Complaint [Document # 67], which was ultimately granted in part and denied in part by Order

of District Judge Sean J. McLaughlin, dated July 11, 2006. [Document # 85].  As a result of this Order, Defendants Wolfe, James, Burks, Lobdell, Clement, Barnett, and Moslak were dismissed from this case, and the following claims were allowed to proceed:  (i) Plaintiff's First Amendment claim against Defendants Beard, Boeh, McKissock, and Hametz, alleging that the promulgation and enforcement of the DOC's prescriptive program policy violates the Establishment Clause; (ii) Plaintiff's First Amendment claim against Defendants Boeh, McKissock, and Hametz, alleging that his right to free exercise of religion has been violated by the enforcement of the DOC's prescriptive programs policy; (iii) Plaintiff's retaliation claim against Defendants Gamble, Snyder, and McQuown, alleging that his First Amendment right to free speech was violated when he was fired from his prison job, and later issued allegedly false misconduct reports, in retaliation for his writing of two poems regarding racial injustice in the legal system; and (iv) Plaintiff's Fourteenth Amendment claim against Defendants Beard and Boeh, alleging that his Equal Protection rights were violated by the issuance of an allegedly false misconduct report, which led to an increase in his custody level and removed him from housing on an honor block within SCI-Albion.  As a result of these claims, Plaintiff seeks declaratory and injunctive relief and monetary damages.

After completion of discovery, the remaining Defendants filed a Motion for Summary Judgment [Document # 115] on January 12, 2007, seeking dismissal of Plaintiff's claims.  On February 7, 2007, the parties filed a Consent to the Jurisdiction of this Magistrate Judge. [Document # 124].  District Judge Sean J. McLaughlin granted the consent by order dated February 9, 2007. [Document # 125].  Plaintiff subsequently filed a brief in response to Defendants' motion for summary judgment, essentially reiterating the basis for his claims. [Document # 126].  This matter is now ripe for consideration.

## B.    Relevant Factual History

Plaintiff was committed to SCI-Albion in or around July 1994. (Document # 39 at ¶ 19). He was transferred to SRCF-Mercer in July 1998 and was returned to SCI-Albion in October 1999. (Document # 39 at ¶¶ 21, 23).  In August 2000, Plaintiff was housed on the honor block at

SCI-Albion, where he had been housed prior to his transfer to SRCF-Mercer. (Document # 39 at ¶ 24).  On or about November 13, 2000, Plaintiff was hired as a Chapel Clerk at SCI-Albion. (Document # 39 at ¶ 25).[1]

On October 24, 2002, Minister Michael Anderson, a contract employee of the DOC, asked if he could make a photocopy of a newspaper article in Plaintiff's possession. (Document # 39 at ¶ 35).  On the back of the newspaper article were two poems written by Plaintiff, which addressed the subject of racial injustice in the courts. (Document # 39 at ¶ 37).  Minister Anderson's secretary photocopied the front and back of the newspaper article and distributed both the article and Plaintiff's poems to "various superintendents, program directors and department heads at SCI-Albion." (Document # 40).  On November 13, 2002, Defendants McQuown, Gamble, and Snyder conducted a Support Team Meeting at which Plaintiff claims he was "told that he did not have any right to write such poetry." (Document # 44).  The next day Plaintiff received a Job Assignment Notice informing him that he had been released from his job as Chapel Clerk, for which he was earning 42¢ an hour, and was reassigned to the General Labor Pool, where he would earn 72¢ a day. (Document # 39 at ¶ 48 and Exhibit A).

On November 18, 2002, Plaintiff sent an inmate's request to Defendant McQuown requesting a written statement of his "reasons and justification" for his decision to remove Plaintiff from his job as Chapel Clerk. (Document # 39, Exhibit B).  In response, Defendant McQuown explained that Plaintiff's poetry, and his intent to share it with "all," was found to be a "threat to the orderly running of the institution," "inflammatory and disruptive," and that Plaintiff's position as Chapel Clerk provided him with "access to many inmates to spread this disruptive material and view." (Document # 39, Exhibit B).

On November 20, 2002, Plaintiff sent another inmate's request to Defendant Gamble

---

[1]

In paragraph 25 of his Third Amended Complaint, Plaintiff indicates that he was hired as Chapel Clerk in October 2002.  In paragraph 32, however, Plaintiff states that he was "assigned to work as a Chapel Clerk" on November 13, 2000.  Since the latter date is consistent with the allegations of Plaintiff's original Complaint (see Document # 3 at Section IV.C, ¶ 1), and more closely corresponds with Plaintiff's subsequent allegations, this Court will construe November 13, 2000, as the appropriate date on which he began his employment as Chapel Clerk.

requesting reasons why he was removed from his job as Chapel Clerk. (Document # 39, Exhibit C). Defendant Gamble responded to Plaintiff's request by indicating that the support team had security concerns regarding the intent of the poetry, "the extent of the contact [Plaintiff's] job allowed [him] with other inmates," and "the possibility of [Plaintiff] distributing [the poetry]" to other inmates. (Document # 39, Exhibit C at p. 2).

