IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LEONARD C. JEFFERSON,
    Plaintiff,

v.      '07 MAR 20 A8:55      C.A. NO. 04-44 ERIE

WILLIAM WOLFE, et al.,
    Defendants.

FILED
CLERK
U.S. DISTRICT COURT

PLAINTIFF'S RESPONSE TO DEFENDANTS' REPLY TO PLAINTIFF'S BRIEF

IN OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT

NOW COMES plaintiff Leonard C. Jefferson and asserts the following to clarify erroneous assertions stated in Defendants' Reply To Plaintiff's Brief In Opposition To Defendants' Motion For Summary Judgment (hereinafter Defendants' Reply) Doc. # 133:

Defendants' first statement, on page 1 of Defendants Reply, erroneously asserts:

> "Plaintiff's claims are premised upon the construct that any general requirement to participate in treatment programs developed by the Bureau of Inmate Services violates his rights under the Establishment Clause and Free Exercise Clause."

The Amended Complaint in this case, Doc. # 39, clearly indicates Plaintiff's Establishment Clause Claim is premised upon the follow construct:

> "...defendants named in this complaint and other PA DOC officials have established a de facto State/Doc sponsored religion which they claim provides the 'values necessary to become productive law abiding citizens.' and, that said State/DOC sponsored religion is made up of religious and secular programs, all of which present values and principles which are offensive to plaintiff's Islamic values and principles, which the PA DOC has selected and have attempted to impose upon plaintiff in the guise of a 'prescriptive program'. While the State/DOC sponsored religion includes programs which courts have defined as 'religious,' the PA DOC has excluded the Religion of al-Islam from the list of programs which it deems to provide the values necessary to become law abiding citizens."
> (see Third Amended Complaint, Doc. # 39, ¶ 84.)

The Amended Complaint indicates Plaintiff's Free Exercise claim is premised upon to following construct:

> "...plaintiff has been punished (with an increase in his custody level

and removal from the honor block) for asserting his constitutional right to free exercise of religion by adhering to the principles, practices and beliefs of the Religion of al-Islam ..." Id. at ¶ 83. and "notwithstanding the ... existence of an array of seven Islamic-based programs, programs which plaintiff believes provide the values necessary to make one a productive law abiding citizen, and which could easily be adapted to fulfill any so-called 'prescriptive programming' needs the PA DOC may deem appropriate for plaintiff in a manner which neither opposes nor offends plaintiff's Islamic beliefs, the PA DOC continues to unnecessarily interfere with plaintiff's right to free exercise of religion." Id. at ¶ 85. and, "In effect PA DOC policy, has in this case, caused plaintiff's custody level to be raised and has caused plaintiff to be moved from an honor block to housing on a non-honor/higher security unit for no reason other than plaintiff's sincerely held religious beliefs." Id. at ¶ 94.

In addition to the above mentioned claims as stated in the Amended Complaint, Doc. # 39 — pages 1, 2 (front and back), 12, 14, 15 and 53 -60 of Appendix to Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment (hereinafter Plaintiff's Appendix) and ¶¶ 18, 20 - 25, 28, 66, 81, 83 & 86 of Declaration in Opposition to Defendants' Motion for Summary Judgment — clearly state the fact that Plaintiff's claims are premised exclusively upon his refusal to participate in Bureau of Inmate Services programs which oppose and/or offend his religious beliefs and traditions. Plaintiff does not object to participating in rehabilitation programs that respect and support his religious beliefs.

Next, Defendants have attempted to mislead the Court by stating, on page 2 of Defendants' Reply, that:

> "With respect to the Establishment Clause, Plaintiff originally claimed that participation in prescriptive programs with religious overtones, such as Alcoholics Anonymous, violates his right. See paragraph 83 and 91 of the Amended Complaint, Doc. # 39 ("prisoners who participate in religious programs which the PA DOC has given its stamp of approval, such as A/A & N/A and others, are rewarded for their participation in religious programs.")

When one reads ¶ 83 of the Amended Complaint in its entirety, it is clear that Plaintiff has based his Establishment Clause claims upon his observation of:

> "...the ongoing overt discriminatory practices of the PA DOC — in

establishing a State/DOC-sponsored religion, which it compels its
prisoners to adopt in order to obtain favorable parole reports, coveted
housing assignments, lower custody levels, etc. -- ",

and not upon compelled attendance of overt religious programs such as AA and/or NA. Similarly, ¶ 91 of the Amended Complaint, Doc. # 39, does not make any accusation related to any compelled attendance of overtly religions programs, but sets forth Plaintiff's claim that "he refuses to subject himself to and/or to embrace the State/DOC sponsored religion" which he has subsequently identified and defined (pursuant to the standards of Malnak v. Yogi, 592 F.2d 197 (1979) and Africa v. Commonwealth of Pennsylvania, 662 F.2d 1025 (3rd Cir. 1981)) in ARGUMENT III of his Establishment Clause claims in his Brief in Opposition to Defendants Summary Judgment Motion.