On July 11, 2003, Defendant Snyder informed Plaintiff that his custody level had been raised from CL-2 (honor block) to CL-3. (Document # 39 at ¶ 87). In response to Plaintiff's inmate request for a written statement of the reasons for the increase in his custody level, Defendant McKissock cited Plaintiff's "misconduct record, the fact that [Plaintiff didn't] have a job, and the issue of [Plaintiff's] refusal to complete any programming." (Document # 39 at ¶ 88 and Exhibit G). As a result, on July 16, 2003, Plaintiff was transferred from SCI-Albion's honor block to a CL-3 unit. On August 6, 2003, in response to a grievance Plaintiff filed with regard to his custody level increase, Defendant Hametz clarified that Plaintiff's "refusal to participate in programs is the reason [he] was moved off the honor unit." (Document # 39, Exhibit H).

In early April 2004, Plaintiff received a job assignment notice informing him that he was to report to Defendant McQuown on April 5, 2004 to resume his work as a Chapel Clerk at the pay rate of 33¢ an hour. (Document # 39 at ¶ 62). However, Plaintiff was later found guilty of a misconduct on May 17, 2004, and was again removed from his job as Chapel Clerk. (Document # 39 at ¶ 72).

### C.    Standard of Review

#### 1.    Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an adverse party may not rest upon the

mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."  Id.

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact.  See Fed.R.Civ.P. 56(c); Krouse v. American Sterilizer Co., 126 F.3d 494, 500 n.2 (3d Cir. 1997).  The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990).  Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact ◁to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial.  Matsushita Elec. Indus. Co. v Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment).  The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will effect the outcome of the case under applicable law.  Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986).  Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegation or suspicions." Firemen's Ins. Co. of Newark, N.J. v.

5

DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).  Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson, 477 U.S. at 247-249.

### 2.    *Pro Se* **Pleadings**

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears "'beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Haines v. Kerner, 404 U.S. 519, 520-521(1972) quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should be done so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Bierley, 141 F.2d 552, 555 (3d Cir. 1969)(petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); Smith v. U.S. District Court, 956 F.2d 295 (D.C.Cir. 1992); Freeman v. Department of Corrections, 949 F.2d 360 (10th Cir. 1991).  Under our liberal pleading rules, a district court should construe all allegations in a complaint in favor of the complainant.  Gibbs v. Roman, 116 F.3d 83 (3d Cir.1997).  See, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)(discussing Fed.R.Civ.P. 12(b)(6) standard); Markowitz v. Northeast Land Company, 906 F.2d 100, 103 (3d Cir. 1990)(same).

## II.    DISCUSSION

### A.    Establishment Clause

Plaintiff alleges that Defendants "violated the Establishment Clause by attempting to force plaintiff to participate in State/DOC sponsored religious programs and then by inflicting punitive measures upon plaintiff when plaintiff repeatedly refused to participate in the State/DOC sponsored religious programs." (Document # 39 at ¶¶ 113).  In particular, Plaintiff

claims that his custody level was increased and he was removed from SCI-Albion's honor block as a result of his refusal to participate in DOC's prescriptive programs, such as Alcoholics Anonymous ("A.A.") and Narcotics Anonymous ("N.A."), which he characterizes as "State/DOC sponsored religious programs." (Document # 39 at ¶¶ 83, 114).

Upon reviewing this claim for the first time in consideration of Defendants' previous motion to dismiss [Document # 67], this Court noted that the record was "devoid of any documents evidencing the prescriptive programs in which Plaintiff refused to participate," and, in particular, failed to indicate whether participation in A.A. and/or N.A. was included in Plaintiff's prescriptive programming. (See Document # 81 at p. 9). As a result, this Court had little choice but to presume that participation in A.A. and/or N.A. was part of Plaintiff's prescription programming and, based on that presumption, concluded that Plaintiff had sufficiently stated a cause of action for violation of the Establishment Clause. (See Document # 81 at p. 10, citing Bobko v. Lavan, 157 Fed.Appx. 516, 518, 2005 WL 3304147 at *2 (3d Cir. Dec. 7, 2005)("[t]he government violates the First Amendment's Establishment Clause when it requires a prisoner to participate in a drug or alcohol rehabilitation program with a religious component.").