Defendants repeatedly assert:

"The programs recommended for Plaintiff are secular in nature and do not
have a religious component. Concise Statement of Material Fact, paragraph
1 - 34."

seeking to ignore the significant role of religion in Americans' lives as defined in Opinions of the U.S Supreme Court, in other contexts, in cases such as:

SCHOOL DIST. OF ABINGTON V. SCHEMPP, 374 U.S. at 306, 83 S.Ct. at 1615
("A relentless and all-pervasive attempt to exclude religion from every
aspect of public life could become inconsistent with the Constitution.");
EPPERSON V. ARKANSAS, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228
(1968)("The First Amendment mandates governmental neutrality between religion and religion, and between religion and non-religion.") LEE V. WEISMAN, 505 U.S. 577, 590, 112 S.Ct. 2649, 2656 (1992)("The First Amendment's
religious clauses mean that religious beliefs and religious expression are
too precious to be either proscribed or prescribed by the State ... It must
not be forgotten then, that while concern must be given to define the protection granted to an objector or a dissenting nonbeliever, these same
Clauses exist to protect religion from governmental interference.");
ZORACH V. CLAUSON, 343 U.S. 306, 314 - 315, 72 S.Ct. 679, 684, 96 L.Ed.
954 (1952)("Nor does the Constitution require complete separation of
church and state; it affirmatively mandates accommodation, not mere tolerance, of all religions, and forbids hostility towards any. ... We are a
religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary.
We sponsor an attitude on the part of government that shows no partiality
to any one group and that lets each flourish according to the zeal of its
adherents and the appeal of its dogma.")

Plaintiff, as a believer in the Supreme Being recognized in the Religion of al-Islam, seeks nothing more than to be afforded an opportunity to participate in prescriptive programs which teach principles that are consistent with his belief in God, and that he not be punished in any way for refusing to participate in atheistic/secular programs which insult, oppose, offend and attack his religious beliefs. The fact situation in this case clearly indicates PA DOC policies do not accommodate, but are hostile toward, Islamic beliefs while said policies accommodate and are not hostile toward Christian beliefs; and thus the PA DOC is not being neutral in matters of religion.

> "Our history is replete with official references to the value and invocation of Divine guidance in deliberations and pronouncements from the Founding Fathers and contemporary leaders. ... Other examples of refences to our religious heritage are found in the statutorily prescribed national motto "In God We Trust," 36 U.S.C. § 186, which Congress and the President mandated for our currency, see 31 U.S.C. § 5112(d)(1)(1982 ed.), ... Congress has directed the President to proclaim a National Day of Prayer each year "on which [day] the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals." 36 U.S.C. § 169h. ... One cannot look at even this brief resume without finding that our history is pervaded by expressions of religious beliefs such as are found in Zorach. Equally pervasive is the evidence of accommodation of all faiths and all forms of religious expression, and hostility toward none. Through this accommodation, as Justice Douglas observed, governmental action has "follow[ed] the best of our traditions" and "respect[ed] the religious nature of our people." 343 U.S. at 314, 72 S.Ct. at 684.

LYNCH V. DONNELLY, 465 U.S. 668, 675, 104 S.Ct. 1355, 1360 (1984).

The Religion of al-Islam call upon Muslims to be conscious of, and to seek guidance from, God to correct improper/unlawful/antisocial conduct whereas PA DOC prescriptive programs which, as Defendants stress "are secular and have no religious component," advance ideas, with the force of the State, that Plaintiff's religious beliefs are inconsistent with the State's goal of rehabilitation. As illustrated in Plaintiff's Brief In Opposition To Defendants' Summary Judgment Motion (hereinafter Plaintiff's Brief), in Establishment Clause ARGUMENT II, and its arguments related to ¶ 2 of the Declaration of Mike Clark

which, in effect, defines the goal of PA DOC programs as causing participants to become "repentant" without invoking or involving God or any religious beliefs or practices.

Repentance for all of one's sins, and not merely those which may have landed on in prison, is a mandatory act in the Religion of al-Islam which begins with one seeking forgiveness from God (see chapter 4 verse 106 of the Holy Qur'an at page 23 of Plaintiff's Appendix) and, from the Islamic perspective, repentance is not possible for one who seeks to remove the Supreme Being from the process. Muslims are taught to seek to please the Supreme Being, by being obedient to His Commands, and are prohibited from excluding the remembrance of God from any and all activities in life. The goal of PA DOC policy, as stated in ¶ 2 of the Declaration of Mike Clark, also indicates the a disregard of the Opinion of the U.S. Supreme Court, in LEMON V KURTZMAN, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971) that the purpose of the Religious Clauses of the First Amendment are "to prevent, as far a possible, the intrusion of either [the church or the state] into the precincts of the other." Repentance is a religious matter for believers and a non-religious matter for non-believers.