Defendants have now submitted copies of Plaintiff's prescriptive program plans that were issued on July 20, 2001, July 24, 2002, and July 11, 2003, respectively. (Document # 118, Appendix, at pp. 52-54). These plans evidence that A.A. and/or N.A. participation was **not** recommended for Plaintiff as part of his prescriptive programming. Instead, Plaintiff was recommended for the following programs: batterer's intervention; stress and anger management; citizenship training; and a long term offender's ("long timer's") group. None of these programs are religious in nature, or require any recognition or concept of a higher authority. (See Declaration of Mike Clark attached to Document # 118, Appendix, at p. 56, ¶ 8; Standardized Treatment Programs manual attached to Document # 118, Appendix, at pp. 9, 12, 15, 16; Document # 118, Appendix, at p. 96). Thus, there is no evidence of record to support a finding that Plaintiff was, in any way, "coerced [into] participat[ing] in a religious exercise" in violation of the Establishment Clause. Warner v. Orange County Dep't of Probation, 115 F.3d

1068, 1076 n. 8 (2d Cir. 1997).  As a result, judgment is entered for Defendants on Plaintiff's First Amendment Establishment Clause claim.

### B.    Free Exercise of Religion

Plaintiff alleges that Defendants "conditioned plaintiff's continued residence on an 'honor block' upon plaintiff's abandonment of sincerely-held religious beliefs," thus violating his First Amendment right to free exercise of religion. (Document # 39 at ¶ 112).  In particular, Plaintiff alleges that he follows and practices the religion of al-Islam, which "clearly and adamantly state[s] the edict that it is not permissible for 'believers" to listen to and/or to accept the teachings of 'non-believers' in matters pertaining to how one should act or think...." (Document # 39 at ¶¶ 75-76).  Thus, Plaintiff claims that he "has been punished (with an increase in his custody level and removal from the honor block) for asserting his constitutional rights to free exercise of religion by adhering to the principles, practices and beliefs of the Religion of al-Islam," which forbid him from participating in "non-Islamic based programs." (Document # 39 at ¶¶ 83-84).

It is well-established that prisoners have a First Amendment right to practice religion while incarcerated.  Bell v. Wolfish, 441 U.S. 520, 544 (1979).  However, the right to practice one's religion while in prison is not absolute.  See Price v. Johnston, 334 U.S. 266, 285 (1948) ("Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.").  Under the First Amendment, regulations or policies that infringe upon a prisoner's rights to religious freedom must pass a reasonableness standard, rather than the usual strict scrutiny standard.[2] Turner v. Safley, 482 U.S. 78, 89 (1987).  "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological

---

[2]

Strict scrutiny is not required because courts need to "afford appropriate deference to prison officials" so that they may "anticipate security problems and adopt innovative solutions to the intractable problems of prison administration."  O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) quoting Turner v. Safley, 482 U.S. at 89.

interests." <u>Turner</u>, 482 U.S. at 89.  Courts generally accord great deference to prison officials'

adoption and execution of policies, regulations, and practices relating to the preservation of

internal order, discipline, and security within the prison environment.  <u>Thornburgh v. Abbott</u>,

490 U.S. 401, 407-08 (1989); <u>Turner</u>, 482 U.S. at 85.

The <u>Turner v. Safley</u> reasonableness test includes four factors for consideration:

> 1) whether there is a legitimate rational connection between the prison regulation and the governmental interest;
>
> 2) whether the prisoners have alternative means of exercising the constitutional right at hand;
>
> 3) the impact that accommodation of the constitutional right would have on other prisoners, guards, and prison resources in general; and
>
> 4) the availability of alternatives to the regulation.

482 U.S. at 89-90.  <u>See also</u> <u>Waterman v. Farmer</u>, 183 F.3d 208 (3d Cir. 1999).[3]

The first <u>Turner</u> factor considers the relationship between the policy and the penological

interest.  "A prison regulation fails this prong if it promotes an interest that is illegitimate or not

neutral, or ... bears no valid, rational connection to the asserted interest."  <u>Fraise v. Terhune</u>, 283

F.3d 506, 516 (3d Cir. 2002).  Under this prong, the court must "accord great deference to the

judgments of prison officials 'charged with the formidable task of running a prison.'"  <u>Sutton v.</u>

<u>Rasheed</u>, 2003 WL 1354099, at * 11 (3d Cir. March 19, 2003) <u>quoting</u> <u>O'Lone v. Shabazz</u>, 482

U.S. 342, 353 (1987).  This factor requires a two-fold analysis: "we must determine whether the

governmental objective underlying the regulations at issue is legitimate and neutral, and that the

regulations are rationally related to that objective."  <u>Id.</u> <u>quoting</u> <u>Thornburgh v. Abbott</u>, 490 U.S.