Next, on page 3 of Defendants Reply, Defendants' assertion that:

> "...given the fact that the construct of Plaintiff's claim under the Establishment Clause is one of Qur'anic interpretation, Defendants should be afforded due deference to prison officials..."

seems to imply Defendants think a suitable basis for this Court to refuse to consider Plaintiff's Establishment Clause claims is the fact that Plaintiff is a Muslim, a follower of the teachings of the Holy Qur'an. The Court should note, Defendants assertion that "Plaintiff's claim under the Establishment Clause is one of Qur'anic interpretation" is baseless in light of the fact that all of the case law cited in the Establishment Clause arguments of

Plaintiff's Brief is from either the U.S. Supreme Court or the Third Circuit Court of Appeals.

Defendants also assert, on page 3 of Defendants' Reply, that:

"It is not even clear in the record provided by Plaintiff, specifically verses of the Holy Qur'an contained in Doc. # 127 at pp. 23 - 30, which verses instruct Plaintiff to disavow any prescriptive treatment offered by the Department of Corrections." (Defendants' footnote which accompanies this assertion is discussed below.)

It is common for people who reject the teachings of a religion to be unable to properly understand those teachings. In most cases it is one's inability to understand the teaching which causes one to reject it. Therefore, it is likely that Defendants, who are neither adherents nor students of the Qur'an, have failed to understand the subtle language of the Qur'anic statement:

"...nor obey any whose hearts We have permitted to neglect the remembrance of Us, one who follows his own desires, whose case has gone beyond all bounds." (18:28)(see page 29 of Plaintiff's Appendix.)

which contains an admonition and a prohibition that Believers understand requires Believers to reject the teachings of non-believers (i.e. non-believes = "any whose hearts We have permitted to neglect the remembrance of Us, one who follows his desires, whose case has gone beyond bounds.") if/whenever the teachings of the non-believers conflict with the teachings of Allah and/or His Messenger, Muhammad. The Qur'an has settled this matter for Believes by stating:

"It is not fitting for a Believer, man or woman, when a matter has been decided by Allah and His Messenger to have any option about their decision: If anyone disobeys Allah and His messenger, he is indeed on a clearly wrong path." (33:36)(see Attachment 1 herein).

Verse 52 of Chapter 25 of the Holy Qur'an states the prohibition against listening to unbelievers in words that make the prohibition undeniably clear even to those who reject the teachings, by stating:

"Therefore listen not to the unbelievers, but strive against them with the utmost strenuousness, with the (Qur'an)." (25:52)(see Attachment 2

herein.)

And, similarly, verse 118 of chapter 3 of the Holy Qur'an states the admonition/prohibition in the following unambiguous terms:

> "O ye who believe! Take not into your intimacy those outside your ranks: they will not fail to corrupt you. They only desire your ruin: rank hatred has already appeared from their mouths: what their hearts conceal is worse. We have made plain to you the Signs if ye have wisdom." (3:118) (see Attachment 3 herein.)

Thus, contrary to the sworn statement of Reverend Ulrich H. Klemm in his Declaration, which is attached to Defendants' Reply, Doc. # 133, (i.e., "To the extent that any inmate who expresses a belief in al-Islam, and who asserts said belief as an exemption from any non-Muslim secular programs, such behavior is purely a subjective conclusion of the requirement of the Muslim faith.") must be viewed as being inaccurate, incorrect and misleading in light of the clear commands of the Holy Qur'an, in the verses cited above, which cause refusing to listen to non-believers to be a religious duty, a means of preserving the purity of one's faith, for the billion and a half people in addition to Plaintiff who bear witness that there is no god except Allah and Muhammad is His Messenger. Additionally, as the Court knows, Reverend Klemm is an officer of State government and, as such, is prohibited by the First Amendment from attempting to prescribe or proscribe Plaintiff's religious beliefs. LEE V. WEISMAN, supra.

Whereas the PA DOC classifies the content of their prescriptive programs as being permissible for Plaintiff, because it is a so-called secular program with no religious content, or not permissible because it has a religious component, Plaintiff's religious beliefs cause him to view the contents of each prescriptive program as being either permissible because it does not advance ideas that are inconsistent with matters that have been decided by Allah and His Messenger, or impermissible because it does advance ideas that are incon-

sistent with the decisions made by Allah and His Messenger, Muhammad. As Charles Adams has written, in his article on Islam in Encyclopedia Americana, 1993, in his opening paragraph on the subject of law:

> "The heart of Islamic religious concern is the law. Islam is an eminently practical way of life. What Muslims most expect from their religion is guidance for all specific situations of life so that they may know how to please God in this world and achieve blessedness hereafter. The Islamic law is the attempt by Muslims to derive a series of specific rules of conduct from the basic sources of guidance, and it comprises a comprehensive set of prescriptions and proscriptions." (see Plaintiff's Appendix, page 32.)

This indicates the teachings and practices of Islam provide guidance from God for Muslims, including Plaintiff, in any conceivable circumstance. The Religion of al-Islam provides instructions from God related to the problems man has attempted to address in the PA DOC's Batterers Intervention, Stress and Anger Management, Citizenship, and Long Term Offenders programs. Because Muslims believe:

> "...men are incapable of discriminating right and wrong by their own unaided powers. It was for this reason guidance was sent to them through prophets. God, who is all-powerful and perfectly free, has decreed a pathway for men." (Id.)

it would be an outright rejection of faith, an act of elevating man to a level above God, for Plaintiff to accept the instructions of non-believers instead of the instructions of Allah and His Messenger concerning proper human conduct.