401, 414-15 (1989).  "The first factor is 'foremost in the sense that a rational connection is a

---

[3]

The <u>Turner</u> analysis "... assumes as a predicate that the plaintiff inmate has demonstrated that a constitutionally protected interest is at stake." <u>DeHart v. Horn</u>, 227 F.3d 47, 51 (3d Cir. 2000).  "The mere assertion of a religious belief [by a prisoner] does not automatically trigger First Amendment protections ... [O]nly those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection." <u>Id.</u>  <u>See also</u> <u>Africa v. Pennsylvania</u>, 662 F.2d 1025, 1029-30 (3d Cir. 1981) ("A court's task is to decide whether the beliefs avowed are (1) sincerely held, and (2) religious in nature...").  Defendants do not argue that Plaintiff's beliefs do not constitute a religion.

threshold requirement - if the connection is arbitrary or irrational, the regulation fails, irrespective of whether the other factors tilt in its favor.  But, ... we do not view it as subsuming the rest of the inquiry."  Id. quoting Wolf v. Ashcroft, 297 F.3d 305, 310 (3d Cir. 2002).

The second Turner factor "requires a court to assess whether inmates retain alternative means of exercising the circumscribed right."  Fraise, 283 F.3d at 518 quoting Turner, 482 U.S. at 90.  However, the analysis focuses specifically on whether Plaintiff "has alternative means of practicing his religion generally, not whether an inmate has alternative means of engaging in the particular practice in question."  DeHart, 227 F.3d at 55 (emphasis added).

The final two factors "focus on the specific religious practice or expression at issue and the consequences of accommodating the inmate for guards, for other inmates, and for the allocation of prison resources."  Sutton at * 15, quoting DeHart, 227 F.3d at 57.

Under Turner's third factor, this Court must examine the impact of an accommodation on other inmates, prison staff, and the available resources within the prison, but "should defer to prison officials when the accommodation 'will have a significant ripple effect on fellow inmates or on prison staff ....'"  Fraise, 283 F.3d at 520 quoting Turner, 482 U.S. at 90.

The fourth Turner factor requires this Court to assess whether there are alternatives to the regulation that would impose only "*de minimis* cost to valid penological interests."  Turner, 482 U.S. at 91.  "The absence of ready alternatives is evidence of the reasonableness of a prison regulation."  Id.  However, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."  Id.

In his Memorandum Order dated July 11, 2006, District Judge Sean J. McLaughlin decided, as a matter of law, "that the prescriptive programs at issue in this case, do advance 'valid penological objectives' given their rehabilitative nature." (Document # 85 at p. 1).  Thus, the first Turner factor has been satisfied; however, while the first Turner factor is "foremost" among the four factors enunciated by the Supreme Court, it does not "subsum[e] the rest of the inquiry."  Wolf, 297 F.3d at 310.  Thus, an analysis of the remaining three factors is required.

10

With regard to the second <u>Turner</u> factor, it is clear from the record that Plaintiff "has alternative means of practicing his religion generally." <u>DeHart</u>, 227 F.3d at 55.  In particular, Plaintiff has acknowledged that the DOC "has, since early 2001, employed ... a full-time Imam to meet the needs of [SCI] Albion's prisoners who adhere to the Islamic way of life," and that SCI-Albion offers "an array of seven Islamic-based programs." (Document # 39 at ¶ 85). Furthermore, Plaintiff's allegations indicate that he has a personal copy of the Qur'an, which he is free to read, and he has been "an active participant in the Islamic services, programs and activities made available by the PA DOC [since] July, 1994." (Document # 39 at ¶¶ 64, 76, 77). Thus, the second <u>Turner</u> factor favors the Defendants.

With regard to the third and fourth <u>Turner</u> factors, Plaintiff proposes that SCI-Albion's current "array of seven Islamic-based programs... could easily be adapted to fulfill any so-called 'prescriptive programming' need the PA DOC may deem appropriate for plaintiff in a manner which neither opposes nor offends plaintiff's Islamic beliefs...." (Document # 39 at ¶ 85).  This Court's review of SCI-Albion's Inmate Program Catalog reveals that there are, in fact, ten Islamic-based programs/activities offered at SCI-Albion:

> <u>Jumah Prayer</u> - a weekly Islamic religious service led by the Imam, which is designed "to help inmates cope and be empowered to live better lives."

> <u>Nation of Islam Religious Service</u> - a weekly Islamic religious service led by an outside minister, which "combines teaching and prayer in building the religious life of the believer."