Defendants arguments that these claims fall under the Free Exercise Clause, and not under the Establishment Clause, does not take into account the actual effect of the prescriptive program policy. Hypothetically, if Plaintiff is forced to attend non-Islamic based prescriptive programs, his Islamic beliefs will be under an attack mounted by the government. His beliefs will be belittled by officers of the State. He will be coerced by officers of the State to abandon the teachings of Allah and His Messenger related to the subject matter of each prescriptive program and coerced to embrace the State's

teachings. He will be coerced by officers of the State to abandon his belief in, and his reliance upon, the Almighty in order to embrace and to rely upon the teachings of the State.

Returning to the real world of the Establishment Clause, such action by any government body in these United States is unconstitutional and illegal on several grounds, including, such a policy's failure to pass the purpose prong, if not all three prongs, of the LEMON TEST because it conveys a message of disapproval of Plaintiff's religion. LEMON V. KURTZMAN, supra, in addition to the grounds stated in ARGUMENTS I, II, AND III of the Establishment Clause section of Plaintiff's Brief In Opposition To Defendants' Summary Judgment Motion.

Plaintiff agrees with Rev. Klemm's statement which indicates the Religion of al-Islam makes seeking knowledge obligatory upon Muslims. However, as is indicated by verse 36 of chapter 33 of the Holy Qur'an (Attachment 1 herein), there are conditions upon the subject matter of the so-called "secular" education programs that Muslims are allowed to participate in. (See footnote 1 on page 4 of Defendants' Reply wherein the statement "... Islam makes no sharp division between sacred and secular affairs, as it expects governments to be imbued with righteousness." appears in FN 580 of the Yusef Ali translation of the Holy Qur'an.) The "secular" programs that Islam encourages Muslims to participate in would include programs like mathematics, mechanics, building trades, medicine, clerical, computers, electronics, engineering, language arts, etc. but does not include "secular" programs such as PA DOC prescriptive programs which provide manmade instructions, which oppose the teachings of the Religion of al-Islam, on how a Muslim should conduct himself in a given situation. The Religion of al-Islam provides guidance for Muslims on proper human conduct in every human affair. As Plaintiff has set forth in ¶¶ 18, 24

and 25 of his Declaration -- and as is indicated by the verses of the Holy Qur'an attached herein -- Muslims are prohibited from listening to the teachings of non-believers which call for Muslims to adopt ideas and ways that differ from the ideas and ways prescribed and proscribed by Allah and his Messenger, Muhammad.

In light of the commands stated in the Qur'anic verses attached herein, which state a plain and clear admonition and prohibition against Believers listening to non-believers, it is not possible that an ordinary, and informed, regular reading of footnote 580 (see page 4 of Defendants' Reply) could produce a meaning which implies the Religion of al-Islam allows Plaintiff to obey authorities when they call him to abandon his faith by participating in programs which teach values and principles which totally oppose basic Islamic values and principles. These factual disputes on matters which are material to the resolution of Plaintiff's religious claims preclude the granting of summary judgment if defendants favor.

In response to Defendants' argument (i.e., "that bringing the poetry into the job site does not constitute protected activity") Plaintiff has provided competent evidence -- via ¶¶ 16, 32, 50, 51, 52, 62, and 90 of his Declaration and via the Declarations of Ronald Johnson, Thomas Twillie and Alonzo Robinson (see pps. 62 - 68 of Plaintiff's Appendix -- which supports his position that he need not show he possessed a constitutional right to do what prison officials had expressly given him permission to do. These differing theories present disputed material facts which precludes the grant of summary judgment in Defendants favor on this claim.

Similarly, with the issue of whether the removal of Plaintiff from his job was reasonably related to a legitimate penological interest, Plaintiff has identified disputed issues of material fact in his Brief and Statement of

Disputed Facts and Declaration which preclude the grant of summary judgment in Defendants favor on the retaliation claim. Plaintiff respectfully urges the Court to recall that, among other glaring inconsistencies in Defendants' theories which Plaintiff has detailed in his Brief, are the undisputed facts that: (1) DC-ADM 801 requires all inmate misconduct to be reported on a DC-141 Misconduct Report form, (2) the statements of five prison officials which were made within six months from the day they copied Plaintiff's poetry indicate said officials' alleged-belief that Plaintiff, by possessing his poetry at work, had "encouraged unauthorized group activity" and had in his possession "items which in the hands of an inmate present a threat to the inmate, others or to the security of the facility"; these accusations identify violations of Misconduct Charges #'s 29 and 36 respectively (see Attachment 4 herein), (3) not one of the five above-mentioned prison officials nor any other prison official complied with the command of DC-ADM 801 which mandated the issuance of a DC-141 Misconduct Reports to Plaintiff for these alleged-threats to the security of the facility due to their actual knowledge that the poetry at issue posed less of a threat to the security of the jail than movies such as ROOTS, ROSEWOOD and/or the talk shows that address racial issues that routinely appear on the televisions watched by 2,000+ inmates in their cells 24 hours per day 7 days per week, (4) notwithstanding the statements made by prison officials in late 2002 and early 2003 about how Plaintiff's possession of the poetry poses a threat to security, prison officials, rather than making any attempt to confiscate the alleged-unacceptable poetry, have allowed Plaintiff to maintain possession of said poetry for more than four years after making their initial statements that Plaintiff's possession of the poetry was an unacceptable threat to security, and (5) prison officials now urge this Court to believe that they eliminated this alleged threat to security by firing