> <u>Hadith</u> - a Muslim program designed to explain "how Prophet Muhammad explained the Qur'an based upon his sayings."

> <u>Muslim Counseling Service</u> - "the Imam counsels Muslims in their religious life, [and] educates them in the proper practice of Islam in family life, social conduct and others."

> <u>Islamic Educational Weekend Retreat</u> - a three day short course in the basic tenet of Islamic religion, offered twice a year.

> <u>Nation of Islam Day</u> - a three hour meeting the first Wednesday of each month to motivate, educate and illustrate the moral teaching of Islamic faith.

> <u>Qur'anic Studies</u> - an extensive study of every verse of the Qur'an, "helping each individual to become more aware of the true meaning of the Qur'an."

        _____ Seerah - a biographical study of how Prophet Muhammad lived his life according to the Qur'an.

        _____ Shariah - study designed to teach inmates how to live according to Islamic law.

        _____ Talim - weekly religious instruction in the Muslim faith led by the Imam.

(See Document # 118, Appendix, at pp. 29, 34, 39-41).

      Significantly, none of the foregoing Islamic-based programs/activities are designed to address the compelling governmental interest in public safety sought to be served by the treatment programs developed by the DOC's Bureau of Inmate Services.  In particular, such programs and activities do not address the criminogenic factors that have caused each individual to commit the criminal act(s) for which he is incarcerated. (See Document # 118, Appendix, at p. 96).  As explained by Defendant Beard, Secretary of the DOC:

> Programming needs are determined based upon a variety of factors such as instant offense, criminal history, nature of offenses, institution behavior, social history, assessed education level, work history, psychological report and interview by staff.  **The psychological objective being to offer appropriate programs to the individual that will address issues that led to criminal behavior and, thus, reduce the likelihood of further criminal behavior and victimization upon release to the community.  This is as much our public safety responsibility as are the fences and walls that hold those committed to our care.**

(See Document # 118, Appendix, at p. 95) (emphasis added).

      Furthermore, a second compelling governmental interest propounded by Defendants is the safety and security of the institution.  In particular, Defendants cite statistical research demonstrating that "an inmate's participation in treatment programs that target 'criminogenic needs' reduce the occurrence of prison misconduct incidents by 10 points, and participation in programs that target three criminogenic needs ... reduced incidents of misconduct by 30 points." (Document # 116, Defendants' Memorandum of Law, at p. 13; Document # 118, Appendix, at pp. 65-67).[4]  This reduction in institutional misconduct has been shown to have a positive

---

    4

This latter interest nullifies Plaintiff's counter argument that "programs that are [solely] designed to reduce the likelihood of re-offending upon one's release from prison are neither appropriate nor serve a rational correctional

impact on the safety and security of both inmates and staff. (Id.).  Once again, none of the Islamic-based programs/activities is designed to address this compelling governmental interest in institutional safety and security.

While Plaintiff makes the bald assertion that the Islamic-based programs can be "easily adapted" to address the objectives sought by the DOC's prescriptive programs, he fails to offer any suggestions on how this would occur.  More importantly, he also fails to take into account the consequences of making such an accommodation solely for the benefit of those inmates who practice the Islamic faith.  Indeed, if the DOC accommodated Plaintiff's position and "adapted" Islamic-based programs to fulfill any prescriptive programming need the DOC may deem appropriate for inmates practicing the Islamic faith, such an accommodation would come perilously close to violating the very same Establishment Clause Plaintiff claims Defendants are already violating.  To avoid such a result, the DOC would likely have to "adapt" other faith-based programs to provide the same benefit to non-Muslim inmates who practice other forms of religion.  This is precisely the type of accommodation this Court must refrain from ordering. See Fraise, 283 F.3d at 520, quoting Turner, 482 U.S. at 90 (holding that courts "should defer to prison officials when the accommodation 'will have a significant ripple effect on fellow inmates or on prison staff...'").  Moreover, such an accommodation would impose much more than a "de minimus cost to valid penological interests."  Turner, 482 U.S. at 91.  As a result, the third and fourth Turner factors weigh in favor of Defendants.

Based on the foregoing, Plaintiff's First Amendment free exercise of religion claim fails to satisfy any of the four factors enunciated by the Supreme Court in Turner.  Judgment is entered for Defendants on this claim.

### C.     Retaliation

Plaintiff claims that he was fired from his job as Chapel Clerk on or about November 14,

_____

goal related to prisoners who are sentenced to life without parole, such as Plaintiff." (Document # 126, Plaintiff's Brief in Opposition, at p. 8).