Plaintiff from his work assignment. These, and other, facts presented in Plaintiff's Brief and Declaration identify disputes issues of material fact from which a reasonable fact finder could conclude no legitimate penological interest could have been served by firing Plaintiff from his job and leaving him in possession of poetry that had the potential to disrupt the orderly operation of other areas of the jail in addition to the the Chapel, and therefore precludes the grant of summary judgment in Defendants favor on Plaintiff's retaliation claim.

    WHEREFORE Plaintiff respectfully urges this Court to deny Defendants' Motion for Summary Judgment.

                                    Respectfully submitted

                                    *Leonard C. Jefferson*
                                    Leonard C. Jefferson, CL-4135
                                    10745 Rt. 18
                                    Albion, PA 16475-0002

Dated: March 18, 2007

THE UNDERSIGNED HEREBY CERTIFIES THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF HIS PERSONAL KNOWLEDGE.

                                    *Leonard C. Jefferson*

March 18, 2007

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing Plaintiff's Response To Defendants' Reply To Plaintiff's Brief In Opposition To Defendants' Motion For Summary Judgment was placed in the mailbox on B/B unit of SCI-Albion on this 18th day of March, 2007 for delivery via first class U.S. mail to:

Christian D. Bareford
Deputy Attorney General
Office of Attorney General
6th Floor, Manor Plaza
564 Forbes Avenue
Pittsburgh, PA 15219

*Leonard C. Jefferson*
Leonard C. Jefferson, CL-4135
10745 Rt. 18
Albion PA 16475-0002

Sūrah 33: *Al Aḥzāb*    1068

36. It is not fitting
    For a Believer, man or woman,
    When a matter has been decided
    By Allah and His Messenger,
    To have any option
    About their decision:[3721]
    If anyone disobeys Allah
    And His Messenger, he is indeed
    On a clearly wrong Path.

37. Behold! thou didst say
    To one who had received
    The grace of Allah[3722]
    And thy favour: "Retain thou
    (In wedlock) thy wife,
    And fear Allah." But thou
    Didst hide in thy heart[3723]
    That which Allah was about
    To make manifest: thou didst
    Fear the people, but it is
    More fitting that thou
                              shouldst[3724]
    Fear Allah. Then when Zayd
    Had dissolved (his marriage)
    With her, with the necessary[3725]
    (Formality), We joined her
    In marriage to thee:
    In order that (in future)
    There may be no difficulty
    To the Believers in (the matter

---

[3721]. We must not put our own wisdom in competition with Allah's wisdom. Allah's decree is often known to us by the logic of facts. We must accept it loyally, and do the best we can to help in our own way to carry it out. We must make our will consonant to the Allah's Will. (R).

[3722]. This was Zayd, son of Hārithah, one of the first to accept the faith of Islam. He was freedman of the Holy Prophet, who loved him as a son and gave him in marriage to his own cousin Zaynab. The marriage however turned out unhappy. See next note.

[3723]. Zayd's marriage with the Prophet's cousin Zaynab, daughter of Jahsh, did not turn out happy. Zaynab the high-born looked down upon Zayd the freedman who had been a slave. And he was not comely to look at. Both were good people in their own ways, and both loved the Prophet, but there was mutual incompatibility, and this is fatal to married life. Zayd wished to divorce her, but the Prophet asked him to hold his hand, and he obeyed. She was closely related to the Prophet; he had given a handsome marriage gift on her marriage to Zayd; and people would certainly talk if such a marriage was broken off. But marriages are made on earth, not in heaven, and it is no part of Allah's Plan to torture people in a bond which should be a source of happiness but actually is a source of misery. Zayd's wish—indeed the mutual wish of the couple—was for the time being put away, but it became eventually an established fact, and everybody came to know of it. (R).

[3724]. All actual facts are referred to Allah. When the marriage is unhappy, Islam permits the bond to be dissolved, provided that all interests concerned are safeguarded. Apparently there was no issue here to be considered. Zaynab had to be considered, and she obtained the dearest wish of her heart in being raised to be a Mother of the Believers, with all the dignity and responsibility of that position. See n. 3706 to 33:28 above.

[3725]. The *'iddah* or period of waiting after divorce (2:28, and n. 254) was duly considered...

---

Sūrah 33: *Al Aḥzāb*    1069

    Of) marriage with the wives[3726]
    Of their adopted sons, when
    The latter have dissolved
    With the necessary (formality)
    (Their marriage) with them.
    And Allah's command must
    Be fulfilled.