2002, in retaliation for two poems he wrote about "racial injustice in the courts." (Document # 39 at ¶¶ 37-51).

Retaliation for the exercise of one's constitutional rights is a separate matter, requiring a distinct legal analysis.  "Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983."  See White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir.1990).  "Government actions, which standing alone, do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right."  Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), quoting Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).

_____In order to state a prima facie case of retaliation, a prisoner must demonstrate:

> 1) the conduct in which he was engaged was constitutionally protected;
>
> 2) he suffered "adverse action" at the hands of prison officials[5]; and
>
> 3) his constitutionally protected conduct was a substantial or motivating factor in the decisions to discipline him.[6]

Carter v. McGrady, 292 F.3d 152, 157-58 (3d Cir. 2002), quoting Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001).  Following the satisfaction of a prima facie case of retaliation, the burden then shifts to the defendants to demonstrate, by a preponderance of the evidence, that their actions would have been the same, even if Plaintiff were not engaging in the constitutionally

---

[5]

To show an "adverse action," the plaintiff must demonstrate that defendants' action were "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights."  Allah v. Al-Hafeez, 208 F.Supp.2d 520,535 (E.D. Pa. June 24, 2002), quoting Allah v. Seiverling, 229 F.3d at 225.  See also Dixon v. Brown, 38 F.3d 379, 379 (8th Cir. 1994) (a plaintiff "need not show a separate, independent injury as an element of the case ... because the retaliatory disciplinary charge strikes at the heart of an inmate's constitutional right to seek redress of grievances, [and] the injury to his right inheres in the retaliatory conduct itself.").

[6]

In analyzing the third element of the retaliation test, the court must determine whether there is a causal connection between the exercise of the constitutional rights and the adverse actions.  "A suggestive temporal proximity between the protected activity and an alleged retaliatory act may be sufficient to meet the causal link requirement of the prima facia case."  Allah v. Al-Hafeez, 208 F.Supp.2d at 535, citing Rauser, 241 F.3d at 330 and Johnson v. Rendell, 56 F.Supp.2d 547, 552 (E.D. Pa. 1999).

protected activities.  <u>Carter</u>, 292 F.3d at 158.  "Once a prisoner has demonstrated that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."  <u>Rauser</u>, 241 F.3d at 334.  In evaluating a prison official's opinion, "[p]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1979).

## 1.    Constitutionally Protected Activity

In its previous motion to dismiss, no argument was put forth by Defendants challenging the constitutional protection that should be afforded Plaintiff's poetry. (<u>See</u> Document # 68, Defendants' Brief, at p. 11).  So, in the Report and Recommendation dated May 15, 2006, this Court agreed that Plaintiff had stated this first prong of the retaliation analysis by alleging that writing poetry was a protected form of free speech under the First Amendment. (<u>See</u> Document # 81 at p. 18).  In this round of dispositive motions, Defendants' position has changed.  Defendants now contend that the content of the poetry itself was found to be "disruptive to the security concerns of the prison" and, thus, was not constitutionally protected speech as a matter of law. (<u>See</u> Document # 116, Defendants' Memorandum of Law, at pp. 19-21).[7]

In support of their contention that Plaintiff's poems do not deserve First Amendment protection, Defendants cite the Supreme Court's plurality opinion in <u>Waters v. Churchill</u>, 511 U.S. 661 (1994), in which the Court found that speech, to be protected in a public employment context, must be on a matter of public concern, and the employee's interest in expressing himself must not be outweighed by any injury the speech could cause to the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

---

[7] Attention is necessarily focused on this argument as Defendants have conceded that Plaintiff has met the second and third prongs of his *prima facie* case. (Document # 116, Defendants' Memorandum of Law, at p. 21).

15

Waters, 511 U.S. at 668.  The plurality explained further that, in applying the foregoing test, the extent of the injury by the employee's speech *need not be actual*; rather, the government's burden is just to show that the speech *threatened to interfere with government operations*.  Id. at 673, 680 (emphasis added).

In this case, Defendants have conceded that Plaintiff's poems address matters of public concern. (Document # 116, Defendants' Memorandum, at p. 17).  Thus, the burden is upon Defendants to show that Plaintiff's poetry threatened to interfere with the DOC's operations in such a way as to justify the removal of Plaintiff from his position as Chapel Clerk.  In this context, the Waters Court found that a government employer is permitted to fire an employee for speaking on a matter of public concern if:

> (i)     the employer's prediction of disruption is reasonable;
>
> (ii)    the potential disruptiveness is enough to outweigh the value of the speech; and
>
> (iii)   the employer took action against the employee based on this disruption and not in retaliation for the speech.