38. There can be no difficulty
    To the Prophet in what
    Allah has indicated to him[3727]
    As a duty: It was
    The practice (approved) of Allah
    Amongst those of old
    That have passed away.[3728]
    And the command of Allah
    Is a decree determined.[3729]

39. (It is the practice of those)
    Who preach the Messages
    Of Allah, and fear Him,
    And fear none but Allah.
    And enough is Allah
    To call (men) to account.[3730]

40. Muhammad is not
    The father of any
    Of your men, but (he is)
    The Messenger of Allah,
    And the Seal of the Prophets:[3731]
    And Allah has full knowledge
    Of all things.

---

[3726]. The Pagan superstition and taboo about adopted sons had to be destroyed. See 33:4-5 and notes 3671-3672 above.

[3727]. See n. 3724 above.

[3728]. The next clause is parenthetical. Those words then connect on with verse 39. Among the people of the Book there was no taboo about adopted sons, as there was in Pagan Arabia.

[3729]. Allah's ordering of the world is always full of wisdom. Even our unhappiness and misery may actually have a great meaning for ourselves or others or both. If our first Plan seems to fail, we must not murmur and repine, but retrieve the position by adopting a course which appears to be the best position in the light of our duties as indicated by Allah. For Allah's Plan is framed on universal principles that cannot be altered by human action.

[3730]. Our responsibility is to Allah, not to men. Men's opinions may have a bearing in our own interpretation of duty, but when that duty is clear, our only course is to obey Allah rather than men.

[3731]. When a document is sealed, it is complete, and there can be no further addition. The Holy Prophet Muhammad closed the long line of Messengers. Allah's teaching is and will always be continuous, but there has been and will be no Prophet after Muhammad. The later ages will want thinkers and reformers, not Prophets...

Sūrah 25: *Al Furqān*                                          900

46. Then We draw it in[3101]
    Towards Ourselves—
    A contraction by easy stages.[3102]

47. And He it is Who makes
    The Night as a Robe
    For you, and Sleep as Repose,
    And makes the Day
    (As it were) a Resurrection.[3103]

48. And He it is Who sends
    The Winds as heralds
    Of glad tidings, going before[3104]
    His Mercy, and We send down
    Pure water from the sky—[3105]

49. That with it, We may give
    Life to a dead land,
    And slake the thirst
    Of things We have created,—[3106]
    Cattle and men in great numbers.

3101. As the sun rises higher and higher, the shadows contract. In regions where the sun actually gets to the zenith at noon, there is no shadow left at that time. Where does it go? It was but a shadow cast by a substance and it gets absorbed by the substance which produced it. (R).

3102. Let us now reverently turn our vision (as far as we are able) to the symbolic meaning. Allah is the Light. All things in creation—whether concrete or abstract—are but shadows, depending on His Light. All shadows are not equal. He gives length or size of substance to such as He pleases. And some shadows almost become reflected lights, like the light of the false or the true Dawn. Such are holy men, in all kinds of gradations. The shadows are constantly in a state of flux; so are all things in Creation, all things we see or covet in this life. Allah, if He wills, can give some of them greater fixity or comparative stability. (R).

3103. Here the symbolism presents a fresh point of view. It is still a contrast between Light and Shade; but the shade of Night is as a Robe to cover and screen us and give us Repose from activity; and the Light of Day is for striving, work, activity. Or again, the Night is like Death, our temporary Death before Judgement, the time during which our senses are sealed in Sleep; and the Day is like the renewal of Life at the Resurrection.

3104. *Cf.* 7:57. The Winds are heralds of Joy, ushering in Rain, which is one form of Allah's Mercy. Again, the symbolism presents a fresh point of view. Heat (which is connected with light) sets up currents in the atmosphere, besides sucking up moisture from the seas, and distributing it by means of Winds over wide surfaces of the earth. In the physical world we know the beneficent action of heat on life, and by contrast, we also know how intolerable high temperatures may become, and how the cloud-bearing Winds come as welcome heralds of rain. (R).

3105. Rain water (in pure air) is not only pure water distilled in air and sky, but it is the best purifying and sanitating agent on the largest scale known to us.

3106. The whole cycle of water—sea, clouds, rain or hail or snow, rivers, and sea again—is a remarkable illustration of the processes of nature making Allah's providence visible to us. The salts of the sea sanitate and purify all the filth that pours into it. Water action, in the form of rain, frost, glaciers, rivers, lakes, etc., is responsible for the building up and configuration of the crust of the earth, and is the chief agent in physical geography. A parched desert quickly comes to life under the action of water. All drinking water, whether derived from rivers, canals, lakes, reservoirs, springs, wells, or waterworks of any kind, are ultimately traceable to rain. The connection of life with water is intimate. The physical basis of life itself, protoplasm, is, in great part, water: see 25:54 below.

Sūrah 25: *Al Furqān*                                          901

50. And We have distributed
    The (water) amongst them, in
                   order,[3107]
    That they may celebrate
    (Our) praises, but most men
    Are averse (to aught) but[3108]
    (Rank) ingratitude.