Waters, 511 U.S. at 677-680.  Importantly, the question of whether the potential disruptiveness of speech would render it unprotected under the Waters analysis is a question of law.  Waters, 511 U.S. at 681.

Here, after Plaintiff's poetry was photocopied and shown to Plaintiff's work supervisors, Defendant McQuown prepared an Employee Report of Incident, dated October 28, 2002, stating that Plaintiff was "informed that the [poetry] was inappropriate," and that "[w]hile no attempt ha[d] been made to disseminate [the poetry], it [wa]s of an inflammatory nature."  (Document # 127, Plaintiff's Appendix, at p. 30).  As a result, a staff meeting was held on or about November 15, 2002, at which it was determined that Plaintiff should be removed from his job as Chapel Clerk due to the inflammatory nature of the poetry he had brought into the workplace. In particular, the vote sheet memorializing the determination states that Plaintiff "had in his possession inflammatory information, specifically poetry of racism, promoting racism and hatred," and that he had "access to the presentation of a potential serious situation." (Document # 127, Plaintiff's Appendix, at p. 15).  Furthermore, the vote sheet contains comments from the

individual staff members, which  included the following concerns regarding the content and nature of the poetry:

| | |
|---|---|
| Defendant Gamble | "Promoting racism/potentially inflammatory poetry  (possible intent to distribute)" |
| Defendant McQuown | "Creates disruption to orderly management of the institution." |
| Defendant Snider | "Sensitive material that could present a volatile situation." |

(Id.).

After receiving the staff's decision to terminate his employment as Chapel Clerk, Plaintiff submitted two separate Inmate's Request to Staff forms to Defendants McQuown and Gamble, requesting from each a written statement of the reasons why he was removed from his job. (Document # 118, Defendants' Appendix, at pp. 132-33).  Defendant McQuown responded to Plaintiff's request, as follows:

> Your poem which you stated you intended for "all."  You stated that a person could "yell fire in a theater if the theater was burning and the theater is burning."  I found this to be a threat to the orderly running of the institution.  It is inflammatory and disruptive.  In your position you had access to many inmates to spread this disruptive material & view.

(Document # 118, Defendants' Appendix, at p. 132).  Defendant Gamble also provided Plaintiff with a written response to his request, stating, in pertinent part:

> The support team hearing regarding your employment was held because the staff had security concerns in regards to the intent of the poetry.  We do not know what your intentions were.  You yourself stated, "it is for everyone."  We also have no way of knowing how other inmates may interpret your poetry if it had been distributed.  We discussed in detail at the staffing the concerns that we had regarding the content of the poetry combined with our concerns about the extent of the contact your job allowed you with other inmates.  It was considered inappropriate for you to have this in your possession at work with the possibility of you distributing it.

(Document # 118, Defendants' Appendix, at p. 134).

The foregoing responses, together with the original incident report and the vote sheet determination, make it clear that Defendants found Plaintiff's poetry to be inflammatory and potentially disruptive to the security and operation of the institution.  The next question that

must be addressed, therefore, is whether Defendants' prediction of disruption was reasonable. <u>Waters</u>, 511 U.S. at 674.  To answer this question, one must consider both the views expressed in the poetry at issue, and the environment within which such views were being expressed.

The first poem that was found to be in Plaintiff's possession is entitled "21st Century's Dawn's Early Light," and reads as follows:

> My Country tis of thee
> This is about your reality
> By the 21st Century's Dawn's early light
> There ain't no justice for you here if you ain't white
>
> Sweet land of liberty
> Bitter was the taste of your slavery
> And that putrid taste remains strong in all of our mouths
> As we now see you lynching us downtown in your courthouses
>
> The whole world watched you beat down Rodney King
> Then we saw white jurors who could not see what we were seeing
> With their open eyes their closed minds saw the police were right
> You know there ain't no justice for you here if you ain't white
>
> Today's lynchings are performed at Police State-style trials
> Perpetuating this injustice American-style
> Highlighting the unstated semantic reality
> That lynchings don't require bodies hanging from the trees
>
> Oh say can you see
> Strange fruit no longer hangs in America's trees
> Now in the land of the free the home of the brave
> Prisons conceal the lynched children of America's slaves
>
> Remember Martin told us to let Freedom ring
> So my Country tis of thee that I sing
> Now in the land of the free the home of the brave
> Prisons conceal the lynched children of America's slaves

(Document # 118, Defendants' Appendix, at p. 135).