51. Had it been Our Will,
    We could have sent
    A warner to every centre
    Of population.[3109]

52. Therefore listen not
    To the Unbelievers, but strive
    Against them with the utmost
    Strenuousness, with the
                   (Qur'ān).[3110]

53. It is He Who has
    Let free the two bodies
    Of flowing water:[3111]
    One palpable and sweet,
    And the other salt and bitter;

3107. The water is distributed all over the world, in order that all life may receive its support, according to its needs. In 25:48-50, we have the argument of contrasts stated in another way. Water is life, and is made available to sustain life all over the world: this is a physical fact which all can see. But water is also the symbol of spiritual life, whose sustaining principle is the Will of Allah as made known to us through Revelation. It sometimes comes to us in our inward or spiritual storms. Many violent unsettlements of the spirit are but heralds of the refreshing showers of spiritual understanding that come in their wake. They purify our souls, and produce spiritual Life even where there was a parched spiritual desert before. They continue to sustain us in our normal spiritual Life out of the reservoirs of Allah's Revelation, which are open to all, and well-distributed in time and space. The universality of distribution is again referred to in the following verse.

3108. In contrast to Allah's abounding Mercy is man's base ingratitude: another symbolic contrast between Light and Darkness, or Water and Drought.

3109. Allah's Message has been distributed to all nations. If it had been necessary, a Prophet could have been sent to every town and village. But Allah's Plan is different. He has sent His Light to every heart, through His Signs in man's conscience, in Nature, and in Revelation.

3110. The distribution of Allah's Signs being universal, the Prophet of Allah pays no heed to carping critics who reject Faith. He wages the biggest Jihād of all, with the weapon of Allah's Revelation. (R).

3111. *Maraja*, literally, let free or loose cattle for grazing. *Baḥrayn*: two seas, or two bodies of flowing water: for *baḥr* is applied both to the salt sea and to rivers. In the world taken as a whole, there are two bodies of water, *viz.*, (1) the great salt Ocean, and (2) the bodies of sweet water fed by rain, whether they are rivers, lakes, or underground springs: their source in rain makes them one, and their drainage, whether above ground or underground, eventually to the Ocean, also makes them one. They are free to mingle, and in a sense they do mingle, for there is a regular watercycle: see n. 3106 above: and the rivers flow constantly to the sea, and tidal rivers get sea water for several miles up their estuaries at high tide. Yet in spite of all this, the laws of gravitation are like a barrier or partition set by Allah, by which the two bodies of water as a whole are always kept apart and distinct. In the case of rivers carrying large quantities of water to the sea, like the Mississippi or the Yangtse Kiang, the river water with its silt remains distinct from sea water for a long distance out to sea. But the wonderful Sign is that the two bodies of water, though they pass through each other, remain distinct bodies, with their distinct functions.

ATTACHMENT 2

Sūrah 3: *Āli 'Imrān*  156

They will show you their backs,
And no help shall they get.

112. Shame is pitched over them[435]
(Like a tent) wherever
They are found,
Except when under a covenant
(Of protection) from Allah
And from men; they draw
On themselves wrath from
    Allah,
And pitched over them
Is (the tent of) destitution.
This because they rejected
The Signs of Allah, and slew
The Prophets in defiance of
    right,[436]
This because they rebelled
And transgressed beyond
    bounds.

113. Not all of them are alike:
Of the People of the Book
Are a portion that stand
(For the right); they rehearse
The Signs of Allah all night
    long,
And they prostrate themselves[437]
In adoration.

114. They believe in Allah
And the Last Day;
They enjoin what is right,
And forbid what is wrong;
And they hasten (in emulation)
In (all) good works:
They are in the ranks
Of the righteous.

115. Of the good that they do,
Nothing will be rejected
Of them; for Allah knoweth well
Those that do right.

---

435. *Durbat*: I think there is a simile from the pitching of a tent. Ordinarily a man's tent is a place of tranquillity and honour for him. The tent of the wicked wherever they are found is ignominy, shame, and humiliation. It is pity from Allah or from men that gives them protection when their pride has a fall. Using the same simile of a tent in another way, their home will be destitution and misery.

436. C/ 3:21, n. 363.

437. In Islam we respect sincere faith and true righteousness in whatever form they appear. This verse, according to Commentators refers to those People of the Book who eventually embraced Islam. [...]

---

Sūrah 3: *Āli 'Imrān*  157

116. Those who reject Faith—
Neither their possessions
Nor their (numerous) progeny
Will avail them aught against
    Allah:
They will be Companions
Of the Fire—dwelling
Therein (forever).[438]

117. What they spend
In the life
Of this (material) world
May be likened to a Wind
Which brings a nipping frost:
It strikes and destroys the harvest
Of men who have wronged
Their own souls: it is not Allah
That hath wronged them, but
They wrong themselves.[439]

118. O ye who believe!
Take not into your intimacy
Those outside your ranks:
They will not fail
To corrupt you. They
Only desire your ruin:
Rank hatred has already
Appeared from their mouths:
What their hearts conceal
Is far worse.
We have made plain
To you, the Signs,
If ye have wisdom.