The other poem that was found to be in Plaintiff's possession is entitled "Self-Healing, and contains, *inter alia*, the following verses:

> \*                          \*                          \*
>
> The only thing missing in their courtroom is their hanging tree
> And justice for people with black skin like you and me
> Courts remain one of America's most racist places
> Please don't try to deny it when its
>     right up in all of our faces
>
> **One hundred and seventeen per one hundred thousand**

18

> is White folk's incarceration rate
> **One thousand six hundred and seventy-three per hundred thousand**
> is Black's rate in this racist state
> Doubt has been dispelled by computerized light
> Black's incarceration rate is fourteen times that of Whites
>
> Social scientist produce these stats then they tell you humongous lies
> Which you'll accept as true if you're determined to remain blind
> Will you act upon the facts upon which these stats stand
> To end State-sponsored hate crimes against the Black man
>
>        *            *            *

(Document # 118, Defendants' Appendix, at p. 136)(emphasis in original).

Both poems express disdain for the American justice system in a way that is blatantly racial, conjuring up harsh images of slavery and lynching to drive home Plaintiff's message of injustice. The second poem even contains a call to action for African-Americans "[t]o end State-sponsored hate crimes against the Black man." Such views expressed to America's population at large would doubtlessly have a minimal impact upon national security; however, it is reasonable to anticipate that such views expressed within the confines of a prison population would have a more dire effect on prison security. Thus, it was reasonable for the Defendants to predict that Plaintiff's poems, if distributed among the prison population, would have a disruptive effect upon the security and operations of the institution. Moreover, this Court finds that the potential disruptiveness was enough to outweigh the value of the views expressed in the poems. Waters, 511 U.S. at 677-680.

Finally, it is abundantly clear from the evidence of record that Defendants removed Plaintiff from his job as Chapel Clerk based on their collective, reasonable belief that Plaintiff's poetry was inflammatory and potentially disruptive to the security and operation of the institution. Id. There is no evidence of record to suggest that Plaintiff's removal was retaliatory.

Based on the foregoing, this Court finds, as a matter of law, that the views expressed in Plaintiff's poetry were potentially disruptive to the security and operation of the institution, such that the poems were not constitutionally protected forms of speech. As a result, judgment is entered for Defendants on this count.

### D.    Equal Protection

Plaintiff alleges a violation of his equal protection rights.  The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "This is not a command that all persons be treated alike but, rather, 'a direction that all persons similarly situated should be treated alike' " Artway v. Attorney General of State of N.J., 81 F.3d 1235, 1267 (3d Cir. 1996), quoting City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439 (1985).  "Treatment of dissimilarly situated persons in a dissimilar manner by the government does not violate the Equal Protection Clause." Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir. 1994).

"When an inmate asserts an equal protection claim based on the allegedly disparate treatment of different religious groups, the governing standard is whether the disparate treatment is reasonably related to a legitimate penological interest." Fraise, 283 F.3d at 521 quoting DeHart, 277 F.3d at 61.   However, as a threshold matter, in order to establish a equal protection violation, the plaintiff must "...demonstrate that [he has] been treated differently by a state actor than others who are similarly situated simply because [he] belongs to a particular protected class." Keevan v. Smith, 100 F.3d 644, 648 (8th Cir. 1996).

As noted in this Court's previous Report and Recommendation, dated May 15, 2006,, Plaintiff appears to be claiming that prisoners who participate in "religious programs" such as A.A. and N.A. are "rewarded" by the DOC for their participation, while Plaintiff "has been punished (with an increase in his custody level and removal from the honor block)" for adhering to the beliefs of his Islamic religion and refusing to participate in such programs. (Document # 81 at p. 21; Document # 39 at ¶ 83).  From these allegations, this Court deduced that Plaintiff is claiming to be similarly situated to other inmates who receive recommendations to participate in prescriptive programs such as A.A. and N.A. (Id.).  This has since proven to be untrue as this Court has determined that Plaintiff was never recommended to participate in A.A. or N.A.

By Plaintiff's own tacit admission, Defendants made available to him the same programs that are offered to those similarly situated to him, and he was eligible to receive the same privileges for participating in such programs as those similarly situated to him.  Plaintiff's claim

that the programs offered by Defendants violate his religious beliefs and preclude him from obtaining the same privileges as those similarly situated to him, is meritless.  As a result, judgment is entered for Defendants on Plaintiff's equal protection claim.

**III      CONCLUSION**

For the reasons set forth above,

IT IS ORDERED that Defendant's Motion for Summary Judgment (Document # 115) is GRANTED.

IT IS FURTHER ORDERED that judgment is entered in favor of Defendants and against Plaintiff.  The clerk shall mark this case as closed.

S/Susan Paradise Baxter
SUSAN PARADISE BAXTER
Chief U.S. Magistrate Judge

Date: March 16, 2007