119. Ah! ye are those
Who love them,
But they love you not—

---

438. C/ 3:10.

439. False "spending" may be either in false "charity" or in having a "good time". For the man who resists Allah's purpose, neither of them is any good. The essence of charity is faith and love. Where these are wanting, charity is not charity. Some baser motive is there: ostentation, or even worse, getting a person into the giver's power by a pretence of charity: something that is connected with the life of this grasping, material world. What happens? You expect a good harvest. But "while you think, good easy man, for surely your greatness is a ripening," there comes a nipping frost, and destroys all your hopes. The frost is some calamity, or the fact that you are found out! Or perhaps it is "High blown pride," as in Shakespeare's *Henry VIII*, iii 3. In your despair you may blame blind Fate or you may blame Allah! Blind Fate does not exist, for there is Allah's Providence, which is just and good. The harm or injustice has come, not from Allah, but from your own soul. You wronged your soul, and it suffered the frost. Your base motive brought you no good: it may have reduced you to poverty, shame, and disgrace. All the brave show of the wicked in this life is but a wind charged [...]

---

ATTACHMENT 3

Inmate Handbook                                                                 Page 53

## Misconduct Charges

### A. Class I Charges (Formal Resolution Only)

1. Assault
2. Murder
3. Rape
4. Arson
5. Riot
6. Escape
7. Robbery
8. Burglary
9. Kidnapping
10. Unlawful restraint
11. Aggravated assault
12. Voluntary manslaughter
13. Extortion by threat of violence
14. Involuntary deviate sexual intercourse
15. Threatening an employee or his/her family with bodily harm
16. Fighting
17. Threatening another person
18. Threatening, harassing, or interfering with a Department K-9 or mounted patrol horse
19. Engaging in sexual acts with others or sodomy
20. Wearing a disguise or mask
21. Failure to report an arrest for any violation of the Pennsylvania Crimes Code (Community Corrections Centers only)
22. Possession or use of a dangerous or controlled substance
23. Possession or use of intoxicating beverages
24. Extortion or blackmail
25. Sexual Harassment
26. Any criminal violation of the Pennsylvania Crimes Code not set forth above (must be specified)
27. Tattooing, or other forms of self-mutilation
28. Indecent exposure
29. Engaging in, or encouraging unauthorized group activity
30. Breaking restriction, quarantine or informal resolution sanction
31. Gambling or conducting a gambling operation or possession of gambling paraphernalia
32. Possession or circulation of a petition, which is a document signed by two or more persons requesting or demanding that something happen or not happen, without the authorization of the Facility Manager
33. Using abusive, obscene, or inappropriate language to an employee
34. Violating a condition of a pre-release program

Inmate Handbook

### B. Class I Charges (Eligible for Informal Resolution)

35. Refusing to obey an order
36. Possession of contraband including money, implements of escape, non-prescribed drugs (or drugs which are prescribed, but which the inmate is not authorized to possess), drug paraphernalia, poisons, intoxicants, materials used for fermentation, property of another, weapons or other items which in the hands of an inmate present a threat to the facility.
37. Violation of visiting regulations
38. Destroying, altering, tampering with, or damaging property.

If you are charged under section B with possession of an item of contraband which is a weapon or an item which in your hands presents a threat to others or to the security of the facility, and the item also has a legitimate use in the area discovered, credible evidence that the item has been used only for the legitimate purpose may reduce the rule violation to a Class II. Possession of drugs (as determined by laboratory analysis), alcohol, poisons, and/or weapons are not eligible for informal resolution.

### C. Class II Charges (Eligible for Informal Resolution)

39. Refusing to work, attend school or attend mandatory programs or encouraging others to do the same
40. Unauthorized use of the mail or telephone
41. Failure to stand count or interference with count
42. Lying to an employee
43. Presence in an unauthorized area
44. Loaning or borrowing property
45. Failure to report the presence of contraband
46. Theft of services (i.e. cable TV or other facility services).
47. Body punching, or horseplay
48. Taking unauthorized food from the dining room or kitchen
49. Failure to report or unexcused absence from work, school, or mandatory programs
50. Smoking where prohibited
51. Possession of any items not authorized for retention or receipt by the inmate not specifically enumerated as Class I contraband
52. Any violation of a rule or regulation in the Inmate Handbook not specified as a Class I misconduct charge

Any attempt to commit any of the above listed charges is a misconduct of the same classification as the completed act.

ATTACHMENT 4

Leonard C. Jefferson, CL-4135
10745 Rt. 18
Albion, PA 16475-0002
March 18, 2007

Clerk's Office
U.S. District Court
P.O. Box 1820
Erie, PA 16507

RE: Jefferson v. Wolfe, C.A. No. 04-44

Dear Clerk:

Would you please file the enclosed document in the above-captioned case. Thank you for your attention to this matter.

Respectfully

Leonard C. Jefferson